**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PANAMA CITY DIVISION**

HEATHER GILLMAN, through next friend
and mother Ardena Gillman;

       Plaintiff,

v.

SCHOOL BOARD FOR HOLMES
COUNTY, FLORIDA

       Defendant.

No. 5:08-cv-34 RS/MD

**PLAINTIFF GILLMAN'S MOTION FOR SUMMARY JUDGMENT AND**
**SUPPORTING MEMORANDUM OF LAW**

April 28, 2008

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .........................................................................................1

PROCEDURAL HISTORY............................................................................................3

THE UNDISPUTED FACTS .........................................................................................4

    I.      Background..........................................................................................4

    II.     For More Than Six Months, There Have Been No Disruptions
           Over Gay Rights. .........................................................................10

    III.    The Atmosphere at Ponce de Leon ............................................11

STANDARD FOR SUMMARY JUDGMENT................................................................12

ARGUMENT ...............................................................................................................13

    I.      Summary Judgment in Favor of Plaintiff is Appropriate Because
           the Undisputed Facts Show that Defendant Violated Plaintiff's
           First Amendment Right to Freely Express Her Political Opinion in
           a Non-Disruptive Manner. ........................................................13

           A.     Ms. Gillman's Political Speech Cannot be Suppressed
                  Under Tinker;  There is No Evidence Sufficient to Forecast
                  a Material and Substantial Disruption at Ponce de Leon..............14

           B.     The Evidence in this Case Cannot, as a Matter of Law,
                  Constitute Evidence Sufficient to Forecast a Substantial
                  and Material Disruption. ...............................................16

           C.     Even if Other Students Engaged in Disruptive Behavior,
                    the Disruptive Behavior of Others Cannot Justify
                  Suppressing a Student's Peaceful Political Expressions in
                  School. .........................................................................19

           D.     Because Gillman's Speech is not "lewd, vulgar or plainly
                  offensive" the School Board Does not Have a Right to Ban
                  it Under Fraser. ...........................................................21

CONCLUSION.............................................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...................................................................12

*Bethel Sch. Dist. No. 403* v. *Fraser*, 478 U.S. 675 (1986)............................................3, 13, 21, 23

*Blackwell* v. *Issaquena County Bd. of Ed.*, 363 F.2d 749 (5th Cir. 1966)..............................15, 17

*Board of Educ., Island Trees Union Free School Dist. No. 26* v. *Pico*, 457 U.S. 853 (1982)...................................................................................................................................2

*Boim* v. *Fulton County School Dist.*, 494 F.3d 978 (11th Cir. 2007) ..............................................2

*Burnside* v. *Byars,* 363 F.2d 744 (5th Cir. 1966).................................................................14, 16

*Butts* v. *Dallas Independent School Dist.*, 436 F.2d 728 (5th Cir. 1971) ...............................13, 20

*Cafe Erotica* v. *St. Johns County*, 360 F.3d 1274 (11th Cir. 2004)..................................................2

*Celotex Corp.* v. *Catrett*, 477 U.S. 317 (1986) ............................................................................12

*Chambers* v. *Babbitt,* 145 F.Supp.2d 1068 (D. Minn. 2001).......................................................16

*Holloman ex rel. Holloman* v. *Harland*, 370 F.3d 1252 (11th Cir. 2004)............................ passim

*Johnston-Loehner* v. *O'Brien*, 859 F. Supp. 575 (M.D. Fla. 1994)...............................................14

*Morse* v. *Frederick*, --- U.S. ---, 127 S. Ct. 2618 (June 25, 2007) ...............................2, 15, 22, 23

*Scott* v. *School Bd. of Alachua County*, 324 F.3d 1246 (11th Cir. 2003) ...............................16, 17

*Terminiello* v. *Chicago*, 337 U.S. 1 (1949)...............................................................................20, 24

*Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) ................................... passim

*Tipton* v. *Bergrohr GMBH-Siegen*, 965 F.2d 994 (11th Cir. 1992)...............................................13

*Vernonia School Dist. 47J* v. *Acton*, 515 U.S. 646 (1995) ............................................................2

*Virgil* v. *School Bd. of Columbia County, Fla.*, 862 F.2d 1517 (11th Cir. 1989)...........................2

*Virginia* v. *Black*, 538 U.S. 343, 123 S. Ct. 1536 (2003) .............................................................15

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

Fed. R. Civ. P. 56.............................................................................................................1

Fed. R. Civ. P. 56(a) ......................................................................................................1

Fed. R. Civ. P. 56(c) .....................................................................................................12

Fed. R. Civ. P. 65(a) .......................................................................................................3

**OTHER AUTHORITIES**

Holmes Dist. Sch. Bd., Code of Student Conduct (2007-08), p. 9, available at
http://hdsb.org/sitedocumentation/student COC0708.pdf., *last visited* April 23,
2008......................................................................................................................9

N.D. Fla. Local Rule 7.1(D) ...........................................................................................1

## MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56(a), plaintiff HEATHER GILLMAN hereby respectfully requests that this Court enter an Order granting her summary judgment against defendant HOLMES COUNTY SCHOOL BOARD in this matter for the reasons set forth in the Complaint and the following Memorandum in Support of Plaintiff's Motion for Summary Judgment with its supporting Affidavit and Exhibits. Pursuant to N.D. Fla. Local Rule 7.1(D), plaintiff respectfully requests oral argument, which plaintiff estimates may require one hour.

WHEREFORE, by this Motion, plaintiff respectfully requests that this Court enter an Order (1) enjoining defendant from restraining, prohibiting, or suppressing Ms. Gillman's expression of support for the respect, equal treatment, and acceptance of gays and lesbians, including, but not limited to, the phrases and symbols listed in the November 2, 2007 letter; (2) enjoining defendant taking retaliatory action against plaintiff for challenging this deprivation of constitutional rights; and (3) awarding nominal damages in the amount of $1 to Ms. Gillman.

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Heather Gillman respectfully submits this memorandum in support of her motion for summary judgment pursuant to Fed. R. Civ. P. 56.

## PRELIMINARY STATEMENT

Through this action, Ms. Gillman, a junior at Ponce de Leon High School ("Ponce de Leon"), seeks to protect her free speech rights to peacefully express her political views in support of equal rights for gay and lesbian persons by displaying

symbols and phrases on her t-shirts, notebooks and other personal possessions. Defendant School Board for Holmes Co., Fla., ("School Board") has violated Ms. Gillman's free speech rights by banning outright virtually any symbol or speech in support of equal rights for gays and lesbians. Discovery has demonstrated that the School Board has not and cannot meet its heavy burden to justify its outright ban and prior restraint of Ms. Gillman's non-violent, non-obscene, affirming speech.

As set forth below, the First Amendment protections afforded public school students prohibit the School Board's censorship. As the Supreme Court has held, and this Circuit has repeatedly affirmed, students retain their First Amendment rights in school. *Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *Morse* v. *Frederick*, --- U.S. ---, 127 S. Ct. 2618, 2622 (June 25, 2007); *Board of Educ., Island Trees Union Free School Dist. No. 26* v. *Pico*, 457 U.S. 853, 853 (1982); *Vernonia School Dist. 47J* v. *Acton*, 515 U.S. 646, 656 (1995); *Boim* v. *Fulton County School Dist.*, 494 F.3d 978, 982 (11th Cir. 2007); *Holloman ex rel. Holloman* v. *Harland*, 370 F.3d 1252, 1264-65 (11th Cir. 2004); *Virgil* v. *School Bd. of Columbia County, Fla.*, 862 F.2d 1517, 1520 (11th Cir. 1989). The School Board cannot meet its burden of showing that the display of rainbow stickers, rainbow belts, and other non-violent, non-obscene gay-supportive slogans would "materially and substantially disrupt the work and discipline of the school." *Tinker*, 393 U.S. at 513; *see also Cafe Erotica* v. *St. Johns County*, 360 F.3d 1274, 1282 (11th Cir. 2004) (noting that that "any system of prior restraint . . . bear[s] a heavy presumption against its constitutional validity.") (citation omitted). Indeed, Ms. Gillman has previously worn an "I support gays" t-shirt and a

rainbow belt to school without incident, much less the type of incident required under *Tinker* to justify the School Board's ban. (Declaration of Heather Gillman ("Gillman Decl."), Exh. A ¶ 7.) Furthermore, as a matter of law, Gillman's political expression cannot be banned as "offensively lewd" or "indecent" under *Bethel Sch. Dist. No. 403* v. *Fraser*, 478 U.S. 675 (1986).

Accordingly, Ms. Gillman respectfully requests that this Court grant her motion for a summary judgment.[1]

## PROCEDURAL HISTORY

Ms. Gillman filed her complaint on January 31, 2008, after the School Board issued its ban against virtually any speech in support of civil rights for gay and lesbian persons. [Doc. No. 1] On February 11, 2008, Ms. Gillman filed a Motion for Preliminary Injunction pursuant to Fed. R. Civ. P. 65(a) seeking to enjoin the School Board from restraining or prohibiting her speech and from taking retaliatory action against her for challenging the School Board's deprivation of her constitutional rights. [Doc. No. 7] On March 10, 2008, the Court issued a scheduling order setting a non-jury trial for May 12-13, 2008 and the parties agreed to join the preliminary injunction motion with a trial on the merits. The scheduling order also set April 28, 2008 as the deadline for filing dispositive motions. [Doc. No. 31] On March 12, 2008, the Court denied as moot Gillman's motion for a preliminary injunction. [Doc. No. 32]

---

[1] In addition to her claim for rights to free speech, Ms. Gillman's complaint also asserts a cause of action for viewpoint discrimination. Because the factual record on that claim is not developed and is subject to additional testimony anticipated from Principal David Davis, Ms. Gillman is not by this motion seeking summary judgment on that portion of her claim.

# THE UNDISPUTED FACTS

## I.    Background.

Heather Gillman is a junior at Ponce de Leon.  Defendant Holmes County School Board controls, operates, supervises, and sets the disciplinary and other policies for Ponce de Leon.  (Deposition of Steven Griffin ("S. Griffin Dep."), Exh. B at 29:6-9, 36:5-22; Deposition of David Davis ("Davis Dep."), Exh. C at 12:22-25.)

At some point in September 2007, Principal David Davis became aware that some students were wearing the slogan "Gay Pride" or "G.P." on their hands and clothes. (Davis Dep., Exh. C at 69:24-70:13.)  Also in September 2007, Christa Harris, a teacher's aide, told Davis that one student, C.W., had identified herself as a lesbian.[2] (Davis Dep., Exh. C at 51:6-52:3.)   After hearing this, Davis met with C.W., discussed her sexual orientation and instructed her not to mention her sexual orientation at school (Davis Dep., Exh. C at 69:7-17; Deposition of C.W. ("C.W. Dep."), Exh. D at 17:16-18:8.) [3]  According to Davis, he then commenced an investigation because:

> [W]hen students can blatantly do these kind of things, expose their sexual preferences and such and going down the hall with them. And when our young, especially our middle school students, are exposed to those kind of things, possibly my concern is what is the point they're doing it, what do they intend to do, those kind of things.  Because it's not activity that ever happened before, that I was aware of it.  It was certainly something I'd want to investigate to see what was going on.  (Davis Dep., Exh. C at 72:14-23.)

---

[2]    Students other than the plaintiff and those identified in the pleadings are identified by their initials in court filings, in accordance with the Protective Order entered in this case, dated March 7, 2008.  [Doc. 28.]

[3]    Principal Davis believes that the term "gay pride" is a sexual term; even before the events of September 2007 he would not have permitted a middle school student to express "gay pride" at school on any form of wearable clothing because of its sexual implications. (Davis Dep., Exh. C at 146:11-20.)

Principal Davis investigated by summoning approximately 30 students into his office, and questioning them about the issue, including a rumor in the school—as it turned out false—that an "anti-gay" speaker was going to appear and preach at an "anti-gay" assembly. (*See generally* Davis Notes, Exh. E.) As part of his investigation, Davis questioned students about their involvement with any speech in support of equal rights for homosexuals, or their reaction to the rumored assembly.[4] (Davis Dep., Exh. C at 71:9-13, 126:18-20.)

On or before September 12, 2007, "probably" while interviewing students, Principal Davis learned that some students had talked about leaving the assembly scheduled for September 12, 2007, if the speaker indeed was "anti-gay". (Davis Dep., Exh. C at 124:8-12, 126:11-24; *see also* Deposition of Donna Hicks ("D. Hicks Dep."), Exh. F at 28:4-29:21, 31:14-18.)

The assembly occurred, it was not anti-gay, and no one left the assembly, in part because the students obeyed when Principal Davis made it "perfectly clear" that there would be no walkouts. (Davis Dep., Exh. C at 126:4-10, 127:19-128:4; A. Harris Dep., Exh. H at 55:12-56:23.) Although he had learned that some students were talking about leaving the assembly prior to the event itself, at no time did Principal Davis consider canceling the assembly or adding additional security. (Davis Dep., Exh. C at 133:12-19.)

---

[4] According to the students who were interrogated by Principal Davis, Principal Davis asked some students about whether they or other students were gay. (Deposition of F.C. ("F.C. Dep."), Exh. G at 16:2-9; C.W. Dep., Exh. D at 17:20-25; Deposition of Adrienne Harris ("A. Harris Dep."), Exh. H at 26:21-25; Deposition of G.P. ("G.P. Dep."), Exh. I at 34:5-7.) Principal Davis admits that he told some students not to talk about their sexual orientation. (Davis Dep., Exh. C at 62:9-11.)

In addition to the issue Principal Davis "investigated", a teacher, Donna Hicks, also reported to Principal Davis that during the first ten minutes of one of her seventh grade reading classes, she had to tell students to quiet down several times. The rest of the class proceeded without incident. (Davis Dep., Exh. C at 213:3-13; D. Hicks Dep., Exh. F at 7:22-8:10, 12:17-22.) Christa Harris, the teacher's aide, also noticed students singing "gay pride" and skipping in the hall on the way into the lunchroom, although she apparently she did not consider this activity problematic enough to report this "disruption" to anyone. (Deposition of Christa Harris ("C. Harris Dep."), Exh. J at 10:2-11, 21:24-22:19.) Defendant has not identified any other teachers or school staff who witnessed any other supposed "disruptions."[5]

Subsequently, eleven students were suspended, most of whom received five day suspensions. (*See* Defendant Holmes County School Board's Objections and Responses to Plaintiff's First Set of Interrogatories and Requests for Production, dated March 17, 2008 ("Def. Resp. Interr., March 17."), Exh. O ¶ 1.) The suspensions that resulted from Davis's investigation are "based" on infractions alleged to have occurred between September 9, 2007 and September 12, 2007. (*Id.*) The reasons given for

---

[5]    Plaintiff has asked for the names of any other witnesses to "disruptions" at Ponce de Leon in September 2007, but defendant has not offered the names of any teacher or school staff witnesses beyond those presented in their initial 26(a)(1) disclosure report. (*See* Defendant Holmes County School Board's Responses and Objections to Plaintiff's Second Set of Interrogatories, dated April 21, 2008 ("Def. Resp. Interr., April 21."), Exh. K ¶ 8; Defendant Holmes County School Board's Report Pursuant to Rule 26(a)(1), dated March 10, 2008, Exh. L.) Plaintiff has also inquired about specific disruptions at deposition, but Principal Davis could not identify other Ponce de Leon faculty or employees who witnessed disruptions. (*See, e.g.*, Davis Dep., Exh. C at 213:2-215:21.) Vice Principal Jones recalled that a teacher, David Griffin, had sent him a student, J.T, who had "GP" written on her forehead. (Jones Dep., Exh. M at 118:14-119:17.) Mr. Griffin testified that he saw J.T. during "bus duty," rather than in a class and that he had sent her to the principal for having "wording on the forehead" that violated the school dress code. (D. Griffin Dep., Exh. N at 13:23-15:19.) Other than this incident, Vice Principal Jones did not recall any other reported "disruptions." (Jones Dep., Exh. M at 119:25-120:3.)

suspension of eight of these students were that they were "illegally organizing" and "disrupting the education process." Another student was suspended for "participating in an illegal organization process during school hours" and "hindering the education process." (*Id.*) One other student was suspended for "vandalizing school property" and for "directing profane language at a school board employee." (*Id.*) No further explanation or specification was provided in any letter to any parent of a student suspended in connection with the gay pride-related events of September 2007. (*See* Letters of Suspension from Principal Davis to Parents, Exh. P.)

Heather Gillman was not involved in Davis's investigation. (Davis Dep., Exh. C at 94:9-23.) Ms. Gillman, who identifies as heterosexual, was moved to express her own political beliefs in support of her cousin, an openly lesbian student at Ponce de Leon, who was suspended in September 2007, as part of Davis's investigation. (Gillman Decl., Exh. A ¶¶ 3-4.) On Wednesday, September 26, 2007, Ms. Gillman wore her cousin's rainbow belt and a handmade shirt stating, "I support gays," to school. (*Id.* at ¶ 7.) On the succeeding Thursday and Friday, Ms. Gillman wore a rainbow belt to school to express the same speech. (*Id.*) Ms. Gillman's political expression did not cause any disruption of the school or other negative reactions. (*Id.*; Declaration of Adrienne Harris ("Harris Decl."), Exh. Q ¶ 7.) Principal Davis was not even aware of Ms. Gillman's expression when it was occurring. (Davis Dep., Exh. C at 172:19-22.) The only reaction that her shirt and belt provoked was from a student who complimented her and asked why Ms. Gillman supported gays. This led to a peaceful and respectful discussion about Ms. Gillman's beliefs and nothing else. (Gillman Decl., Exh. A ¶ 7.)

Despite wearing her "I support gays" t-shirt and rainbow belt without incident, Ms. Gillman was concerned that she could be suspended by Principal Davis for showing support for gay rights. (Gillman Decl., Exh. A ¶¶ 3-4.) She therefore sought clarification from the School Board about its position regarding peaceful and affirming student expression in support of the respect, equal treatment, and acceptance of gays and lesbians. (Gillman Decl., Exh. A, ¶ 4.) On November 2, 2007, Mmes. Gillman and Harris, through legal counsel, sent a letter to counsel for the School Board, seeking guidance regarding exactly which phrases and symbols they could wear or write on their personal belongings at school without being punished. (Gillman Letter, Exh. R.) Specifically, in the letter, Mmes. Gillman and Harris sought permission to express their political beliefs through the following phrases and symbols:

(a) "Gay Pride" or "GP"

(b) "Gay?  Fine by Me!"

(c) "I'm Straight, but I vote Pro-Gay"

(d) "I Support Equal Marriage Rights"

(e) "Equal, Not Special Rights"

(f) "God Loves Me Just the Way I Am" (in rainbow colors or in a rainbow)

(g) "Pro-Gay Marriage"

(h) "Sexual Orientation is Not a Choice.  Religion, However, Is."

(i) A rainbow in the shape of an arch or flag

(j) A triangle with one corner at the bottom, rainbow or pink colored

(k) A pink armband or an armband with a triangle on it

(l)    "I Support My Gay Friends"

(m)    "I Support Gays"

(n)



(o)

(p)

(*Id.*)

By letter dated November 12, 2007, the School Board, through its attorney, advised Mmes. Gillman and Harris that School Board policy prohibited the display of any and all of the phrases or symbols listed in the November 2, 2007 letter. (Gillman Decl., Exh. A ¶ 5; Sch. Bd.'s Letter, dated Nov. 12, 2007 ("Sch. Bd.'s Letter"), Exh. S.) The School Board justified this censorship on the ground that such expression at Ponce de Leon would "likely be disruptive and interfere with the educational process." (Sch. Bd.'s Letter, Exh. S.) In the letter, the School Board also stated that students could not wear the requested symbols because they indicated membership in an "illegal organization." (*Id.*) The School Board defined "illegal organization" as "any attempt to use the school day for activities that are not school related or school sponsored." (*Id.*; compare Holmes Dist. Sch. Bd., Code of Student Conduct (2007-08), p. 9, available at http://hdsb.org/sitedocumentation/student COC0708.pdf., *last visited* April 23, 2008.) No

further justification for the ban on speech was offered. The School Board has acknowledged that its ban of these symbols was based completely on Principal Davis's explanation to the School Board of the events at Ponce De Leon in September 2007. (S. Griffin Dep., Exh. B, at 99:15-100:5.)

## II. For More Than Six Months, There Have Been No Disruptions Over Gay Rights.

There have been no "disruption[s]" related to gay pride since September 2007 (Davis Dep., Exh. C at 249:5-11), and there is currently no organization at Ponce de Leon—"illegal" or otherwise—advocating equal rights for gays and lesbians or celebrating gay pride.[6] (*See* Def. Resp. Interr., April 21., Exh. K ¶ 11; Deposition of D.L.L. ("D.L.L. Dep."), Exh. T at 44:11-18, 59:10-60:22; A. Harris Dep., Exh. H at 54:25-55:11; Deposition of J.F. ("J.F. Dep.), Exh. U at 54:24-56:1.) Other than certain students picking on a female student in early September 2007, Principal Davis is not aware of any harassment of gay or lesbian students at Ponce de Leon; he has witnessed no threats against gay or lesbian students and none have been reported, nor is he aware of any students who are hostile to gays. (Davis Dep., Exh. C at 241:8-16, 290:2-19.) At the present time, Principal Davis cannot say whether the banned symbols would cause disruption of the educational process at Ponce de Leon. (Davis Dep., Exh. C at 118:10-17) (testifying that he does not know "whether [a rainbow symbol] would or would not

---

[6]       Counsel for defendant Holmes County School Board has indicated that the prohibition on illegal organizations in the Student Code of Conduct should be interpreted as "both a noun and a verb." Defendant offers this grammatical analysis to explain how the rule can be used to ban speech when there is no actual "illegal" organization related to gay pride at Ponce de Leon. Defendant also argues that students expressing support for gay rights constitutes "illegally organizing" and is therefore prohibited under the Student Code of Conduct—an assertion that is a creatively inaccurate way to interpret the plain language of defendant's own policies. (Def. Resp. Interr., April 21., Exh. K ¶ 13.)

provoke students to engage in disruptive behavior”); *see also id.* at 276:13-278:13 (testifying that he “can’t read the future” in response to questions about what specific disruptions he believes would occur if Ms. Gillman wore a banned “Pink Floyd” rainbow t-shirt or a “Reading Rainbow” t-shirt).)   At least one other teacher with twenty-five years of experience, David Griffin, stated that the banned symbols would not be disruptive if worn by well-behaved students.  (D. Griffin Dep., Exh. N, at 37:2-4, 54:14-57:5.)

## III.     The Atmosphere at Ponce de Leon

Ponce de Leon is a typical high school.  Students at Ponce de Leon “argue all the time about one thing or another” (Davis Dep., Exh. C at 216:21-217:3); and this is permitted because “there’s nothing wrong with peaceable arguments.” (*Id.*)   Indeed, students argue about various topics at school, including sports and social relationships. (F.C. Dep., Exh. G at 77:25-78-25.)  Students at Ponce de Leon are allowed to circulate petitions (Davis Dep., Exh. C at 207:8-11) that reflect their views on various issues, and students pass notes to each other “all the time.”  (C.W. Dep., Exh. C at 75:19-23.)  Also, Ponce de Leon is a “very loud” school (Deposition of C.B. (“C.B. Dep.”), Exh. V at 33:15), and students are generally loud and often “screaming” in the hallways.  (F.C. Dep., Exh. G at 86:9-13.)  One Ponce de Leon teacher states that his class is “disrupted” every day by students’ conversations.  (Deposition of Thomas Hicks (“T. Hicks Dep.”), Exh. W at 18:19-19:15.)

Students at Ponce de Leon are permitted to talk amongst themselves at various times during the school day, for example: in the hallway (C. Harris Dep., Exh. J

at 15:11-16:1), at lunch, where students are generally "very loud" and engage in "playing around," including hitting and chasing each other (C.B. Dep., Exh. V at 33:8-25), while outside in gym class (Deposition of M.C. ("M.C. Dep."), Exh. X, at 54:23-55:5), as well as in class when the teacher in charge allows it. (*See* M.C. Dep., Exh. X at 54:23-55:5; C.W. Dep., Exh. D at 85:19-86:5; F.C. Dep., Exh. G at 83:22-84:6; D.L.L. Dep., Exh. T at 69:6-69:13.) Although not technically permitted, students have been known to write on themselves, with their names or declaring their love for another student. (C.B. Dep., Exh. V at 34:25-35:11.) Students have also been known to draw "sketches" and other "stuff" independent of their classwork. (F.C. Dep., Exh. G at 57:25-58:9, 61:21-24.)

Despite the fact that many students are openly gay, anti-gay harassment of gay or lesbian students has generally not been a problem (Davis Dep., Exh. C at 241:8-19), and Ponce de Leon is considered to be very safe and orderly. (*See id*. at 106:19-107:14.)

## STANDARD FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56(c), summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is "'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the

outcome of the suit under the governing [substantive] law." *Tipton* v. *Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).

**ARGUMENT**

I.     **Summary Judgment in Favor of Plaintiff is Appropriate Because the Undisputed Facts Show that Defendant Violated Plaintiff's First Amendment Right to Freely Express Her Political Opinion in a Non-Disruptive Manner.**

Under *Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.* and *Bethel Sch. Dist. No. 403* v. *Fraser*, student speech may only be censored if it would "materially and substantially disrupt the work and discipline of the school," or is "lewd" or "plainly offensive." *Tinker* v. *Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506, 513 (1969); *Bethel Sch. Dist. No. 403* v. *Fraser*, 478 U.S. 675, 678 (1986). In the Eleventh Circuit, a "school may not prohibit expressive activity unless there are 'facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities.'" *Holloman ex. rel. Holloman* v. *Harland*, 370 F.3d 1252, 1273 (11th Cir.2004) (quoting *Tinker*, 393 U.S. at 514). Without such a reasonable apprehension, defendant may not censor Ms. Gillman's speech.

Precedent for this Circuit has repeatedly and vigorously enforced the constitutional protection afforded school students by *Tinker*. *Holloman ex rel. Holloman* v. *Harland*, 370 F.3d 1252 (11th Cir. 2004) (student silently raising his fist during recital of Pledge is protected expression); *Butts* v. *Dallas Independent School Dist.*, 436 F.2d 728 (5th Cir. 1971) (school officials may not prohibit students from

wearing black arm bands to protest war)[7]; *Burnside* v. *Byars,* 363 F.2d 744, 749 (5th Cir. 1966) (directing district court to preliminarily enjoin ban on "freedom buttons" because students did not engage in disruptive behavior); *Johnston-Loehner* v. *O'Brien*, 859 F. Supp. 575 (M.D. Fla. 1994) (school policy requiring prior approval by superintendent before distribution of nonschool materials is unconstitutional content-based prior restraint on speech). The undisputed facts in this case show that the School Board cannot meet its burden because there is no reasonable apprehension that Ms. Gillman's expressions of support for the equal rights of gay and lesbian persons would disrupt the school, nor is such speech lewd as a matter of law. Therefore, the School Board's rule that she may not engage in this political speech is unconstitutional.

>    **A.    Ms. Gillman's Political Speech Cannot be Suppressed Under *Tinker;* There is No Evidence Sufficient to Forecast a Material and Substantial Disruption at Ponce de Leon.**

As the Supreme Court held in *Tinker*, students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker*, 393 U.S. at 506, 513. Political student speech may only be censored if it would "materially and substantially disrupt the work and discipline of the school." *Id*. In the Eleventh Circuit, "there must be demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption of school activities before expression may be constitutionally restrained." *Holloman*, 370 F.3d at 1273 (citation omitted). "Where students' expressive activity does not materially

---

[7]    *See Bonner* v. *City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*) (adopting as binding precedent for the Eleventh Circuit all decisions of the Fifth Circuit handed down prior to close of business on September 30, 1981).

interfere with a school's vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably might have such an effect." *Id.* at 1274.

"Political speech, of course, is 'at the core of what the First Amendment is designed to protect.'" *Morse* v. *Frederick,* --- U.S. ---, 127 S. Ct. 2618, 2626 (June 25, 2007) (citing *Virginia* v. *Black*, 538 U.S. 343, 365 (2003)). Consequently, in assessing whether political student speech materially and substantially disrupts school activities, a court "cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some de minimis, insubstantial impact on classroom decorum." *Holloman*, 370 F.3d at 1271. The "desire [of school officials] to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" is insufficient to justify suppression. *Tinker*, 393 U.S. at 509. Similarly, "a showing of mild curiosity" by other students or "discussion and comment" among students is insufficient to justify suppression. *Holloman,* 370 F.3d at 1271 (citations omitted). Even some "hostile remarks" or "discussion outside of the classrooms" is not enough to support censorship by school officials. *Id.* at 1272 (citations omitted).

Rather, to justify a prior restraint on student speech, the School Board must present specific facts that would lead a reasonable educator to believe that future expression of the speech would cause a material and substantial disruption. *See e.g.*, *Blackwell* v. *Issaquena County Bd. of Ed.*, 363 F.2d 749, 751-54 (5th Cir. 1966) (upholding ban where students skipped their scheduled classes and where a student entered a class in session, ignored the teacher and passed out buttons without

permission); *compare Burnside* v. *Byars,* 363 F.2d 744, 749 (5th Cir. 1966); *see also*

*Scott* v. *School Bd. of Alachua County*, 324 F.3d 1246, 1249 (11th Cir. 2003) (ban of

Confederate flag upheld where school officials presented evidence of racial tension,

racially motivated fightsand where the Confederate flag was so "associated with racial

prejudice and so likely to provoke feelings of hatred and ill will in others that they are not

appropriate in the school context.")  Any facts presented by the School Board will only

support a ban if there is a "nexus" between those specific facts and the threat of

disruption allegedly posed by the speech at issue.  *Chambers* v. *Babbitt,* 145 F.Supp.2d

1068, 1072 (D. Minn. 2001).

> **B.**     **The Evidence in this Case Cannot, as a Matter of Law, Constitute
> Evidence Sufficient to Forecast a Substantial and Material
> Disruption.**

Defendant claims that it can place a prior restraint on Ms. Gillman's

political speech because, in light of the student "disruptions" in September 2007, such

speech "will likely be disruptive and interfere with the educational process."  (*See* Sch.

Bd.'s Letter, Exh. S.)  This argument fails under *Tinker* because under the undisputed

facts, it is clear that speech supportive of gays and lesbians would not disrupt Ponce de

Leon.

The alleged disturbances by students in September 2007 are

indistinguishable from activities tolerated by Ponce de Leon on a daily basis and fall far

short of facts sufficient to <u>forecast</u> a material and substantial disruption.  The vast

majority of episodes involving speech supportive of gays and lesbians described by

Principal Davis and other Ponce de Leon faculty are little more than the everyday

discourse and activities typically generated from a school with more than four hundred students in seventh through twelfth grades. As shown pg. 10-11 *supra,* there is nothing unusual about student petitions, arguments, screaming, drawing and note passing at Ponce de Leon. Although one teacher, Donna Hicks, reported that during the first ten minutes of one of her seventh grade reading classes, she had to tell students to quiet down several times, this isolated incident hardly stands out at a school where student discussions of all sorts regularly disrupt classroom instruction for minutes at a time. (D. Hicks Dep., Exh. F at 12:17-22; T. Hicks Dep., Exh. W at 18:19-22.)[8] Such behavior is exactly the sort of innocuous "hostile remarks" or "discussion outside of the classroom" that cannot support censorship of student political speech. *Holloman*, 370 F.3d at 1272.

While some students planned to walk out of a September 12, 2007 assembly if it featured an anti-gay speaker, Principal Davis was able to prevent the walkout simply by making it "perfectly clear" to students that there would be no walkouts. (Davis Dep., Exh. C at 127:19-128:4; (D.L.L. Dep., Exh. T, at 64:3-10); A. Harris Dep., Exh. H at 56:5-9.) At the time, Principal Davis did not perceive the threat of a student walkout significant enough to consider canceling the assembly or adding additional security. (Davis Dep., Exh. C at 133:12-23.) This non-event, non-disturbance, clearly does not arise to the classroom invasions and violence present in *Scott,* 324 F.3d at 1249, and in *Blackwell,* 363 F.2d at 751-4.

---

[8]     The ten minute disruption of Donna Hicks' class also cannot support a showing under *Tinker* for the reasons stated in Section C.

Furthermore, subsequent events prove that speech supportive of gays and lesbians would not materially and substantially disrupt Ponce de Leon. For example, Ms. Gillman's "I support gays" t-shirt and rainbow belt did not cause any disruption at Ponce de Leon. (Gillman Decl., Exh. A ¶ 7). Another student, J.F., wore a t-shirt with the words "Gay Pride" without incident. (J.F. Dep., Exh. U at 20:2-10, 27:12-14, 46:5-25, 56:24-57:8.) More generally, there have been no purported "disruptions" relating to gay pride since September 2007 (Davis Dep., Exh. C at 249:5-11), and there is currently no organization at Ponce de Leon—"illegal" or otherwise—advocating equal rights for gays and lesbians or celebrating gay pride. (*See* Def. Resp. Interr., April 21., Exh. K at ¶ 11; D.L.L. Dep., Exh. T at 44:11-18, 59:10-60:22; A. Harris Dep., Exh. H at 54:25-55:11; J.F. Dep., Exh. U at 54:24-56:1.) Other than certain students picking on a female student in early September 2007, Principal Davis is not aware of any harassment of gay or lesbian students at Ponce de Leon; he has witnessed no threats against gay or lesbian students and none have been reported, nor is he aware of any students who are hostile to gays. (Davis Dep., Exh. C at 241:8-16, 289:19-290:19.) Thus, not only has speech supportive of gay and lesbian persons been shown to be non-disruptive, the environment at Ponce de Leon provides no reason to expect a disruption might occur.

The administration at Ponce de Leon recognizes that at present, there is no reason to believe that speech supportive of gay and lesbian persons would be disruptive. For example, teacher David Griffin stated that the symbols would not be disruptive if worn by well-behaved students. (D. Griffin Dep., Exh. N, at 54:14-57:5.) When asked whether the rainbow symbol would provoke disruptive behavior from middle-schoolers,

Principal Davis replied "Again, I don't know whether it would or not." (Davis Dep., Exh. C at 118:10-17.) Similarly, when asked what adverse affects might flow from Ms. Gillman wearing a shirt saying "gay pride," Principal Davis replied "I don't know. I wish I could predict the future that well, but I can't." (*Id*. at 230:9-18.) When asked again what adverse actions he might anticipate, Principal Davis replied "I don't know what I would anticipate." (*Id*. at 230:21-23.) Because, under controlling law, defendant must have facts sufficient to forecast a substantial and material disruption, defendant's inability to predict that Ms. Gillman's speech would have disruptive effects is tantamount to an admission the speech is protected and may not be banned. As the Eleventh Circuit stated in *Holloman*, it "should be quite effortless" for "[a] teacher or principal" to recognize whether a "student is disrupting class, and it should not be too hard to determine whether a student's activities are likely to have such an effect." 370 F.3d at 1279.

Since defendant cannot point to any facts that might justify suppression of Ms. Gillman's speech or identify any reason to anticipate disruption, its ban cannot stand under *Tinker*.

**C.** **Even if Other Students Engaged in Disruptive Behavior, the Disruptive Behavior of Others Cannot Justify Suppressing a Student's Peaceful Political Expressions in School.**

It is undisputed that Ms. Gillman's rainbow belt and "I Support Gays" t-shirt did not disrupt the learning environment. Even if, however, defendant could reasonably forecast disruptions by other students stemming from Ms. Gillman's

expressions of support for gay and lesbian persons—which it cannot—Ms. Gillman's expressions are still protected by the First Amendment.

Courts have repeatedly rejected the idea that disruptive conduct by <u>other</u> classmates are grounds for suppressing a student's peaceful political speech in public schools. In *Tinker*, the Supreme Court recognized a risk that "[a]ny variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance." 393 U.S. at 508. The Court concluded, however, that "our Constitution says we must take this risk . . . ." *Id.* (citing *Terminiello* v. *Chicago*, 337 U.S. 1, 4 (1949).

The Eleventh Circuit has also rejected the argument that disruptive reactions of <u>other</u> students are legitimate grounds for suppressing speech. *See*, *e.g.*, *Holloman*, 370 F.3d 1252, 1276; *Butts* v. *Dallas Independent School Dist.*, 436 F.2d 728, 732 (5th Cir. 1971) ("[W]e do not agree that the precedential value of the *Tinker* decision is nullified whenever a school system is confronted with disruptive activities or the possibility of them."). In *Holloman*, a student silently raised his fist in protest during the Pledge of Allegiance. 370 F.3d at 1261. Defendant argued that discipline was appropriate because the student speech could have led other students to cause disruptions of the educational process. *Id.* at 1274. But the Eleventh Circuit rejected this argument, holding that even if school officials are "correct in fearing that other students may react inappropriately or illegally, such reactions do not justify suppression of [plaintiff's] expression." *Holloman*, 370 F.3d at 1276. Drawing an analogy to another case in which

school officials had improperly prohibited a male student from wearing long hair because other students had reacted disruptively, the Eleventh Circuit stated, "[t]he fact that other students might take such a hairstyle as an incitement to violence is an indictment of those other students, not long hair." *Holloman*, 370 F.3d at 1275.

The court observed that to allow a school to restrict a student's freedom of expression because of potential disruptive behaviors of other students "is to sacrifice freedom upon the altar of order, and allow the scope of our liberty to be dictated by the inclinations of the unlawful mob." *Id*. The proper solution, instructed the Eleventh Circuit, is to protect the expression and punish the disruptive behavior. *Id*. Therefore, even if the School Board could show that Ms. Gillman's expression will cause other students to behave badly, such a showing is insufficient to justify the defendant's ban under the *Tinker* and Eleventh Circuit precedent. If such behavior ever occurs at Ponce de Leon in reaction to Ms. Gillman's peaceful expression, the defendant is obligated to follow the Eleventh Circuit's ruling by protecting Ms. Gillman's speech and by punishing those students who are actually being disruptive.

**D.**    **Because Gillman's Speech is not "lewd, vulgar or plainly offensive" the School Board Does not Have a Right to Ban it Under *Fraser*.**

There is only one set of circumstances under which a School District may suppress a student's political speech if it does not meet *Tinker's* "material disruption" standard. In *Bethel Sch. Dist. No. 403* v. *Fraser*, the Supreme Court held that a School District could exercise some control over "vulgar and offensive terms . . . [or] terms of debate highly offensive or highly threatening to others," even if the speech did not cause a material disruption. 478 U.S. 675, 683 (1986). But *Fraser* itself and subsequent cases

in both the Supreme Court and the Eleventh Circuit make it clear that this analysis is limited to instances where the speech in question is plainly offensive, and as defendant agrees, those circumstances do not exist here.

Both parties agree that the speech Ms. Gillman wants to express is not lewd or offensive. As defendant admitted: "The Board's decision to prohibit display of the phrases and symbols listed in Paragraph 21 (a-p) of the Complaint . . . was not based upon any perception that the phrases and symbols, standing alone, are inherently lewd, vulgar, profane, obscene, political or plainly offensive." (Def. Resp. Interr., April 21., Exh. K at ¶ 15.) Thus, the parties agree that the principle of *Fraser* is not applicable here.

In his deposition, however, Principal Davis—seemingly contrary to the position of defendant—argued that many of the symbols and phrases Ms. Gillman would like to wear could be considered sexually suggestive because they allude to a person's sexual orientation, and could therefore be banned. (*See* Davis Dep., Exh. C at 74:24-75:21.) Principal Davis's erroneous belief that the School Board may ban a t-shirt that alludes to sexual orientation betrays a deep misunderstanding of the circumstances under which a school lawfully may ban lewd expression. For as the Supreme Court noted in *Morse* v. *Frederick*, *Fraser* "should not be read to encompass any speech that could fit under some definition of 'offensive.' After all, much political and religious speech might be perceived as offensive to some." 127 S. Ct. at 2629.

While Davis may contend that phrases like "Equal Not Special Rights" and "God Loves Me Just the Way I Am" are sexually suggestive (*see* Davis Dep., Exh. C at 159:23-160:3), this is not sufficient justification to ban such speech as "lewd" under

*Fraser*.  Student speech has been classified as "plainly offensive" under *Fraser* in rare circumstances, where the speech has been offensive not only to local standards of propriety and acceptability, but has been obviously, universally and unmistakably offensive.  *See*, *e.g.*, *Morse* v. *Frederick*, 127 S. Ct. at 2628-2629 (upholding disciplinary actions taken in response to a student's banner that said "Bong Hits 4 Jesus," on the theory that it supported illegal drug use).

In *Fraser*, a student made a speech at a school assembly nominating another student for elected office that was laced with obvious and blatant sexual innuendo.  478 U.S. at 677-678.  As a result of this speech, the School District suspended him for three days.  *Id*. at 678.  The Court found that the speech's sexual content was "plainly offensive to both teachers and students" as well as "lewd and indecent."  *Id*. at 680, 683.

In its analysis, the Court took care to distinguish Fraser's suggestive speech—which had no political message and was purely sensationalistic—from the black armbands at issue in *Tinker*—which were worn in order to convey a political message. 478 U.S. at 680.  The School District was only able to punish Fraser for his speech because his statements were of slight social value, and not the sort of speech that was properly part of political discourse.  It is undisputed that Heather Gillman wants to display non-vulgar symbols supporting equal rights for gay and lesbian persons in order to express her political beliefs.  The t-shirts and slogans she would like to display are, like

the armbands in *Tinker*, a peaceful public symbol of her political views. It is therefore not the sort of speech at issue in *Fraser*. The defendant agrees. *See* p. 21 *infra*.[9]

## CONCLUSION

As the Supreme Court noted six decades ago, "[t]he right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello* v. *City of Chicago*, 337 U.S. 1, 4 (1949). Ms. Gillman asks that the Court protect her right to speech and enter an order granting summary judgment. The undisputed facts show that the School Board cannot censor Ms. Gillman's speech under either *Tinker's* "material disturbance" standard, or *Fraser's* "plainly offensive" standard. For this reason, this Court should therefore grant summary judgment to the plaintiff.

**RESPECTFULLY SUBMITTED,**

| | |
|---|---|
| **Christine P. Sun** (Cal. Bar No. 218701)<br>ACLU LGBT Rights Project<br>P.O. Box 120160<br>Nashville, TN 37212<br>csun@aclu.org<br>Tel: 615.329.9934<br>Fax: 615.329.9796 | ___s/Maura E. Miller_____<br>**Maura E. Miller** (NY Bar No. 4228854)<br>Tel: 212.558.4130<br>Fax: 212.558.3388<br>millerme@sullcrom.com<br>125 Broad Street<br>New Yor, NY 10004-2400 |
| **Benjamin James Stevenson** (Fla. Bar. No. 598909)<br>American Civil Liberties Union Found. of Florida | **Garrard R. Beeney** (NY Bar No. 1656172)<br>Tel: 212.558.3737<br>Fax: 212.558.3354 |

---

[9] The position of the parties no doubt reflects the clear ruling of this Circuit in *Gay Straight Alliance of Okeechobee High School* v. *Sch. Bd. of Okeechobee County*, 483 F. Supp. 2d 1224, 1229 (S.D. Fl. 2007) (holding that school board could not ban a student organization devoted to fostering the equal treatment of gay and lesbian persons simply because the name of the club included the word "gay".)

| | |
|---|---|
| Post Office Box 12723<br>Pensacola, FL 32591-2723<br>bstevenson@aclufl.org<br>Tel: 850.429.9128<br>Fax: 786.363.1985<br><br>**Randall C. Marshall** (Fla. Bar No.: 0181765)<br>RMarshall@aclufl.org<br><br>**Robert F. Rosenwald, Jr.** (Fla. Bar No.: 0190039)<br>RRosenwald@aclufl.org<br>American Civil Liberties Union Found. of Florida<br>4500 Biscayne Blvd., Suite 340<br>Miami, FL 33137<br>Tel: 786.363.2713<br>Fax: 786.363.1392 | beeneyg@sullcrom.com<br>New York, NY 10004-2400<br><br>**Thomas Livezey Laughlin IV** (NY Bar No. 4471975)<br>Tel: 212.558.4806<br>Fax. 212.558.3358<br>laughlint@sullcrom.com<br>New York, NY 10004-2400<br><br>**Meg Dana Holzer** (NY Bar No. 4500351)<br>Tel: 212.558.4640<br>Fax: 212.558.3354<br>holzerm@sullcrom.com<br>New York, NY 10004-2400<br><br>**Vincent Yang Liu** (NY Bar No. 4520813)<br>Tel: 212.558.4980<br>Fax: 212.558.3588<br>liuv@sullcrom.com<br>125 Broad Street<br>New York, NY 10004-2400 |

**Counsel for Plaintiff**