IN THE UNITED STATES DISTRICT COURT
OF THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

HEATHER GILLMAN, through next
friend and mother Ardena Gillman;

    Plaintiff,

vs.                                   Case No.  5:08-cv-34/RS-MD

SCHOOL BOARD FOR HOLMES COUNTY,
FLORIDA,

    Defendant.
_____/

## TRIAL BRIEF

Defendant, SCHOOL BOARD FOR HOLMES COUNTY FLORIDA ("the School Board"), pursuant to the Parties Joint Report of Parties' Conference (Doc. 29) and the Court's Scheduling and Mediation Order (Doc. 30), files this trial brief on all issues for which it did not seek summary judgment.

In her complaint, Plaintiff requests that the Court enter an order "enjoining the enforcement of Defendant['s] policies concerning expression related to 'illegal organizations' or 'secret societies' on the grounds that such policies "are void for vagueness, overbroad, and unconstitutional, facially and as applied to the contested phrases and symbols" that were the subject of correspondence exchanged between the ACLU and an attorney for the School Board prior to this lawsuit being filed. Complaint ¶¶25,C; Exhs. 1, 2. In relation to the School Board's policy on illegal organizations and secret societies, Plaintiff further contends that

> By banning and imposing a prior restraint on all speech concerning activities that are not school related or school sponsored, the policies on their face create an impermissible risk of suppression of ideas, penalize a substantial amount of speech that is constitutionally protected, and fail to give fair notice of what is prohibited. As applied to the contested phrases and symbols, Plaintiff is unaware

of any secret society or unlawful organization that uses any of the contested phrases or symbols as indications of membership.

Complaint ¶25.

The challenged provision of the School Board's Code of Student Conduct ("Code") reads as follows:

> Illegal organizations – any attempt to use the school day for activities that are not school related or school sponsored. Students shall not wear any color, clothing, insignia, emblem, jewelry, or other object in such a manner as to indicate membership or association with any secret organization.

## I. Facial Challenge

Read strictly in isolation, the illegal organizations policy could appear ambiguous; however, when read together with the remaining provisions of the Code and relevant provisions in Florida law, its meaning, scope and limitations become immediately apparent.

Using a common reference, the term "organization" is defined as "the act or process of organizing; a group of persons organized for some end or work; association."[1] The common definition of the word "illegal" is defined as "forbidden by law or statute; contrary to or forbidden by official rules, regulations, etc; . . . informal."[2] Thus, the average reader can conclude from the title that the provision prohibits organizing or participating in a group or association of persons organized for some end or work in a manner that is contrary to statute, law, rule or regulations.

### A. Statutory Authority

Florida Statute Section 1006.14, which prohibits certain student organizations, provides in relevant part:

---

[1] *See*, <http://dictionary.reference.com/browse/organization> (accessed April 27, 2008).
[2] *See*, <http://dictionary.reference.com/browse/illegal> (accessed April 27, 2008).

(1) It is unlawful for any person, group, or organization to organize or establish a fraternity, sorority, or other secret society whose membership is comprised in whole or in part of students enrolled in any public K-12 school[.]

(2) A secret society shall be interpreted to be a fraternity, sorority, or other organization whose active membership is comprised wholly or partly of students enrolled in public K-12 schools and which perpetuates itself wholly or partly by taking in additional members from the students enrolled in public K-12 schools on the basis of the decision of its membership rather than on the right of any student who is qualified by the rules of the school to be a member of and take part in any class or group exercise designated and classified according to gender, subjects included in the course of study, or program of school activities fostered and promoted by the district school board and district school superintendent or by school principals.

. . .

(5) It is unlawful for any student enrolled in any public K-12 school to be a member of, to join or to become a member of or to pledge himself or herself to become a member of any secret fraternity, sorority, or group . . . or to take part in the organization or formation of any such fraternity, sorority, or secret society; provided that this does not prevent any student from belonging to any organization fostered and promoted by the school authorities, or approved and accepted by the school authorities and whose membership is selected on the basis of good character, good scholarship, leadership ability, and achievement.

(6) The district school board may enforce the provisions of this section and prescribe and enforce such rules as are necessary. District school boards shall enforce the provisions of this section by suspending or, if necessary, expelling any student in any public K-12 school who violates this section.

Florida's prohibition against secret societies and other unlawful student organizations was first enacted in 1943. Its constitutionality was challenged in 1945 by a group of students wanting to start an organization for the purpose of worshipping Satan. In *Satan Fraternity v. Board of Public Instruction*, 22 So. 2d 892, 893156 Fla. 222, 224 (Fla. 1945), the Florida Supreme Court upheld the constitutionality of the provision, observing that

> It is quite true as contended by appellants that purely social activities should not be tinkered with by law but whether high school fraternities and sororities are purely social is a question of fact which the Legislature has answered in the negative and we find no reason to disturb their finding. . . . The public school system has a very definite place in our scheme of things and the question in every

case is whether or not the high school fraternity or sorority disrupts or materially interferes with that purpose. The cases here cited show conclusively that there has been a feeling in this country that this question requires an affirmative answer, and the Legislature has concluded the matter in this state.

*Id*. at 225-26.

In *Rupp v. Bryant*, 417 So. 2d 658, 667 n.7 (Fla. 1982), the Florida Supreme Court reaffirmed that Florida's prohibition against secret societies and other unlawful student organizations "prohibits secret societies in public schools, and by its terms effectively requires that [student organizations] be school sanctioned and supervised." The Court also announced that schools had a duty under tort law to supervise the activities of student organizations and could be sued for negligently discharging that duty. *Id*. at 666-670.

A review of applicable Florida law quickly reveals that the policy is not an arbitrary fiat concocted by the School Board to stifle student expression. Instead, it is the vehicle through which the School Board is discharging its duties – both as mandated by the Florida Legislature and arising under tort law – to prohibit such organizations in the schools under its care.

**B. Clarifying Provisions within Code of Student Conduct**

The section of the Code of Student Conduct that defines and describes legal student organizations is titled "Student Activities," and it reads as follows:

**STUDENT ACTIVITIES**

> Co-curricular activities are considered an important part of the total school experience. However, the main emphasis should be on academics. Clubs and organizations will be organized only with the advice and approval of the administration and should evolve from the curriculum needs.

> When it is determined that the formation of a club or organization is in the best interest of the students of Holmes County Schools, a time place and faculty advisor will be provided. In order for a club to become or remain active, the club must have definite goals, objectives, activities, and a yearly evaluation. In the annual review of the club, if the administrative staff does not feel that it has accomplished its goals, then the club will be disbanded.

Thus, an illegal organization is a student group or association organized for some end or purpose that meets one or more of the following criteria: 1) it is not organized with the advice and approval of the administration; 2) it does not evolve from curriculum needs; 3) it has not been determined that the club or interest of the students of Holmes County schools; 4) it has not been not provided a time, place or faculty advisor; 5) it does not have definite goals, objectives, activities and is not evaluated yearly; or, 6) the club was disbanded because the administrative staff did not feel that it had accomplished its goals.

While the definition provided above is fairly comprehensive, the illegal organization policy does not end with simply its title. It goes on to proscribe student activities that are prohibited under the policy. It first does so in the language immediately after the title that reads "any attempt to use the school day for activities that are not school related or school sponsored." If this sentence is read in isolation, then the School Board concedes that it is a broad prohibition. However, if one reads it together with the sentence that follows it, as well as the rest of the Code of Student Conduct, the kind of behavior which is prohibited becomes clarified.

Because the Code of Student Conduct is directed to the conduct of students, it logically follows that the word "activities" refers to student activities. As noted above, student activities, as the School Board uses the term, are described and defined in the policy titled "Student Activities." One examining the "Student Activities" policy to determine what the Board meant by student "activities" in its illegal organizations policy would be reassured that he or she was on the right track by the fact that the "Student Activities" policy deals entirely with the requirements necessary for maintaining *legal* student organizations.

Additional insight is found in the requirement that, to be prohibited, student activities that constitute participation in an illegal organization not be school related[3] or school sponsored.[4] Giving the words "related" and "sponsored" their ordinary meanings, it becomes clear that organizing or participating in an organization that is associated or connected with the school or which the school supports or endorses would not violate the "illegal organizations" policy.

The School Board's illegal organization policy also contains the sentence "Students shall not wear any color, clothing, insignia, emblem, jewelry, or other object in such a manner as to indicate membership or association with any secret organization." Admittedly, use of the word "secret" in this sentence is somewhat incongruous, stylistically, with the preceding sentence's reference to "illegal" organizations. However, given the stringent disclosure and review requirements set out in the Student Activities policy for maintaining legal student organizations, it follows that a "secret organization" would also be "illegal," particularly when the prohibition against wearing the signs and symbols of a secret organization appears within the "illegal organizations" policy.

Fla.Stat. §1006.14 only prohibits organizing and engaging in the activities of unlawful student organizations; not wearing colors, clothing, insignia, emblems or jewelry associated with such organizations. Assuming that the wearing of various insignia are not "engaging in the activities," the question becomes "do students have a constitutional right under the First Amendment to wear the emblems, colors, logos, etc. associated with organizations that are illegal under Florida law or prohibited under School Board policy?" The answer is no because

---

[3] "associated; connected." *See*, <http://dictionary.reference.com/browse/related> (accessed April 27, 2008).
[4] "assum[ing] responsibility for another person or a group during a period of instruction, apprenticeship, or probation; vouch[ing] for the suitability of a candidate for admission; financ[ing] a project or an event carried out by another person or group[.] See, <http://dictionary.reference.com/browse/sponsored> (accessed April 27, 2008).

"a school need not tolerate student expression that is inconsistent with its 'basic educational mission,' even though the government could not censor similar speech outside the school." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 108 S. Ct. 562, 567 (1988), quoting *Fraser*, 478 U.S. at 685.

That the Holmes County School Board could reasonably conclude that allowing students to wear the emblems, insignia and logos, etc. of organizations that violate Florida law or School Board policy would be inconsistent with its "basic educational mission" to "inculcat[e] the habits and manners of civility" in students, *Fraser*, 478 U.S. at 681, is so obvious that the matter does not warrant further discussion. *c.f. Morse v. Frederick*, 127 S. Ct. 2618 (2007) (holding that schools need not tolerate speech that advocates illegal drug use).  Further, "'[T]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts.'"  *Hazelwood*, 484 U.S. at 567-68 quoting *Fraser*, 468 U.S. at 683.

Having completed this analytical exercise, the only logical conclusion to be drawn is that the School Board's illegal organizations policy prohibits organizing or engaging in the activities of, or wearing the emblems, colors, insignia, etc. associated with a student organization that either meets the criteria for unlawful secret societies set out in Florida Statutes or that violates the rules and regulations for maintaining legal student organizations set out by the School Board in the Student Activities provision of the Code of Student Conduct.

This policy is not an unconstitutional power grab on the part of the Board; it is the School Board's attempt to give effect to the section of Florida Statutes that dictates enforcement of a legislatively mandated prohibition on secret societies and to discharge its duty to supervise the activities of student organizations under tort law.  The prohibition against wearing the signals,

emblems, etc. of illegal organizations or secret societies is a reasonable measure intended to prevent students from openly flaunting the law and the policies of the School Board, and is perfectly consistent with the School Board's duty to inculcate the habits and manners of civility in students.

"Given the school's need to be able to impose disciplinary sanctions for a wide range of unanticipated conduct disruptive of the educational process, the school disciplinary rules need not be as detailed as a criminal code which imposes criminal sanctions." *Fraser*, 478 U.S. at 686. Schools' "duties and responsibilities are primarily custodial and tutelary and thus discretionary in nature, not legalistic. . . . . If the schools are to perform their traditional function of 'inculcating the habits and manners of civility,' *Fraser*, 478 U.S. at 681, they must be allowed the space and discretion to deal with the nuances. The touchstone is reasonableness[.]" *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1542-1543 (7th Cir. 1996).

Further, "[T]he overbreadth doctrine is not casually employed. Because of the wide-reaching effects of striking down a statute on its face . . . we have recognized that the overbreadth doctrine is strong medicine and have employed it with hesitation, and then only as a last resort." *L.A. Police Dep't. v. United Reporting Publ'g Corp.*, 528 U.S. 32, 29, 120 S. Ct. 483, 489 (1999). "[A] law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771, 102 S. Ct. 3348 (1982).

With the above admonitions in mind, "The Court must determine whether a narrower construction might avoid a finding of unconstitutionality." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.4, 102 S. Ct. 1186 (1982). To prevail, an overbreadth plaintiff . . . must demonstrate that a regulation's overbreadth is 'not only … real, but substantial as well,

judged in relation to the [challenged regulation's] plainly legitimate sweep,' and also that no 'limiting construction' or 'partial invalidation' could 'remove the seeming threat or deterrence to constitutionally protected expression.' A court, however, "will not rewrite a …law to conform it to constitutional requirements." *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 258 (4th Cir. 2003) (internal citations omitted).

In applying the standard articulated above to the illegal organizations policy at issue in this case, it is evident that a narrowing construction exists that will prevent a finding of unconstitutionality, and that this construction does not require the provision to be rewritten. Bearing in mind that school board policies need not be as precisely worded as criminal statutes, one need only take the provision out of the vacuum in which Plaintiff has placed it and read it together with the School Board's policy on "legal organizations" in the Code of Student Conduct and with Florida's law prohibiting unlawful secret societies. Once done, this exercise cures any alleged vagueness or overbreadth in the policy, and it becomes evident that the policy is both reasonable and constitutional.

**II. As-Applied Challenge**

Plaintiff's challenge to the application of the School Board's illegal organizations policy stems from the following language, contained in a November 12, 2007 letter from the School Board's attorney to the ACLU:

> As you know, illegal organizations are defined by the School Board as any attempt to use the school day for activities that are not school related or school sponsored. Illegal organizations are, therefore, prohibited as they interfere with the educational process. . . . Further, students are not permitted to wear any color, clothing, insignia, emblem, jewelry or other object that may indicate membership in any secret/illegal organization. . . . [S]aid symbols were used and can further be used by select students to show participation in an illegal organization as defined by the School Board. Please remember that many of the students that previously were wearing "G.P." on their skin and clothing admitted to planning a walk-out and protest of a school assembly at Ponce de Leon School.

9

Plaintiff's Complaint at Exh. 2.

The symbols referred to in the correspondence are a series of symbols and slogans set out in a letter the ACLU sent the School Board on November 2, 2007 (hereinafter, "gay pride messages"). Plaintiff's Complaint at Exh. 1.

The School Board does not argue that wearing the gay pride messages above would violate the portion of the illegal organizations policy that prohibits organizing or engaging in illegal or unauthorized student activities. Instead, the Board contends that, in light of the events that occurred at Ponce de Leon High School in September 2007, doing so would indicate membership or association with an illegal or unauthorized student association. The first critical question then becomes whether such organization existed at Ponce de Leon at or near the time of the ACLU's request. As noted above, under Section 1006.14(2), Fla. Stat.

> A secret society shall be interpreted to be a . . . organization whose active membership is comprised wholly or partly of students enrolled in public K-12 schools and which perpetuates itself wholly or partly by taking in additional members from the students enrolled in public K-12 schools on the basis of the decision of its membership rather than on the right of any student who is qualified by the rules of the school to be a member[.]

G.P., a fourteen year old girl, was one of a group of ten students who were suspended on September 24, 2007 for "illegal organizing" and "disruption of the educational process." These ten students were leaders of an ad hoc student organization that formed when false rumors were circulated that a student named C.W. had been suspended by Ponce de Leon Principal David Davis because she was a lesbian. According to G.P., this group of students identified themselves as "Gay Pride" and had the purpose of getting other students in an "uproar," and mad at Principal Davis for his alleged suspension of a student because she was gay. [G.P. Depo. p. 22].

10

According to G.P., to accomplish these ends members of the group planned and executed several activities which included creating and hanging posters, circulating petitions, vandalizing school property, trying to organize disruption of a school assembly and writing or drawing on their clothes or bodies "Gay Pride," "G.P." and various manifestations of the rainbow[5] to express disagreement with what they were falsely led to believe were Principal Davis' discriminatory suspension policies. [G.P. Depo. pp. 23-24] They also chanted or shouted "Gay Pride." G.P.," and related slogans in the hallways and on the playing fields of the school. [G.P. Depo. p. 24] One member, F.C. told other members he planned to use paint to vandalize Principal Davis' office. [A.H. Depo. p. 33]

According to G.P., members of what many student participants described as "the Gay Pride thing" attempted to use the school day – both inside and outside of class – to recruit other members into the organization. When this occurred in class, members of the group would do so quietly, "on the down-low," so as to be sneaky and not get caught. [G.P. Depo. pp. 60-61] According to G.P., if outside students wanted to become part of the "Gay Pride thing," they were required to join in the protest activities being conducted by existing members. If a student wanted to join the "Gay Pride thing," existing members told prospective members they would "get back to" them, then made collaborative decisions about whether to admit the new members to the group based on private discussions concerning whether a prospective member was likely to be a "snitch" or "tattle-tale." [G.P. Depo. p. 66]

The gay pride group's protest activities lasted approximately one week, beginning on September 10, 2007. During this time, Principal Davis, through reports from teachers, became aware of the existence of the gay pride "protest movement" within his school. He began to

---

[5] Including arched rainbows, rainbow striped clothes, jewelry in rainbow colors, and words written in rainbow colors.

11

interview students who were wearing the symbols and slogans associated with the movement. Most of these students cooperated with his investigation by volunteering the names of other students who were involved. Principal Davis ultimately identified ten students who were regarded as "ring leaders" of the gay pride movement and suspended them for organizing a student group in violation of school board policies and for disrupting the educational process. An eleventh grade student, who was also a leader of the gay pride movement, had been suspended the week before for writing "F--k Mr. Davis'" on the columns in front of the school. [Affidavit of David Davis, ¶¶ 19, 27].

C.W., one of the ten suspended ringleaders, estimated that at one point the gay pride protest group included "way more than 20 students," possibly "half the school." [C.W. Depo. p. 26] According to C.B., another suspended ring leader, there have been recent episodes at Ponce de Leon where students have worn Pink Floyd[6] t-shirts resulting in a "big old blow-up" over the gay pride issue, meaning students became agitated and incensed with the perceived actions or policies of Principal Davis. [C.B. Depo. p. 46]

Given the testimony of G.P., the "gay pride organization" that existed at Ponce de Leon in September 2007 clearly met the statutory definition of a secret society because its active membership was comprised wholly of students and because it perpetuated itself wholly or partly by taking in additional members on the basis of the decision of its membership rather than on the right of any student who was qualified by the rules of the school to be a member. It clearly was an "illegal" organization both because its members did things that were criminally illegal, such as commit acts of vandalism, and because it was not properly sanctioned or authorized by the

---

[6] The t-shirts in question reproduce the cover of Pink Floyd's album "Dark Side of the Moon." The image is of a triangular prism on a field of black with a beam of white light passing through it which emerges from the prism divided into the seven colors of the spectrum. *See*, Exh. 16.

school. Further, there is no evidence that the members of the gay pride organization ever approached the school administration about establishing any kind of legitimate student group.

Having established that an illegal organization or secret society existed at Ponce de Leon at or near the time of the ACLU's request, the next question is whether the ACLU's gay pride messages could reasonably be associated with that organization.

As described above, the primary symbols and slogans used by the group were messages advocating gay pride and various incarnations of the rainbow. All of the slogans included in the ACLU's November 2, 2007 include direct reference to gays or gay issues. Two of the three symbols include the rainbow and are commonly understood to be symbols associated with gay issues. The third is apparently a symbol associated with the transgender community, a group commonly associated with gays that apparently takes issue with being born male or female. It was the opinion of the School Board that these symbols were sufficiently associated with the gay pride protest organization that wearing them would violate the illegal organizations policy.

Respectfully submitted this <u>28th</u> day of April, 2008.

        **COPPINS MONROE ADKINS**
        **DINCMAN & SPELLMAN, P.A.**

        BY:s/*Holly A. Dincman*
        Holly A. Dincman, FBN: 0115614
        Michael P. Spellman, FBN: 0937975
        Donald C. Freeman, FBN: 0736171
        1319 Thomaswood Drive
        Tallahassee, Florida 32308
        (850) 422-2420 (Telephone)
        (850) 422-2730 (Facsimile)
        hdincman@coppinsmonroe.com
        mspellman@coppinsmonroe.com
        dfreeman@coppinsmonroe.com
        ATTORNEYS FOR DEFENDANTS HOLMES COUNTY SCHOOL BOARD

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished this <u>28th</u> day of April 2008 by CM/ECF to:

| | | |
|---|---|---|
| Benjamin James Stevenson<br>American Civil Liberties Union Foundation of Florida<br>PO Box 12723<br>Pensacola, FL 32591-2723 | Randall C. Marshall<br>Robert F. Rosenwald, Jr.<br>American Civil Liberties Union Foundation of Florida<br>4500 Biscayne Blvd., Suite 340<br>Miami, FL 33137 | Christine P. Sun<br>ACLU LGBT Rights Project<br>P.O. Box 120160<br>Nashville, TN 37212 |
| Garrard R. Beeney, Esq.<br>Maura Miller, Esq.<br>Thomas L. Laughlin, Esq. | Vincent Yang Liu, Esq.<br>Meg D. Holzer, Esq.<br>Sullivan & Cromwell<br>125 Broad Street<br>New York, NY 10004-2400 | |

           s/*Holly A. Dincman*
           Attorney