IN THE UNITED STATES DISTRICT COURT
OF THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

HEATHER GILLMAN, through next
friend and mother Ardena Gillman;

      Plaintiff,

vs.                                                    Case No.   5:08-cv-34/RS-MD

SCHOOL BOARD FOR HOLMES COUNTY,
FLORIDA,

      Defendant.
_____/

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, SCHOOL BOARD FOR HOLMES COUNTY, FLORIDA ("School Board"),

pursuant to Rule 56, Federal Rules of Civil Procedure, and N.D.Fla. Loc. R. 7.1(A) files this

memorandum of law in support of its Motion for Partial Summary Judgment in its favor on the

Complaint filed by Plaintiff, HEATHER GILLMAN ("Plaintiff").

## MEMORANDUM OF LAW

## I.       INTRODUCTION

This is a First Amendment case involving a student's challenge to the School Board's

decision to ban certain symbols and slogans related to gay rights at Ponce de Leon High School

("PDL") based on disruptions that occurred at PDL in September 2007.  The case is brought

pursuant to 42 U.S.C. § 1983 and the First Amendment to the U.S. Constitution under three

theories: 1) that the School Board's decision to ban the symbols and slogans resulted in violation

of Plaintiff's right to free speech under the Constitution; 2) that the School Board has engaged in

impermissible viewpoint discrimination by either a) delegating final policymaking authority to

PDL Principal David Davis ("Mr. Davis"), b) by ratifying Mr. Davis' alleged constitutionally impermissible motives; c) through imposition of the School Board's own constitutionally impermissible motives; or d) on a theory that the School Board acted with deliberate indifference to the alleged impermissible motives of Mr. Davis, resulting in known or obvious violation of Plaintiff's constitutional rights; and 3) that the School Board's policies regarding "illegal organizations" and "secret societies" are unconstitutionally vague and overbroad on their face and as applied to Plaintiff. The School Board moves for summary judgment on the first two theories and respectfully requests that the Court grant partial summary judgment for the reasons that follow.

## II.    STANDARD OF REVIEW

Under Fed. R. of Civ. P. 56(c), summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986) (quoting Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e)). A factual dispute is "'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, (1986). A fact is "material" if it "might affect the outcome of the suit under the governing [substantive] law." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251, 106 S. Ct. at 2512. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). Thus, "[i]f

reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.,* 975 F.2d 1518, 1534 (11th Cir. 1992) (citing Mercantile Bank & Trust v. Fidelity & Deposit Co., 750 F.2d 838, 841 (11th Cir. 1985)). However, "[a] mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251, 106 S. Ct. at 2511).

*Reynolds v. Winter*, 2008 U.S. Dist. LEXIS 31840, 2-4 (N.D. Fla. Apr. 17, 2008).

III. **THE SCHOOL BOARD'S SUPPRESSION OF STUDENT SPEECH IN THIS CASE IS JUSTIFIED UNDER *TINKER* IN LIGHT OF THE SCHOOL BOARD'S REASONABLE FORECAST OF MATERIAL DISRUPTION AND SUBSTANTIAL DISORDER.**

Plaintiff asserts that the School Board, by deciding to ban the symbols and slogans contained in the November 2, 2007 letter from Plaintiff's counsel to the School Board, violated Plaintiff's right to free speech. [Complaint ¶ 21, Exh. 1]. The School Board acknowledges that its November 12, 2007 decision to ban the symbols and slogans at issue prohibits speech that would otherwise be protected. [Complaint ¶ 22, Exh. 2]. However, the School Board has asserted an affirmative defense under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969) based on disruptions that occurred at PDL in September 2007.

A. **The *Tinker* Standard**

In *Blackwell v. Issaquena Cty. Bd. of Educ.* 363 F.2d 749 (5th Cir. 1966), students sued school officials to enjoin enforcement of a regulation forbidding students from wearing "freedom buttons."[1] The officials imposed the ban after approximately thirty students arrived at school wearing the buttons and created a disturbance by noisily talking in the hallways when they were scheduled to be in class. The following day, approximately 150 students came to the school wearing the buttons. These students distributed buttons to other students in the hallways and

_____

[1] The buttons were about an inch in diameter and depicted black and white hands joined together next to the initials of a civil rights group called the Student Nonviolent Coordinating Committee. *Blackwell*, 363 F.2d at 750.

accosted some by pinning buttons on them when they had not asked for one. As the Fifth Circuit[2] noted, "[t]his activity created a state of confusion, disrupted class instruction, and resulted in a general breakdown of orderly discipline[.]" *Id*. at 751. Students continued to wear buttons and cause disruption for several days. Many were suspended. Some sued.

The Fifth Circuit decided *Blackwell* on the same day it decided a similar case, *Burnside v. Byars*, 363 F.2d 744 (5th Cir. 1966). In both cases, school officials banned the wearing of "freedom buttons" under penalty of suspension. In *Burnside*, the court declared the ban unconstitutional because there was no evidence that "the presence of such buttons on school grounds [caused] a disturbance of classroom activities nor was such a rule necessary for the maintenance of order and discipline within the school under the facts and in the circumstances of that case." *Id*. at 753.

In *Blackwell*, on the other hand, the court upheld the constitutionality of the school's ban, noting that

> [T]he District Court was presented with evidence of numerous instances . . . where students conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with the proper decorum and discipline of the school and disturbed other students who did not wish to participate in the wearing of the buttons[.]

> In the instant case, as distinguished from the facts in *Burnside*, there was more than a mild curiosity on the part of those who were wearing, distributing, discussing and promoting the wearing of buttons. There was an unusual degree of commotion, boisterous conduct, a collision with the rights of others, an undermining of authority, and a lack of order, discipline and decorum.

> *Id*. at 753-54.

"The school authorities in [*Blackwell*] had a legitimate and substantial interest in the orderly conduct of the school and a duty to protect such substantial interests in the school's

---

[2]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

operation," the *Blackwell* court declared, because "the reprehensible conduct described above was so inexorably tied to the wearing of the buttons that the two are not separable." *Id*. at 754.

In *Tinker*, decided three years later, school officials suspended students from public high school for wearing black armbands to school in protest of the Vietnam War. The Supreme Court declared this action unconstitutional because there was no evidence that wearing black armbands had or might reasonably lead to disruption of the educational process.

The students' conduct, the *Tinker* court reasoned, was closely akin to pure speech, which it acknowledged was entitled to comprehensive protection under the First Amendment; *but*, the Court announced, "conduct by the student, in class or out of it, which for any reason – whether it stems from time, place, or type of behavior – materially disrupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech." *Id*. at 513.

The principles announced in *Tinker* are now known as the *Tinker* standard, the yardstick by which content-specific restrictions on student speech are measured. Under the *Tinker* standard, school officials may permissibly impose content-specific restrictions on speech that otherwise would be protected under the First Amendment if sufficient evidence exists to allow the officials to reasonably forecast that the speech, if allowed, would materially disrupt classwork or involve substantial disorder or invasion of the rights of others. *Id*. The *Tinker* standard has been applied in a wide variety of scenarios involving varying forms of expression and disruption.

For example, in *Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004), Holloman filed suit against school officials claiming he had been punished for silently raising his fist rather than reciting the Pledge of Allegiance with the rest of his class. *Id*. at 1259. The court found no

disruption under *Tinker*, noting that courts "cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some *de minimis*, insubstantial impact on classroom decorum." *Id*. at 1271 (internal citations omitted.)  In reaffirming what it called the "*Burnside-Blackwell* dyad," the *Holloman* court noted that "conduct that may be constitutionally protected in one school under one set of circumstances may tend to incite disruption or disorder – and so be constitutionally proscribable – in others."[3]

In factual contrast to *Holloman* is *Scott v. School Bd. of Alachua Cty.*, 324 F. 3d 1246 (11th Cir. 2003).  In *Scott*, the Eleventh Circuit upheld the constitutionality of a school's unwritten ban on displaying the Confederate flag because of the potential for that symbol to create disruption where "school officials presented evidence of racial tensions existing at the school and provided testimony regarding fights which appeared to be racially based in the months leading up to the actions underlying the case." *Id*. at 1248-49.

There was no evidence that the school district "attempted to suppress civil debate on racial matters," the court noted, but rather "the district had concluded that the display of certain symbols that have become associated with racial prejudice are so likely to provoke feelings of hatred and ill will in others that are inappropriate in the school context." *Id*. at 1249.  Where it is "a school administrator's professional observation that certain expressions have lead to, and therefore could lead to, an unhealthy and potentially unsafe learning environment for the children they serve," the court wrote, it "will not interfere with the administration of a school."[4]

Disruptions need not, however, rise to the level of what was seen in *Scott* and other Confederate flag cases to satisfy the *Tinker* standard.  Nor must school officials prove in absolute terms that future disruption will *in fact* occur if the prohibited speech is allowed.  School

---

[3] *Id*. at 1274.
[4] *Id*. at 1247.

officials also need not wait for additional disruption to occur before taking action to prevent it.[5] As Judge Richard Posner wrote just days ago for the Seventh Circuit, "We don't think a school is required to prove that unless the speech at issue is forbidden serious consequences will *in fact* ensue. That could rarely be proved. [I]t is enough for the school to present 'facts which might reasonably lead school officials to forecast substantial disruption.'"[6]

For example, in *Heinkel v. Sch. Bd.*, 194 Fed. Appx. 604, 610 (11th Cir. 2006), the court upheld on *Tinker* grounds a school board's refusal to allow a middle school student to disseminate pro-life literature to her classmates, who ranged in age from 11 to 14. Birth control and abortion were not part of the middle school curriculum at Heinkel's school, the court noted, and the school district's lead health education teacher testified, "'we don't discuss abortion in the school setting' because it is 'a very emotional issue' that 'creates some anger,' 'polarizes a class,' and 'becomes disruptive to the educational setting.'" *Id*. at 609-610. Taking into account the age of Heinkel and her classmates, the court was persuaded that the school board's concerns were valid and upheld the ban as applied.

In upholding the school board's ban on *Tinker* grounds, the *Heinkel* court relied on *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412 (3d Cir. 2003), where the court examined the application of the *Tinker* standard to young children. "Any analysis of the students' rights to expression on the one hand, and of schools' need to control behavior and foster an environment conducive to learning on the other, must necessarily take into account the age

---

[5] *See*, *West v. Derby Unified School District*, 206 F.3d 1358, 1363 (10th Cir. 2000) ("The fact that T.W.'s conduct may not have resulted in an actual disruption of the classroom does not mean that the school had no authority to act. The district had the power to act to prevent problems before they occurred; it was not limited to prohibiting and punishing conduct only after it caused a disturbance.").

[6] *Nuxoll v. Indian Prairie Sch. Dist. #204*, 2008 U.S. App. LEXIS 8737 at *13-14 (7th Cir. Ill. Apr. 23, 2008) (citations omitted).

and maturity of the student,"[7] the court wrote. "[S]peech appropriate for eighteen-year-old high school students is not necessarily acceptable for seven-year-old grammar school students. Human sexuality provides the most obvious example of age-sensitive matter . . . but there are any number of topics that are more appropriate for older students than younger ones." [8]

Drawing on the cases above, the principles that guide the application of the standard set out in *Tinker* can be summarized as follows: it is permissible to prohibit students from wearing or displaying slogans and symbols when the wearing or displaying of such symbols is inexorably associated with past disruptive behavior.[9] Accordingly, what might be constitutionally protected at one school can be prohibited at another.[10] The disruption anticipated from the prohibited speech must not be theoretical or *de minimus*[11] but also need not be proven as a matter of fact because that is exceedingly difficult to do.[12] Further, school officials may take action to prevent subsequent disruptions before they occur.[13] The younger the children, the more discretion and authority school officials have, particularly where the prohibited speech is not part of the curriculum and tends to upset or polarize students.[14] As will be shown below, every element described above was present and every requirement met in relation the School Board's prohibition in this case.

---

[7] *See also*, *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 683-84 (1986); *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1538 (7th Cir. 1996) ("Age is a critical factor in student speech cases."); *Baxter by Baxter v. Vigo Cty. Sch. Corp.*, 26 F.3d 728, 738 (7th Cir. 1994) ("Age is a relevant factor in assessing the extent of a student's free speech rights in school.").

[8] *Id.* at 416-17.

[9] *Blackwell*, 363 F.2d 749 at 754.

[10] *Id.*; *Holloman*, 370 F.3d 1252 at 1271, 74.

[11] *Holloman*, 370 F.3d 1252 at 1271, 74.

[12] *Nuxoll*, 2008 U.S. App. LEXIS 8737 at *13-14.

[13] *West*, 206 F.3d at 1363.

[14] *Walker-Serrano*, 325 F.3d 412 at 416-18;

### B. Application of *Tinker* to This Case

That the gay pride protest group caused material disruption of classroom work and substantial disorder at PDL in September 2007 is beyond serious debate.[15]  In terms of the nature of that disruption, this case is factually most analogous to *Blackwell*.  Just as in *Blackwell*, there is ample evidence in the testimony of the teachers, administrators and students who witnessed or participated in the protests that students, acting in the name of gay pride, "conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with the proper decorum and discipline of the school and disturbed other students who did not wish to participate" in the protests.[16]  Further, the wearing, displaying, shouting or chanting of gay pride slogans and symbols resulted in "an unusual degree of commotion, boisterous conduct, a collision with the rights of others, an undermining of authority, and a lack of order, discipline and decorum" at PDL.[17]

Just as in *Blackwell*, the relationship between the wearing or displaying of slogans and symbols associated with gay pride and students' disruptive behavior is obvious and inescapable.  Just as the students in *Blackwell* used "freedom buttons" as a symbol of and a catalyst to perpetuate their protest, so did the students in this case use slogans asserting gay pride or gay rights and various symbols, including the rainbow, to express their contempt for the administration of PDL.[18]

*Blackwell* and *Holloman* illustrate two principles that are important to this case.   The first is that when a disruption that satisfies the requirements of *Tinker* has occurred in a school,

---

[15] Davis Affidavit ¶¶ 20, 21, 25, 27; Jones Depo. P.118; Harris Depo. pp. 9-12; G.P. Depo. pp. 11-13, 22-23; C.W. Depo. pp. 25-26, 32;  F.C. Depo. pp. 12-13, 15, 22-25, 36-38, M.C. Depo. pp. 21-23, 25-26, 50-51; A.H. Depo. 31-34; D.L. Depo. pp. 13-14, 32-35, 16-21; J.F. Depo. pp. 12-15; 15-22.
[16] *Blackwell*, *363 F.2d at 753.  See also,* n. 15, supra.
[17] *Id.*
[18] *See*, n. 15, *supra.*

school boards have *more* discretion and authority to prohibit speech they regard as likely to incite further disruption than in situations where no such disruption has occurred. This leads to the second principle, which is that speech that might be constitutionally protected at a school where no disruption has occurred can be proscribed at a school where it has. As the freedom button cases illustrate, this is true regardless of whether the prohibited speech appears innocuous when divorced from the context in which the prohibition arose. In the presence of substantial disruption, prohibited speech need not be as inherently inflammatory as the Confederate flag to be permissibly banned under *Tinker*.

The disruption the School Board in this case forecasted would result from wearing the prohibited symbols and slogans is not theoretical or *de minimus*. It is not the momentary distraction caused by the raising of a fist seen in *Holloman* that concerns the School Board. It is the reigniting of the conflagration of student protest that practically paralyzed PDL in 2007, a conflagration sufficiently serious that an important new reading program was nearly derailed for the remainder of the 2007-08 school year.[19]

As noted in *Nuxholl*, the School Board is not required to prove as a matter of indisputable fact that wearing the prohibited symbols and slogans will reignite the protest movement. "It is enough . . . to present 'facts which might reasonably lead school officials to forecast substantial disruption.'"[20] The School Board has done so in this case by presenting evidence that, to a significant number of students at PDL, the prohibited symbols and slogans have come to mean something far different than what is communicated on their face.

To the students at PDL, particularly the seventh graders, who were most directly involved in the protest movement, the wearing or display of messages or symbols relating to gays, gay

---

[19] Davis Affidavit ¶25.
[20] 2008 U.S. App. LEXIS 8737 at *13-14.

rights or gay pride has come to symbolize a challenge to the authority of Principal Davis and other administrators.[21] As the record makes abundantly clear, many of the students at PDL are not afraid to take that challenge directly to the administration. An illustrative example is student M.C. When she became involved in the gay pride protest movement, her manner of "express[ing] her support for the fair treatment of gays and lesbians"[22] apparently was to write "Fu-- Mr. Davis!" on the columns in front of the school.[23] Student F.C. apparently gave voice to his desire to express his support for gays and lesbians by telling his friends he wanted to vandalize Mr. Davis's office with spray paint.[24] This is compelling evidence that, at least at PDL, wearing or displaying the prohibited symbols and slogans communicates a message that is different from the message that might be communicated at a school where the events of September 2007 had never occurred, and that receipt of this message by the students at PDL has a tendency to incite actions on their part that are inherently inimical to discipline and order. This is all the School Board needs to establish to prevail on a *Tinker* defense in this case, and it has done so through the testimony elicited thus far.

Having made the reasonable determination that, at PDL, the wearing and display of messages relating to gay pride and gay rights carries with it an unacceptable connotation and incites students to unacceptable actions, the Board had authority to take action to prevent further disruption before it happened.[25] The School Board is under no obligation to engage, for Ms. Gillman's benefit, in some kind of sociological experiment to see if chaos and anarchy break out

---

[21] *See*, n. 15, *supra*.
[22] Complaint, ¶¶ 2, 20-21, 23-24, 26, 30, 35, B, D.
[23] M.C. Depo. pp. 21-23.
[24] A.H. Depo. pp. 33-34.
[25] *West*, 206 F.3d at 1363 ("The district had the power to act to prevent problems before they occurred" it was not limited to prohibiting and punishing conduct only after it caused a disturbance.").

all over again.[26] Nor is it required, as Plaintiff urges, to sit idly by while discipline and decorum break down a second time so it can punish the offenders after the breakdown is complete. Plaintiff relies on *Holloman* to urge this "punish the offenders" logic but fails to acknowledge that the *Tinker* defense pursued in *Holloman* was primarily theoretical because nothing even remotely close to what happened at PDL happened at the school in that case.

Though not necessary to prevail on a *Tinker* defense in this case, the wisdom of the School Board's judgment in prohibiting Plaintiff's proposed symbols and slogans is borne out by the testimony of C.B., who described episodes where, long after September 2007, the mere wearing by students of Pink Floyd t-shirts[27] that have nothing to do with gay pride or gay rights resulted in the whole gay pride issue "blow[ing] up" again, prompting students to openly question Principal Davis' authority.[28] The School Board would have been on perfectly solid ground under *Tinker* even without this testimony; that the wearing of t-shirts that bear only an abstract resemblance to the prohibited symbols and slogans has *in fact* prompted students to question and challenge the authority of PDL's administrators confirms its decision. In this regard, this case is similar to the Confederate flag cases, where there is no serious question that displaying the prohibited symbols and slogans will in fact undermine the educational process.

The final factor that supports the School Board's action is the age of the students who present the greatest danger of "blowing up" again. Students attend PDL from the sixth through twelfth grades. As noted above,"[a]ny analysis of the students' rights to expression on the one hand, and of schools' need to control behavior and foster an environment conducive to learning

---

[26] *Id.*

[27] The t-shirts in question reproduce the cover of Pink Floyd's album "Dark Side of the Moon." The image is of a triangular prism on a field of black with a beam of white light passing through it which emerges from the prism divided into the seven colors of the spectrum. *See*, Exh. 16.

[28] C.B. Depo. pp. 43-45.

on the other, must necessarily take into account the age and maturity of the student."[29]  In this case, the students who most concern the Board are not as young as the third graders in *Walker-Serrano*, but they nonetheless still have many important, formative years of development ahead of them before they reach the level of maturity of a high school junior or senior.  As the cases cited above establish, this must be considered when evaluating the School Board's prohibition.

Woven throughout Plaintiff's Complaint is the suggestion that she and other students will respond maturely to her display of gay pride messages at school, as if this behavior will spark a sudden dialectical debate among seventh graders about the Defense of Marriage Act or domestic partnership law.  This suggestion, however, fails to recognize the reality of how seventh graders *actually* responded when confronted with the (wholly fabricated) issue of perceived discrimination against one of their gay friends.  When the students who led the gay pride protest movement were told (falsely) that Mr. Davis had suspended their friend for being a lesbian, they did not respond in a mature fashion, by approaching Mr. Davis to ask if this was true or asking their parents to intercede on C.W.'s behalf.  As noted above, many responded predictably.[30]  Not surprisingly, this led to "catfights" among students that resulted in intellectual exchanges such as "Gay is gross!"; "Gay is wrong!"; "Shut up and bite me!"; and "[Y]ou are fat, stupid and ugly and I have my opinion!"[31]

Among younger students, the activities of the gay pride protestors clearly became "a very emotional issue" that "create[ed] some anger," "polarize[d] a class," and "bec[ame] disruptive to

---

[29] *Walker-Serrano*, 325 F.3d at 416-17
[30] *i.e.*, by writing "Fu-- Mr. Davis" on columns at the school, taping vulgar signs to themselves referring to oral sex, making coded signs and posting them in the bathroom, circulating petitions in class or by hassling other students in the hall to join their movement, organizing a walk-out at an assembly, etc. *See*, n. 15, *supra*.
[31]  Depo. of G.P. pp. 71-72, 81-82, 84, 88-89.

the educational setting."[32]  The School Board's forecast of what was likely to happen if Ms. Gillman was allowed to wear her gay pride messages so soon after the September 2007 disruption was grounded in a reasonable assessment of the actual reality surrounding the behavior of middle school and young high school students, not a naïve hope for a best case scenario that is demonstrably unlikely to occur.  Again, C.B.'s testimony concerning students' response to Pink Floyd t-shirts[33] illustrates the wisdom and reasonableness of this judgment.

Having sixth graders as young as eleven or twelve years old in the same building with high school seniors requires PDL's administrators to perform a precarious balancing act, respecting and satisfying the emotional and intellectual needs of both age groups in a way that prevents one from causing psychic injury to the other.  The general rule that speech that might be protected at one school may constitutionally be prohibited at another is especially applicable in schools where mature high school students, who are practically adults, are mixed in with very impressionable, young children who may be living through the most psychically and emotionally vulnerable periods of their lives, especially in a school where a significant number of those young children have taken part in events like those of September 2007.  In exercising its judgment, the School Board had a duty to take into account the welfare of all of its students in light of the recent breakdown in discipline and order at PDL, especially the youngest and most vulnerable.  While perhaps cold comfort to Ms. Gillman, for the Board not to have done so in this case would not only have been unreasonable, it would have been grossly irresponsible.

Because the School Board's actions in this case were eminently reasonable in light of the events of September 2007, it should be awarded summary judgment on Plaintiff's First Amendment claim.

---

[32] *Heinkel,* 194 Fed. Appx. at 609-610.

[33] *See*, nn. 27, 28, *supra*

**IV. THE SCHOOL BOARD IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S VIEWPOINT DISCRIMINATION CLAIM BECAUSE THERE IS NO THEORY, WHETHER BASED ON THE BOARD'S OWN ALLEGED CONSTITUTIONALLY IMPERMISSIBLE MOTIVES OR A CUSTOM, DELEGATION, RATIFICATION OR DELIBERATE INDIFFERENCE THEORY THAT PLACES LIABILITY ON THE SCHOOL BOARD.**

There are four scenarios in which the School Board may be liable for viewpoint discrimination under 42 U.S.C. § 1983 – (1) a constitutional deprivation was caused by a policy or custom of the School Board ("Policy/Custom Theory"); (2) the School Board delegated its authority to a subordinate who, in turn, caused a constitutional deprivation ("Delegation Theory"); (3) the School Board acted with deliberate indifference to a constitutional deprivation ("Deliberate Indifference Theory"); (4) the School Board ratified a constitutionally impermissible decision or recommendation of a subordinate or employee ("Ratification Theory"). *Sherrod v. Palm Beach Cty Sch. Dist.*, 424 F. Supp. 2d 1341, 1344 (S.D. Fla. 2006). Plaintiff cannot overcome summary judgment under any of these theories.

**A.     There is no evidence that the School Board acted with its own constitutionally impermissible motive in either its statement of official policy or through custom.**

State law governs the determination of who is a final policymaker. In Florida, multi-member school boards are deemed to be the final policymaker. See Sections 1001.32(2), 1012.22 and 1012.33, Fla. Stat.; *K.M. v. School. Bd. of Lee Cty. Fla.*, 150 Fed.Appx. 953 (11th Cir. 2005). There is no evidence in this case that would lead to a contrary conclusion.

**1.     *Official Policy – The School Board's decision to ban the symbols and slogans at issue in this case does not reflect a constitutionally impermissible motivation on the part of the School Board.***

In the Eleventh Circuit, to attach liability for viewpoint discrimination to the School Board under an "official policy" theory, Plaintiff has to show that a *majority* of the members of the governing body acted with constitutionally impermissible motives. *Church v. City of*

*Huntsville*, 30 F.3d 1332 (11th Cir. 1994) (homeless individuals alleging that a city had adopted a policy of harassing the homeless to drive them from the city, no liability found where majority had not acted with discriminatory intent); See also, *Esperanza Peace and Justice Center v. City of San Antonio*, 316 F.Supp. 2d 433, 452 (W.D.Tex. 2001); *Holt Cargo Sys., Inc. v. Delaware River Port. Auth.*, 20 F.Supp. 2d 803 (E.D. Pa. 1998), *aff'd* 165 F.3d 242 (3d Cir. 1999). Plaintiff deposed only one of five voting members of the School Board; his deposition testimony did not reveal evidence of impermissible motives.[34] To the contrary, affidavits demonstrate that the School Board was motivated by a desire to prevent additional disruption at PDL.[35] Plaintiff cannot identify any evidence in the record to contradict this evidence or demonstrate that a majority of the Board acted with constitutionally impermissible motives. Accordingly, summary judgment on this theory is warranted.

**2.      *There is insufficient evidence to attach liability to the School Board on a "custom resulting in constitutional violation" theory.***

To attach liability to the School Board on a "custom" theory, there must be evidence of frequent, repeated constitutional violations by an employee over time. In this case, the challenged policy was only enforced once at PDL in connection with the discrete September 2007 disruptions. This is simply insufficient to establish custom.

*Holloman v. Harland*, 370 F.3d 1252, 1294 (11th Cir. Ala. 2004) is directly on point. In *Hollomon*, the Eleventh Circuit rejected this theory where a teacher and principal had punished students for refusing to recite the pledge of allegiance on only two occasions. *Id*. at 1294. It is not appropriately applied in this context, either, and summary judgment in the School Board's favor on this theory is warranted.

---

[34] Scott Depo. p.41.
[35] Affidavits of Vernon Lewis, Rickey Callahan, Jason Motley, Anthony Register, and Gary Scott, ¶ 5.

**B.    There is no evidence that the School Board delegated final policymaking authority to PDL Principal David Davis.**

A school board is not "liable for the unconstitutional acts of its employees under a *respondeat superior* theory." *Monell v. Department of Social Services*, 436 U.S. 658, 690-91, 98 S. Ct. 2018, 2035-36 (1978).  *Holloman*, 370 F.3d at 1252.  "Local government liability can exist when someone with final policymaking authority delegates that authority to someone else. But, the delegation must be such that the decision is not subject to review by the policymaking authority." *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002).

Plaintiff cannot demonstrate that the School Board delegated policymaking authority to Mr. Davis to decide whether to ban the symbols and slogans contained in the November 2, 2007 letter.  The School Board, *not Mr. Davis*, created the Code of Student Conduct ("the Code") and applied its interpretation of the Code to Plaintiff without consultation with Mr. Davis.[36]  Additionally, Mr. Davis has taken no direct action against Plaintiff; she was neither interviewed nor punished by Mr. Davis, and has never discussed her desired speech with Mr. Davis.[37]

*Holloman*, *supra*, is again instructive.  In *Hollomon*, the court allowed the plaintiff to pursue a viewpoint discrimination claim against a school board on a delegation theory.  However, the principal in *Hollomon*, unlike Mr. Davis, had directly punished the plaintiff.  Although the principal's punishment was theoretically subject to review by the superintendent and school board via a grievance process, the facts showed the plaintiff's graduation was days away and review would not be meaningful.  Additionally, the *Hollomon* plaintiff had been paddled, a punishment that could not be undone.  *Hollomon* at 1293.  The facts in *Hollomon* that gave rise to a viable viewpoint discrimination claim against the school board are not present in

---

[36] Affidavits of Vernon Lewis, Rickey Callahan, Jason Motley, Anthony Register, Gary Scott, ¶ 3.
[37] Gillman Depo. pp. 21, 24.

the instant case.  Accordingly, summary judgment in favor of the School Board on this theory of liability is appropriate.

C.     **There is no evidence that the School Board acted with deliberate indifference to known or obvious violation of Plaintiff's constitutional right to support imposing liability against the School Board.**

Plaintiff contends that the School Board acted with deliberate indifference to a known or obvious violation of Plaintiff's constitutional rights.  Specifically, Plaintiff argues that the School Board ignored that Mr. Davis' suspension of students was motivated by his own personal animus against homosexuals, which violated the constitutional rights of those suspended.   Plaintiff argues that the School Board's decision to ban the symbols and slogans in her attorney's November 2, 2007 is connected to Mr. Davis' alleged impermissible motive and animus, and is tantamount to a violation of *her* constitutional rights.  The School Board is liable, according to Plaintiff, because it has acted with deliberate indifference to Mr. Davis' motives.  For the reasons that follow, Plaintiff's argument must be rejected.

Governmental liability under 42 U.S.C. § 1983 may be established where the final policymaker of the local governmental entity acted with deliberate indifference to a constitutional deprivation. *Sherrod v. Palm Beach Cty. School Dist.,* 424 F. Supp. 2d 1341, 1344 (S.D.Fla. 2006); *Calhoun v. Volusia Cty.*, 499 F. Supp. 2d 1299, 1305 (M.D. Fla. 2007).  The U.S. Supreme Court has described deliberate indifference as "a <u>stringent</u> standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action or inaction." *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382 (1997). (emphasis added).   The Eleventh Circuit has held that "in order to establish deliberate indifference, plaintiff must be able to allege (and prove at trial) that the defendant (1) was objectively aware of a risk of serious harm; (2) recklessly disregarded the risk of harm; and (3)

this conduct was more than merely negligent. *Maldonado v. Snead*, 168 Fed. Appx. 373 (11th Cir. 2006).

*Sherrod* involved a school employee's claim of retaliation due to termination of employment based on speech protected by the First Amendment. In *Sherrod*, the court rejected imposing liability on a deliberate indifference theory where the employee had been investigated and concerns over poor performance were raised from a variety of independent sources. *Sherrod*, 424 F. Supp. 2d at 1348.

Importantly, the court in *Sherrod* observed, "[t]he Eleventh Circuit has not ever addressed whether deliberate indifference is a viable theory in the context of a § 1983 action claiming retaliation for having engaged in protected speech." 424 F.Supp.2d at 1348. Likewise, the Eleventh Circuit has not addressed this theory in the context of student speech nor has counsel located any other court that has done so.

For a deliberate indifference claim to be viable, the policymaker has to know or it has to be obvious that the consequence of the decision will result in a constitutional violation. As a threshold matter, there is no evidence that the School Board members *knew* of any alleged anti-gay animus on the part of Mr. Davis.[38] Plaintiff asserts that the School Board did not do *enough* to determine if Mr. Davis acted with anti-gay animus. However, the undisputed evidence demonstrates that the Superintendent spoke with Mr. Davis about whether certain comments had been made to students other than Plaintiff. Specifically, Superintendent Griffin directly asked Mr. Davis if he had made comments about whether it was "wrong to be gay" or that "being gay is against the Bible." Mr. Davis denied making such comments to any student. As such, the School Board did, in fact, investigate allegations against Mr. Davis. Plaintiff is left with only an attack on the adequacy of that investigation. Mere failure to investigate, or a poor or negligent

---

[38] Affidavits of Vernon Lewis, Rickey Callahan, Jason Motley, Anthony Register, Gary Scott, ¶ 3.

investigation does not rise to the level of deliberate indifference.  *See*, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130, 108 S. Ct. 915 (1988) (plurality opinion)(providing, in pertinent part, "[T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where (as here) the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale."); *Davis v. Williams*, 2006 U.S. Dist. LEXIS 88126 (M.D. Fla. Dec. 5, 2006)(applying the principle in the context of whether deliberate indifference was shown for a ratification theory); *Despain v. Uphoff*, 264 F.3d 965, 972 (10th Cir. 2001) (deliberate indifference "entails something more than mere negligence").

To succeed under a deliberate indifference theory, Plaintiff must also show that a violation of her constitutional rights would be a known or obvious consequence of the School Board's action or inaction. There is no evidence that *had* the School Board investigated more diligently it would have discovered Mr. Davis' alleged anti-gay animus; and, further, that ignoring Mr. Davis' alleged animus would have lead to the <u>known or obvious</u> conclusion that banning the symbols and slogans in the November 2, 2007 letter would result in violation of Plaintiff's constitutional rights.  Stated simply, Plaintiff's theory is devoid of any supporting evidence.

Plaintiff glosses over one crucial aspect in this case, which must be factored into whether the School Board's decision amounted to deliberate indifference: the occurrence of substantial and material disruption at the school in September 2007.  Plaintiff would have this Court treat Mr. Davis' alleged comments regarding the "rightness" or "wrongness" of being gay to students in a vacuum, with no knowledge or consideration of the disruptions that occurred in September 2007; *and*, more importantly, as negating the School Board's ability to take any action to prevent

future disruption. Assuming *arguendo* that Mr. Davis *did* make inappropriate comments about his personal views to students other than Plaintiff, this is *not* a pure expressive speech case like *Tinker* where an impermissible motive was the sole reason for action being taken to prohibit expressive student speech, it is a case where there was material and substantial disruption that occurred independent of any alleged personal view that Mr. Davis may have held or communicated to students other than Plaintiff. What Mr. Davis *might* have said did not, under any circumstance, give students the right to materially disrupt and substantially interfere with the school setting, even if they disagreed vehemently with his views. Additionally, it does not impact the School Board's ability to take action to prohibit future disruption in accord with *Tinker* and its progeny. Accordingly, summary judgment in favor of the School Board on this theory of liability is appropriate.

> **D. There is no evidence to demonstrate that the School Board ratified Mr. Davis' alleged constitutionally impermissible motive.**

"For plaintiffs to state a successful § 1983 claim against a municipality [or other local governmental entity] based on a ratification theory. . . they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis . . . ." *Garvie v. City of Fort Walton Beach*, 366 F.3d 1186, 1189 (11th Cir. 2004) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1175 n.12 (11th Cir. 2001)); *Campbell v. Rainbow City*, 434 F.3d 1306 (11th Cir. 2006); *Hall v. Marion Sch. Dist. No.2*, 31 F.3d 183 (4th Cir. 1994).

The Fifth Circuit offered this example of ratification and its inherent limitation: "[I]f a school board -- a policymaker under Monell -- approves a superintendent's decision to transfer an outspoken teacher, knowing of the superintendent's retaliatory motive for doing so, the governmental entity itself may be liable; but if the school board lacks such awareness of the basis

for the decision, it has not ratified the illegality and so the district itself is not liable." *Milam v. City of San Antonio*, 113 Fed.Appx. 622, 626 (5th Cir. 2004); *Sherrod,* 424 F. Supp. 2d at 1346 (S.D. Fla. 2006)

Plaintiff cannot make the required showing in this case. Mr. Davis has *never* been to a School Board meeting, nor is there any evidence that he discussed the issues presented in this suit with any School Board members.[39] There is no evidence that any member of the School Board knew of Mr. Davis' alleged impermissible motivations, or, for that matter, that a majority of the School Board members based their decisions on Mr. Davis' personal views.[40] Given the lack of awareness by the School Board of Mr. Davis' alleged motives, Plaintiff cannot present evidence to support a claim of ratification, and the School Board is entitled to summary judgment on this claim.

## V. CONCLUSION

For the foregoing reasons, Defendant School Board for Holmes County, Florida, respectfully requests that this Court grant partial summary judgment in its favor.

Respectfully submitted,

*s/Holly A. Dincman*
Holly A. Dincman, FBN: 0115614
COPPINS MONROE ADKINS
DINCMAN & SPELLMAN, P.A.
1319 Thomaswood Drive
Tallahassee, Florida 32308
(850) 422-2420 (Telephone)
(850) 422-2730 (Facsimile)
hdincman@coppinsmonroe.com
Attorneys for Defendants

---

[39] Davis Depo. p. 27.
[40] Affidavits of Vernon Lewis, Rickey Callahan, Jason Motley, Anthony Register, and Gary Scott, ¶ 3.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was furnished this <u>28th</u> day of April 2008 by CM/ECF to:

| | | |
|---|---|---|
| Benjamin James Stevenson<br>American Civil Liberties<br>Union Foundation of Florida<br>PO Box 12723<br>Pensacola, FL  32591-2723 | Randall C. Marshall<br>Robert F. Rosenwald, Jr.<br>American Civil Liberties Union<br>Foundation of Florida<br>4500 Biscayne Blvd.,<br>Suite 340<br>Miami, FL  33137 | Christine P. Sun<br>ACLU LGBT Rights Project<br>P.O. Box 120160<br>Nashville, TN  37212 |
| Garrard R. Beeney, Esq.<br>Maura Miller, Esq.<br>Thomas L. Laughlin, Esq.<br>Vincent Yang Liu, Esq.<br>Meg D. Holzer, Esq.<br>Sullivan & Cromwell<br>125 Broad Street<br>New York, NY 10004-2400 | | |

<u>s/*Holly A. Dincman*</u>
Attorney