IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

HEATHER GILLMAN, through next )
friend and mother, Ardena Gillman; )
                                   )  **5:08CV34/RS**
                Plaintiff,         )  **MAY 12, 2008**
vs.                                )  **9:00 A.M.**
                                   )  **PANAMA CITY, FLORIDA**
SCHOOL BOARD FOR HOLMES            )
COUNTY, FLORIDA; and DAVID         )
DAVIS, in his official capacity as )
principal of Ponce de Leon High School, )
                                   )
                Defendants.        )
_____)


TRANSCRIPT OF FIRST DAY OF TRIAL
BEFORE THE HONORABLE RICHARD SMOAK
UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFF:        GARRARD R. BEENEY
                          MAURA EILEEN MILLER
                          MEG DANA HOLZER
                          Attorneys at Law
                          Sullivan & Cromwell LLP - New York NY
                          125 Broad Street
                          New York, New York 10004

                          CHRISTINE P. SUN
                          ACLU LGBT Project
                          P. O. Box 120160
                          Nashville, Tennessee 37212

                          BENJAMIN JAMES STEVENSON
                          American Civil Liberties Union
                            Foundation of Florida
                          P. O. Box 12723
                          Pensacola, Florida 32591-2723

APPEARANCES:  (Continued)


FOR THE DEFENDANTS:        HOLLY A. DINCMAN
                           DONALD FREEMAN
                           MICHAEL PATRICK SPELLMAN
                           Attorneys at Law
                           Coppins, Monroe, Adkins
                             Dincman & Spellman
                           1319 Thomaswood Drive
                           Tallahassee, Florida 32308

PROCEEDINGS

*IN CHAMBERS*

THE COURT:  All right, where are we this morning?

MR. BEENEY:  Good morning, Your Honor, Gary Beeney representing Heather Gillman.  We have a couple of logistical issues we would like to raise with respect to the judicial privacy policy.  We have provided to Your Honor a copy of the depositions, the plaintiff's exhibits and the defendants' exhibits.  I think those binders either will be or are on Your Honor's desk.

The exhibits, Your Honor, we at least have redacted the names of the students and put in their initials and I don't know if Your Honor would like us to substitute the originals or leave in the redacted versions.

THE COURT:  David, don't we need to really leave it in the redacted version?

LAW CLERK:  Yes.

THE COURT:  Let's just leave in the redacted version and people maintain the originals for safekeeping if we have to have them.  Will that work?

MS. DINCMAN:  I think that will work.  And when it comes to student's names in court, do you want us to try to have them call them by initials, or say "a female student"? How should we deal with that.

THE COURT:  Let's try two initials.  Anybody have the

1    same two initials?

2         MS. DINCMAN:  I don't think so.  I think it may be a

3    little bit cumbersome for our witnesses, but we need to do

4    that.  So --

5         THE COURT:  I tell you what I would like to have,

6    though, is a -- something to decode that with, if you all would

7    just --

8         MR. BEENEY:  We've given that, Your Honor, in the

9    binders.  We've got it alphabetically by the last initial,

10   alphabetically, and the name of the student, and that will be

11   in the binders on Your Honor's bench.

12        One issue that I think comes up, I'm not quite sure

13   how you would like to handle, is deposition testimony.  They

14   may be used to refresh or impeach.  We thought that one

15   possibility is to simply try again to use the initials but to

16   block the big screen in the courtroom and just use the small

17   monitors when we use deposition testimony, or how would Your

18   Honor like to handle that?

19        THE COURT:  Kristin, do you have any comments?

20        DEPUTY CLERK:  I'm not that familiar with running the

21   computer --

22        THE COURT:  We can simply keep the publish button off

23   and we'll all have small screens.

24        MS. DINCMAN:  Okay, that will be fine with us, Your

25   Honor.

1      MR. BEENEY:  Is that all right?

2      MS. DINCMAN:  Yes.  We have a couple other issues.  Of

3  course one of the things we want to do is invoke the rule of

4  sequestration when we start.  We have a lot of witnesses here,

5  some of whom are students, most of whom are students.  And I

6  don't know if it's Your Honor's preference or practice to call

7  the witnesses in and give them some sort of instruction about

8  what that means, or how you normally handle that.  we've also

9  got a fairly full courtroom of observers too.  So in terms of

10  logistically, if you wanted to call people in and talk to them,

11  I don't know how easy that would be.

12      THE COURT:  Well, I'm going to leave it to you to

13  explain to your witnesses, you know, that they're to stay out

14  of the courtroom, they're not to talk to each other about the

15  case.

16      MS. DINCMAN:  All right.  We've already told our folks

17  that, and I assume you all will do the same.

18      MR. BEENEY:  Yes, ma'am.

19      Your Honor, one other thing about the exhibits and

20  deposition testimony, we have binders which we thought would

21  expedite it if we were able to leave those in the witness box

22  for witnesses, or would Your Honor prefer that we approach the

23  witness with each exhibit and do it that way?

24      THE COURT:  You think you can tell them, "please turn

25  to tab" type thing?

1          MR. BEENEY:  That's exactly what we were planning, and

2     I think both sides agree that might be the most expeditious.

3          MS. DINCMAN:  We've brought a binder for the witness

4     table.

5          THE COURT:  If it stumps people, you'll need to go

6     over there and make sure they're turning to right place.

7          MS. DINCMAN:  I think we can do that.

8          And Your Honor, we have one issue that needs to be

9     addressed.  Friday, I guess about midnight, we received an

10    amended pretrial disclosure from the plaintiff that identified

11    11 new exhibits, as a late filing, and they are magazine

12    articles from *Teen Vogue*, *People*, *Redbook*, a series of

13    articles, and I want to make an ore tenus motion in limine to

14    exclude that evidence.

15         I know that that's coming late, Your Honor, but we

16    received it late.  We didn't get copies of the actual articles

17    until midday yesterday.  I think there was an attempt to send

18    them, but the attachments were too large, so we didn't receive

19    them until the middle of the day yesterday.

20         They're irrelevant as far as we can see and are

21    inadmissible hearsay.  We don't know that there's any exception

22    that we've been able to identify that would allow for admission

23    of those articles.  We don't have an expert in this case who is

24    going to testify.  They're certainly not learned treatises, not

25    market or commercial publications that people in a profession

1    would commonly rely on, and we want to exclude them on that

2    basis and the fact that they were such a late disclosure.

3         MR. BEENEY:  Your Honor, two issues.  One, the

4    relevance and the timeliness.  On the relevance, these articles

5    will be tied up by a witness as to articles that are available

6    at the Ponce de Leon High School library, and they are directly

7    relevant to an issue that Your Honor identified when Your Honor

8    said the significance, or lack thereof, of the range of ages in

9    the school in determining the proprietary -- excuse me,

10   propriety of the speech, these articles are things that are

11   available to students in the school and therefore relevant to

12   that issue:  What is the atmosphere of the school in terms of

13   the kinds of things that are talked about?  Not offered for the

14   truth, but really the fact that they are available and

15   therefore witnesses can testify.  There's no prejudice.

16   Witnesses can testify as to whether they're available or

17   whether they're not available.

18        As to the lateness, Your Honor, we turned them over to

19   Ms. Dincman when we got them.  We didn't receive them until

20   Thursday.  Traveled down here Friday and tried to get them to

21   Ms. Dincman Friday, so there was no hiding the ball at all,

22   again, and I think there's no prejudice because it's not a

23   question of what's in the article.  What's in the article is

24   what's in the article.  It's not a question of the truth of

25   what's in the article.  It's just a question of whether they're

1   available, and that's an easy issue that any witness can

2   address, and we think they're directly relevant to the issue

3   Your Honor identified.

4          MS. DINCMAN:  I think it is prejudicial because if

5   these are things available in the library at the school, we

6   haven't been given an opportunity to go and determine if they

7   are in fact.  And if so, we've been in discovery on this case

8   for sometime now.  These are things that could have, with the

9   exercise of reasonable diligence, been discovered long before

10  that and turned over to us in a way that we have a chance to

11  meet the substance of that evidence.

12         You know, and even if they're not offered for the

13  truth, certainly if they're introduced into evidence, the

14  subject matter of the articles is going to be discussed by the

15  witnesses, even if the definite content of them is not.  So we

16  ask that they be excluded on that basis.

17         THE COURT:  Wasn't May 5th your date for providing

18  exhibits?

19         MR. BEENEY:  It was, Your Honor, but --

20         THE COURT:  I'm going to stick with that.  I don't

21  think that forecloses you from particular testimony about the

22  availability, but for what it's worth.

23         MR. BEENEY:  Okay.

24         MS. DINCMAN:  Thank you, Your Honor.

25         MR. BEENEY:  And I think on my list, Your Honor, I

1 just have one other issue, which is whether Your Honor would

2 find an opening useful before we start the evidence.

3 　　　　THE COURT:  I think if you keep it relatively brief,

4 for my attention span.

5 　　　　MR. BEENEY:  I think your attention span will outlast

6 my speaking ability, Your Honor.

7 　　　　THE COURT:  Don't count on it.

8 　　　　MS. DINCMAN:  Ours is going to be very brief, Your

9 Honor.

10 　　　　THE COURT:  I imagine, you know, this may have some

11 strong feelings within the school or within the community.

12 Everybody is going to be well behaved?  Do you see any

13 problems?

14 　　　　MS. DINCMAN:  I know on our end the witnesses are.

15 　　　　MR. BEENEY:  And we have drilled that into them as

16 well, Your Honor, and we also have avoided any out-of-court

17 statement to anybody.

18 　　　　THE COURT:  Yes.  This has gotten some relatively

19 brief comment on local television, and the local newspaper.

20 　　　　MR. BEENEY:  There was a camera outside this morning,

21 but they weren't asking anybody any questions.

22 　　　　THE COURT:  Just fairly brief.  So I just suggest the

23 usual newspaper legal fellow is David Angier, and I would

24 suggest that you all limit your contact with them to saying

25 good morning and good afternoon, probably make life easier for

1  you.

2          MS. DINCMAN:  Absolutely.

3          THE COURT:  A fellow a few years ago was the head of

4  St. Joe Paper Company, his rule of press relations to the press

5  was when you've said "Good morning" to the press, you've said

6  two words too many.

7          MR. BEENEY:  There are three words which I've learned

8  is, "You can't win."

9          THE COURT:  Okay, anything else?

10         MS. DINCMAN:  I don't think so, Judge.

11         THE COURT:  We'll take a midmorning break for about 15

12 minutes, and usually I try to break between 12:00 and 1:15 for

13 lunch and an afternoon break.  When do you think we'll get

14 wrapped up?

15         MR. BEENEY:  Without knowing -- and allowing for

16 cross-examination, I would think that we would be done with our

17 case in chief certainly today.

18         MS. DINCMAN:  And we'll -- we are going to try to keep

19 ours as tight as possible.  When they conclude, we'll be ready

20 to go.  I doubt ours would run the entirety of the day

21 tomorrow, so I have a feeling there's going to be some overlap

22 between their case in chief and our case in chief in some

23 witnesses, and that we may be able to finish --

24         THE COURT:  Midafternoon tomorrow?

25         MS. DINCMAN:  I would say so.

1    Your Honor, when do you end your testimony days so

2    that we can at least let our witnesses know about what time

3    they will be done?

4    THE COURT:  I try not to push people past 5:00, and in

5    this case where we've got people coming some distance, I try to

6    take that into account.  If we're within 20 minutes of

7    finishing somebody, you know, I think it makes sense to go

8    ahead and get them over with, even if it means staying a little

9    bit later.  But I try not to go into the night.

10   MS. DINCMAN:  Your Honor, one question.  Because we

11   have students here who are missing school, basically, to be

12   here, instead of having to recall those witnesses tomorrow,

13   should we need them, we would like to be able to expand the

14   examination of them to get that done all at one time so that

15   they could, in fact, if they're called today, be released and

16   not have to come back tomorrow.  I don't know if opposing

17   counsel has an issue with that, or if that's something the

18   court would want us to do so we can release these children and

19   let them get back to school.

20   MR. BEENEY:  Well, you know, I obviously would prefer

21   the children to be in school, but without knowing the

22   defendant's case, Your Honor, I'm not sure what our rebuttal

23   case, if anything, will look like.  And so regrettably, I think

24   we probably need the witnesses to hang around until we figure

25   out if we're going to have a rebuttal case.

1     THE COURT:  I think for us to try to keep this in an

2  organized fashion, we're probably going to let you all do yours

3  separate in the usual manner.

4         We limit everything to direct, cross and redirect.

5  Very, very rarely will we go into recross.  Okay?

6         MS. DINCMAN:  All right.  I think we're ready.

7         MR. BEENEY:  Thank you, Your Honor.

8         THE COURT:  Are you all ready?

9         MS. DINCMAN:  Yes, we are.

10        THE COURT:  Give you about five minutes to get settled

11  in and then we'll get started.

12        MR. BEENEY:  Thank you, Your Honor.

13     **(Recess from 9:13 a.m. until 9:20 a.m.)**

14        THE COURT:  Good morning.

15        MS. DINCMAN:  Good morning, Your Honor.

16        THE COURT:  Ready to proceed?

17        MR. BEENEY:  Your Honor, Gary Beeney for Plaintiff

18  Heather Gillman.  If I may, Your Honor I would like to start

19  with a couple of introductions.  Also with me today is

20  Christine Sun and Plaintiff Heather Gillman, Benjamin

21  Stevenson, Maura Miller, Meg Holzer, and Your Honor, those are

22  the lawyers that with Your Honor's permission will be handling

23  the witnesses.

24        Also with us today is Meghan Bradley and Diana Iskelov

25  and helping us with some of the AV materials will be John

Christopher, and with the documents, Katelyn Witek. Thank you, Your Honor.

Your Honor, may it please the court. This case is about Defendant Holmes County School Board depriving Plaintiff Heather Gillman of her first amendment right to free speech to express her support for the equal treatment of gay and lesbian persons.

Specifically, Ms. Gillman, an 11th grade student at Ponce de Leon High School, would like to express her political views in a non-disruptive, non-violent way, by the display of affirming statements and symbols, denigrating no one or thing. They are positive, pure speech.

Defendant has threatened Ms. Gillman with discipline, up to and including suspension, if she expresses her views under any circumstances, including through the displays and symbols in Plaintiff's Exhibit 2.

And Your Honor, we have taken an excerpt from Plaintiff's Exhibit 2, which contains the symbols and phrases. And if we can, maybe we can just stick that up there. This is an excerpt of the symbols and phrases which the defendant has said Ms. Gillman may not wear or display on any of her possessions, including her notebooks.

Your Honor, Ms. Gillman's claim, based on defendant's censorship, are two: First, that she has been completely deprived, without justification, of her First Amendment rights

to express support for the equal treatment of gay and lesbian persons; second, that the Board's unconditional ban on her speech constitutes viewpoint discrimination because the Board, by its policies, deliberate indifference to -- and too, the ratification of the anti-gay views of the principal of Ponce de Leon High School has banned Ms. Gillman's speech because of disagreement with the content of her message.

Now the Board attempts to justify its ban of Ms. Gillman's peaceful and affirming pure speech by raising a single defense, claiming that the Board has met its burden under Tinker v. Des Moines because the Board claims it can reasonably anticipate a display of these symbols by Ms. Gillman will lead to a substantial and material disruption of the school.

The Board relies solely on the events occurring at Ponce De Leon High School in September of '07 to make that prediction. Before demonstrating, Your Honor, that the events of September of 2007 do not in any respect meet the Tinker, Holloman or Burnside standard, or justify the Board's ban on conditional -- on Ms. Gillman's speech, it's important, I think, to note what this case is not about.

Ms. Gillman is not in any way attempting to interfere with Ponce de Leon's educational mission or appropriate school discipline. If a student writes a vulgarity, the student is subject to discipline. If a student interrupts a class,

likewise.

All Ms. Gillman is asking is that the school allow her to display, in a nonoffensive way, the symbols and phrases that she has asked, to show her support for gay and lesbian persons.

There is no evidence in this record, and as I understand it, the School Board is not arguing that there is any evidence whatsoever that Ms. Gillman will display these slogans in anything other than a respectful and peaceful way.

Now, with respect to Ms. Gillman's claim under the First Amendment to the Constitution, there is one issue:  Can the Board meet its burden under <u>Tinker</u>, <u>Holloman</u> and the other cases by demonstrating facts that would lead a reasonable school authority to forecast that the speech at issue here will lead to a substantial and material disruption of the school activities?

The evidence, however, Your Honor, that the Board will present will fit precisely within exactly what <u>Holloman</u> has rejected as a legitimate justification for the ban of speech. In <u>Holloman</u> the court rejected, "theoretical possibility of discord," the "insubstantial impact in classroom decorum," "hostile remarks by students," "discussion of students outside the classroom," "abstract concerns," "mere possibilities and potential impact" of prior conduct to forecast substantial and material disruption.

A ban such as that at issue here, can be justified

1  under <u>Holloman</u> only if there is, "real or substantial threat of

2  actual disorder."  The evidence that the Board will present to

3  Your Honor cannot meet that standard.

4  There are five reasons, Your Honor, why the Board will

5  not be able to meet the <u>Tinker</u> and <u>Holloman</u> test.  First, there

6  was no material disruption at Ponce de Leon High School in

7  September of 2007.  Therefore those events do not support any

8  reasonable prediction that the display of these symbols will

9  lead to a material and substantial disruption of the school.

10  And I will review the evidence with Your Honor, if I

11  may, about the events of September '07.  But just as a bit of

12  an aside, a lot of the evidence that the parties will be

13  presenting relate to those events.  Those events are material

14  to the Board's ability to predict disruption, but in many ways,

15  Your Honor, those events are also irrelevant and they're

16  irrelevant for the second reason why the Board can't meet the

17  test under <u>Tinker</u> and <u>Holloman</u>.

18  Whatever occurred at PDL, Ponce de Leon, in September

19  of '07, there is not a sufficient nexus of the conduct of those

20  September events to the speech at issue here so that those

21  events can be used to reasonably predict what the reaction to

22  that speech will be.  The events of September '07 are not, in

23  the words of <u>Blackwell</u>, inexorably tied to Plaintiff Gillman's

24  speech.  The events of September of '07 at Ponce de Leon High

25  School were occasioned not by the display of the symbols or

1   phrases such as those that Ms. Gillman wishes to display, but

2   they were a reaction to the perceived or real anti-gay acts by

3   the school administration.  However those September events are

4   characterized, they were caused by the perceived unfair

5   treatment of gay and lesbian students at Ponce de Leon, not by

6   the display of symbols and phrases in support of equal

7   treatment for gay and lesbian persons.

8        In addition to the lack of any kind of subject matter

9   nexus, we would ask Your Honor to take into account, as well,

10  the lack of a temporal nexus.  The events that occurred in

11  September of 2007 at Ponce de Leon have passed.  They were

12  dealt with by the school administration.  Students were

13  punished severely and there has been not a hint of a disruption

14  since that time.

15       The third reason why the Board cannot meet its burden

16  under Tinker and Holloman, Your Honor, is that we don't need to

17  use predictions to conclude what will happen at Ponce de Leon

18  if students are permitted to wear the symbols and phrases of

19  Plaintiff's Exhibit 2.  We know what happened when students

20  displayed these phrases because they have displayed the

21  phrases.  And what's happened when they have is basically

22  nothing.

23       Your Honor will hear evidence that students wore these

24  symbols and phrases, and the only reaction was a peaceful and

25  respectful discussion about why Ms. Gillman wanted to express

her support for gay and lesbians.  There is no need to rely on predictions.  We know exactly what happens when students at Ponce de Leon wear these phrases.

Fourth, there's no reason to believe that Ms. Gillman, or for that matter any other student, planned any disruptive activity in connection with wearing these words and phrases.

If, however, other students cause disruption as a result of Ms. Gillman's display of peaceful and affirming speech, as we understand the Board to be claiming, the duty of the Board is to respond by punishing the students who are disruptive, not by silencing Ms. Gillman.

As the Eleventh Circuit said in <u>Holloman</u>, if we deny the constitutional right to speak because of the reaction to that speech, that would, quote, "allow the scope of our liberty to be dictated by the inclinations of the unlawful mob."

Finally, Your Honor, the events of September '07 at Ponce De Leon High School cannot give rise to a legitimate ban on the speech at issue here because the ban is motivated by disagreement with the message.

We will present to Your Honor substantial evidence that the principal at Ponce de Leon High School banned this speech long before the Board ever addressed the issue because of his disagreement with the content.

The Board's responsibility to investigate, to make an independent determination, did not happen.  The Board merely

adopted 100 percent the principal's determination of what happened at Ponce de Leon in September of 2007.

There will be evidence by several students, and indeed a parent, that will describe many of the anti-gay statements made by the administration at Ponce de Leon, and the Board was asked to investigate those issues, and instead the Board did nothing other than simply adopt the administration's view of the events of September 2007.

Now, the evidence with respect to actually what happened in September of 2007 at Ponce de Leon is as follows, Your Honor:  It was not prompted by the peaceful expression of support for gay and lesbian rights by the display of these symbols.  Briefly -- and Your Honor, again, will be hearing the evidence about this in some detail -- a student at Ponce de Leon was taunted as a result of being -- identifying as a lesbian.

She confided to a teacher's aide, who reported the incident to the principal.  The principal interrogated that student, told her things such as that it was wrong to be gay, that he didn't want her around any of the middle school students, and in fact that she would be suspended if she was around any of the middle school students, as if her sexual orientation was a disease that could be contracted by them.

Word got out that the principal had made these anti-gay statements and the students reacted to it, not the

1    reaction to any symbols or phrases that anybody was wearing,

2    and not as a reaction to any of the symbols or phrases that

3    plaintiff wishes to display to express her support.

4         Now, when Your Honor listens to the evidence, we

5    respectfully ask Your Honor to separate what the kids said they

6    would do in support of their friends who they believe were

7    being persecuted versus what actually happened, because the

8    Board's papers in this case frequently blur the two.

9         Basically what actually occurred was students wore --

10   several of them wore "Gay Pride" or "GP" on their bodies.  They

11   may have made small signs indicating their support for gay

12   rights, although no adult seems to have seen them.  They

13   shouted "Gay Rights" in the hallway, in hallways that are

14   typically loud and students are shouting.  They passed notes in

15   class, where students do that all the time.

16        And with respect to the Holloman and Tinker test of

17   the disruption of the educational process, there will be

18   evidence that there was a single disruption to one class, and

19   that disruption consisted of a teacher not being able to get

20   control of her class for the first ten minutes of the class

21   until she told the students, in essence, to shut up and sit

22   down.  She then got her class in order.  That is the sole

23   evidence of any disruption whatsoever to anything involving the

24   educational process at Ponce De Leon High School in September

25   of 2007.

1        Your Honor, the Board also, by its evidence, will be

2   unable to demonstrate that anything that happened in September

3   of 2007, however mischaracterized, had anything to do with the

4   symbols or phrases that Ms. Gillman wishes to display.

5        There will be evidence, uncontroverted, that the

6   activities of the students in September of 2007 at Ponce de

7   Leon was a reaction to their perception, real or imagined, that

8   the administration was engaged in what, in effect, amounted to

9   an anti-gay witch hunt.

10        Your Honor, while it's certainly not for Ms. Gillman

11   to dictate what is taught at Ponce de Leon, our schools are an

12   opportunity to learn about the diversity of the world and

13   people in it.  As the court said in Tinker, quote, "Vigilant

14   protection of constitutional freedoms is nowhere more vital

15   than in the community of our American schools."

16        There is simply no basis under the Constitution to ban

17   Ms. Gillman's peaceful, affirming support for the equal rights

18   she wishes to express.

19        We respectfully ask Your Honor to restore to

20   Ms. Gillman and the other students in Holmes County the

21   constitutional rights that the School Board has unlawfully and

22   unreasonably taken away.

23        Thank you, Your Honor.

24        THE COURT:  Ms. Dincman?

25        MS. DINCMAN:  Good morning, Your Honor.  I'm Holly

1    Dincman.  I'm here today on behalf of the Holmes County School

2    Board, and before I begin, let me introduce the folks that I

3    brought with me to try this case.  I have with me as a

4    representative of the School Board, School Superintendent Steve

5    Griffin.

6              MR. GRIFFIN:  Morning, Judge.

7              THE COURT:  I have my law partner and co-counsel,

8    Michael Spellman.

9              MR. SPELLMAN:  Good morning, Your Honor.

10             MS. DINCMAN:  My co-counsel, Don Freeman.

11             MR. FREEMAN:  Good morning, Your Honor.

12             MS. DINCMAN:  And we've also brought with us our

13   paralegal, Georgia Hatch, and our law clerk Scott Seagle.

14             I will be very brief, Your Honor, because I think that

15   the evidence that we're going to put on will speak for itself.

16   It is correct that there are three claims presented:  One, that

17   plaintiff's rights were violated by the suppression of speech,

18   and we have offered a <u>Tinker</u> defense to that of substantial

19   disruption.  We're going to put on the administrators.  We're

20   going to put on teachers and we're going to put on students,

21   and we believe the evidence is going to show that there was a

22   very serious series of disruptions that happened in September

23   of 2007.

24             We're going to put on evidence that the disruption

25   goes beyond the four walls of the classroom, and that the court

is entitled to consider that and consider the sum total of
disruption throughout the school.  The evidence will show that
students vandalized the school, that students were chanting
outside the school "Gay Pride" and slogans that are indicated
as part and parcel of the slogans that are at issue in this
case; not all of them, but certainly "Gay Pride," "GP," and a
variety of rainbow symbols.  We'll present evidence that
students wrote slogans all over their body and their foreheads
and went around school and carried those slogans into classes.

We'll present evidence that the students were
disrupting classes, that they were talking about this in class,
and that the students who were involved acted in an organized
fashion in the sense of recruiting other students to engage in
disruptive behavior, that they were making plans to walk out of
an assembly and inciting students to wide ranging support in
order to do that.

We are going to show that the symbols that are at
issue in this case are inexorably tied to the symbols that were
used in September of 2007 to cause disruption, and we'll also
be able to demonstrate that the plaintiff herself was tied in
with the disruptions that occurred in September of 2007,
specifically that she was part of the plan to walk out of the
student assembly and to be part of the disruptions that were
planned.

The court doesn't have to make a distinction between

what students plan to do or what students said they were going
to do.  We'll show that under the existing law, the School
Board is entitled to take into account planned disruptions that
are actually unsuccessful.  They are allowed to consider what
happens in a school beyond the four corners of a classroom,
because what happens in hallways and before schools, at times
when the School Board is responsible for the control and
discipline of students and the maintenance and order of the
school, does count.  And the court is entitled to take that
into consideration and to take into consideration the judgment
of the principal, who was investigating these incidents.

We are going to show that this is not theoretical;
that this is disruptions that in fact occurred.  And we are
going to be able to present evidence through our administrators
and our teachers, and the students, that the Board was
presented with facts that would make it reasonable for an
educator to conclude that bringing these symbols and slogans
back into the school system in Holmes County is likely to
result in disruption.  We will be able to prove that and to
satisfy our burden on that score.

We'll prove that the School Board has taken action,
not out of a desire to punish the plaintiff, Ms. Gillman, or
deprive her of her constitutional rights, but out of a simple
desire to maintain order and discipline inside the school
system and to keep the focus on where it needs to be, and

that's on the learning program and the educational process at
the school.

On the viewpoint discrimination claim, the plaintiff
is proceeding on a ratification theory and a deliberate
indifference theory.  We will introduce the testimony of our
superintendent and our School Board members that will show that
they made their decisions about the symbols and slogans that
are at issue and the decision to prohibit students from
presenting those, whether on T-shirts, tattoos, their
foreheads, which are all part of things that they're being
asked to allow students to do in this case at this time, they
made that decision independently; that they didn't take into
consideration any alleged, impermissible motive on the part of
Principal David Davis, and that they made their decision
without knowledge of or without regard to that.

We'll be able to show that they did not in fact act
with deliberate indifference, which is a very high and hard
standard for the plaintiff to prove.  And I want to emphasize
that the burden of proof on that rests with the plaintiff.  It
goes beyond mere negligence, it goes beyond gross negligence.
They had to basically turn a blind eye to the violation of
constitutional rights that may ensue.  And we will be able to
prove with the evidence and show that they did not do that, and
that they did not act with deliberate indifference to the
plaintiff's rights, or it was not so obvious to them at the

time they made their decision that the result would be

violation of plaintiff's rights.

We'll show that their motivation was coming on the

heels of a series of serious disruptions that occurred in

September 2007 and out of a sincere desire to prevent that type

of disruption from occurring again within the school system.

And finally, Your Honor, we're going to present

evidence about the School Board's policies, and that when they

are read in the context of the Student Code of Conduct, and

Florida law, and the overarching scope of the School Board's

policies as a whole, that they are not vague or

unconstitutional or overbroad, either on their face or as

applied to Plaintiff Heather Gillman.

The defense is ready to proceed, Your Honor.

THE COURT:  All right, Mr. Beeney.

MR. BEENEY:  Thank you, Your Honor.

Your Honor, our first witness will be Plaintiff

Heather Gillman, and with Your Honor's permission, Ms. Sun will

conduct the examination.  Thank you, Your Honor.

DEPUTY CLERK:  Please raise your right hand.

**HEATHER DANIELLE GILLMAN, PLAINTIFF WITNESS, DULY SWORN.**

DEPUTY CLERK:  Please state your full name and spell

your last name for the record.

THE WITNESS:  Heather Danielle Gillman, G-I-L-L-M-A-N.

**DIRECT EXAMINATION**

1    BY MS. SUN:

2    Q.  Good morning, Ms. Gillman.  My name is Christine Sun.  Are

3    you a little nervous today?

4    A.  Yes.

5    Q.  Good.  Me too, just a little bit.

6        I just want to ask you for a favor before we start your

7    testimony.  There are a number of witnesses in this case who

8    are minors, who are your fellow students, and I know it's going

9    to seem a little bit awkward at times, but if you could please

10   refer to them using their initials, as opposed to their first

11   name or their last names, you would be doing us a great favor.

12   Could you try to remember to do that?

13   A.  Yes.

14   Q.  Thank you.  Do you currently attend Ponce De Leon High

15   School in Ponce de Leon, Florida?

16   A.  Yes.

17   Q.  If I refer to Ponce De Leon High School as PDL, will you

18   know what I'm referring to?

19   A.  Yes.

20        THE COURT:  Ms. Gillman, would you please sit up

21   closer to that microphone?  Thank you.

22   BY MS. SUN:

23   Q.  What grade are you currently in?

24   A.  11th.

25   Q.  Do you intend on attending PDL next year?

1    A.   Yes.

2    Q.   Are you involved in any school activities or clubs at PDL?

3    A.   I'm in Science Club and SWAT, which is Students Working

4    Against Tobacco.

5    Q.   How old are you?

6    A.   Seventeen.

7    Q.   Where do you currently live?

8    A.   With my mom and dad.

9    Q.   What's your mom's name?

10   A.   Ardena Gillman.

11   Q.   At some point during this school year, did you make

12   T-shirts that showed your support for gay and lesbian persons?

13   A.   Yes.

14        MS. SUN:   Your Honor, may I approach with T-shirts

15   that she's made?

16   BY MS. SUN:

17   Q.   Heather, I'm just going to direct your attention to the

18   stack of T-shirts I just handed to you.  Could you just look

19   them over and let me know how many of them there are?

20   A.   Yes.  There are seven.

21   Q.   And do you recognize those T-shirts?

22   A.   Yes.

23   Q.   What are they?

24   A.   They're the T-shirts I made to show what I would like to

25   wear to Ponce de Leon to show my support for gays and lesbians.

1          MS. SUN:  Your Honor, at this time plaintiffs move to

2     enter into evidence the T-shirts which have been marked as

3     Plaintiff's Exhibit 4.

4          MR. FREEMAN:  No objection, Your Honor.

5          THE COURT:  Be admitted.

6     **(Plaintiff Exhibit No. 4 received in evidence.)**

7     BY MS. SUN:

8     Q.  Ms. Gillman, if you could do me the favor of holding up

9     that first T-shirt and showing it to the court.  What does that

10    T-shirt read?

11    A.  "I Support Equal Marriage Rights."

12    Q.  And what are you trying to express through that T-shirt?

13    A.  That I think gays and lesbians should be allowed to marry,

14    to get married, because they're just people.

15    Q.  How long have you held that view?

16    A.  For a few years now.

17    Q.  Could you show the court the next T-shirt?

18    A.  Yes.

19    Q.  And could you describe that T-shirt?

20    A.  It is "Accept" with the rainbow behind it.

21    Q.  And what are you trying to express through that T-shirt?

22    A.  That I think gays and lesbians should be accepted for who

23    they are.

24    Q.  And what are you trying to show through using a rainbow?

25    A.  Just that it's -- I've known it to be the gay pride symbol.

1    So I'm giving pride to the gays and lesbians.

2    Q.  Could you show the next T-shirt, please?  What does that

3    T-shirt say?

4    A.  "Equal, Not Special Rights.

5    Q.  What are you trying to express through that T-shirt?

6    A.  That I think gays and lesbians should have equal rights and

7    they shouldn't be special, because they're just people.

8    Q.  And the next T-shirt, please.  Could you please read that

9    T-shirt?

10   A.  "I Support Gays."

11   Q.  What are you trying to express through that T-shirt?

12   A.  My support for gays and lesbians.

13   Q.  I'm just going to ask you to briefly show the next three

14   T-shirts.  I think we get a sense of why you want to wear these

15   T-shirts and what the theme is, but if you could just hold them

16   up briefly and just read them.

17   A.  "God Loves Me the Way I Am."

18   Q.  Okay.  And what's the next T-shirt?

19   A.  "I'm Not Gay, I Just Like Rainbows."

20   Q.  If you could just describe that T-shirt briefly.

21   A.  They're hearts and the rainbow coloring.

22   Q.  So we just talked about the message that you want to

23   express through your T-shirts.  Is your answer any different

24   for the last three T-shirts that you just held up for the

25   court?

1   A.   No, it's not.

2   Q.   Who is the principal at PDL?

3   A.   Mr. David Davis.

4   Q.   Who is the vice principal at PDL?

5   A.   Mr. Jones.

6   Q.   Has Principal Davis ever asked you what your intent is in

7   wanting to wear the T-shirts supporting gays and lesbians?

8   A.   No.

9   Q.   What about Vice Principal Jones?

10  A.   No.

11  Q.   Has any teacher or administrator at PDL ever asked you what

12  your intent is in wearing those T-shirts?

13  A.   No.

14  Q.   Have you worn any of those T-shirts to PDL?

15  A.   No.

16  Q.   Why not?

17  A.   Because the letter we got from the School Board saying that

18  I would not be allowed to wear any of these T-shirts to school.

19  Q.   If I could direct your attention to a binder that should be

20  up there.  Could you please turn to tab 3?

21  A.   Which one, the plaintiff's exhibits?

22  Q.   Yes.

23  A.   Okay.

24  Q.   Have you seen the letter that's been marked as Plaintiff's

25  Exhibit 3 before?

1    A.   Yes.

2    Q.   What is that letter?

3    A.   It is the letter stating that I would not be allowed to

4    wear the T-shirts to school.

5    Q.   What's the date of that letter?

6    A.   November 12th, 2007.

7            MS. SUN:  Your Honor, at this time plaintiffs offer

8    into evidence what has been marked as Plaintiff's Exhibit 3.

9            MR. FREEMAN:  No objection.

10           THE COURT:  Be admitted.

11       **(Plaintiff Exhibit No. 3 received in evidence.)**

12   BY MS. SUN:

13   Q.   What's your understanding of what the consequences would be

14   if you decided to wear your T-shirts to school?

15   A.   I would either be asked to take the T-shirt off or I would

16   be suspended.

17   Q.   Was this letter a response to a letter that your attorneys

18   wrote on your behalf to the School Board?

19   A.   Yes.

20   Q.   Could you please turn to tab No. 2 in that binder?

21   A.   Okay.

22   Q.   Have you seen Exhibit 2 before?

23   A.   Yes.

24   Q.   What is it?

25   A.   It is the letter asking which symbols or slogans I would be

1    allowed to wear to school.

2    Q.  What's the date of that letter?

3    A.  November 2nd, 2007.

4            MS. SUN:  Your Honor, at this time plaintiffs offer

5    into evidence what has been marked for identification as

6    Plaintiff's Exhibit No. 2.

7            MR. FREEMAN:  No objection.

8            THE COURT:  Be admitted.

9        **(Plaintiff Exhibit No. 2 received in evidence.)**

10   BY MS. SUN:

11   Q.  If you look at the November 2nd letter, in the second

12   paragraph there is a sentence that starts with, "We seek

13   permission."

14   A.  Okay.

15   Q.  You see where I'm referring?

16   A.  Yes.

17   Q.  Could you please read that sentence up through the colon

18   mark?

19   A.  Read it aloud?

20   Q.  Yes, please.

21   A.  "We seek permission for and on behalf of Axxxxxxx and

22   Heather to express themselves through the following phrases,

23   symbols or images, (1) printed on a T-shirt, belt, armband

24   button, bracelet, or another article of clothing or accessory.

25   (2) written, tattooed, or drawn on their arms, bodies, personal

1    notebooks, or other ungraded, personal class materials, or, (3)

2    affixed as a sticker to personal notebooks or other ungraded,

3    personal class material:"

4    Q.  Do you see underneath there a number of slogans and symbols

5    starting with "Gay Pride," and then on the next page ending

6    with the letter P and a rainbow?

7    A.  Yes.

8    Q.  We have made as a visual aid those slogans and symbols on

9    this poster.  Could you just quickly review all those symbols

10   and slogans and let me know when you're done?

11   A.  Yes.  I'm done.

12   Q.  What message do these slogans and symbols generally

13   represent to you?

14   A.  The support of gays and lesbians.

15   Q.  Do you desire to express all of these slogans and symbols

16   on a T-shirt or a notebook that you bring to school?

17   A.  Yes.

18   Q.  And we talked earlier about your intent in wanting to wear

19   the T-shirts to school.  Is your answer any different with

20   respect to your intent in wanting to express these slogans and

21   symbols?

22   A.  No.

23   Q.  And since you received the November 12th letter, have you

24   worn any of these symbols or slogans, or displayed any of these

25   symbols or slogans, at school?

1   A.   No.

2   Q.   One of the T-shirts you have is an "I Support Gays" shirt.

3   At a different time, did you have a similar shirt?

4   A.   Yes.

5   Q.   Okay.  Could you please describe that shirt?

6   A.   It was a white T-shirt with lettering about this big

7   (indicating), in blue lettering, and it says, "I Support Gays,"

8   with a rainbow on it.

9   Q.   When did you make that shirt?

10  A.   In September of 2007.

11  Q.   Where did you make the shirt?

12  A.   At home.

13  Q.   Where is it now?

14  A.   Somewhere at home.

15  Q.   Did anyone help you make the shirt?

16  A.   My mom did.

17  Q.   Did your mom know whether you intended to wear the shirt to

18  school?

19  A.   Yes.

20  Q.   And how did she know that?

21  A.   I told her.

22  Q.   Okay.  Did she try to stop you from wearing the shirt?

23  A.   No.

24  Q.   Did she support you in wearing the shirt?

25  A.   Yes.

1  Q.  At the time, were you afraid, in September of 2007, of

2  wearing your shirt to PDL?

3  A.  Yes, I was.  I was afraid that I was going to be suspended.

4  Q.  Why were you afraid of that?

5  A.  Because he had told Axxxxxxx she would not be allowed to

6  wear a rainbow belt to school.

7  Q.  Let me, before you go on, who is the he you're referring

8  to?

9  A.  Mr. Davis.

10  Q.  Sorry.

11  A.  And it had a rainbow on it, so I thought that maybe I could

12  get in trouble for it, but it didn't say anything in the

13  Student Code of Conduct about it, so I wasn't sure.

14  Q.  I'm going to refer to Axxxxxxx as A.H.

15  A.  I forgot.  I'm sorry.

16  Q.  I just want to make sure you know who I'm referring to.

17  What is your relationship to A.H.?

18  A.  She's my cousin.

19  Q.  Does she also attend PDL?

20  A.  Yes.

21  Q.  As far as you know, does A.H. openly identify as lesbian at

22  school?

23  A.  Yes.

24  Q.  Are there other students who openly identify as gay or

25  lesbian at school, to your knowledge?

1    A.   Yes.

2    Q.   And what grades are they generally in?

3    A.   Middle school up to high school.

4    Q.   And of those students that you have -- that you know openly

5    identify as gay or lesbian, have you ever heard them talking

6    about who they want to date or who's cute, that sort thing?

7    A.   Yes.

8    Q.   Can you describe for me just what you have in mind?

9    A.   I would be walking by somebody and they would be like, "Oh,

10   she's pretty," or something like that.

11   Q.   Have you seen any negative reaction from other students in

12   reaction to students who are openly gay or lesbian talking

13   about who they want to date?

14   A.   No.

15   Q.   Do you have any impression as to the tolerance level of the

16   students at PDL to students who identify as openly gay or

17   lesbian?

18   A.   They're pretty tolerant.

19   Q.   And what do you mean by that?

20   A.   They don't really have anything against gays or lesbians.

21   If they hear them talking about somebody, like they want to

22   date them, they won't say anything to them.

23   Q.   Now I just want to ask you a couple of questions about your

24   experience as a student at PDL on a daily basis.  And it's been

25   a while since I went to high school, so try to bear with me.

1    How many classes do you have as a high school student?

2    A.   Seven.

3    Q.   And how many classes did you have -- actually, I forgot to

4    ask you, how long have you attended PDL High School?

5    A.   Since 6th grade, except for in 8th grade I went to Bonifay

6    for half a year.

7    Q.   So you were a middle school student at PDL?

8    A.   Yes.

9    Q.   How many classes did you have as a middle school student?

10   A.   Six.

11   Q.   Are there breaks during the school day?

12   A.   Yes.   There are breaks in between classes.

13   Q.   And how long are those breaks?

14   A.   Four minutes.

15   Q.   And what are students generally doing during those breaks?

16   A.   Walking to class or going to their lockers.

17   Q.   And during those breaks, have you ever heard students

18   yelling at each other down the hallway, across the hallway,

19   that sort of thing?

20   A.   Yes.

21   Q.   So what kinds of things do you hear students yelling?

22   A.   They can be yelling stuff like, "Wait up," or, "You dropped

23   your book," or something like that.

24   Q.   And how often would you say that you hear students yelling

25   at each other in the hallways during breaks on a daily basis?

1  A.  Two or three times a day.

2  Q.  And have you ever heard students arguing in the hallways

3  during breaks at PDL?

4  A.  Yes.

5  Q.  And what do you hear students arguing about?

6  A.  Like which teacher is better, who's cuter, what's going on

7  this weekend, or something like that.

8  Q.  How often would you say that you hear students arguing with

9  each other in the hallways during breaks?

10 A.  Four or five times a day.

11 Q.  Have you ever seen students, for the lack of a better term,

12 "horsing around" with each other during breaks?

13 A.  Yes.

14 Q.  And what do you mean by -- what have you seen in terms of

15 students horsing around?

16 A.  They'll like hit each other in the arm or run after each

17 other in the hallway.

18 Q.  And how often would you say that you see students horsing

19 around with each other during breaks?

20 A.  Three or four times a day.

21 Q.  And we've been asking -- I've been asking you a number of

22 questions about the breaks between classes.  Would your answers

23 about students yelling or arguing or horsing around with each

24 other, would that change if I asked you specifically about

25 lunchtime?

1   A.  No.

2   Q.  And I asked you questions about your experience as a high

3   school student.  Would any of your answers change if I asked

4   you about your experience as a middle school student?

5   A.  No.

6   Q.  Have there been times where you've been sitting in class

7   and a teacher -- a teacher has had to tell students to be quiet

8   or to stop talking?

9   A.  Yes.

10  Q.  And what kind of examples do you have in your mind?

11  A.  Like they can be talking about stuff that happened over the

12  weekend or they can be talking about what's going on this

13  weekend, or stuff like that.

14  Q.  How about students arguing in classes?

15  A.  Yes.

16  Q.  Okay.  And what have you heard students arguing about in

17  classes?

18  A.  Basically who's cuter, which teacher is better, what class

19  do they like better, stuff like that.

20  Q.  And how often, would you say -- well, have you seen

21  situations where a teacher has had to tell students to be quiet

22  more than once?

23  A.  Yes.

24  Q.  Okay, and how often would you say that that occurs?

25  A.  Maybe two or three times a day.

1  Q.  Did you miss any school in September of 2007 to the best of

2  your recollection?

3  A.  I might have missed a day or two.

4  Q.  And we've been talking about your daily experiences as a

5  student at PDL.  Did anything out of the ordinary happen in

6  terms of students yelling or arguing or horsing around or

7  talking in class --

8  A.  No.

9  Q.  -- in the classes that you went to in September, 2007?

10  A.  No.

11  Q.  At some point in September 2007, were you aware of a school

12  assembly, a mandatory school assembly?

13  A.  Yes.

14  Q.  What was your understanding of what that assembly was going

15  to be about before it happened?

16  A.  Morals.

17  Q.  Okay.  And how did you know that that was the subject

18  matter of the assembly?

19  A.  *The Silent Bulletin*.

20  Q.  What's -- I'm sorry, what's *The Silent Bulletin*?

21  A.  They type in stuff on the computer and it shows up on all

22  the TVs in the classrooms.

23  Q.  Was there anymore information that you remember getting

24  about what the subject matter of the assembly would be from the

25  principal or the school administration?

1   A.   No.

2   Q.   At some point did -- before the assembly, did students talk

3   to you about -- or were you aware that some students were going

4   to leave the assembly?

5   A.   Yes.

6   Q.   And who were those students, using their initials?

7   A.   A.H. and C.W.

8   Q.   And how did you become aware that they were going to leave

9   the assembly?

10  A.   They were talking about it at lunch.

11  Q.   And did they give you a reason as to why they were going to

12  leave the assembly?

13  A.   They said if the preacher who was going to be there said

14  anything about gay people, that they were going to get up and

15  leave.

16  Q.   Did they ask you to leave the assembly?

17  A.   No, they didn't ask me.

18  Q.   Did, at some point, you decide to leave the assembly if the

19  speaker was anti-gay?

20  A.   Yes.

21  Q.   And why did you decide to do that?

22  A.   Because if he would have said anything about gays, I would

23  have got up and walked out, or left the assembly, because I

24  don't believe that I should be preached to about something like

25  that.

1    Q.   And at the time, in your mind, what was your idea as to how

2    you would leave the assembly?

3    A.   Just get up and leave peacefully.

4    Q.   And at the time were you worried that you would cause some

5    sort of disruption in the assembly?

6    A.   No.

7    Q.   Why not?

8    A.   Because people get up and walk out of assemblies all the

9    time.

10   Q.   What do you mean by that?

11   A.   Like they can get up and walk to the bathroom or something

12   like that.

13   Q.   And would you have -- I'm sorry, would you have said

14   anything as you left the assembly?

15   A.   No.

16   Q.   Did you make any plan with the students that you believed

17   would leave the assembly to all stand up, you know, in unison

18   together and walk out, or, you know, did you make any sort of

19   plan with them as to how you would leave the assembly?

20   A.   No.

21   Q.   And if you had been punished for leaving the assembly,

22   would you have been upset?

23   A.   I would have been upset, but I would have accepted it

24   because it was my own decision to walk out.

25   Q.   And did you attend the assembly?

1    A.   Yes.

2    Q.   And who was the speaker?

3    A.   A preacher.  I don't remember his name.

4    Q.   Did he say anything about gay or lesbian people?

5    A.   No.

6    Q.   Did anyone leave?

7    A.   No.

8    Q.   Did you leave the assembly?

9    A.   No.

10   Q.   And why not?

11   A.   Because he didn't say anything about gay people.

12   Q.   And earlier we were talking about your, "I Support Gays"

13   shirt that you made in September of 2007.  Did at some point in

14   September of 2007, did you wear that shirt to PDL?

15   A.   Yes.

16   Q.   And why did you decide to make that shirt?

17   A.   Well, I was --

18   Q.   I'm sorry, why did you decide to wear that shirt?

19   A.   Well, I was upset that Mr. Davis was talking -- that he was

20   telling the students that it was wrong to be gay, or it was

21   going down the wrong path, or it was against the Bible.  So I

22   made the shirt to support gays and lesbians.

23   Q.   Is there any other reason that you decided to wear the

24   shirt?

25   A.   I didn't agree with what Mr. Davis was saying.

1   Q.   And how many days did you wear the T-shirt to school?

2   A.   One.

3   Q.   Did you wear anything else along with your T-shirt to

4   express your support for gays and lesbians?

5   A.   I wore the rainbow belt of Axxxxxxx's -- of A.H.'s.

6   Q.   Could you please describe that belt?

7   A.   It was about like that big (indicating), and it had a

8   rainbow going around it.

9   Q.   Were you afraid that you -- well let me ask you, in

10  relation to the assembly, do you recall when you wore the shirt

11  and rainbow belt?

12  A.   I think it was the week after the assembly.

13  Q.   And you testified earlier that you were afraid that you

14  would be suspended, but you didn't know for sure.  Why did you

15  wear the shirt and rainbow belt if you thought that you would

16  be suspended, from what Principal Davis was saying?

17  A.   Because I wanted to show my beliefs that I supported gays

18  and lesbians, that I didn't agree with what Mr. Davis was

19  saying, and basically that was the only reason.

20  Q.   Did you on any other days in September of 2007 wear

21  anything else to support -- to express your support for gays

22  and lesbians?

23  A.   No.

24  Q.   So you wore the shirt and belt on one day in September of

25  2007.  what reaction, if any, did you get from students?

1   A.  I only had one girl tell me she liked my shirt, and then

2   she seen that it said "I Support Gays," and she asked me about

3   it, and that was it.  We had maybe a five- or ten- minute

4   conversation about it.

5   Q.  Did you have any reaction from teachers at PDL to your

6   shirt?

7   A.  I had my first period teacher, Mr. Galloway, look at it and

8   kind of laughed to hisself.

9   Q.  Did he say anything to you about your shirt?

10  A.  No.

11  Q.  And is it -- do middle schoolers and high schoolers share

12  the same set of buildings at PDL?

13  A.  Yes.

14  Q.  And you typically see middle schoolers at some point during

15  your school day?

16  A.  Only before and after school.

17  Q.  And on that day that you wore your "I Support Gays" and

18  rainbow belt to PDL, were you wearing a jacket or anything over

19  your shirt?

20  A.  I only wore a jacket second and fourth periods because of

21  the air conditioning.

22  Q.  So to the best of your recollection, were you wearing your

23  "I Support Gays" and rainbow shirt in plain view before and

24  after school in the times that you could see the middle school

25  students?

1  A.  Yes.

2  Q.  To the best of your recollection, did any of those students

3  have any reaction to your shirt?

4  A.  No.

5  Q.  Did you wear your rainbow belt any other time in September

6  of 2007?

7  A.  I wore it the two days after I wore the "I Support Gays"

8  shirt.

9  Q.  The two consecutive days?

10  A.  Yes.

11  Q.  Was there any reaction to your rainbow belt from other

12  students, whether they be high school students or middle school

13  students, to your rainbow belt?

14  A.  I had some people say they liked my belt.

15  Q.  Was there anything else?

16  A.  No.

17  Q.  Do you have any impression of Principal Davis' views

18  regarding homosexuality?

19  A.  Yes.

20      MR. FREEMAN:  I'm going to object, calls for

21  speculation.

22      MS. SUN:  I'm going to ask her her basis.

23      THE COURT:  All right, I'll allow it.

24  BY MS. SUN:

25  Q.  What's the basis of your view?

1    A.  What he had said to A.H. in the office.

2    Q.  Okay.  Let me ask you this.  How would you -- are you

3    friends with A.H.?

4    A.  Yes.

5    Q.  Do you -- how would you describe her in terms of your

6    friendship?

7    A.  We're really close.  We're like best friends, basically.

8    Q.  Do you talk to her every day?

9    A.  Yes.

10   Q.  And at the time these events were happening in September of

11   2007, did you talk to her about the -- her conversations with

12   Principal Davis?

13   A.  Yes.

14   Q.  And what is your understanding of Principal Davis' views

15   regarding homosexuality?

16          MR. FREEMAN:  Objection, calls for hearsay.

17          MS. SUN:  I think it goes to her state of mind as to

18   why she wants to wear the shirt.

19          THE COURT:  I think that's a proper hearsay objection

20   and A.H. can testify to it.

21          MS. SUN:  Okay.

22   BY MS. SUN:

23   Q.  Do you have any personal animosity towards Principal Davis?

24   A.  No.

25   Q.  Is one of your intents in wearing your T-shirts to show

1    some sort of dislike toward Principal Davis?

2    A.  No.

3    Q.  Do you think that your T-shirts are sexually suggestive in

4    any way?

5    A.  No.

6    Q.  And why not?

7    A.  Because they're just T-shirts showing equal support of gays

8    and lesbians.

9    Q.  Other than what we've talked about, is there anything that

10   you've done to show your support for gays and lesbians at PDL?

11   A.  No.

12   Q.  Is there anything besides wearing your T-shirts that you

13   plan on doing in terms of showing your support for gays and

14   lesbians at PDL?

15   A.  Only leaving the assembly.

16   Q.  But in terms of future conduct?

17   A.  No.

18   Q.  Okay.  Other than wearing your T-shirts?

19   A.  Yes.

20   Q.  Okay.  Is there a school library at PDL?

21   A.  Yes.

22   Q.  And do the middle schoolers and high schoolers share that

23   library?

24   A.  Yes.

25   Q.  Are there magazines available for students to look at in

1    the library?

2    A.   Yes.

3    Q.   Could you name some of those magazines?

4         MR. FREEMAN:  Objection, relevance.

5         THE COURT:  Overruled.

6    BY MS. SUN:

7    Q.   Go ahead.

8    A.   *Cosmogirl!, Teen Vogue*, *Seventeen*, *BMX Rider*, or something

9    like that, *Newsweek*, *Redbook*, *Woman's Day*, there's some other

10   ones that I don't remember.

11   Q.   Do students need permission from a librarian to look at the

12   magazines?

13   A.   No.

14   Q.   Where are they located in the library?

15   A.   In the back of the library on like a shelf thing.

16   Q.   You mentioned the *Teen Vogue* is available in the PDL

17   library for students to look at.  Is *Teen Vogue* a magazine that

18   you regularly look at or scan or read?

19   A.   Yes.

20   Q.   Okay.  And what's your understanding of the types of

21   articles that are generally in *Teen Vogue*?

22   A.   Dating, sex education stuff, style, stuff like that.

23   Q.   What about *Cosmogirl!*, is that a magazine that you

24   regularly look at?

25   A.   Yes.

1   Q.  And what's -- what types of articles are in *Cosmogirl!*?

2   A.  Same thing as *Teen Vogue* basically.

3   Q.  I suspect the answer will be the same for this next

4   magazine, *Seventeen*, is that magazine available at PDL?

5   A.  Yes.

6   Q.  Do you regularly look at *Seventeen*?

7   A.  Yes.

8   Q.  What types of articles are in *Seventeen*?

9   A.  Same things.

10  Q.  At some point this past school year, did you receive an

11  award in connection with this case?

12  A.  Yes.

13  Q.  And what was the award for?

14  A.  It was --

15       MR. FREEMAN:  Objection, relevance.

16       THE COURT:  Overruled.

17       THE WITNESS:  It was a certificate -- I don't know how

18  to put it -- showing my bravery, I guess, in supporting gays

19  and lesbians.

20  BY MS. SUN:

21  Q.  And do you know who gave you this award?

22  A.  The English Teachers something.

23  Q.  Okay.  Did you receive any money in connection with this

24  award?

25  A.  No.

1   Q.   Okay.  What did you get?

2   A.   I got the certificate and two books from Gloria Pipkin.

3        MS. SUN:  I have no further questions at this time.

4   Thank you, Ms. Gillman.

5                        **CROSS-EXAMINATION**

6   BY MR. FREEMAN:

7   Q.   Good morning, Ms. Gillman.

8   A.   Good morning.

9   Q.   I want to talk to you first a little bit about the T-shirts

10  that you have right in front of you there.  When did you make

11  those T-shirts?

12  A.   In April.

13  Q.   And was that prior to a deposition you gave?

14  A.   I think it was before, yes.

15  Q.   And was that -- how long before your deposition did you

16  make those T-shirts?

17  A.   Maybe a week before.

18  Q.   Okay.  And you made those in preparation for I think this

19  trial today?

20  A.   Yes.

21  Q.   So just so we're clear on this, are you saying -- you still

22  very much want to wear the symbols and slogans that are on that

23  poster, correct?

24  A.   Yes.

25  Q.   I want to talk to you a little bit about A.H., your cousin.

1    You said that you and she are very close, right?

2    A.   Yes.

3    Q.   Best friends?

4    A.   Yes.

5    Q.   So as best friends, would it be fair to say you confide in

6    one another?

7    A.   Yes.

8    Q.   Would it be fair to say that as best friends, A.H.

9    sometimes tells you things that she might not tell anybody

10   else?

11   A.   Yes.

12   Q.   You also mentioned during your direct testimony that A.H.

13   is openly gay, correct?

14   A.   Yes.

15   Q.   Now, Ponce de Leon is a small, conservative town, isn't it?

16   A.   Yes.

17   Q.   And being openly gay in a place like Ponce de Leon isn't

18   very easy, is it?

19   A.   No.

20   Q.   But you supported A.H. in her life-style because you're

21   best friends and you're cousins, right?

22   A.   Yes, and because I support gays and lesbians.

23   Q.   And I think you mentioned a student named C.W. earlier?

24   A.   Yes.

25   Q.   She is a friend of A.H. as well?

1    A.   Yes.

2    Q.   Is she a friend of yours too?

3    A.   Kind of.  We are acquaintances more.

4    Q.   And C.W., she's gay as well, right?

5    A.   Yes.

6    Q.   Now, what grade was A.H. in just this last year that just

7    ended?

8    A.   Ninth.

9    Q.   What grade was C.W. in?

10   A.   Twelfth.  Are we talking about this year?

11   Q.   We're in the summer now; the year has ended?  Or is it

12   still --

13   A.   We're still in school.

14   Q.   This year then.

15   A.   C.W. is in 12th, and A.H. is in 9th.

16   Q.   Now, in the 9th grade at Ponce de Leon, there aren't a

17   whole lot of girls who identify themselves openly as lesbians,

18   are there?

19   A.   No.

20   Q.   Or in the 12th grade for that matter?

21   A.   No.

22   Q.   So by doing that, that makes them a minority in the class,

23   correct?

24   A.   Minority?

25   Q.   Meaning there are few of them in comparison to the total

1    number of kids in class?

2    A.   Yes.

3    Q.   And when you're in the 9th grade, being in a minority group

4    can be tough, can't it?

5    A.   If you don't have people that support you.

6    Q.   Isn't it true that in the 9th grade, kids often pick on

7    kids who are different from all the rest?

8    A.   Not really.

9    Q.   As far as you know, back before September 2007,

10   notwithstanding the fact that they were in a minority group,

11   A.H. and C.W. managed to get along all right for the most part

12   at PDL, right?

13   A.   Yes.

14   Q.   Nobody was really picking on them or anything like that?

15   A.   No.

16   Q.   But that changed in September of 2007, didn't it?

17   A.   Yes.

18   Q.   And I think you touched on this earlier.  It came to your

19   attention in September of 2007 that they were having

20   problems -- that A.H. was having problems with Mr. Davis,

21   correct?

22   A.   Yes.

23   Q.   Now, when this came to your attention that A.H. was having

24   problems with Mr. Davis, was that because of her sexual

25   orientation?

1    A.   Yes.

2    Q.   And that upset you, didn't it, that they would be hassled

3    by her principal because of her sexual orientation?

4    A.   Yes.

5    Q.   And when you found that out, you told your mother about it,

6    correct?

7    A.   Yes.

8    Q.   And were you upset when you told your mother about it?

9    A.   Kind of, but not really that upset.

10   Q.   Did you tell your mother you were upset?

11   A.   Yes.

12   Q.   And shortly after you found that out, that's when you made

13   your "I Support Gays" T-shirt, correct?

14   A.   Yes.

15   Q.   And prior to that, prior to you finding out about this

16   difficulty your cousin was having with Mr. Davis, you never

17   made any kind of T-shirt like that before, correct?

18   A.   Yes.

19   Q.   You had -- I'm sorry, I asked the question poorly.  You had

20   made a T-shirt like that before or you had not?

21   A.   I had not.

22   Q.   So whatever it was that happened with Mr. Davis, that

23   motivated you to make that T-shirt and wear it to school,

24   correct?

25   A.   Yes, but I had seen some T-shirts over the summer that had

1    support for gays and lesbians on it, so I seen them, and I

2    liked them, but I couldn't find them anywhere.

3    Q.  So you had seen them over the summer, but you didn't make

4    one, say, in September -- well, actually, you did make one in

5    September.  But you had seen some over the summer, but you

6    didn't make one prior to you finding out about the difficulty

7    that A.H. had with Mr. Davis, correct?

8    A.  Yes.

9    Q.  All right.  So would it be fair to say, then, that in

10   making the T-shirt, in addition to wanting to express support

11   for gays and lesbians, you were also motivated by your

12   disagreement with what you perceived Mr. Davis had done, right?

13   A.  Yes.

14   Q.  And by wearing your T-shirt, you wanted to broadcast that

15   disagreement to other students at Ponce de Leon, correct?

16   A.  Yes.

17   Q.  So in a way, by making the T-shirt, in light of what you

18   had been told about Mr. Davis, you were standing up to him,

19   weren't you?

20   A.  Not standing up to him.  I was just putting my belief out

21   there that I thought that gays and lesbians should be accepted

22   for who they are and not have to be ridiculed by a principal,

23   or anybody.

24   Q.  But rightly or wrongly, you believed that Mr. Davis

25   perceived that issue differently, correct?

1    A.   Yes.

2    Q.   And you wanted to send a message that you disagreed with

3    him?

4    A.   Yes.

5    Q.   Now, at the beginning of every school year you're given a

6    copy of the Code of Student Conduct, correct?

7    A.   Yes.

8    Q.   And that Code of Student Conduct is put out by the Holmes

9    County School Board?

10   A.   Yes.

11   Q.   And when you received the Code of Student Conduct, you're

12   required to take a copy of it home and give it to your mother,

13   correct?

14   A.   Yes.

15   Q.   And your mother is required to sign off that she

16   acknowledged receiving it, and you have to return that form

17   back to school?

18   A.   Yes.

19   Q.   And at the beginning of every school year the teachers sit

20   the students down and they read to them the Code of Student

21   Conduct as well, correct?

22   A.   Yes.

23   Q.   So would it be fair to say that students have fair warning

24   of what's in the Student Code of Conduct?

25   A.   Yes.

1          MS. SUN:  Objection, calls for a legal conclusion.

2          THE COURT:  Overruled.

3     BY MR. FREEMAN:

4     Q.  Now within the Code of Student Conduct there's a dress

5     code, is there not?

6     A.  Yes.

7     Q.  And that dress code prohibits the wearing of body piercing

8     jewelry other than earrings, correct?

9     A.  Correct.

10    Q.  Before all this stuff happened with A.H. and C.W., there

11    was a time when you wore a nose ring to school, correct?

12         MS. SUN:  Objection, relevance, goes to -- I think

13    it's going to her character, and it's not a proper line of

14    inquiry.

15         THE COURT:  What's the relevance of the jewelry?

16         MR. FREEMAN:  Judge, if allowed a little bit of

17    leeway, I'm going to establish both bias and what her

18    motivations are in wearing what she wants to wear.

19         THE COURT:  I'll allow it, see where you go.

20    BY MR. FREEMAN:

21    Q.  All right, now, when you wore this nose ring, that was in

22    January of 2006, correct?

23    A.  Yes.

24    Q.  And when you did that, it was in violation of the dress

25    code that you had been given earlier in the year, correct?

1    A.   Yes.

2    Q.   The dress code that the students read to you -- I mean that

3    the teachers read to you at the beginning of the year?

4    A.   Yes.

5    Q.   And when you wore that nose ring to school, Mr. Davis made

6    you take it out, didn't he?

7    A.   Yes.

8    Q.   Sent you to the bathroom to take it out and then come back

9    and talk to him?

10   A.   Yes.

11   Q.   But when you went back to the bathroom -- or when you went

12   to the bathroom to take it out, you didn't take it out, did

13   you?

14   A.   No.

15   Q.   Came back to his office?

16   A.   Yes.

17   Q.   You asked him to call your mother?

18   A.   Yes.

19   Q.   And basically told him that if your mother made him -- I'm

20   sorry, if your mother told you to take it out, then you would

21   take it out, is that right?

22   A.   Yes.

23   Q.   So, when it came to the nose ring incident, you wanted to

24   stand up to Mr. Davis by not taking the nose ring out, in the

25   same way you wanted to stand up to him by wearing your "I

1   Support Gays" T-shirts, right?

2   A.  No, I didn't want to take my nose ring out because I was

3   afraid the hole would grow up and it would get infected.

4   Q.  But you knew that it was in violation of the Code of

5   Student Conduct, right?

6   A.  Yes.

7   Q.  And you knew that Principal Davis had the authority it tell

8   you to take it out because it was in violation of the Code of

9   Student Conduct, correct?

10  A.  Yes.

11  Q.  But you didn't want to take it out?

12  A.  No.

13  Q.  Now, you talked earlier about finding out -- well somebody

14  told you that there was going to be a preacher at this assembly

15  in September of 2007 who was going to tell kids that being gay

16  was wrong, or something like that, is that correct?

17  A.  Yes.

18  Q.  And when you were told this by your cousin, you agreed that

19  if that were to happen you were going to walk out of the

20  assembly, correct?

21  A.  Yes.  I came to that conclusion on my own though.

22  Q.  Well, okay, you came to the conclusion immediately after

23  your cousin told you that that was what was going to happen at

24  the assembly, correct?

25  A.  Not immediately.  I thought about it a little bit and then

1    I thought -- then I decided that I would leave the assembly.

2    Q.  But it was your cousin who told you that that was going to

3    happen?

4    A.  Yes.

5    Q.  It was your cousin who first mentioned the idea of walking

6    out to you?

7    A.  Yes.

8    Q.  Now, when you wore this "I Support Gays" T-shirt, that was

9    the same week as the assembly, correct?

10   A.  I think it was the week after, actually.

11   Q.  Did you give a deposition in this case?  In your deposition

12   did you testify that you wore the T-shirt before the assembly?

13   A.  I don't remember.

14   Q.  Do you think if I were to show you a transcript of your

15   deposition it would refresh your recollection on that point?

16   A.  Yes.

17        MR. FREEMAN:  Can I approach the witness, Your Honor?

18        THE COURT:  Yes.

19   BY MR. FREEMAN:

20   Q.  All right, I'm going to direct your attention to page 36 of

21   the deposition.

22   A.  Okay.

23   Q.  And I want you to read lines 20 through 22 on page 36.

24   A.  Which one?  There's four boxes.

25        MR. FREEMAN:  I'm sorry, can I approach the witness

1    again, Your Honor?

2          THE COURT:  Yes.

3    BY MR. FREEMAN:

4    Q.  When I say 36, I'm referring to --

5    A.  Okay.

6    Q.  And can you review for me, just to yourself, lines 20

7    through 22?

8    A.  Yes.

9    Q.  And I also want to direct your attention to page 53 of the

10   deposition.  Again, the number is on the right-hand corner of

11   the little boxes.

12   A.  Okay.

13   Q.  And can you look at lines 16 through 22?

14   A.  Yes.

15   Q.  All right, now, in your deposition did you testify that you

16   wore the T-shirt the same week as the assembly?

17          MS. SUN:  Your Honor, I believe that the deposition

18   testimony that Mr. Freeman is pointing to is about when she

19   made her T-shirt and then when she wore her T-shirts in

20   relation to suspensions.  So to the extent that it's somehow

21   being used to show impeachment, I think that it's improper.

22          THE COURT:  Mr. Freeman?

23          MR. FREEMAN:  I can ask a couple more questions, Your

24   Honor.

25

BY MR. FREEMAN:

Q.  In your deposition, did you testify that you made your T-shirt the week of the assembly but before the assembly?

A.  Yes.

Q.  Did you wear your T-shirt after you made it?

A.  After the assembly, yes.

Q.  So you made your T-shirt but you didn't -- you let it sit for a few days before you wore it?

A.  Yes.

Q.  And after this -- well, how many days after the assembly did you wear your T-shirt?

A.  The next week.

Q.  Was it the following week -- the following week, was that -- was your cousin suspended from school during that period?

A.  I think she might have been.

Q.  She might have been.  When your cousin was suspended from school, did you disagree with that decision on the part of the school?

A.  Yes.

Q.  Okay.  And so at the time that your cousin was suspended, then you made the decision to wear the "I Support Gays" T-shirt?

A.  Yes.

Q.  What was your cousin suspended for?

1   A.   I'm not sure what she was suspended for.

2   Q.   When you were having -- when all of these -- when you were

3   having these conversations with your cousin about walking out

4   of the assembly, did she mention to you -- or did she ask you

5   to wear any clothing that said "Gay Pride" or anything like

6   that?

7   A.   No.

8   Q.   Did she ask you to make any T-shirts that said "Gay Pride"

9   or anything like that?

10  A.   No.

11  Q.   Did she mention to you that she was asking other students

12  to make those kind of T-shirts?

13  A.   No.

14  Q.   Did she mention to you that she and other students were

15  making posters related to gay pride?

16  A.   No.

17  Q.   So you had this conversation with your cousin about what

18  had happened to her and C.W. with Mr. Davis, correct?

19  A.   Yes.

20  Q.   And you had this conversation about the assembly and

21  walking out of the assembly, correct?

22  A.   Yes.

23  Q.   These were all generally within the same week or so --

24  A.   Yes.

25  Q.   -- time period?  But during those conversations, she never

1    mentioned anything about other students in her class wearing

2    "Gay Pride" T-shirts or anything like that?

3    A.   No.

4    Q.   This is your cousin who confides in you?

5    A.   Yes.

6    Q.   Tells you things she wouldn't tell other people?

7    A.   Yes.

8    Q.   She never mentioned that, though?

9    A.   No.

10   Q.   Now, it was shortly after this conversation -- I mean

11   shortly after your cousin was suspended that you contacted the

12   ACLU, right?

13   A.   Yes.

14   Q.   And shortly after that the ACLU became your attorneys in

15   this case?

16   A.   Yes.

17   Q.   Be fair to say you contacted the ACL because you disagreed

18   with what Mr. Davis did, suspending your cousin?

19   A.   Yes.

20        THE COURT:  Mr. Freeman, I'm not particularly

21   interested in how and why she contacted the ACLU.

22        MR. FREEMAN:  Yes, sir.

23   BY MR. FREEMAN:

24   Q.   You mentioned earlier that middle school students mix with

25   high school students, correct, sometimes, at school?

1    A.   Before and after school, yes.

2    Q.   Do middle school students and high school students mix on

3    the bus going to school and from school as well?

4    A.   Yes.

5    Q.   And on the bus going to and from school at Ponce de Leon,

6    it's not just middle school and high school students who are on

7    the bus; elementary school students are on the bus as well,

8    correct?

9    A.   Yes.

10   Q.   So sometimes on the bus you can have kids as young as six

11   or seven on the same bus with kids as old as 16 or 17, right?

12   A.   Yes.

13   Q.   And you mentioned that you wore your -- when you wore your

14   "I Support Gays" T-shirt, that you came into some sort of

15   contact or some sort of interaction with middle school students

16   that day, correct?

17   A.   Yes.

18   Q.   Was that at the beginning or the end of the day?

19   A.   The end of the day.

20   Q.   Did you attend any classes with any middle school students

21   that day?

22   A.   No.

23   Q.   Because the high school students don't attend classes with

24   middle schoolers, do they?

25   A.   No.

1    Q.  So if you had any interaction with the middle school

2    students, it would have been relatively brief in comparison to

3    the entire school day, correct?

4    A.  Yes.

5    Q.  I want to talk to you a little bit about Plaintiff's

6    Exhibit 2, which has already been put into evidence.  Can you

7    see that okay?

8    A.  Uh-huh.

9    Q.  Or I guess look it up in your notebook there, Plaintiff's

10   Exhibit 2, please.  I want to direct your attention back to

11   some language that you discussed earlier on your direct exam,

12   the sentence that starts with, "We seek permission for and on

13   behalf of Axxxxxxx and Heather to express themselves through

14   the following phrases, symbols or images, (1) printed on a

15   T-shirt, belt, armband, button, bracelet or another article of

16   clothing or accessory, (2) written, tattooed," et cetera,

17   et cetera.

18        Would it be fair to say if you're allowed, if the judge

19   orders it, that you're going to wear the signs and symbols and

20   slogans that are in this letter to Ponce de Leon?

21   A.  Yes.

22   Q.  Would it be fair to say that you are going to wear them at

23   Ponce de Leon in the manner set out in that letter?

24        MS. SUN:  Objection, compound and vague.

25        THE COURT:  Overruled.

1          THE WITNESS:  What was the question?

2     BY MR. FREEMAN:

3     Q.  Would it be fair to say that you're going to wear those

4     signs, symbols and slogans in the manner that's set out in that

5     letter?

6     A.  Yes.

7     Q.  That would include tattooing them on your body?

8     A.  Maybe not tattooing.

9     Q.  Okay, but writing them on your body?

10    A.  Yes.

11    Q.  That would include writing them on your arm?

12    A.  Yes.

13    Q.  And other places on your body?

14    A.  Yes.

15    Q.  During the week around the time that this assembly

16    occurred, you were aware that there were other students writing

17    "Gay Pride" symbols and slogans on their body, correct?

18    A.  No.

19    Q.  You were not aware of that?

20    A.  No.

21    Q.  Did you see any kids with "GP" written on their hand?

22    A.  I saw maybe one or two kids.

23    Q.  Did you understand "GP" to mean "Gay Pride"?

24    A.  I was told it was Gxxxxxx Pxxxxxx.

25    Q.  All right.  Would it be fair to say that -- oh, I'm

1    sorry -- at Ponce de Leon, students aren't allowed to paint

2    their faces, are they?

3    A.   Yes, like for pep rallies and stuff they are.

4    Q.   Let me ask the question more precisely.  With the

5    exception -- with certain exceptions like pep rallies,

6    generally speaking, students aren't allowed to paint their

7    faces, is that right?

8    A.   Not paint their faces.  I've seen students walk around with

9    writing on their faces from pens and stuff.

10   Q.   Writing on there their faces?

11   A.   Yes.

12   Q.   Now as far as you know, is writing on your face permitted

13   at Ponce de Leon?

14   A.   Yes.

15   Q.   Okay.  Okay.  And if the judge grants your order -- I mean

16   grants your request in this case, can we infer from that that

17   you would be willing to write these slogans on your face or

18   your head as well?

19   A.   Yes, I guess.

20   Q.   Okay, fair enough.  And a student with these symbols or

21   slogans written on their head or face that rides the bus, that

22   student would potentially interact with elementary school

23   students, correct?

24   A.   Yes.

25   Q.   I want to talk to you a little bit about the award that you

1  were given.  You said that you were given a couple of books?

2  A.  Yes.

3  Q.  By a woman named Gloria Pipkin?

4  A.  Yes.

5  Q.  What were the names of those books?

6  A.  I do not remember the names of the books.

7  Q.  And who nominated you for that award?

8  A.  I don't know.

9  Q.  Don't know.  Okay.  I don't have anything further.

10          THE COURT:  Redirect?

11          MS. SUN:  Nothing further.

12          THE COURT:  All right, let's take our midmorning break

13  for 15 minutes.

14          Counsel, when you bring your witnesses in, I'm going

15  to deputize you and give you the responsibility of making sure

16  that they get up close to that microphone.  They are generally

17  looking in that direction.  So if they're close to that mike,

18  it helps those of us in the background.  And I think it's

19  better that you remind them rather than me and I give heart

20  failure.

21          Okay, 15 minutes?

22      **(Recess from 10:35 a.m. until 10:52 a.m.)**

23          THE COURT:  All right, ready with your next witness?

24          MR. BEENEY:  We are, Your Honor.  Call student C.W.,

25  and with Your Honor's permission, she will be examined by

1    Ms. Miller.

2              DEPUTY CLERK:  Please raise your right hand.

3         **C.W., PLAINTIFF WITNESS, DULY SWORN.**

4              DEPUTY CLERK:  You may be seated.  Please state your

5    full name and spell your last name for the record.

6              MS. MILLER:  I'm sorry, do we still want her to state

7    her full name for the record, Your Honor?

8              DEPUTY CLERK:  Sorry.

9              MS. MILLER:  Just in keeping with Your Honor's

10   protective order in this case, I'm going to refer to this

11   witness as C.W., or Miss W.

12                       **DIRECT EXAMINATION**

13   BY MS. MILLER:

14   Q.  Miss W., as much as you can when you're talking about

15   students in any of your answers, if you could use their

16   initials.  I know that's kind of hard, but as much as you can,

17   try to refer to people, students, as -- by their initials, if

18   that's okay.

19   A.  (Nods affirmatively.)

20   Q.  And you've got a microphone right in front of you.  I would

21   like you to sit as close as possible to it so we all can hear

22   you.

23        Are you okay?  Are you sure?  This is going to be real

24   quick, it's going to be real easy, and I'm not going to ask you

25   anything that's going to upset you or anything like that.

1   Nobody here wants to upset you.  We're just going it talk about

2   a couple of things that happened last September at school and

3   then we're going to get you right out of here.

4       Your Honor, can I have a minute or two to talk --

5           THE COURT:  Sure.

6       **(Pause)**

7   BY MS. MILLER:

8   Q.  Again, we're just going to have a few questions and then

9   Ms. Dincman is going to ask you a few questions and then we're

10  going to be all done, and again, just talk as close to the mike

11  as you can so we can hear you.

12      I'm Maura Miller, and I represent Heather Gillman, who is

13  the plaintiff in this case.  Miss W., are you a student at

14  Ponce De Leon High School?

15  A.  Yes, ma'am.

16  Q.  And what grade are you in?

17  A.  A senior, I'm in 12th.

18  Q.  And how old are you?

19  A.  Seventeen.

20  Q.  And I'm going to talk to you about some matters that arose

21  at Ponce de Leon in September of 2007.  Okay?

22  A.  Yes, ma'am.

23  Q.  In September of 2007, do you recall having a conversation

24  with a teacher's aide named Christa Harris?

25  A.  Yes, ma'am.

1    Q.  And what was that conversation about?

2    A.  I had gotten upset at lunch because the middle school girls

3    made fun of gay people, and I was telling Ms. Harris about it,

4    and I told her that I was gay too, and then I told her that --

5    why it upset me and I thought that I should tell her because

6    she was one of the teachers' aides and so I told her.

7    Q.  And you told Ms. Harris about your sexual orientation

8    because you wanted to explain why you were upset?

9    A.  Yes, ma'am.

10   Q.  Okay.  Is there anything else you recall about that

11   conversation with Ms. Harris?

12   A.  No, ma'am.

13   Q.  Okay.  Do you know if Ms. Harris told anyone about your

14   conversation with her?

15   A.  Mr. Davis.

16   Q.  Okay.  You mean Principal Davis?

17   A.  Yes, ma'am.

18   Q.  How do you know that Ms. Harris told Principal Davis about

19   your conversation with her?

20   A.  Because Mr. Davis called me in his office and he told me.

21   Q.  He told you that Ms. Harris told you about your

22   conversation?

23   A.  Yes, ma'am.

24   Q.  Did Principal Davis ask you any questions about the girls

25   who were teasing you?

1    A.   He asked -- the only question he asked about them was who

2    they was, and I told him I didn't know.

3    Q.   Did he ask you any other questions?

4    A.   He asked me -- he called me in there, he asked if I had a

5    conversation with Ms. Harris and told her that I was gay, and I

6    said, "Yes, sir," and he asked me if I was, and I didn't know I

7    couldn't answer him -- didn't have to, so I told him, "Yes,

8    sir."

9    Q.   What did Principal Davis say when you told him you were

10   gay?

11   A.   That it wasn't right to be gay.  And he threatened to -- he

12   asked if my parents knew about the situation, and I said, "No,

13   sir," and he threatened to call my parents, and asked for the

14   telephone number.

15   Q.   He asked for your parents' telephone number?

16   A.   Yes, ma'am.

17   Q.   Did he tell you anything else about what you could or

18   couldn't do at school?

19   A.   Yes.  If I was around any middle school girls I would be

20   suspended from school.

21   Q.   Okay.  How did you react to what Principal Davis told you?

22   A.   Well, I started crying because it was pretty upsetting.

23   Q.   Do you know if Principal Davis investigated any of the

24   people that were teasing you?

25   A.   Probably not because I didn't know who it was.

1  Q.  Were you still upset when you left Principal Davis' office?

2  A.  Yes, ma'am.  And I talked to Ms. Godwin and I told her

3  that -- my conversation with Mr. Davis.

4  Q.  Who is Ms. Godwin?

5  A.  She's like a teacher's aide, I guess you could say.

6  Q.  Did you talk to Ms. Godwin right after you left Principal

7  Davis' office?

8  A.  Yes, ma'am, on the way to the buses.

9  Q.  So your meeting with Principal Davis was at the end of

10  school?

11  A.  Yes, ma'am.

12  Q.  And then you left his office?

13  A.  Yes, ma'am.

14  Q.  And then you ran into Ms. Godwin?

15  A.  Yes, ma'am.  She was wanting to know why I was upset, why I

16  was crying.

17  Q.  What did you tell her?

18  A.  My conversation with Mr. Davis about that he said it wasn't

19  right to be gay and he was going to tell my parents.

20  Q.  Did you tell anybody else about what Principal Davis said

21  to you?

22  A.  A.H.

23  Q.  Were you at school the day after you met with Principal

24  Davis?

25  A.  No, ma'am.  I was out that day.

1    Q.   Why were you out?

2    A.   My sister had surgery.

3    Q.   Okay.  When you returned to school after your sister's

4    surgery, did you pick out that there were some students there

5    showing support for equal rights for gays and lesbians?

6    A.   Tell me that again please.

7    Q.   Sure.  When you returned to school, after your sister's

8    surgery -- so when was that?

9    A.   It would be that Wednesday.

10   Q.   Okay.  And did you find out that there were some students

11   at school who were showing support for equal rights for gays

12   and lesbians?

13   A.   Yes, sir.

14   Q.   How did you find out about that?

15   A.   Well, A.H. told me.  Sorry.  I'm trying to think of the

16   initials.  V.L. said she had made signs and her brother, J.L.,

17   made signs too.  People made signs about it and wrote like "GP"

18   on their hands.

19   Q.   Did you see any signs at school with slogans supporting

20   equal rights for gays and lesbians?

21   A.   No, ma'am, I never saw any signs.

22   Q.   Did you see students with "GP" on their hand?

23   A.   Yes, ma'am.

24   Q.   About how many students did you see with "GP" on their

25   hands?

1   A.  About like half the school, because it was like a bunch of

2   people.

3   Q.  Are you sure it was half the school or --

4           MS. DINCMAN:  Objection.

5           THE COURT:  Overruled.

6   BY MS. MILLER:

7   Q.  Did you see the whole school that day?

8   A.  Yes, ma'am.

9   Q.  And about half the school had "GP" on their hands?

10  A.  Yes, ma'am, because it was a lot of people.

11  Q.  What does "GP" stand for?

12  A.  "Gay Pride."

13  Q.  Did you see any students putting symbols that were

14  supportive of equal rights for gays and lesbians on their

15  clothing?

16  A.  Some had made T-shirts, like two or three.

17  Q.  Two or three students?

18  A.  Yes, ma'am.

19  Q.  In September of 2007, did you hear any students yelling

20  "Gay Pride" in the hallways at Ponce de Leon?

21  A.  I've heard it like once, and I don't know exactly how many

22  times I heard it, but I had heard it.

23  Q.  When you say yelling or shouting, about how loud do you

24  mean?

25  A.  Louder than your normal tone, but not like screaming it.

1    Q.   In September of 2007, did you hear any students yelling

2    "Gay Pride" in classes?

3    A.   No, ma'am.

4    Q.   Are the hallways at Ponce de Leon normally pretty loud?

5    A.   It varies day from time.

6    Q.   Sometimes they're pretty loud?

7    A.   Yes, ma'am.

8    Q.   Do students argue with each other at Ponce de Leon?

9    A.   Everyday occurrence.

10   Q.   They argue in the hallways?

11   A.   Yes, ma'am, always, classrooms, it doesn't really matter.

12   Q.   Did you hear about any students who were planning to leave

13   an assembly around September 12th, 2007?

14   A.   Yes, ma'am, because they thought that a preacher was coming

15   to talk to us about being gay, like gay morals and stuff like

16   that.  But it turns out that's not what it was and nobody

17   walked out or said anything about it.

18   Q.   So the assembly was held?

19   A.   Yes, ma'am.

20   Q.   And did any students walk out of that assembly?

21   A.   No, ma'am.

22   Q.   Miss W., did you ever hear about a gay movement at Ponce de

23   Leon in September of 2007?

24   A.   No, ma'am.

25   Q.   Was there like a group of people that you could join or --

1    to support gay rights?

2    A.   No, ma'am, there's nothing to join.

3    Q.   Sorry, I didn't hear you.

4    A.   No, ma'am, there's nothing to join.

5    Q.   Can you tell me what happened later in September 2007 when

6    you were called into Principal Davis' office with some other

7    kids?

8    A.   We was told that we was being suspended.  We really didn't

9    get the gist that we was being suspended until the end of it

10   because he used a lot of big words, whatever, so we didn't

11   understand.

12   Q.   Okay, so today do you know why you were suspended?

13   A.   To be honest with you, no, ma'am.

14   Q.   Is there a binder up there?  It says Plaintiff's Exhibits.

15   A.   This one?

16   Q.   Could you turn to tab 1, to the binder in front of you?

17   Will you look it over, and let me know when you're done?

18   A.   The suspension letter, right.

19   Q.   So you recognize this document?

20   A.   Yes, ma'am.

21        MS. MILLER:  Your Honor, I would like to submit this

22   document as Plaintiff's Exhibit 1.

23        MS. DINCMAN:  No objection.

24        THE COURT:  It will be admitted.

25        **(Plaintiff Exhibit No. 1 received in evidence.)**

BY MS. MILLER:

Q.  In the middle of that document there's two numbers.

A.  Yes, ma'am.

Q.  Could you read those to yourself?  Does that help explain to you why you were suspended?

A.  Honestly, no.

Q.  Would you mind reading what it says there?

A.  One, illegal organizing; two, disruption of the educational process.

Q.  So that says why the school says you were suspended?

A.  Yes.

Q.  Why do you think you were suspended?

A.  I have no idea.  I guess because Mr. Davis just doesn't like me.

Q.  Did Principal Davis say anything to you during that meeting when you were suspended?

A.  He asked me in front of everybody in there, he asked me if I was gay, and I said, "Yes, sir."  And he raised his voice and he's like, "No, I didn't," and I was just like okay, and just sat back because I didn't want to get in trouble.

Q.  And Miss W., based on your experience, what's your impression of what Principal Davis thinks of homosexuals?

        MS. DINCMAN:  Objection, calls for speculation.

        THE COURT:  Overruled.

        MS. MILLER:  Entirely based on her own actual

1   experience of meetings and conversations with Principal Davis.

2            MS. DINCMAN:  And lack of foundation.

3            THE COURT:  Overruled.

4   BY MS. MILLER:

5   Q.  You can answer the question.

6   A.  He doesn't like gay people and they shouldn't be around at

7   school, kind of like they're the scum of the earth.

8   Q.  Pardon?

9   A.  Kind of like they're the scum of the earth, they shouldn't

10  be in the school or around him.

11           MS. MILLER:  That's all I have.

12                       **CROSS-EXAMINATION**

13  BY MS. DINCMAN:

14  Q.  Good morning, Ms. Wxxx, I'm the attorney for the Holmes

15  County School Board.  How you doing?

16  A.  Not too good.

17  Q.  All right, well, we'll be fast.  I just want to clarify,

18  you're a senior at Ponce de Leon, right?

19  A.  Yes, ma'am.

20  Q.  And you're age 17.  Ponce de Leon is a mixed school in the

21  sense that it has both middle and high school, is that correct?

22  A.  Yes, ma'am.

23  Q.  And what grade -- what ages does that cover?

24  A.  Sixth through 12th.

25  Q.  And how old is a 6th grader?  Do you know?

1    A.   Usually around 11 or 12.

2    Q.   Eleven or 12?

3    A.   Yes, ma'am.

4    Q.   And then seniors are what, 17 or 18 years old?

5    A.   Seventeen to 19, yes, ma'am.

6    Q.   And your middle school and high school are in the same

7    building, right?

8    A.   Yes, ma'am.

9    Q.   And if I understand correctly, you've got an elementary

10   school on the property but in a different building?

11   A.   Kind of.  They're like down the hill.

12   Q.   It's right next door, but down the hill just a little bit?

13   A.   Yes, ma'am.

14   Q.   Now, on the day that you talked with Chrissy Harris, the

15   teacher's aide, you had had an argument with five middle school

16   girls at lunch, is that correct?

17   A.   It was a group of girls.  I'm not sure how many, but, yes,

18   ma'am.

19   Q.   Would you say more than five?

20   A.   About that, yes, ma'am.

21   Q.   And what grade were those girls?

22   A.   Middle school.

23   Q.   Do you have any idea how old they were?

24   A.   Probably about 7th or 8th graders.

25   Q.   And when you had that fight, angry words were used, right?

1    A.   Yes, ma'am.

2    Q.   They were laughing and pointing and you went over to them

3    and said, "What's your problem?"  Is that correct?

4    A.   Yes, ma'am.

5    Q.   And then an argument began after that?

6    A.   Yes, ma'am.

7    Q.   And after that you were so angry that you went outside and

8    hit the wall with your hand?

9    A.   Yes, ma'am.

10   Q.   And that argument was over gay or lesbian and their views

11   about gays and lesbians, right?

12   A.   Not really their views as them picking.

13   Q.   After you had gone up to them and said, "What's your

14   problem?"

15   A.   Yes, ma'am.

16   Q.   And when I say the "Gay Pride Events," do you know what I'm

17   talking about?

18   A.   No.

19   Q.   Isn't that what students called what was going on in

20   September 2007, "Gay Pride"?

21   A.   I guess so, yes, ma'am.

22   Q.   And that argument that you had, that was really before any

23   of the gay pride stuff began, right?

24   A.   Yes, ma'am.

25   Q.   When you talked to Chrissy Harris, she didn't ask you any

1    type of question about your sexual orientation, did she?

2    A.   No, ma'am.

3    Q.   You offered that to her?

4    A.   Yes, ma'am.

5    Q.   And in fact she was helpful to you, wasn't she?

6    A.   She was, yes, ma'am.

7    Q.   And didn't she ask you who the girls were that were picking

8    on you?

9    A.   And I didn't know.

10   Q.   You didn't know the names of them?

11   A.   (Indicates negatively.)

12   Q.   When you went to meet with Principal Davis, you didn't give

13   Principal Davis the names of the girls who were picking on you?

14   A.   No, ma'am, because I didn't know.

15   Q.   You didn't -- after you had that argument, you didn't

16   report it to anybody who worked in the lunchroom, did you?

17   A.   No, ma'am.

18   Q.   And you didn't independently go and -- to the

19   administration and report it, did you?

20   A.   No, ma'am.

21   Q.   And when you met with Principal Davis, that was the

22   following Monday, right?

23   A.   Yes, ma'am.

24   Q.   And Assistant Principal Jones was in the room too?

25   A.   Yes, ma'am.

1    Q.   That whole meeting lasted less than ten minutes?

2    A.   Yes, ma'am, because it was the end of school.

3    Q.   And Principal Davis took notes, didn't he?

4    A.   Most of it, yes, ma'am.

5    Q.   And was that his normal practice every time you went in

6    there that he would take notes?

7    A.   He writes some things down but not all.

8    Q.   How do you know that?  Have you ever seen his notes?  You

9    haven't ever looked at his notes, have you?

10   A.   You can tell when you're talking because he writes down

11   something, and when he talks more, he's sitting there

12   listening, and when he talks more, sometimes he writes

13   different things down, like just writes.

14   Q.   You don't have any way of knowing if he supplements those

15   notes afterwards, do you?

16   A.   No, ma'am, I've never looked at them.

17   Q.   During that meeting, Davis didn't say anything to you about

18   religion, did he?

19   A.   No, ma'am.

20   Q.   He didn't use any type of profanity, did he?

21   A.   No, ma'am.

22   Q.   No curse words?

23   A.   No, ma'am.

24   Q.   He didn't yell at you?

25   A.   No, ma'am.

1    Q.  And isn't it true during that meeting that Davis told you

2    that he had received reports that there was kissing and

3    inappropriate contact going on between students in the

4    bathrooms?

5    A.  No, ma'am.

6    Q.  Didn't say that at all to you?

7    A.  No, ma'am.

8    Q.  Didn't tell you that you ought to stay away from the middle

9    school students in the context of hugging and kissing and

10   touching in the bathrooms?

11   A.  He said to stay away from middle school girls, that's

12   exactly what he said.

13   Q.  When you left that meeting, you were not in fact suspended,

14   were you?

15   A.  No, ma'am.

16   Q.  And you were out the next day because your sister had

17   surgery?

18   A.  Yes, ma'am.

19   Q.  And when you got back to school, lots of people came up to

20   you to tell you the things that they had been doing?

21   A.  Yes, ma'am.

22   Q.  And way more than 20 people had written "Gay Pride" on

23   their hands?

24   A.  Yes, ma'am.

25   Q.  You think it was half the school had written stuff on their

1    hands?

2    A.   Yes, ma'am.

3    Q.   And was -- based on your perception of what was going on in

4    the school, was it -- was the talk of it all over the school?

5    A.   Yes, ma'am, pretty much.

6    Q.   Everybody was buzzing?

7    A.   That's something to talk about, so yes, ma'am.

8    Q.   And after this lawsuit was filed, you had seen students

9    arguing, is that correct, about gay rights?

10   A.   I've already gotten into arguments.

11   Q.   Oh, you have.  You've gotten into two arguments with

12   another student, C.S., over this lawsuit and gay rights, is

13   that correct?

14   A.   Yes, ma'am.

15   Q.   And one of those happened in the library, am I right?

16   A.   Yes, ma'am.

17   Q.   And you take a middle school student around during some of

18   his classes; he's a disabled student; is that correct?

19   A.   Yes, ma'am.

20   Q.   And on that particular day that the library argument

21   happened, you had taken him to the library when it was his P.E.

22   class time, am I right about that?

23   A.   Yes, ma'am, that's normally what we do.

24   Q.   That's part of his class time?

25   A.   Yes, ma'am.

1   Q.  And when you went in there, students were in the library,

2   working, reading, typing?

3   A.  Yes, ma'am.

4   Q.  And you got into an argument with C.S. over the lawsuit and

5   gay rights?

6   A.  Over the lawsuit, yes, ma'am.

7   Q.  And people stopped what they were doing while you were

8   having that argument and watched the two of you argue?

9   A.  Yes, ma'am.

10  Q.  And you think that argument -- how long you think it

11  lasted?  About five minutes?

12  A.  Probably about that, because Ms. English came over there

13  and broke it up.

14  Q.  Oh, Ms. English came and broke it up; a teacher had to

15  intervene, stop the argument?

16  A.  Librarian.  She just said, "That's enough," and took me out

17  there to calm me down.

18  Q.  She had to calm you down; you were really upset?

19  A.  Yes, ma'am.

20  Q.  And this same student, C.S., you've gotten in a second

21  argument with her since the lawsuit has been filed over this

22  lawsuit, the issues raised in lawsuit, is that correct?

23  A.  Yes, ma'am.

24  Q.  And it happened during the middle of the class, is that

25  right?

1    A.   Yes, ma'am.

2    Q.   Your first period class?

3    A.   Yes, ma'am.

4    Q.   And what was the class working on while you were having

5    that argument with C.S.?

6    A.   I think we was just working on our section, but everybody

7    was talking anyway.

8    Q.   Working on sections, is that like a work book that you do

9    after the teacher is finished talking?

10   A.   No, ma'am.  He just comes in and tells us, usually after

11   our notes are done, next day he tells us to work on section

12   assessments.

13   Q.   What's a section assessment?  Is that like a homework

14   assignment that you have to look at?

15   A.   Review in the back of the book after you finish each

16   section of a chapter and we just write it down.

17   Q.   But you're supposed to be working on that during that time

18   because that's what the teacher's told you to do, correct?

19   A.   Yes, ma'am.

20   Q.   And there was another teacher in the classroom when that

21   occurred, correct?

22   A.   Ms. Hudson.

23   Q.   Ms. Hudson.  And Ms. Hudson had to tell you and C.S. to

24   stop arguing with each other?

25   A.   Yes, ma'am.

1  Q.  And C.S. didn't stop arguing; it kept going on for a little

2  while?

3  A.  Yes, ma'am.

4  Q.  And you know who A.H. is?

5  A.  Yes, ma'am.

6  Q.  You know who I'm referring to when I say A.H.?

7  A.  Yes, ma'am.

8  Q.  And when all of the gay pride stuff was going in September

9  of 2007, isn't it true that you got into a fight with A.H.?

10  A.  Not in September.

11  Q.  You didn't get in any fight with her during September?

12  A.  Not September, no, ma'am.

13  Q.  Over girlfriends, no fight like that?

14  A.  No, ma'am.

15  Q.  After that, have you gotten in a fist fight with A.H. since

16  that time?

17      MS. MILLER:  Objection, Your Honor, relevance.

18      THE COURT:  Overruled.

19      THE WITNESS:  I'm sorry.

20  BY MS. DINCMAN:

21  Q.  You were fighting over liking the same girl, is that

22  correct?

23  A.  No, ma'am.  We got into in a fight over something else.

24  Q.  Really.  What was that something else?

25  A.  The fact that I was told that she helped get me suspended

1    the first time when I got suspended, and she called me up at my

2    house and said that she was going to kick my tail.  So I went

3    to school the next day and we got in a fight.

4    Q.  About the fact that she had gotten you suspended in

5    relation to this?

6    A.  Yes, ma'am.

7    Q.  Okay.  And she called you up at the house and said she was

8    going to beat you up?

9    A.  Yes, ma'am.

10   Q.  And you jumped on her, right?

11   A.  Yes, ma'am, I did.

12   Q.  Did you knock her unconscious?

13   A.  To be honest with you, I have no idea.  I got up and I was

14   took straight to the office.

15   Q.  Don't know what the aftermath was?

16   A.  Only what people told me and they said that she was kind of

17   beat up, and I felt bad about it.

18   Q.  But you're still not friends with her?

19   A.  No, ma'am, but I did apologize to her.  I asked Mr. Jones

20   to call her in the office so I could apologize.

21   Q.  Okay.  And A.H. has told you that she had gotten in trouble

22   in the past for hanging out in the bathroom waiting on a middle

23   school girlfriend, B.A., is that correct?

24   A.  Waiting on B.A., but she didn't call her "a middle school

25   girlfriend."

1    Q.  You don't know for a fact whether B.A. is her middle school

2    girlfriend?

3    A.  Right.

4    Q.  And A.H. is a high school student, right?

5    A.  Yes, ma'am, 9th grade.

6    Q.  And I just want to understand some of the things that

7    you've talked about with Mr. Davis.  You didn't tell students

8    that Mr. Davis had suspended you when in fact he hadn't?

9    A.  I did not tell students that.  In fact the day that I got

10   back, some students asked me, and I straightened it out and

11   explained that I did not.

12   Q.  That you didn't allow any students to labor under this

13   false assumption that he had suspended you?

14   A.  Right.

15   Q.  And you didn't tell anybody that a preacher was coming and

16   that he was going to talk about how it was immoral to be gay?

17   You didn't do that?

18   A.  No, ma'am, I got told.

19   Q.  Who told you that?  Use the initials please.

20   A.  A.H. and T.N.

21   Q.  A.H. and T.L.?

22   A.  T.N., and like a bunch of other people, but I have no idea

23   what their names are.

24   Q.  T.N. is a middle school student?

25   A.  No, ma'am, high school.

1   Q.   You didn't tell students that they should stand up and yell

2   and walk out of assembly if the preacher said anything about

3   being gay?

4   A.   No, ma'am.

5   Q.   And you didn't plan on doing that, did you?

6   A.   Well, if he was talking about gay people, yes, ma'am, I was

7   going to walk out.

8   Q.   You were going to stand up and yell "Gay Pride"?

9   A.   I wasn't going to yell.  I was going to walk out.

10  Q.   And you didn't tell anybody to make a T-shirt and wear it

11  to school?

12  A.   No, ma'am.

13  Q.   You didn't call people at home and tell them, this is what

14  you ought to do, you need to wear a T-shirt, you need to write

15  on yourself, anything like that?

16  A.   No, ma'am, everybody did that by themselves.

17  Q.   No prompting from you?

18  A.   No, ma'am.

19  Q.   And you didn't tell anybody to make signs and post them

20  around the school?

21  A.   No, ma'am, I never seen any signs.

22  Q.   And you didn't make any signs yourself?

23  A.   No, ma'am, because I never seen any.

24  Q.   You didn't tell the students to do anything that might

25  disrupt the school?

1   A.  No, ma'am.

2   Q.  And in fact, you told Mr. Davis you didn't have anything at

3   all to do with the whole gay pride thing?

4   A.  I did tell him that.

5   Q.  And that's true you didn't have anything to do with it, did

6   you?

7   A.  No, ma'am, I didn't.

8         MS. DINCMAN:  All right, I don't have any other

9   questions.

10        MS. MILLER:  I have a couple questions, Your Honor.

11                    **REDIRECT EXAMINATION**

12  BY MS. MILLER:

13  Q.  Regarding the incident in September where the middle school

14  girls were teasing you -- remember that?

15  A.  Yes, ma'am.

16  Q.  Were you wearing any clothing with any symbols or phrases

17  supportive of gay rights on it?

18  A.  No, ma'am.

19  Q.  Did you have anything like on your hands that had a symbol

20  that supported gay rights on it?

21  A.  No, ma'am, I don't wear anything like that to school.

22  Q.  You've never worn anything like that to school?

23  A.  No, ma'am.

24  Q.  We talked before about how students are -- can be talking

25  loudly in the library -- in the hallways, correct?

1    A.   Yes, ma'am.

2    Q.   And we talked before about how students can be talking and

3    arguing right in the middle of class, correct?

4    A.   Yes, ma'am.

5    Q.   Is that same thing true in the library?  Do students talk

6    loudly and argue loudly in the library as well?

7    A.   Yes, ma'am, sometimes they do.

8    Q.   We talked about -- or you talked with Ms. Dincman about a

9    disagreement that you had with a student named C.S.  When that

10   fight in the library happened with C.S., who started it?

11   A.   C.S. did.

12   Q.   And what happened at the end of that fight?

13   A.   Ms. English took me out in the hallway and she calmed me

14   down and talked me into going and talking to Mr. Jones.

15   Q.   Anything happen to C.S.?

16   A.   Mr. Jones said he would talk to her.

17   Q.   Same thing, you had another fight with C.S. while you were

18   in a class?

19   A.   Yes, ma'am.

20   Q.   Who started that?

21   A.   Again, she did.

22   Q.   Okay.  And was C.S. punished after that fight?

23   A.   Mr. Jones again said he would talk with her.

24   Q.   Do you know if Mr. Jones spoke with her about either of

25   those incidents?

1    A.   No, ma'am, but I'm pretty sure he did because he told me he

2    would.

3    Q.   But you don't know if he did?

4    A.   No, ma'am.

5    Q.   We also talked about -- you also talked with Ms. Dincman

6    about a fight that you had with A.H. in January of 2008,

7    correct?

8    A.   Yes, ma'am.

9    Q.   And after you had that fight with A.H., where you, quote,

10   unquote, as Ms. Dincman said, "jumped on her," were you

11   punished?

12   A.   I got three days' suspension and then she pressed charges,

13   so I got ten hours -- no, 20 hours' community service and a

14   200-word essay.

15   Q.   But the school punishment that you received for harming

16   A.H. at school was three days, is that correct?

17   A.   Yes, ma'am.

18   Q.   Okay.  And how many days were you suspended in September of

19   2007 for allegedly being involved in the gay pride movement?

20   A.   I was given five days.

21             MS. MILLER:  Thank you so much.

22             THE WITNESS:  Yes, ma'am.

23             THE COURT:  Ma'am, you may step down.

24             MR. BEENEY:  Thank you, Your Honor.  The plaintiff's

25   next witness is Principal David Davis.

1          Your Honor, I'm placing Mr. Davis' deposition up here.

2          DEPUTY CLERK:  Please raise your right hand.

3     **DAVID HILTON DAVIS, PLAINTIFF WITNESS, DULY SWORN.**

4          DEPUTY CLERK:  You may be seated.  Please state your

5     full name and spell your last name for the record.

6          THE WITNESS:  David Hilton Davis, D-A-V-I-S.

7                         **DIRECT EXAMINATION**

8     BY MR. BEENEY:

9     Q.  Good morning, sir.  Mr. Davis, we have not met.  My name is

10    Gary Beeney and I represent Heather Gillman.

11    A.  Good morning, sir.

12    Q.  Sir, where are you currently employed?

13    A.  Holmes County School Board.

14    Q.  And what's your position?

15    A.  Principal of Ponce de Leon High School.

16    Q.  And you've held that role as principal of -- can we refer

17    to it as PDL?

18    A.  Yes.

19    Q.  Save some of our court reporter's typing fingers there.

20         PDL, you've been principal at PDL for about a year?

21    A.  Yes, a year and three months.

22    Q.  What did you do before that, sir?

23    A.  Assistant principal for about the same length of time.

24    Q.  And before that?

25    A.  I was teaching at the high school there, I think for about

1   four or five years.

2   Q.  And you're an employee of the Holmes County School Board?

3   A.  Yes.

4   Q.  And you've been with the Board for about 12 years?

5   A.  Yes.

6   Q.  Now, would you agree with me, sir, that you and the Board

7   are intricately connected?

8   A.  I would agree with that, yes, sir.

9            MS. DINCMAN:  Objection, leading.

10           MR. BEENEY:  Your Honor, this is an employee of the

11  defendant.

12           THE COURT:  Overruled.

13  BY MR. BEENEY:

14  Q.  I'm sorry, your answer, sir, was?

15  A.  I said, yes.

16  Q.  And so, in essence, a question to you is questioning the

17  School Board, is that right, sir?

18           MS. DINCMAN:  Objection, calls for a legal conclusion.

19           THE COURT:  Overruled.

20           THE WITNESS:  Ask the question again, please.

21  BY MR. BEENEY:

22  Q.  Question to you, is, in essence, really questioning the

23  School Board, is that right?  In your view?

24  A.  Yes, in my view.

25  Q.  And in fact when it came time to swear to the accuracy of

1    the School Board's written answers to some questions that we

2    asked, they asked you to swear to the accuracy, do you remember

3    that, sir?

4    A.  I do not.

5    Q.  Okay.  Let me ask you just quickly to turn -- and you see,

6    Mr. Davis, two binders in front of you?

7    A.  Yes.

8    Q.  And one of them, I think, says "Exhibits"?

9    A.  Yes, sir.

10   Q.  Would you turn, sir, there, to the one that's under tab 19.

11   You'll see, sir, I think on the right-hand side, little tab

12   numbers?

13   A.  Yes.

14   Q.  And if I've got it right, that should be a document that

15   says Defendant School Board for Holmes County, et cetera?

16   A.  Right.

17   Q.  And would you turn to the last page of that document, sir?

18   And that's -- I'll wait until you get to it, sorry.

19   A.  Sure.

20   Q.  And that's you swearing to the accuracy of what the School

21   Board put in this document, is that right, Mr. Davis?

22   A.  Yes.

23   Q.  All right, sir, you can put that away.  We're going to be

24   using it again, but not for right now.

25         Now, doing the work for Holmes County, am I correct, sir,

1   that there was never a time when you felt you couldn't do your

2   job?

3   A.   That's exactly right.

4   Q.   And you understand the reason we're here for this lawsuit

5   is because the Holmes County School Board decided to ban

6   certain symbols and phrases from the Holmes County schools?

7   A.   Yes.

8   Q.   And that's a policy set by the Board?

9   A.   Yes.

10  Q.   Now Mr. Davis, let me ask you to go back to that binder,

11  and go to the document under tab No. 2.  Do you recognize that

12  letter, sir?

13  A.   Yes, I do.

14  Q.   And did you read this letter at or about the time that it

15  was sent?

16  A.   I did, yes.

17  Q.   And we have, Mr. Davis -- just so that we can all follow

18  it -- we've got a blow-up from that letter right there.  Are

19  you able to see that, sir?

20  A.   Yes.

21  Q.   And these are the symbols and the phrases that have now

22  been banned by the Holmes County School Board in Plaintiff's

23  Exhibit 2, is that right, sir?

24  A.   Yes.

25  Q.   Now, as of when was this policy by the School Board

1    promulgated?  When did it set that policy banning these symbols

2    and phrases?  Do you know, sir?

3    A.  Don't know exact date, but it's after September of '07.

4    Q.  So the policy to ban these symbols and phrases was first

5    set by the Holmes County School Board after September of 2007?

6    A.  No, I don't think that's true.

7    Q.  So when was it set, sir?

8    A.  It was always in policy.

9    Q.  So the School Board always banned the symbols and phrases

10   that are in Plaintiff's Exhibit 2?

11   A.  Yes.

12   Q.  And all of the phrases there, that would mean that before

13   September of 2007, no student could wear, for example, a

14   rainbow on their person or put it on a notebook, is that right?

15   A.  They probably could have, but it would be because of my

16   lack of knowledge of what the symbol represents.

17   Q.  So if -- going back to the 12 years you've been with the

18   Holmes County School Board --

19   A.  Right.

20   Q.  -- if you had been aware that a rainbow was an expression

21   of support for equal rights for gays and lesbians, you would

22   have made sure that that wasn't on anybody's notebook?

23   A.  I can't tell you.  That's calls for speculation.  I don't

24   know.

25   Q.  What would you have done, sir, if you had seen that?

1    A.   I would probably -- well, again, I can't speculate as to

2    what I would have done.  I would have followed School Board

3    policy.

4    Q.   And your view was that it's against the School Board policy

5    going way back?

6    A.   Yes.

7    Q.   And if you see a violation of the School Board policy, you,

8    as principal, would do something about that?

9    A.   I would investigate, yes.

10   Q.   And you, as a teacher, if you saw something that you knew

11   was a violation of School Board policy, you would correct that,

12   right, sir?

13   A.   Again, speculation.  I don't know what I would do, depended

14   on the situation.

15   Q.   So if you saw something you knew to be a violation, you

16   don't know whether you would correct it or not?

17   A.   If I knew it to be a violation, yes.

18   Q.   And you would correct it?

19   A.   Possibly.

20   Q.   So you don't know one way or the other whether you would?

21   A.   I can't speculate as to what I would do.

22   Q.   Okay, that's fair.  Now, you agree with the policy to ban

23   these symbols and phrases?

24   A.   Yes.

25   Q.   And the reason you agree with that policy is because you

1  think that a student seeing these symbols or phrases on another

2  student could cause that student, or encourage that student, to

3  act out in a sexual way, is that right?

4  A.  No, sir.

5  Q.  Okay, now Mr. Davis, the other binder, sir, that's in front

6  of you, is -- I think it says it's your -- maybe I haven't

7  given it to you.

8       Have I given you your deposition, Mr. Davis?  Is that up

9  there?

10      May I approach, Your Honor?

11  A.  Yes.

12  Q.  That's it.  I'm sorry.

13      Mr. Davis, I would like to see if you can find for me, sir,

14  page 253 of your deposition.

15  A.  Okay.

16  Q.  And just let me know, sir, when you're there.

17  A.  I'm there.

18  Q.  And I would like you to read along with me, Mr. Davis,

19  starting -- you see those little numbers on the left-hand side,

20  if you would find No. 13?

21  A.  Yes.

22  Q.  And just read along with me, sir.

23      "Question:  Okay, so are you saying that gay pride could

24  have the possibility of encouraging students to act out in some

25  sort of sexual way?

1    "Answer:  It could.  The possibility is there, yes."

2    Mr. Davis, were you asked those questions?  Did you give

3  that answer?

4  A.  Yes.

5  Q.  Now, I want to explore with you a bit about the policy of

6  banning Ms. Gillman from showing support for the equal rights

7  of gay and lesbian persons on the symbols that are here on

8  Exhibit 2.  Is that School Board policy a written policy,

9  Mr. Davis?

10  A.  Yes.

11  Q.  And where would you find it?

12  A.  You would find it under dress code.

13  Q.  Okay.  What about someone putting it on a notebook, is that

14  under the dress code policy?

15  A.  No, it's not under dress code policy.

16  Q.  Where would I find that written in the policy of the School

17  Board?

18  A.  You would not find it written in the policy of the School

19  Board.

20  Q.  But it is part of the policy of the School Board now, that

21  you may not put, for example, a rainbow on a notebook?

22  A.  Yes.

23  Q.  And is that a written policy?

24  A.  No.

25  Q.  So how does a student or a teacher know about that policy?

1   A.   A student or a teacher would not know about that policy

2   other than the dress code.

3   Q.   So if these things were put on something other than

4   clothes, a student wouldn't know that they were banned at Ponce

5   de Leon?

6   A.   Yes, they would know that.

7   Q.   And how would they know that, sir?

8   A.   Because under dress code it says, "any statement such as

9   sexually suggestive."

10  Q.   And you believe these phrases are sexually suggestive.

11  A.   Yes, I do.

12  Q.   And you believe a rainbow is sexually suggestive?

13  A.   I do, yes.

14  Q.   Is that based, Mr. Davis, on ever seeing anyone in any

15  context seeing a rainbow and acting in a sexual way?

16  A.   Repeat the question again.

17  Q.   Is your view that the symbols and phrases in Plaintiff's

18  Exhibit 2 -- and I'm focusing now, for example, on the rainbow.

19  Your belief is that they're sexually suggestive.  And I want to

20  ask you just one question about the basis of your belief.  Is

21  the basis of your belief that seeing a rainbow is sexually

22  suggestive based on you ever observing anybody acting in a

23  sexual way as a result of seeing a rainbow?

24  A.   No, I've never observed anybody conducting themself in a

25  sexual way as a result of a rainbow.

1  Q.  Now the policy going way back at Ponce de Leon and Holmes

2  County would prohibit a student from wearing a T-shirt that

3  said "Gay Pride" or "GP," is that correct?

4  A.  Yes.

5  Q.  And it would prohibit a student wearing a T-shirt that said

6  "Gay Rights, Fine By Me"?

7  A.  Yes.

8  Q.  And it would prohibit a student from wearing a T-shirt that

9  says, "I Support Equal Marriage Rights"?

10 A.  Yes.

11 Q.  Now, at PDL, Mr. Davis, can a student say that?  Can a

12 student say, "I support equal marriage rights"?

13 A.  Yes.

14 Q.  So they can say it; they just can't wear it?

15 A.  They can say it, yes.

16 Q.  But they can't wear it?

17 A.  But they can't wear it, right.

18 Q.  Why?

19 A.  Because -- well, you can say it in the privacy of your own

20 conversation.  We could -- in the -- it could be suggestive in

21 that it could bring about ideas for kids to consider and could

22 actually cause kids to be disruptive in class.

23 Q.  I'm sorry, sir, I don't think I followed you.  So a student

24 at PDL can say any of the phrases on Plaintiff's Exhibit 2?

25 A.  Well, with restraint.

1    Q.   What does that mean, sir?

2    A.   That means that you don't impose your views on others.

3    Q.   So in the hallway or at lunch period, there's nothing wrong

4    with a student saying to another student -- let's just pick one

5    here -- "Equal, Not Special Rights," they can say that?

6    A.   Could be.  There could be something wrong with that.

7    Q.   And if there was no imposition on anybody who didn't want

8    to hear, or they did it in a peaceful and respectful way, they

9    could do that?

10   A.   Well, you're speaking of the situation in a vacuum, and

11   there's no such thing that exists in a school.  Whatever

12   happens, as a general rule, has a purpose, design; it also has

13   things that lead into those situations.  There are other

14   details involved.  Nothing ever happens in a vacuum.

15   Q.   Well, help me then.  What's the rule?  Can I sit down at

16   lunch at PDL and say to my friends, "I support equal marriage

17   rights?"  Can I do that at PDL?

18   A.   Yes, you can.

19   Q.   But I can't put that on my notebook?

20   A.   No.

21   Q.   And I can't put that on a T-shirt?

22   A.   No.

23   Q.   And that's true with all the words that -- all the phrases

24   and the symbols here, I can sit down and say that to my

25   friends, or walk down the hall and say it to a friend, or even

1    just mention it to anybody in the hallway or lunch room.  I can

2    say all this; I just can't wear them?

3    A.  There's a -- it's -- you must take it in a broader view

4    than that.  There's always children who are around other

5    children, and many kids don't want to be involved in those type

6    conversations.  And so it should not be imposed upon them.

7    Just as I would not want religious ideas being imposed upon

8    children who don't want to hear them, or don't want to be a

9    part of that conversation.  But if they're willing -- if

10   they're willing to be involved in the conversation, that's

11   quite different.

12   Q.  Okay, now, if I go up to someone at school, Mr. Davis, and

13   I say to them, "I support equal marriage rights," how do I know

14   if they're willing?

15   A.  I don't know how you would know whether they were willing

16   or not.  I don't know how you would know that.

17   Q.  Okay, neither do I, sir.  Let me ask you a question.  In

18   the privacy of a student's locker, now you would not allow them

19   to have a piece of paper in that locker that says, quote, "U

20   have gay pride," quote, is that right?

21   A.  I would not now, no.

22   Q.  And because this policy has been in effect for as long as

23   you've been with Holmes County, you wouldn't have allowed that

24   back ten years ago?

25   A.  I would not have been looking for it ten years ago.

1    Q.  My question, sir, was whether you would have allowed it.

2    A.  I don't know.  That calls for speculation.

3    Q.  So you don't know?

4    A.  I don't know whether I would or not.  I can't possibly know

5    what I would do ten years ago.

6    Q.  But you told me it's against the policy of the Board?

7    A.  I wasn't in administration ten years ago.

8    Q.  Well, that's not the question, sir.  You told me that

9    having that piece of paper in your locker would be against the

10   policy of the Board?

11   A.  Yes.

12   Q.  But you can't tell me whether you would be enforcing that

13   Board policy ten years ago?

14   A.  I can't speculate as to what I would do ten years ago and

15   what I can -- excuse me, what I can do is say that if I had

16   been in administration ten years ago and knew it was against

17   the policy, I would enforce it, yes.

18   Q.  But not as a teacher?

19   A.  I would certainly bring it to the attention of the

20   administration.

21   Q.  Now, let's just switch topics for just a minute, Mr. Davis,

22   and let's talk a little bit about Ponce de Leon.  There are 420

23   students, give or take, at PDL?

24   A.  Currently there's 400.

25   Q.  400?

1    A.    406, I'm sorry.

2    Q.    And grades 6 through 12?

3    A.    Yes.

4    Q.    And, generally, PDL is a peaceful school?

5    A.    Yes.

6    Q.    In fact, in the whole Holmes County district, the PDL

7    school scored best on a student survey asking students if they

8    felt comfortable and whether they felt threatened or harassed,

9    questions like that, is that right, sir?

10   A.    I don't know if they scored best.  What I can report to you

11   is that the results of the survey and the summary survey

12   reported that Ponce de Leon did not have enough negative

13   responses to assign any percentages, which was -- I think

14   speaks well for our school.

15   Q.    And you were the only school that had so few negative

16   responses that they couldn't score them, right?

17   A.    To my knowledge, yes.

18   Q.    So that would be the best?

19   A.    Depends on who's determining what's best.

20   Q.    I think we can both agree with each other that peacefulness

21   and tranquility and students feeling comfortable is a good

22   thing?

23   A.    Absolutely.

24   Q.    And you did the best on that of any school --

25   A.    I don't know whether I did the best.  I did enough to where

1    I was proud of it, yes.

2    Q.  We can't agree that you did best, but we can agree you were

3    the only school they couldn't score the negative responses?

4    A.  That's the only one I saw, yes.

5    Q.  You're proud of the peaceful and tranquil environment that

6    you've established at PDL, aren't you?

7    A.  I don't know that I can take credit for all that.  We've

8    got some great teachers and I've got a great vice principal,

9    so, no, I can't take credit for all that.  They certainly are a

10   part of it as well.

11   Q.  But you're proud of the atmosphere at PDL?

12   A.  Yes.

13   Q.  And if something is not conducive to the tranquil

14   environment at PDL, then you believe it hinders the educational

15   process, isn't that right?

16   A.  It could.

17   Q.  But if something hinders or is not conducive to the

18   tranquil environment, it could, but it may not, hinder the

19   educational process, is that what you're saying?

20   A.  I can't sit here and think of every possible scenario that

21   could happen, but I'm just saying it possibly could, yes.

22   Q.  But it possibly could not?

23   A.  May not, who knows.

24   Q.  And students at PDL, you believe, need to be protected from

25   things that are not conducive to the tranquil environment, is

1    that right?

2    A.   That's true.

3    Q.   And because of the environment at PDL, students can wear

4    the Confederate flag, right?

5    A.   Yes.

6    Q.   That's not banned, is it?

7    A.   No.

8    Q.   And you've seen kids wearing T-shirts that have the

9    Confederate flag, right?

10   A.   I've saw company's logos and such with Confederate flags.

11   I think I recall seeing some Confederate flags on the back side

12   of T-shirts.

13   Q.   So you do remember kids wearing Confederate flags?

14   A.   Yes, I do.

15   Q.   So the policy at Ponce de Leon is that a student can wear a

16   Confederate flag, but not a rainbow?

17   A.   If a student -- if a Confederate flag became the symbol of

18   some organization that had been organized, and that violated

19   School Board policy and brought about disruptions, as the

20   situation did on September of '07, yes, it would be banned.

21   Q.   Well, it is banned, right?  The rainbow is banned?

22   A.   I'm talking about the Confederate flag.

23   Q.   Are you telling us you don't think the Confederate flag is

24   a symbol?

25   A.   It depends on who's viewing it.

1  Q.  But that's not true with respect to a rainbow?

2  A.  Depends on who's wearing it, what it means.

3        THE COURT:  Mr. Davis, how many black students are at

4  your school?

5        THE WITNESS:  We don't have any, sir.

6        THE COURT:  You don't have any?

7        THE WITNESS:  No, sir.

8        THE COURT:  Are you familiar with the association of

9  the Confederate battle flag with Klan ceremonies.

10        THE WITNESS:  No, sir.

11        THE COURT:  You've never seen --

12        THE WITNESS:  Oh yes, sir, yes, sir, yes, sir, I do.

13  Talking about the Ku Klux Klan and such, yes.

14        THE COURT:  All right, go ahead, counsel.  I'm sorry.

15        MR. BEENEY:  No.  Thank you, Your Honor.

16  BY MR. BEENEY:

17  Q.  Mr. Davis, although you disagree with him, you know your

18  assistant principal, Mr. Jones, would not make an issue of a

19  student wearing a swastika if the student had no ill intent;

20  you know that, right?

21  A.  No, sir, I don't know that.

22  Q.  You don't know that?  Would you turn to page 291 of your

23  deposition, sir?  Are you there, sir?

24  A.  Yes.

25  Q.  Read with me from lines 6 through 12:

1      "Question:  Okay, I'll represent to you that Assistant

2   Principal Jones testified that he would not necessarily tell a

3   student who had a swastika shirt" --

4           THE WITNESS:  Hang on just a minute.  I'm sorry.  What

5   page are you on?

6   BY MR. BEENEY:

7   Q.  291, sir.

8   A.  And where are you at?

9   Q.  Line 6 in the left-hand column.  Does that start with

10  question, "Okay"?

11  A.  Yes.

12  Q.  So I'm just reading from line 6, and I'm going to read

13  down, Mr. Davis, to line 22.

14  A.  Right.

15  Q.  Starting from line 6, sir:

16      "Question:  Okay, I'll represent to you that Assistant

17  Principal Jones testified that he would not necessarily tell a

18  student who had a swastika shirt to turn it inside out.  Do you

19  agree with that view?"

20      And then there is an objection.  And -- on line 11.

21      "Answer:  "He may not.  Again, Mr. Jones is a youthful

22  administrator."

23      And then there's a comment by counsel, and you've said,

24  again, on line 15, "Administrator, yes, this is his first year.

25  He doesn't have a whole lot of experience.  And some of these

1    things may not be as prevalent in his mind.  The possibility

2    that it's prevalent in the mind that maybe somebody who had

3    experience in administration, has had some degree and knowledge

4    of law.  And so no, I do not agree with that.  And I would not

5    allow students to wear swastikas on their shirt."

6        Were you asked that question and given those answers, sir?

7    A.  Yes.

8    Q.  So you were aware that Vice Principal Jones took the view

9    that as long as there was no ill intent, it was okay to wear a

10   swastika at PDL?

11   A.  I knew that when they brought it to my attention.

12   Q.  Did you ask Principal Jones -- Vice Principal Jones about

13   it?

14   A.  Yes, when I returned to school I asked him about it.

15   Q.  Did he tell you he said that?

16   A.  Yes.

17   Q.  So again, at least according to Vice Principal Jones, okay

18   to wear a swastika, but not a rainbow?

19   A.  Mr. Jones doesn't think it's okay to wear a swastika.

20   Q.  Changed his mind?

21   A.  Yes.

22   Q.  Now, Mr. Davis, parents expect you to protect their

23   children from the things they would not particularly want their

24   students to see, is that right?

25   A.  I can't assume what parents expect.  I don't -- or I

1    shouldn't say I know what parents expect.  I would assume that

2    they would, yes.

3    Q.  Turn to page 58 of your deposition, sir.  And just let me

4    know when you're there.

5    A.  I'm there.

6    Q.  Okay.  And I want to start at line 6, Mr. Davis.

7        "Question:  Okay.  So is it your understanding that when

8    C." -- and I'm using initials here, Mr. Davis, and we're going

9    to try to do that -- "when C. explained to Ms. Harris,

10   regardless of whether it was appropriate or inappropriate, that

11   when C. explained to Ms. Harris that she was a lesbian, that

12   she was communicating sexual things?

13       "Answer:  Well, let me preface my answer to that by this

14   statement:  As principal, parents entrust their children to my

15   school."

16   A.  Yes.

17   Q.  "They believe by sending their kids to my school I will

18   maintain an atmosphere that is conducive to learning, that I

19   will protect their children from exposure to things they

20   wouldn't particularly want them exposed to.  They believe that

21   I would make the best decision to make sure there's a learning

22   environment that promotes peace and tranquility.

23       "And that" -- excuse me -- "and so any sexual talk, whether

24   it be lesbianism or heterosexualism or any other sexual talk, I

25   would prefer that it was -- that students didn't engage in

1    those kind of conversations."

2        Were you asked those questions and did you give those kinds

3    of answers?

4    A.  Yes, I did.

5    Q.  But you do have 406 students at PDL, and kids can be loud,

6    right, Mr. Davis?

7    A.  Yes.

8    Q.  And kids argue all the time about one thing or another?

9    A.  Well, it's common, yes.

10   Q.  And students sometimes circulate petitions outside of

11   class, and that's permitted?

12   A.  Yes.

13   Q.  And as a general matter at PDL, it's the assistant

14   principal, Mr. Jones, that handles discipline, correct?

15   A.  As a general rule, yes.

16   Q.  Because the principal normally doesn't have time for those

17   sorts of issues?

18   A.  Yes.  I have a lot of administrative duties, yes.

19   Q.  So you trust vice president -- excuse me, Vice Principal

20   Jones to enforce the disciplinary policies of the Holmes County

21   School Board?

22   A.  Yes, I do.

23   Q.  And at PDL you allow kids to form groups and clubs?

24   A.  According to School Board policy, yes.

25   Q.  And there is a Science Club at PDL?

1    A.   Yes.

2    Q.   And there is a Future Business Leaders of America club?

3    A.   Yes.

4    Q.   And there is a Family, Career and Community Leaders of

5    America club?

6    A.   Yes.

7    Q.   And there's a Youth for Christ club?

8    A.   Yes.

9    Q.   And some kids of Christian groups that meet prior to

10   school?

11   A.   Yes.

12   Q.   And school bulletins sent out on a daily basis sometimes

13   advertise Christian-related activities at schools?

14   A.   Yes.

15   Q.   But if kids wanted to promote a club to -- I'm sorry,

16   withdrawn.  If kids wanted to form a group to promote tolerance

17   among gays and lesbian persons, you can't say whether that

18   would be permitted, because you would have to investigate and

19   consult with attorneys and all that kind of thing?

20   A.   Yes.

21   Q.   And so with all these activities that you have at PDL,

22   including Youth for Christ club and Family, Career and all

23   that, you're not sure whether you would allow a club that

24   promoted gay and straight tolerance?

25           MS. DINCMAN:  Objection, asked and answered.

1          THE COURT:  Overruled.

2          THE WITNESS:  I would consult my lawyer also -- I mean

3     our district board lawyer.  I would also consult our

4     superintendent to be sure that whatever decision I made was

5     according to School Board policy and was legal, yes.

6     BY MR. BEENEY:

7     Q.  But you can't tell the court today whether you would permit

8     that or not?

9     A.  No.

10    Q.  Now one of the classes that's taught at PDL is a sexual

11    abstinence class?

12    A.  Yes.

13    Q.  And although it's not a sex ed class, per se, sex ed may

14    come up at various times during the class?

15    A.  Possibly, yes.

16    Q.  And you assume that condoms and birth controls are

17    discussed in that class?

18    A.  Yes, I can make that assumption, yes.

19    Q.  Now, at PDL you also recite the Pledge of Allegiance

20    frequently, like at the beginning of a basketball game?

21    A.  Yes.

22    Q.  And if a student refuses to recite the pledge, you would

23    investigate and determine whether you would allow that

24    behavior, is that correct?

25    A.  Repeat the question please.

1    Q.  If the student refuses to cite the Pledge of Allegiance at

2    a basketball game, you would investigate and determine whether

3    you would allow that?

4    A.  No, I would not.

5    Q.  Would you turn, sir, to page 170 of your deposition?

6    Again, Mr. Davis let me know when you're there.

7    A.  I'm there.

8    Q.  And I would like to read from line 19.

9    A.  Okay.

10   Q.  "Question:  Sure.  You mentioned that things that cause

11   other students to giggle or to be distracted from their lesson

12   plan or the education that they're getting could be banned.

13   And I'm just wondering if it's -- is it the fact that it's gay

14   rights or does that rule apply to other types of speech that

15   could potentially be a distraction?

16       "Answer:  Any type of speech would be a consideration.

17   Again, you would investigate, you would try to make a

18   determination based on the law and based upon the School Board

19   policy.

20       "Answer:  Okay.

21       "Answer:"  --

22   I'm sorry, I read that wrong.

23       "Question:  Okay.

24       "Answer:  So you wouldn't arbitrarily tell a child that

25   they had to pledge allegiance to the flag.

1      "Question:  Okay.  So you would not expect a teacher to

2    send a student who, instead of reciting the Pledge of

3    Allegiance, raised his arm -- raised his fist instead of

4    reciting the Pledge of Allegiance -- you would not expect that

5    teacher to send the student to you?

6      "Answer:  They possibly could.  They're certainly at

7    liberty to if they feel uncomfortable with it or they're not

8    certain that, you know, they know the policy regarding those

9    issues.  I would suggest that maybe if they didn't send the kid

10   to the office, at least would bring it to our attention, so

11   that we could determine whether or not that's a behavior we

12   would allow in school."

13   A.  Right.

14   Q.  You were asked those questions and gave that answer?

15   A.  I did, but in the context of what's said here, you

16   mentioned "raising the fist" and that's different than just not

17   pledging allegiance to the flag.  That would add significance.

18   Q.  So refusing the Pledge of Allegiance is something you would

19   allow?

20   A.  Yes.

21   Q.  But raising silently a fist during the Pledge of Allegiance

22   is something you would have to investigate and decide whether

23   you would allow it or not?

24   A.  Wouldn't have to investigate it, no, but it probably would

25   be wise to.

1    Q.  Can you say today whether you would allow that or not?  If

2    a student silently just raised his or her fist during the

3    Pledge of Allegiance, would you allow that at PDL?

4    A.  If they had no other intent and there was nothing else

5    involved other than just raising the fist, yes, I would allow

6    that, I think.

7    Q.  And what intent would the student have to have for you to

8    not allow that?

9    A.  Well, I can, you know, possibly speculate if it had

10   something to do with some organization, if there had been prior

11   issues at the school that disrupted the educational process

12   that involved that raising of the fist.  There would be several

13   things to consider.

14   Q.  So if a bunch of kids said, "Hey, recite the pledge," and

15   they disrupted that, then you would tell the kid not to raise

16   his fist and recite the pledge?

17   A.  No.

18   Q.  You wouldn't?  What would you do in that situation?

19   A.  Would you repeat that again, please?

20   Q.  Yeah, if there were kids at a basketball game and the

21   student silently raised her fist while the Pledge of Allegiance

22   was being said and that caused a commotion because it bothered

23   some other kids who thought you should recite the pledge, what

24   would you do in that situation?

25   A.  I would correct the kids who were harassing the child who

1  raised their fists.

2  Q.  But you don't do that with gay rights; you ban the symbol

3  of gay rights?

4  A.  I don't ban the symbol, no, I enforce School Board policy.

5  Q.  And the School Board policy is to ban the symbols?

6  A.  The symbols are banned by School Board policy, yes.

7  Q.  Now, do you, Mr. Davis, think it's right that if someone

8  refused to pledge allegiance to the flag and caused a

9  commotion, that you would deal with the kids that caused the

10  commotion, but that someone who wants to peacefully exhibit

11  their support for gay and lesbians rights, that they're the

12  ones that can't speak.  Does that sound right to you?

13  A.  Would you repeat the question please?

14  Q.  Yeah, and it wasn't a very good question.  But what I'm

15  getting at, Mr. Davis is, is that -- and you know what, I

16  couldn't agree with you more, that if a kid is exercising their

17  rights and someone creates a disturbance, you deal with the

18  person that creates the disturbance, right?

19  A.  If that's -- excuse me, if that was all that was involved,

20  yes.

21  Q.  And you certainly have the ability to deal with

22  disturbances at PDL?

23  A.  Yes.

24  Q.  But what I'm having trouble with, Mr. Davis, is, is that

25  the School Board policy doesn't do that with rights for gays

1    and lesbians.  It tells the speaker that you can't say

2    anything, instead of punishing the people that might cause the

3    disruption.  Can you explain why that is to me?

4    A.  Yes, because -- repeat the question, please.

5    Q.  May I have read back?

6       **(Record read)**

7          THE WITNESS:  Yes, because these things have caused

8    disruption.  For example, in September of '07, it was related

9    to a disruption in the classroom.  Also, kids who -- as a

10   general rule, children have a tendency to go further than just

11   taking a particular subject and just speaking of it from a

12   political standpoint, or analyzing it from a political

13   standpoint, or to form their own views.  Generally what they do

14   is when they hear these things having to do with sexuality,

15   they in mind, then, picture those people engaging in such

16   things.  And they begin to talk among themselves and talk about

17   who's having sex with who and such things.

18   BY MR. BEENEY:

19   Q.  So one of the reasons why you tell kids who want to

20   peacefully display these symbols that they can't do it is

21   because it creates in the minds of other kids images of sexual

22   acts?

23   A.  Yes.

24          THE COURT:  How do you know that, Mr. Davis?

25          THE WITNESS:  By experience, sir.

1          THE COURT:  What specifically?  How do you know that

2     that prompts that mental image?

3          THE WITNESS:  Because of experience in the past, how

4     the children react when they hear these kind of things.

5          THE COURT:  What about all of the things in our daily

6     life that are deliberately intended to provoke heterosexual

7     images, unfortunately, also?

8          THE WITNESS:  Yes.

9          THE COURT:  You can't escape it.

10          THE WITNESS:  Right.

11          THE COURT:  What do you do about that?

12          THE WITNESS:  In cases where it's disruptive to the

13     educational process, we certainly try to engage our kids in

14     things that would be conducive to learning.

15          THE COURT:  We're talking about teenagers; this must

16     be high on their list of things they think about.

17          THE WITNESS:  Yes.  We got -- our school is 6th

18     through 12th and we've got a mixture of children.  And

19     generally, things of this nature are spoken of quite

20     frequently.  And certainly in class sometimes it could easily

21     hinder the educational process because kids are engaged in

22     these conversations.

23          THE COURT:  I don't know how you make teenagers quit

24     talking about it.

25          THE WITNESS:  Well, I'm speaking of in class.  You

1   wouldn't make them stop talking about it in their own time and

2   such, but I'm talking about in classroom setting.

3          THE COURT:  Counsel, it's noon.  Are you at an

4   appropriate stopping point for our noon break?

5          MR. BEENEY:  Your Honor, would you mind if I just

6   asked a couple questions to follow up and then took our break,

7   on Mr. Davis' last answer?

8          THE COURT:  All right, two more.

9          MR. BEENEY:  Really just one.

10  BY MR. BEENEY:

11  Q.  Mr. Davis, you said one of the reasons why with other

12  speech you deal with the people who cause the disruption and

13  with speech in support of gay and lesbians rights you tell the

14  speaker not to speak is because of the events of September '07.

15         MS. DINCMAN:  Objection, mischaracterizes his

16  testimony.

17         THE COURT:  Overruled.  You would you can clear that

18  up on cross.

19         THE WITNESS:  Would you repeat the question, please?

20  BY MR. BEENEY:

21  Q.  Yes, sir.  I asked you why with other speech you deal with

22  disruption by taking care of the kids who are disruptive, and

23  why with speech that supports gay and lesbians rights you tell

24  the speaker not to talk.  And one of the things I think you

25  told me was the reason for that was you had experience of

1    September '07 and that's why you tell the speaker in support

2    gay and lesbians rights not to talk; is that right, sir?

3    A.   I would not tell the speaker not to talk.  They have the

4    right to talk in their own privacy of their own conversations.

5    Q.   All right.  But you tell someone who wants to wear a

6    rainbow on their shirt that they can't wear it?

7    A.   Yes.

8    Q.   And one of the reasons is because of the events of

9    September '07 at PDL?

10   A.   Yes, School Board policy.

11   Q.   But you told me this was a policy that went way before

12   that?

13   A.   School Board policy, yes.

14   Q.   But way before September '07?

15   A.   Yes.

16   Q.   So the policy that was in effect at the School Board before

17   September 7th -- I suppose you have to agree with me -- can't

18   be based on the events that occurred in September of '07?

19   A.   Certainly make it more prone.

20   Q.   But the policy can't be based on that if the policy was in

21   effect before the events occurred?

22   A.   I can't speak to that.

23        MR. BEENEY:  All right, if Your Honor please, this

24   would be a good point to take a break if Your Honor would like.

25        THE COURT:  All right, let's be back so we can get

1    started at 1:15.

2          MR. BEENEY:  Thank you, Your Honor.

3       **(Recess from 12:04 p.m. until 1:18 p.m.)**

4          THE COURT:  Okay, good afternoon.  Ready to proceed?

5          MR. BEENEY:  Yes, Your Honor, if I may.

6    BY MR. BEENEY:

7    Q.  Good afternoon, Mr. Davis.

8    A.  Good afternoon, sir.

9    Q.  Mr. Davis, I would like to now talk to you about the events

10   at PDL in September of 2007.  It's your position that there was

11   illegal organizing and a disruption to the educational process

12   at that time?

13   A.  Yes.

14   Q.  And that illegal organizing and disruption was involved

15   with equal rights for gay and lesbian persons?

16   A.  No.

17   Q.  It was not?

18   A.  No.

19   Q.  Did the illegal disruption and organizing have anything to

20   do with gay rights?

21   A.  I don't see where it did, no.

22   Q.  Now, as a result of -- withdrawn.  In September of 2007,

23   you conducted an investigation into the events that were going

24   on at PDL?

25   A.  Yes.

1    Q.  And would it be all right, sir, if we called that the

2    September events, so we'll know what we're talking about?

3    A.  Yes.

4    Q.  Now, as a result of the events and your investigation,

5    there were 11 children that were suspended, is that right, sir?

6    A.  I think that's right, yes.

7    Q.  And you made that decision?

8    A.  Yes.

9    Q.  And you suspended each of those 11 children for five school

10   days?

11   A.  Yes.

12   Q.  Mr. Davis, I would like to ask you if you would look in

13   that binder that says it's got exhibits in it, and I would like

14   to ask you to turn to No. 10 and maybe we can stick that up on

15   the screens, if we may.

16       Mr. Davis, the only question I want to ask you is is just

17   to page through these letters, and then I just want to ask you

18   if these are the letters that you signed suspending the

19   students that are named here.  That's my only question, sir.

20   A.  Yes.

21       MR. BEENEY:  Your Honor, I would like to offer Exhibit

22   10 into evidence, please?

23       MS. DINCMAN:  No objection.

24       THE COURT:  It will be admitted.

25       **(Plaintiff Exhibit No. 10 received in evidence.)**

BY MR. BEENEY:

Q.  Mr. Davis, nine of these students -- withdrawn.  You wrote these letters?

A.  No, my secretary types these letters, and I sign them.

Q.  Did you give her the content to put into these letters?

A.  Yes.

Q.  Did you read them before you signed them?

A.  I can't recall whether I did or not.

Q.  Do you have any reason to believe today that the content of any of these letters is not 100 percent accurate?

A.  Yes, there is a discrepancy in the date there, I think. For example, September 9th, I think it was on Sunday, and that was a typo.

Q.  So you're referring to the fact that in nine of these letters they talk about the activity that the student had engaged in for which they were suspended occurred on September 9, is that what you mean?

A.  What I'm saying is I think that that was a date that's on Sunday.  That's either a typo or I wrote in the wrong date.  I don't know which.

Q.  So September 9 on these letters really should be Tuesday, September 11?

A.  Could -- there or about.  I'm not certain about that date.

Q.  Well, in the first paragraph of each of these suspension letters, you're telling the guardian or the parents of the

 1    child that you suspended that they were suspended for

 2    activities that they were involved in on a specific date,

 3    correct?

 4    A.  Yes.

 5    Q.  And which day were those activities that the child was

 6    involved in for which they were suspended?  You don't know,

 7    sir?

 8    A.  I don't recall the exact date, no.

 9    Q.  But whatever it was, you put in one day in these letters,

10    the activities occurred on a single day in nine of these

11    letters?

12    A.  It was not all encompassing, but it certainly included that

13    day, yes.

14    Q.  So you didn't tell the parents other days that the student

15    had engaged in activities for which they were suspended?

16    A.  No, because I didn't know how many days there were all

17    total.

18    Q.  But you didn't say that either?  You told the parents that

19    it was for offenses which occurred on a single day?  That's

20    what you told the parents?

21    A.  That's what's in the letter, yes.

22    Q.  Okay.  I think we may come back to these letters,

23    Mr. Davis, but I think we're done with them for right now.

24        Now, the reason you gave for nine out of the 11 suspensions

25    were illegal organizing and disruption to the education

1    process.

2    A.   That's correct.

3    Q.   And those are two policies of the Holmes County School

4    Board:  No illegal organizing, no disruption to the educational

5    process?

6    A.   That's true.

7    Q.   And do you ever recall discussing either of those policies

8    with any of the school district people?

9    A.   No.

10   Q.   Now, Mr. Davis, this morning you told us that the policies

11   to ban these symbols at PDL had been a policy that had gone

12   back before September 7th, and I want to ask you, sir, do you

13   know whether the School Board agrees with you that that policy

14   has always been in effect?

15   A.   Before I answer that, can I go back to the previous

16   question, to restate that, please, if I need to?  Can I hear

17   that question again?

18   Q.   Are you talking about the one just before the last one?

19           THE COURT:  Do you recall ever discussing either of

20   these policies with the School Board, any of the school

21   district people?  Is that the question?

22           THE WITNESS:  Yes.

23   BY MR. BEENEY:

24   Q.   I think it was.  Right?  Is that the one you want to talk

25   about, Mr. Davis?

1    A.  Well, I think that -- I don't know whether I talked about

2    the policy itself.  I certainly talked about the circumstances

3    involved.

4    Q.  Right.  But my question was about the illegal organizing

5    and the disruption to the educational process policies; you've

6    never discussed what those mean with people in the school

7    district?

8    A.  I can't say for certain.  I want to say I can't recall

9    because I can't really recall whether I did or not.

10   Q.  But you can't recall doing it?

11   A.  Right, I can't recall it.

12   Q.  All right.  And then we were going on to the next question

13   that I think I asked Mr. Davis, which was:  Do you know whether

14   the School Board agrees with you that there has been a ban

15   at -- in the Holmes County Schools of students wearing these

16   phrases and symbols that are in Plaintiff's Exhibit 2 long

17   before the events of September 9?

18   A.  I believe that they would.  They would certainly be aware

19   that they are contrary to dress code, in violation of dress

20   code, yes.

21   Q.  Why is wearing a rainbow a violation of the dress code?

22   A.  Well, it would be now.  Prior to the events of September

23   '07, it may not have been an issue because I wasn't even aware

24   that it was a symbol of having anything to do with sexuality.

25   But had I known it back then -- and certainly if I had known

1    that it was an expression of such, I would have treated it in

2    the same manner.

3              THE COURT:  Mr. Davis, let me ask you something.

4    Looking at the chart, suppose the T-shirt simply had "Equal,

5    Not Special Rights," and no rainbow, would that be permitted?

6              THE WITNESS:  Yes, sir -- it would not be permitted,

7    sir, because, again --

8              THE COURT:  What is inflammatory about "Equal, Not

9    Special Rights"?

10             THE WITNESS:  It's a suggestive slogan.  Again --

11             THE COURT:  Suggestive of what?

12             THE WITNESS:  Sexuality.

13             THE COURT:  I said no rainbow, just "Equal, Not

14   Special Rights."

15             THE WITNESS:  When we talk about equal, you're talking

16   about gay/lesbian issues.

17             THE COURT:  All right, what about if we had no

18   rainbow, but the T-shirt simply said, "God Loves Me Just the

19   Way I Am."

20             THE WITNESS:  Again, same --

21             THE COURT:  That wouldn't be permitted either?

22             THE WITNESS:  No, sir, same answer.

23             THE COURT:  Because you say it has a sexual

24   connotation?

25             THE WITNESS:  Yes.

1              THE COURT:  All right.

2              THE WITNESS:  Because when you say "Love me as I am,"

3    you're talking about loving me as a homosexual, which, again,

4    there's sexual connotation, and kids draw inference.

5              THE COURT:  Isn't that a fair statement of the

6    scriptures, that God loves even the sinners?

7              THE WITNESS:  Certainly is, sir, yes, certainly is.

8              THE COURT:  And that's not sexual?

9              THE WITNESS:  Well, again, it could be so.  What I'm

10   looking at is where do you draw the line?  At what point do you

11   say that it is sexual and it is not sexual when it's involving

12   things of sexuality?  And that statement involves things of

13   sexuality.

14             THE COURT:  So even if they didn't have the rainbow,

15   those two statements, "Equal, Not Special Rights," and "God

16   Loves Me Just the Way I Am," you feel those create a danger of

17   disruption of the school?

18             THE WITNESS:  Yes, sir.

19             THE COURT:  Okay.

20             MR. BEENEY:  Thank you, Your Honor.

21   BY MR. BEENEY:

22   Q.  Mr. Davis, just to follow up on a couple of questions that

23   the court asked you, what about just "God Loves Me" instead of

24   "God Loves Me Just the Way I Am," would "God Loves Me" be okay?

25   A.  Yes, sir.

1   Q.  So it's "Just the Way I Am" that creates the sexuality?

2   A.  It's the implications of the message, the slogan, the

3   slogan is suggestive.

4   Q.  And what about "Love Me as I Am"?  We know that's banned

5   but what about just, "Love Me"?

6   A.  Again, in a vacuum, I don't see any -- see anything wrong

7   with that, no.  However, if it's used in a manner to be

8   disruptive or used in connection with some sort of disorder in

9   the schools, then it would be a different consideration.

10  Q.  Okay, but just -- so "Love Me," without any disorder, is

11  okay, but "Love Me As I Am" is not?

12  A.  Correct.

13  Q.  Mr. Davis, as far as you know, Heather Gillman was not

14  involved in any way in any of these September '07 events that

15  you believe caused disruption?

16  A.  Not that I'm aware of.

17  Q.  In fact, her name wasn't even mentioned in your

18  investigation?

19  A.  No.

20  Q.  That's correct, isn't it?

21  A.  That's correct.

22  Q.  And you have no reason to believe that Ms. Gillman wants to

23  display any of these symbols in a sexually suggestive way, do

24  you?

25  A.  I don't have any idea what Ms. Gillman wants to do.

1    Q.  And that would include you have no idea that she wants to

2    display them in a sexually suggestive way?

3    A.  I would have no idea what her intentions are.

4    Q.  And that would include the fact that you don't know whether

5    she wants to display them in a sexually suggestive way?

6    A.  I don't know that, no.

7    Q.  And Mr. Davis, has anybody ever said to you that they read

8    the phrase --

9    A.  Can I also add to that please?

10   Q.  Go ahead, sir.

11   A.  There are T-shirts that say -- or makes the statement,

12   "Save a Horse, Ride a Cowboy."  While they may not believe, or

13   a student may not believe that has any sexual connotation, I

14   think it does.  And I think that the average student would

15   think that it does.  And so --

16   Q.  And in that respect, in terms of sexual connotation, you

17   kind of think of "Save a Horse, Ride a Cowboy," as being

18   similar to "Equal, Not Special Rights"?

19   A.  Yes, because children's minds go to -- immediately to the

20   act of committing sexual acts, yes.

21   Q.  You know, we explored this a little bit this morning.  I

22   would like to delve into it a little bit as well.  The idea

23   that a child's mind goes to sexual acts by reading, "Equal, Not

24   Special Rights," has anybody ever told you that?

25   A.  Has anybody ever told me that?

1    Q.   Yes, sir.

2    A.   No, sir.

3    Q.   Have you ever observed anybody indicating by words or

4    behavior that their mind goes to sexual acts when they read

5    "Equal, Not Special Rights"?

6    A.   That doesn't make any -- really that's not a point to

7    consider, because it violates School Board policy, and because

8    it has suggestive -- or it is sexually suggestive, therefore it

9    violates School Board policy.  So how I view it or how any

10   others would view it is irrelevant.

11   Q.   Mr. Davis, I want to have my question read back, sir, and I

12   want you to answer that question, sir.

13        MR. BEENEY:  May I have the question read back, Your

14   Honor?

15        THE COURT:  Have you ever observed anybody indicating

16   by words or behavior that their mind goes to sexual acts when

17   they read, "Equal, Not Special Rights"?

18        THE WITNESS:  No, sir.

19   BY MR. BEENEY:

20   Q.   Now just to finish up on the topic of Ms. Gillman, you have

21   no reason to believe that she wishes to wear these phrases and

22   symbols as part of an illegal organization, do you?

23   A.   I would have no way of knowing that.

24   Q.   Or to be disruptive.  You also have no way of knowing that?

25   A.   Yes, she would certainly know it would be disruptive

1    because of the atmosphere that's at school now, because of the

2    seriousness of the situation at school.

3    Q.  You think that Ms. Gillman, if she wore these today, would

4    do it because she either knows or wants to be disruptive?

5    A.  I couldn't tell you that, but she would certainly know that

6    it could have that consequence.

7    Q.  Okay.  Mr. Davis, would you take a look at page 177 of your

8    deposition, sir?

9    A.  Okay.

10   Q.  And on -- I'm going to read from line 13.

11       "Question:  Okay.  Do you have any reason to believe that

12   Heather's point in wearing any of the slogans or the symbols in

13   Exhibit 1" -- which is now Exhibit 2 -- "is to encourage

14   students to form an illegal organization?

15       "Answer:  I wouldn't have any -- I wouldn't have any clue

16   whether or not she intends to do that; or if she did, was that

17   her intent.  I wouldn't have any idea.  I would have to

18   investigate to come to know those facts."

19       Were you asked that question and give that answer?

20   A.  Yes.

21   Q.  Now, Mr. Davis, really, the fear that you have, if Heather

22   wore these phrases or symbols, is that other students might be

23   disruptive if they read these phrases, is that right?

24   A.  No, sir, it's not a fear, it's a concern.

25   Q.  All right, so the concern you have is that other students

1  might react in a disruptive way, to reading these symbols or

2  phrases?

3  A.   It could reenergize the movement that took place in

4  September of '07.

5  Q.   You can't say now that you know that it would?

6  A.   Obviously not.

7  Q.   So your belief is is that it could?

8  A.   From all I know about the atmosphere that's there, from

9  what I know about how kids feel, I believe that it could, yes.

10  Q.   Now, when you think of the School Board policy prohibiting

11  disrupting the educational process, in your mind that includes

12  this lawsuit, is that right?  This lawsuit is disruptive to the

13  educational process at PDL, is that right?

14  A.   Yes, sir, it has.

15  Q.   And the reason it's disruptive to the educational process

16  is because you've had to come here to testify and spend time on

17  it, right?

18  A.   Not only come here, but much time, yes.

19  Q.   And so as a result of you having to spend time on a

20  lawsuit, the lawsuit has disrupted the educational process in

21  violation of School Board policy?

22  A.   Well, I could have gotten a lot more done had I not spent

23  so much time with this case.

24  Q.   Does that mean the answer to my question is yes, sir?

25  A.   Give me your question again, please.

1          MR. BEENEY:  Your Honor, may I have it read back?

2     **(Record read.)**

3          MS. DINCMAN:  Objection, Your Honor, whether the

4     court -- or lawsuit is subject to School Board policy.

5          MR. BEENEY:  Well, Your Honor, what we're doing is

6     exploring the witness' understanding of a policy he used to

7     suspend 11 children.

8          THE COURT:  It's overruled.

9          THE WITNESS:  I believe that the process has hindered,

10    yes.

11    BY MR. BEENEY:

12    Q.  Now, Mr. Davis, you started your investigation of the

13    September events on September 12th and you ended your

14    investigation on September 24th?

15    A.  Approximately there.  I can't recall exactly dates.

16    Q.  Let me see if your deposition refreshes your recollection.

17    Would you turn to page 68, sir?

18         And Mr. Davis, I'm going to do this quickly, and I just

19    want to refer you to line 6 in which you said, quote, "I'm

20    telling you my investigation began on the 12th, and I ended, I

21    believe, on the 24th."  Is that accurate?

22    A.  That expresses uncertainty, yes.

23    Q.  But that's what you believed at the time you gave your

24    deposition; it started on the 12th and you believed it ended on

25    the 24th?

1    A.   Meaning I'm not certain, yes.

2          MS. DINCMAN:  Objection, Your Honor, there's an

3    excerpt from page 67 that I think fairly should be included to

4    put this in context.  And that would be page 67, lines

5    8 through 13.

6          THE COURT:  I'll let you do that on cross.

7          MS. DINCMAN:  Okay.

8    BY MR. BEENEY:

9    Q.   Mr. Davis, during this period of the 12th to what you

10   believe was the 24th, you took notes of your interviews?

11   A.   I believe it's the 12th through the 24th.

12   Q.   But you took notes of all those interviews that you

13   conducted then?

14   A.   Yes.

15   Q.   And would you take a look, sir, at the exhibit binder under

16   No. 13?

17         And Mr. Davis, just page through those quickly.  And the

18   question I want to ask you is whether Exhibit 13 contains,

19   along with some other things, a complete copy of your notes

20   regarding the investigation of the September '07 events?

21   A.   The question is, is this a complete copy?

22   Q.   Yes, sir.

23   A.   I would have to take my originals and go through it page by

24   page to answer that, sir, but it seems to be, yes.

25   Q.   I'm not trying to trick you at all.  But one of the reasons

1    I'm asking is because I noticed something yesterday.  You see

2    those little numbers on the bottom right-hand corner?

3    A.   Yes.

4    Q.   Would you turn to page 667?  I'm sorry, 666.  Doesn't have

5    a number on it.  We just have to assume it's between 665 and

6    667.  You see the page I'm on?

7    A.   That would be a fair assessment.

8    Q.   You see at the very bottom of the page, and I wonder if we

9    would highlight it.  The last word there says "Over"?

10   A.   Right.

11   Q.   Would that indicate to you that there was something on the

12   other side of this page when you wrote it?

13   A.   Yes.

14   Q.   But if you turn to the page as it was produced to us,

15   you'll see 667, which is the next page, the margin is still in

16   the left-hand side of the page.  So my question, Mr. Davis, is,

17   are we missing a page of your notes?

18   A.   Possibly.  I don't know.  Possibly.

19   Q.   Now, in your notes -- withdrawn.

20        MR. BEENEY:  Your Honor, I would like to offer Exhibit

21   13, please.

22        MS. DINCMAN:  Your Honor, I do have an objection to

23   it.  I think under Rule 106, the entire thing has to be put

24   into the record.  But I cannot tell from looking at this where

25   the redactions are to put in the initials, if there's also been

 1  substantive content that's taken out without looking at that.

 2  So I have an objection to introducing these without ensuring

 3  that all the substantive content of it is included.

 4       THE COURT:  Are these in the form in which the

 5  defendant produced these documents?

 6       MR. BEENEY:  No, Your Honor.  We have redacted the

 7  full names of the students.  And I believe I can represent to

 8  Your Honor that the only thing we've redacted are the names and

 9  put in the initials, and I would be also more than happy to

10  provide an unredacted copy to counsel so they can follow along

11  if they believe anything else has been redacted.

12       MS. DINCMAN:  I would have to do that.  Your Honor, I

13  really would prefer if we introduce a copy of his notes that

14  are unredacted and file it under seal, or do something of that

15  nature so it's a complete representation of what his actual

16  notes were as he took them.

17       THE COURT:  I don't think that's necessary.  I think

18  we are obligated to have as complete a public record as can be

19  accomplished.  And obviously we're going to have to resort to

20  redaction to be able to meet that requirement.

21       Now over the next break, why don't you all get

22  together and see if you can't resolve these concerns.  I see

23  the point here.  This is on the undated page.  It's all

24  September 13th, and then it says "Over," and then on 0667, it's

25  dated 9/14.

1          MR. BEENEY:  I was actually going to ask counsel --

2          THE COURT:  Looks like something maybe fallen behind

3     the copier or something.

4          MS. DINCMAN:  I don't know.  I think what we'll have

5     to do is get the originals as they were produced to us and do

6     an examination, or it could be that our Bates numbering pages

7     got out of order.

8          THE COURT:  I think you all can get it straightened

9     out between now and tomorrow afternoon and we can talk about

10    it.

11         MR. BEENEY:  Thank you, Your Honor.

12    BY MR. BEENEY:

13    Q.  Now Mr. Davis, you were careful to accurately record in

14    these notes what students said to you?

15    A.  I didn't record everything.  I recorded things I felt like

16    were significant.

17    Q.  But what you did -- I didn't mean to suggest that you kept

18    a word-by-word transcript, but my question was more when you

19    decided to write something down because it was important to

20    you, you wrote it down accurately?

21    A.  As best I could, yes.

22    Q.  And you did the same thing with respect to what you said;

23    you wrote down accurately what you said to these students, is

24    that right?

25    A.  Yes, as best I could, yes.  I make these notes for my

 1    own -- for my own benefit, to refresh my memory and at a later

 2    time to keep me abreast with what one student tells me and

 3    another student tells me.  It generally --

 4    Q.  Let me just ask you; we can agree that these notes are

 5    accurate reflections of what you believe was said to you and

 6    what you believe you said to students at the time you wrote

 7    them?

 8    A.  These are an accurate reflection of what I know the

 9    students said to me.

10    Q.  What about what you said to them?

11    A.  And what I know I said to them.

12    Q.  This investigation in September of 2007 reflected in these

13    notes was important to you, right?

14    A.  Well, it's important in that I was trying to come to the

15    truth about what exactly had taken place.

16    Q.  So it was important?

17    A.  It was important, yes.

18    Q.  And in fact, even though it's the job of Assistant

19    Principal Jones to handle discipline, you made sure that you

20    took over this investigation regarding gay rights?

21    A.  No, sir.  You're not stating it accurately.  This was

22    reported to me.  Mr. Jones was a new principal, or a new

23    assistant principal, and I knew this -- that these were serious

24    allegations and serious issues directed toward my office.

25    And -- and much of what was said was directed toward me

1    personally, toward my office personally, towards the

2    administrative office, and it was important to me that I did

3    this to be sure that it was done right and that I had all the

4    facts.

5    Q.  You know, I'm glad you mentioned that, Mr. Davis, because

6    it, I think, goes back to an answer that you gave earlier

7    today.  When we talked about the fact that this was really --

8    September of '07 was really not events about gay rights; they

9    were really events about challenges to you and your authority,

10   is that right?

11   A.  No, sir, not all together.  That was a part.  But certainly

12   it didn't encompass gay rights in my mind.  What was in my mind

13   was the threats to students' safety and threats to the

14   day-to-day orderly operations of our school, and threats to

15   vandalize the school, to vandalize my office and these kind of

16   things.  Those were the things I was trying to come to a clear

17   knowledge of as to exactly what took place.

18   Q.  When is the last time you read through those notes,

19   Mr. Davis?

20   A.  When is the last time I read through them?

21   Q.  Yes, sir.

22   A.  With any kind of -- with any kind of real attention,

23   probably last night.

24   Q.  Now, the suspensions that you gave to these 11 students for

25   five days, would you agree with me that forbidding a child to

1  be in school for five days and to stay away from all school

2  related activities is a severe punishment?

3  A.  I will say that it's -- that it is a firm punishment, but

4  it well fits the acts that the kids were committing at the

5  time.

6  Q.  Mr. Davis, we're trying to keep on a schedule here, and I

7  want to ask you if you would, sir, to try to focus on my

8  question and answer that, and then we can move along as quickly

9  as we can.

10  A.  You're assuming that I am not doing that and I am doing

11  that.

12  Q.  My only question was --

13        THE COURT:  Time out.  Listen carefully to his

14  question and answer it directly, and Ms. Dincman can help you

15  explain or whatever you feel needs to said further.

16        THE WITNESS:  Thank you, Your Honor.  I'll certainly

17  do that.  And I apologize, sir.

18  BY MR. BEENEY:

19  Q.  So Mr. Davis, would you agree a five-day suspension is a

20  severe punishment?

21  A.  I agree that ten days would be severe, five days would be

22  less severe.

23  Q.  And am I correct in understanding that when you suspend a

24  child from school, they're given a zero for that day and they

25  can't make that work up?

1    A.   That is true.  They're given a zero for assignments that

2    are given during those times.

3    Q.   And right around this time of September -- and I think in

4    fact that you gave out these five-day suspensions, the next

5    month you had occasion to deal with a student who threw a rock

6    at a bus and broke a bus window.  Do you recall that?

7    A.   Yes, I do.

8    Q.   And you gave that student a three-day suspension?

9    Withdrawn.  I don't think I've got that right.  In fact you

10   didn't suspend that student at all?

11   A.   That's because I never could come to a conclusion for

12   certain that that student was guilty of doing that.

13   Q.   Now when you gave these five-day suspensions to these

14   students, were you trying to send a message to the school that

15   whatever it was that occurred in September of 2007, it was not

16   to happen again?

17   A.   I wasn't sending a message; I was teaching children there's

18   consequences for doing wrong, and teaching children to make

19   right choices.

20   Q.   Right choices in the sense of what?

21   A.   Doing right and wrong.

22   Q.   In the context of your investigation, what wrong choices

23   were they making?

24   A.   They made a choice to organize and to disrupt the

25   educational process.

1    Q.  By doing what?

2    A.  By misconduct, and by disrupting classes and such things.

3    Q.  Now, you also told these students, or at least their

4    parents anyway, that if anything like this happened again, it

5    might result in your recommending that they be expelled, isn't

6    that right?

7    A.  What I told them, that if such a like event occurred again

8    that it could result in ten days' suspension with

9    recommendation for expulsion, yes.

10   Q.  Would you turn to PX-10, Mr. Davis and we can just look at

11   any one of those suspension letters if we could just put one of

12   those up.  And --

13   A.  Where are those located?

14   Q.  I'm sorry, sir?

15   A.  Where are those located?

16   Q.  At 10 on the exhibit binder, No. 10.

17   A.  I'm sorry.

18   Q.  And I just want to refer you to the final paragraph.  And

19   you told them that any further violation of this nature may

20   result in an out-of-school suspension for the maximum number of

21   days and recommendation for expulsion?

22   A.  That's correct, depending on the severity of what took

23   place.

24   Q.  Now we can agree, at least, that expulsion is severe, can't

25   we?

1    A.   We can agree, yes.

2    Q.   Now, you didn't set out in the letters, Exhibit 10, any of

3    the specifics of what the kids did to merit the suspension, is

4    that right?

5    A.   No, sir.

6    Q.   But the specifics of what they did are contained in your

7    notes, Exhibit 13, is that right?

8    A.   That's correct.

9    Q.   And you sent copies of the suspension letters to

10   Superintendent Griffin, the superintendent of the Holmes County

11   School District?

12   A.   That's common procedure, yes.

13   Q.   And did he object or disagree in any way with what you had

14   done here with regard to these suspensions?

15   A.   Evidently not, no.

16   Q.   Certainly you never heard any objection from the School

17   Board or the district office about what you had done with

18   respect to these suspensions?

19   A.   I did not, no.

20   Q.   Now one of these suspensions -- and it's the suspension of

21   M.C., Mr. Davis, and that's on page 0595.

22   A.   Right.

23   Q.   That suspension was different from the others.  It wasn't

24   for illegal organizing.  It was for vandalizing school

25   property, directing profane language, giving false information

1    and participating in disorder, is that correct?

2    A.   That's correct.

3    Q.   But that's the only one out of all of these 11 that

4    mentions anything like any of those four offenses, is that

5    right?

6    A.   That's correct.

7    Q.   So it was one student out of the 406 that you have that

8    engaged in the activity that you mentioned in the suspension

9    letter, as far as you know?

10   A.   That's true.

11   Q.   Now, in conducting your investigation, Mr. Davis, you

12   wanted to be fair and honest, correct?

13   A.   Yes, sir.  That's the goal.

14   Q.   And part of being fair and honest is to talk to all the

15   people who have relevant information to the matter that you're

16   investigating.  Would you agree with that?

17   A.   As best you can, yes.

18   Q.   And after you gather all the information that's relevant,

19   only then do you decide what to do?

20   A.   Yes.

21   Q.   Now, one of the first people that you interviewed on the

22   very first day of your investigation was F.C.  And do you

23   remember that?

24   A.   The first day I interviewed, yes.

25   Q.   And in fact, he was the second person you interviewed on

1    the first day of your investigation?

2    A.   Yes, but that interview had -- was not being conducted

3    having to do with this incident.  It was being conducted

4    because --

5    Q.   Mr. Davis, I'm sorry to interrupt you, and I really don't

6    want to do it, but my only question was:  He was the second

7    person you interviewed on the first day of your investigation?

8    And we'll get to what it was all about later, but if you'll

9    listen to my question, we really will go a lot quicker.

10   A.   Are you referring -- then clarify for me, please, are you

11   referring to the incident of '07 that had to do with the

12   movement there, the gay pride movement, or are you referring to

13   he was the first one I talked to on 9/12?

14   Q.   He was the second person you talked to on 9/12?

15   A.   He was the second one I talked to on 9/12, I believe that's

16   correct.

17   Q.   Now you still had a lot of people to talk to with respect

18   to the September investigation?

19   A.   I didn't know that at the time.  I knew that as time

20   progressed.

21   Q.   But not on September 12th?

22   A.   Well later on in the day I found out, yes.

23   Q.   But not before you talked to F.C.?  You didn't know you had

24   a lot of people to talk to?

25   A.   I don't recall whether I -- I don't recall.

1  Q.  Now, when F.C. came into your office -- and you were about

2  to tell us it really was about a topic that had nothing to do

3  with the September events, right?

4  A.  The reason he was directed to my office was -- had nothing

5  to do with that, right.

6  Q.  Now when he came into your office, he had written in ink on

7  his hand the words "Gay Pride," right?

8  A.  That's true.

9  Q.  And you said to him, "What's the point, of having 'Gay

10  Pride' on your hand?"  Didn't you?

11  A.  That's true.

12  Q.  And do you recall what F.C. answered when you asked him

13  that question?

14  A.  Said something to the nature it stood for "Gay Pride" and

15  he supported them.

16  Q.  Right, he said --

17  A.  Supported --

18  Q.  He said, "I'm supporting -- expressing my support for

19  gays," right?

20  A.  No, he said he was supporting "them," and having -- I'm

21  assuming talking about the ones who were attempting to, I

22  guess, display some sort of discontent or displeasure over

23  whatever the issues were at the time.

24  Q.  So as a result of him saying, "I'm expressing my support of

25  them," you concluded that he was creating some kind of a

1    message with respect to being displeased with you?

2    A.  I don't -- well, that's -- I think that's what he said.  I

3    can't recall.

4    Q.  Sorry.  What is it that you think he said?

5    A.  I don't recall what --

6    Q.  Okay, turn to page 144 of your deposition.

7        Now, again, Mr. Davis, I just want to do this quickly, so

8    if you'll look at line 19, you asked F.C., quote, "I asked him

9    what did that mean.  And he said, gay pride.  I said, Okay, gay

10   pride, what's the point?  He said, I'm just expressing my

11   support of them.  I said okay."

12       Does that refresh your recollection that that's the way

13   that conversation went?

14   A.  At the time, that was the best of my recollection.

15   Q.  And you have a different recollection today?

16   A.  I don't have a different recollection today.

17   Q.  Okay.  Now, when F.C. said to you, "I'm just expressing my

18   support of them," your reaction was to make him leave your

19   office in the middle of a conversation and wash "Gay Pride" off

20   his hand, is that right?

21   A.  Yes.

22   Q.  And you wouldn't even let him sit in your office and

23   continue the conversation until he had that washed off?

24   A.  That's correct.  It was a violation of School Board policy.

25   Q.  And in fact, Mr. Davis, as a concerned principal, do you

1  walk around PDL to just get a sense of what's going on during

2  the school day?

3  A.  Not every day.  Some days my time is consumed with

4  administrative things, but I try to get out as much as

5  possible.

6  Q.  Do you pop into classes?

7  A.  Yes.

8  Q.  Do you talk to kids at lunch?

9  A.  Occasionally, yes.

10  Q.  Do you see them in the hallway?

11  A.  Occasionally, yes.

12  Q.  And the only person that you ever saw at PDL in September

13  of 2007 that had anything like "Gay Pride" written on them was

14  F.C.?

15  A.  I can't recall.

16  Q.  Okay, would you turn to 187 of your deposition?  And I'm

17  going to start, Mr. Davis, at line 4.

18      "Question:  What other slogans did you see or was reported

19  to you -- well, okay.  Did you see students wearing other

20  slogans related to the gay pride movement in September of 2007?

21  Can you just identify them for me?

22      "Answer:  What I saw?

23      "Question:  Yes.

24      "Answer:  That's the question?

25      "Question:  Yes.

1   "Answer:  I saw one student, F.C., wearing GP on his hand.

2   "Question:  Okay.

3   "Answer:  I may have -- I can't say for certain, but I

4   think I saw one of the girls that may have had it.  I don't

5   recall.  I will just say I don't -- other than Fxxxx, I don't

6   recall seeing anybody else wear it.

7   "Question:  Any other slogans that you personally saw

8   students wearing?

9   "Answer:  No."

10  Were you asked those questions and gave those answers?

11  A.  I did.  I was expressing, again, my uncertainty.

12  Q.  Sir, my only question to you was:  Were you asked those

13  questions and did you give those answers?

14  A.  Again, I did --

15  Q.  Mr. Davis, can you just answer my question yes or no,

16  otherwise, sir, we're never going to get out of here?

17  A.  I'm going to -- I'm assuming we're --

18       MR. BEENEY:  Your Honor, may I ask the assistance of

19  the court?

20       THE COURT:  Mr. Davis, can you answer that question

21  yes or no?

22       THE WITNESS:  Yes, sir, I can.

23       THE COURT:  Let's do it that way.

24       THE WITNESS:  I'll answer no.

25

BY MR. BEENEY:

Q.  You were not asked those questions and you did not give those answers?

A.  Yes, I was asked those questions and I did give that answer, yes.

Q.  Okay, thank you, sir.

Now, the reason you ordered F.C. to immediately wash "Gay Pride" off his hand and not even finish the conversation you were having on that very first day was because you've concluded that it was not appropriate to display in PDL, quote, "Gay Pride," is that right?

A.  I concluded that he had violated School Board policy, and brought it into my presence, which shows some degree of defiance.

Q.  And you thought it was not appropriate, however, to display "Gay Pride," is that right?

A.  My concern was not the appropriateness of it; my concern was he had violated School Board policy and brought it into my office in defiance.

Q.  Mr. Davis, would you turn to page 146 of your deposition? And I'm just going to read a couple quick lines on line 6.

"Question:  Okay.  Why did you have him go wash his hands?

"Answer:  Because I didn't believe that that was appropriate to be wearing to school."

Were you asked that question and did you give that answer?

1    A.   I was asked that question and I did give that answer, yes,

2    sir.

3    Q.   Now, the reason you didn't think it was appropriate to have

4    phrases like "Gay Pride" shown at school is because they have

5    sexual implications?

6    A.   Repeat that, please.

7    Q.   The reason you did not think it was appropriate to have

8    "Gay Pride" slogan written on his hand is because you believe

9    that "Gay Pride" has sexual implications?

10   A.   That is -- that is the School Board policy.

11   Q.   No, sir, my question is about what you believe.  You

12   believe that displaying the phrase "Gay Pride" results in

13   sexual implications and that is why you thought it was

14   inappropriate to wear?

15   A.   If it's contrary to School Board policy, then it would be

16   inappropriate, yes.

17   Q.   And the reason you thought it was inappropriate was because

18   "Gay Pride" has sexual implications?

19   A.   Certainly involved, yes.

20   Q.   And you also believe the phrase, "I am straight, but I vote

21   pro-gay" is a sexually related issue that would not be

22   acceptable at PDL?

23   A.   That's true.

24   Q.   So you would ban anything at PDL that had, in your mind,

25   any sexual implications?

1    A.   I would, whether be it heterosexual or homosexual, yes.

2    Q.   Forgive me, Mr. Davis, if we've covered this, but all of

3    the symbols on Plaintiff's Exhibit 2 are sexually suggestive?

4    A.   Yes.

5    Q.   Now, in PDL, boys will certainly say to a girl, "I want to

6    date her because she's cute," or something like that?  Is that

7    correct?

8    A.   Yes.

9    Q.   And you allow that all the time?

10   A.   Well, usually guys don't come around me telling me that

11   girls are cute.

12   Q.   All right, if you heard somebody saying that, you would

13   certainly allow it, wouldn't you?

14   A.   Yes.

15   Q.   And that's because saying, "I want to date Mary because

16   she's cute" has no sexual implications, right?

17   A.   Could have, depends on what his intent was in saying that.

18   Q.   But you don't ban him saying, "I want to date Mary because

19   she's cute," but you do ban someone saying, "I vote pro-gay"?

20   A.   No, I don't ban that unless I'm convinced that if he had

21   had a sexual harassment charge brought against him with the

22   young lady he's referring to, then I would have issues with

23   that.

24   Q.   Well, I know we can think of all sorts of conversations

25   that might have happened or might not, but if the only

1    information you know about a student is that he went and said,

2    "I want to date Mary because she's cute," you wouldn't

3    discipline that student?

4    A.  I would not.

5    Q.  But you would if someone wore a T-shirt that says, "I vote

6    pro-gay"?

7    A.  I would not discipline them, no.  What I would have them do

8    is remove the clothing and replace it.

9    Q.  Okay.  Now, while it's okay for a boy to say, I'm dating a

10   girl because she's cute, you would have to investigate before

11   saying whether it's okay for a girl to say she's dating a girl;

12   isn't that right?

13   A.  Possibly, yes.

14   Q.  So I think we've established your view about speech, would

15   you agree with me, is that speech relating to gay rights is

16   sexually suggestive, but speech relating to homosexual

17   relationships is not sexually suggestive?

18   A.  That's a misrepresentation of what I think.

19   Q.  Okay.  Do you believe that all pro-gay speech could be

20   sexually suggestive?

21   A.  I couldn't say that.

22   Q.  One way or the other?

23   A.  Right, I couldn't know.  That's speculation.

24   Q.  Now, Mr. Davis, does Mr. Griffin know your view that the

25   symbols and phrases on Plaintiff's Exhibit 2 are sexually

1    suggestive?

2    A.   I couldn't testify to what Mr. Griffin knows.

3    Q.   Well you could if he told you and you could if you told

4    him?

5    A.   If he told me I certainly would, yes.

6    Q.   That's what I'm talking about.  Do you know whether he

7    knows about your view that all the phrases and symbols on

8    Plaintiff's Exhibit 2 are sexually suggestive?

9    A.   What I'm saying is I don't know if Mr. Griffin knows that

10   or not.

11   Q.   What about the School Board, do you know if they know?

12   A.   I'm certain that Mr. Griffin knows I will apply School

13   Board policy.

14   Q.   Again, Mr. Davis, I want to please implore you to listen to

15   my question so we can move along.

16   A.   Sure.

17   Q.   Does the School Board know your view that all the symbols

18   and phrases on Exhibit 2 are sexually suggestive?

19   A.   They never asked me.

20   Q.   Do you know whether they know?

21   A.   Since they haven't asked me, I'm sure they wouldn't know.

22   Q.   Now as a result of your view about the suggestions that are

23   embodied in all of the phrases and symbols in Exhibit 2, would

24   you agree that your view is, is that those symbols and phrases

25   are inherently disruptive to the school process?

1    A.  Yes, they could be.

2    Q.  Now, do you know, Mr. Davis, that that view that you just

3    expressed conflicts with Board policy?

4    A.  I do not believe that my view conflicts with School Board

5    policy.

6    Q.  Okay, would you take a look, sir, at Exhibit 3 in your

7    binder, and I want to direct your attention to the first page,

8    paragraph 3, with the sentences that start, "Specifically."

9    Are you there sir?

10   A.  Yes.

11   Q.  If we could highlight that, third paragraph, second line.

12   "Specifically" -- and this is referring to Ms. Gillman's

13   counsel --

14   A.  Just a minute.  Your second paragraph?

15   Q.  Yeah, third paragraph.

16   A.  Third paragraph.

17   Q.  Second sentence.

18   A.  Okay, good.

19   Q.  "Specifically, you" -- meaning counsel to Ms. Gillman --

20   "and the students involved were never told that under the

21   policies of Holmes County School Board pro-gay speech is

22   considered inherently disruptive and/or inappropriate for the

23   school environment.  In fact, the School Board has no such

24   policies regarding pro-gay or anti-gay speech.  What the Board

25   seeks to maintain is the sanctity of the learning environment

1    at each school within the district."

2        Do you believe that's consistent with your view that all of

3    the phrases on Exhibit 2 are banned because they are inherently

4    disruptive?

5    A.   Could I take a minute and read this again?

6    Q.   Yes, sir.

7    A.   And your question, please?

8    Q.   Well, I think you just told us before I asked you to look

9    at the letter that these symbols and phrases were inherently

10   disruptive, and now I've got a letter from the School Board

11   saying that they didn't believe they are inherently disruptive,

12   and I'm just asking you how you reconcile those two.

13   A.   Well, how I would reconcile these two is to sit down with

14   the School Board and ask them to explain what they meant by

15   this, and then I could tell if we were in agreement or not.

16   Q.   Have you ever seen Exhibit 3 before, the letter to

17   Mr. Stevenson from Mr. Young dated November 12, 2007,

18   Plaintiff's Exhibit 3?  Have you ever seen that?

19   A.   I may have.  I can't recall.

20   Q.   And you now believe that you're going to need to sit down

21   with the School Board and find out what the policy is?

22   A.   I'm already aware of what the policy is.

23   Q.   Well, in order to reconcile your view of the policy and

24   what's expressed in the letter, you need to talk to the School

25   Board; is that what you told us?

1    A.    I would certainly ask for clarification, yes.

2    Q.    Okay.  Now, the statement by the School Board that the

3    School Board has no policies -- such policies, excuse me --

4    regarding pro-gay and anti-gay speech, do you believe that that

5    conflicts with your instruction to F.C. to wash the words "Gay

6    Pride" off his hand?

7    A.    No.

8    Q.    Now, Mr. Davis, let me go back to your notes of your

9    investigation from the 12th to what you believe to be the 24th.

10   And I don't expect you to take the time to count, but if I told

11   you that the notes in Exhibit 13 reflected 45 separate

12   interviews for that period, would that sound about right to

13   you?

14   A.    I can't say.

15   Q.    Feel free to page through Exhibit 13.

16   A.    I'll just take your --

17   Q.    I don't want to take a lot of time on it.

18   A.    If you counted it, that's fine.

19   Q.    But nothing you believe is contrary to that?

20   A.    Right.

21   Q.    Okay.  Now, out of these 45 interviews, if you'll accept

22   that -- and we can wipe this off, I'm sorry.  Out of those 45

23   interviews, 44 -- 44 out of the 25 (sic) were with children and

24   one was with a teacher, is that right?

25   A.    Yes.

1    Q.   So at least with respect to your interview notes of the

2    September investigation, you spoke to one teacher?

3    A.   That's true.

4    Q.   And out of the 44 or 45 interviews in which you took notes,

5    you spoke to some kids twice, in fact 11 of them by my count?

6    You spoke to some kids twice?

7    A.   I will agree with that, yes.

8    Q.   And you spoke to one three times?

9    A.   I don't recall.

10   Q.   And all in all, again, does it sound about right that you

11   spoke to 30 kids?

12   A.   Yes.

13   Q.   Now, how many teachers do you have at PDL?

14   A.   Twenty-eight.

15   Q.   And your interview notes reflect that out of what you

16   believe to have been a disruption to the school, your

17   investigation, at least as reflected in your notes, involved

18   talking to one of those 28 teachers?

19   A.   Actually I didn't bring the teacher in, the teacher came to

20   me to provide information.

21   Q.   So if she hadn't come to you, you wouldn't have spoken to

22   any teachers?

23   A.   That's true.

24   Q.   Now, during the course of these 30 interviews of the

25   children, they told you all sort of things, right?

1    A.   Yes.

2    Q.   And I can go into it in some detail, but without belaboring

3    it, some of them told you things that conflicted with each

4    other, right?

5    A.   Yes.

6    Q.   And virtually all of the 30 or so kids interviewed were

7    willing to tell you that other kids were doing something, or

8    saying something, right?   In other words they named names?

9    A.   I think -- I can't say that all did, but most did, yes.

10   Q.   I think all but one, is that right?  All but T.B.?

11   A.   I don't recall whether it was just one or not.

12   Q.   Well, if you turn to an -- in Exhibit 13.  And if you turn

13   to the interview of T.B., and I'll tell you what page that is

14   in just one second.  It is on the bottom there, Mr. Davis,

15   0681.

16   A.   And you're referring to which one now?

17   Q.   T.B. at the top of the page there.

18   A.   T.B.?

19   Q.   T.B., yes, sir.  And she told you three things:  She said,

20   "I wrote 'GP' on my hand, I don't want to tell on my friends, I

21   don't know anything else about it"?

22   A.   Right.

23   Q.   And you suspended her for five days?

24   A.   Yes.

25   Q.   Now in terms of kids naming names, you asked, and kids told

1    you, who was displaying the phrase "Gay Pride" at PDL, isn't

2    that right?

3    A.   Yes.

4    Q.   And when kids told you who was doing that, you wrote down

5    the names of the kids who had written "GP" or "Gay Pride" on

6    their hand?

7    A.   Yes.

8    Q.   And in fact, if my count is correct, you wrote down the

9    names of at least 25 kids who had written "Gay Pride" on their

10   hand?  Is that about right?  Sound about right to you?

11   A.   Could be, yes.

12   Q.   And you made sure that any time a kid told you that another

13   kid had written "Gay Pride," you wrote it down in your notes?

14   A.   Yes.

15   Q.   Now Mr. Davis, I want to talk to you about how the

16   September 7 events began and talk to you about C.W.  Do you

17   know whom I'm referring to?  This will help because these

18   events began --

19   A.   Yes, yes, yes.

20   Q.   You know who I'm talking about.  These events began

21   September 10 when C.W. complained to a teacher's aide, Christa

22   Harris, that she had been taunted because she was gay?

23   A.   She said, I believe, if I'm not mistaken, that she had

24   mentioned to her that some kids had been, I think, calling her

25   names or something to that effect.  I can't recall.

1  Q.  Because she was identified as a lesbian?

2  A.  She told her that she was, yes, and that another student

3  was.

4  Q.  But what C.W. said was is that kids were teasing her and

5  asking her if she was gay?

6  A.  I can't recall if that's what Ms. Harris -- those were her

7  exact words.  I can't recall.

8  Q.  I'm not trying to ask you what the exact words of

9  Ms. Harris.  I'm trying to get to your understanding.  You're

10  aware that C.W. said that kids were teasing her and asking her

11  if she was gay?

12  A.  Yes.  And when Ms. Harris came to me, that was one of the

13  concerns, yes.

14  Q.  Now, if you go to the first page of Exhibit 13, Mr. Davis,

15  these are your interview notes of C.W. on September 10.

16  A.  Yes.

17  Q.  And in the course of that interview you wrote down the

18  names of five students who were the ones that were teasing C.W.

19  and asking her if she was gay.

20  A.  Yes.

21  Q.  And you were concerned about C.W. being harassed, is that

22  right?

23  A.  Yes.

24  Q.  But at the end of your interview of C.W., of the student

25  who had come to you because she had been harassed, your

1   response to her was, "Don't discuss your sexual orientation

2   with anyone at school," isn't that right?

3   A.  I don't recall if I made that statement to her that day or

4   not.  I don't recall.

5   Q.  Would you turn to your deposition at page 69?

6       Again, to move this along, Mr. Davis, I may ask you to read

7   this to yourself silently, 69, line 7.  And read down to line

8   15 where you say, "That was at the end of the conversation."

9   And tell me when you're done, sir.

10  A.  Okay.

11  Q.  Now, does that refresh your recollection that the end of

12  this interview with C.W. on September 10 when she had come to

13  talk about the fact that she had been harassed, your response

14  was, "Don't tell anybody about your sexual orientation"?

15  A.  That was -- that's mischaracterizing the situation.

16  Q.  Well, then let me ask it this way if you think that's

17  mischaracterizing, Mr. Davis:  Did you tell C.W. on

18  September 10 not to discuss with anybody at school her sexual

19  orientation?

20  A.  Again, off the top of my head I can't recall.

21  Q.  Let's do it the long way, unfortunately.  Page 69, sir?

22  A.  Okay.

23  Q.  And I'm going to start at line 7.

24      "Question:  So you mentioned that you had -- in the

25  conversation that you had with Cxxxxx -- C., on September 10,

1    2007, that you explained to her because she could not give you

2    an answer to what the point of telling Ms. Harris that she was

3    a lesbian, you explained to Miss W. that she should not discuss

4    her sexual orientation generally at school?"

5        Answer on line 15:  "That was at the end of the

6    conversation."

7    A.   Yes.

8    Q.   So you did tell her in that conversation that she should

9    not discuss her sexual orientation generally at school,

10   correct?

11   A.   That is what I said.

12   Q.   And that means that you told C.W., who had come to you

13   because she had been harassed, not to, in effect, say in

14   school, "I identify as a lesbian"?

15   A.   She did not make any statements as to that effect, that she

16   had talked to Ms. Harris because she was being harassed.

17   Q.   The question I have for you, sir, is what you instructed

18   C.W. in that conversation is not to go into school and say to

19   anybody, "I identify as a lesbian"?

20   A.   What I explained to this student was -- was that --

21   Q.   I'm sorry, Mr. Davis, can you answer my question, which is:

22   By telling C.W. not to discuss her sexual orientation at

23   school, that included her not saying to anybody, "I am a

24   lesbian"?  Is that correct?

25   A.   That was not the intent, but I did say that, yes.

Q.  Okay, so it was okay for C.W. to go -- to say to people, "I

identify as a lesbian," or not?  I'm confused.

A.  What I was saying to her was that these things are

personal.  A lot of people do not want to hear nor be engaged

in that kind of conversation.  While it is my responsibility to

secure this student's rights, it is also my responsibility to

secure the rights of other children who do not want to be --

and other staff members, who do not want to be engaged in these

conversations.

    And oftentimes there's a danger, especially among children,

engaging in these things that would end up in sexual

harassment.  Because kids are cruel, and kids say things a lot

of time without realizing the impact it has on the other

children.

    And so my intent was -- was to -- was to not only deal with

this situation at hand, but also there was -- when this student

was brought to my class -- excuse me, to my office -- I knew

about her background and had a heart about that and I was

concerned that other children would be saying these things to

her, because it just adds misery to misery.

    I was concerned about the reports that children had

conveyed to Ms. Harris about sexual contact or sexual

misconduct going on in the bathrooms, because in the

'06-'07 school year we had an alleged sexual assault in a

bathroom, or sexual misconduct, I'll put it that way, that

1   was -- ended up in the hands of the sheriff's department and

2   the state's attorney.  All these things were in my mind.  And

3   so that statement reflects all those things.

4   Q.  And those are in your mind, but what C.W. heard was, "Don't

5   tell anybody you're a lesbian."

6   A.  What I expressed to her was not to say -- not tell anybody

7   you're a lesbian, but my thinking was, don't just walk up to

8   people blatantly, and without reserve, and without constraint,

9   expressing your sexual orientation.  It has no point.

10  Q.  Now have you ever told anybody that you believed to be a

11  heterosexual not to discuss the fact that they're a

12  heterosexual with anybody?

13  A.  I have told several students on several occasions not to be

14  speaking of sexual issues regarding heterosexual acts, yes.

15  Q.  I'm not talking about acts, I'm talking about someone just

16  simply saying, "I'm a heterosexual."  Have you ever told

17  anybody not to do that?

18  A.  I don't recall ever telling anybody to not express

19  themselves as a heterosexual.  It's never been an issue.

20  Q.  Now, because you were -- because you were concerned about

21  the teasing of C.W., you must have gone out and talked to these

22  five kids who you now knew were the culprits, if I can use that

23  word, you went out and talked to them and told them that this

24  was wrong?

25  A.  She could not identify, or would not identify, who the

1    middle school students were who were engaging in these -- as

2    she put it -- these harassing statements.  And unless I know

3    who the students are, I can't actively investigate the issue.

4    Q.  You've got the five -- Mr. Davis, I'm sorry.

5    A.  And of the five students she mentioned, she said that they

6    had asked her if she was gay.

7    Q.  And this was in the context of a conversation --

8    A.  Yes.

9    Q.  -- in which she was complaining about being harassed,

10   right?

11   A.  She wasn't in there to complain about being harassed.  She

12   was in there because I sent for her.

13   Q.  You sent for her?

14   A.  Yes.

15   Q.  Did it occur to you that maybe the names of the people she

16   gave you who said they're the ones that are asking me if I were

17   gay, that those were the kids that were involved in this

18   incident?

19   A.  The students she named were not middle schoolers, they were

20   high schoolers.

21   Q.  Did it occur to you that they were involved in this

22   incident, or no?

23   A.  The reason I did not pursue this --

24   Q.  I'm sorry, Mr. Davis.  My question, again, sir, is:  Did it

25   occur to you that these were the students that were involved in

1    the incident that in fact left C.W. in tears?

2    A.  No, that did not occur to me.

3    Q.  But you did intend to talk to them, didn't you?

4    A.  I did, yes.

5    Q.  But you never did, right?

6    A.  I never did.

7    Q.  But you did have time to make sure that you wrote down all

8    the students who were wearing "Gay Pride" on their hand, you

9    just didn't have time to get to these students?

10   A.  That's true.  It wasn't that I didn't have time; it was

11   just one of those things that slipped through the cracks.

12   Q.  Now the child, the young lady, C.W., the one who was the

13   topic of this teasing, now she got suspended, right?

14   A.  She did.

15   Q.  She got suspended for five days?

16   A.  That's true.

17   Q.  But you didn't even talk to the kids on your list?

18   A.  That first list?

19   Q.  Yes.

20   A.  No, I did not.

21   Q.  Now, Mr. Davis, I've been through the 30 pages of your

22   notes of the interview in September, and I want to kind of see

23   if I can put the interview notes together in a way that --

24   without going through them all.

25       In terms of what some of the kids told you some other kids

1   were doing, there were kids asking others to sign a petition?

2   Do you remember that?

3   A.   Yes.

4   Q.   Now, there's no indication that that occurred during a

5   class, right?

6   A.   And there's no indication -- no, that I'm --

7   Q.   And kids wrote GM?

8   A.   I don't recall.  I don't recall whether kids told me those

9   happened in class or not.

10  Q.   That was not a significant issue, whether it occurred in

11  class or not?

12  A.   It would be a significant issue.

13  Q.   But having read these last night, you don't recall?

14  A.   I don't recall, no.

15  Q.   Now kids wrote "GP" or "Gay Pride" on their hand or shirt,

16  is that right?  That's what the kids told you?

17  A.   Yes, that was one of the many things they told me.

18  Q.   And you saw one instance of this?

19  A.   That's true.

20  Q.   And other kids were asking kids about their views of gay

21  rights and how they felt about civil rights for gay people, is

22  that right?

23  A.   That was reported, yes.

24  Q.   And there was a report of a concern of two girls kissing in

25  the bathroom, right?

A.   Yes.

Q.   Now, you never verified that, right?  In other words you
don't know whether it happened or not, is that right?

A.   No, I do not know whether it happened or not.

Q.   And there was also some reports of some kids making up
signs in support of rights for gays and lesbians?

A.   Right.

Q.   But you never saw any?

A.   I did not.  I depended on the repeated testimony of
children.

Q.   And what you depended on, the repeated testimony of
children, was to suspend kids for five days, right?

A.   Right, I depended on the testimony of children to
substantiate some claims, yes.

Q.   Well, indeed, because we know now you only spoke to one
teacher, it was to substantiate all the claims.

A.   I did not speak to one teacher to substantiate the claims.
I spoke with a teacher who came to my office to give me
information that I did not know.

Q.   Now -- and then the kids also told you that they would
leave an assembly if the assembly had an anti-gay preacher in
it, right?

A.   There were many kids who told me that the plan was to use
these signs, placards if you will, that were being assembled in
classes and in homes, and they were calling one another on

1    phones to determine what placard they should make.  And their

2    intent was to stand and scream or yell out, "Gay Pride" and

3    leave the assembly.

4    Q.  Now if that's actually what kids told you, you certainly

5    would have written that down, because it's important, right?

6    A.  Well there was several times kids mentioned to me --

7    Q.  Sorry, Mr. Davis, you got to listen, sir.  If kids really

8    told you that, certainly you would have written that in your

9    notes because that would have been important?

10   A.  Yes, they said they were going to yell "Gay Pride" and walk

11   out, yes.

12   Q.  Just to get to that issue, nobody walked out of the

13   assembly?

14   A.  They did not walk out of the assembly, that's true.

15   Q.  Because you put an end to that?

16   A.  Well, I certainly tried to intervene, yes.

17   Q.  Now, they also said that they were going to do some other

18   stuff, kicking you in the fanny, getting you arrested, spray

19   painting your office, right?

20   A.  Yes.

21   Q.  And you're laughing.  Because it's silly, isn't it?

22   A.  No, sir, it's not silly.

23   Q.  Why were you laughing?

24   A.  Just laughing because it's funny.

25   Q.  Why is it funny?

1    A.  Because it's amazing that children at that age could be

2    thinking such things, contemplating such things, when they're

3    at school to get an education.

4    Q.  And that's what caused you to laugh?

5    A.  Well, I didn't sit here and analyze why I laughed.  Maybe

6    it was just a reaction.  Who knows.

7    Q.  Well, now, let's talk about what actually happened in

8    September of '07, as opposed to kids saying things that I agree

9    with you are kind of funny in a way.  Kids did write "GP" on

10   their hands or "Gay Pride" on their hands?

11   A.  That's true.

12   Q.  And were you able to ever confirm that anybody actually

13   made up a sign, other than what kids told you?

14   A.  I didn't go looking to see if they did.

15   Q.  In fact you saw none?

16   A.  That's true.

17   Q.  And we know no one walked out of an assembly?

18   A.  That's true.

19   Q.  Nobody yelled at an assembly?

20   A.  That's true.

21   Q.  Nobody held up signs at an assembly?

22   A.  That's true.

23   Q.  And nobody kicked you in the fanny or had you arrested or

24   spray painted your office?

25   A.  Certainly did not.

1  Q.  Did you ever hear anybody yelling "Gay Pride" in the

2  hallways of school?

3  A.  I did not.

4  Q.  Did you observe any kids talking about gay pride?

5  A.  I did not.

6  Q.  But at least you heard from one teacher, Ms. Hicks, about

7  that issue, right?

8  A.  Yes.

9  Q.  So I think what we've just agreed is, is that what actually

10  happened in September of 2007 related to this issue was that a

11  couple kids said that other kids were yelling in the hallway,

12  you talked to Ms. Harris about a class incident, one class

13  incident that we'll get to in a minute, there may have been

14  petitions, there may have been kids drawing signs, and we know

15  that at least one kid had "GP," "Gay Pride," written on his

16  hand.  Does that about sum it up?

17  A.  No, sir, you can omit the term "may," because I'm convinced

18  it did happen.

19  Q.  What did happen?

20  A.  All those things.

21  Q.  The yelling in the hallway, talking during class, doing the

22  petition, drawing signs and writing "Gay Pride"?

23  A.  Yes.

24  Q.  But that's only based on what we lawyers would say was

25  hearsay, right?

1    A.  Well, principals often have to rely on hearsay to gather

2    evidence and determine issues by the preponderance of the

3    evidence.  And so you can -- if you had to personally hear

4    everything that was said, or personally see every infraction,

5    then no kids would ever commit very many infractions because

6    we're not there to see them.

7    Q.  What about teachers seeing infractions, Mr. Davis?  There

8    was so much going on here that you were hearing from these

9    kids, what you must have done is gathered your faculty and

10   said, "What's going on at PDL?  Tell me what's going on."  You

11   must have done that, right?

12   A.  I did not do that.

13   Q.  Right, you didn't do that.  And you didn't talk to any

14   other administrator about what did you see and then wrote it

15   down in your notebook, did you?

16   A.  I talked to Mr. Jones, yes.

17   Q.  And did you write anything down about what Mr. Jones told

18   you in your notebook?

19   A.  No, I did not.

20   Q.  Now I want to go to the one teacher that you did speak to.

21   And just, again, to try to do this in a reasonably expeditious

22   fashion, during your investigation of the September 2007

23   events, there was one teacher, and only one teacher, that told

24   you, in fact, what actually happened in classrooms was that one

25   class was disrupted for ten minutes and she got it back to

1    order when, in effect, she said, "Yo, shut up"?

2    A.   Are you speaking or referring to Ms. Hicks?

3    Q.   Yes, sir.

4    A.   What Ms. Hicks reported to me was that -- the severity of

5    what was taking place.  She said, "It is beginning to" -- in my

6    words -- "mushroom, spread."  And she said, "That's all kids

7    want to talk about, and I can't have class," something to that

8    extent.

9    Q.   But what you understand actually happened was that kids

10   were talking during the first ten minutes of her class, she

11   said, "Shut up" and they got back to order?

12   A.   That's not what was conveyed to me.

13   Q.   It's not?

14   A.   That's not what I've heard, or that's not what I recall her

15   saying.

16   Q.   Now let's take a look at what Ms. Hicks actually swore to,

17   okay?  So could we put up Ms. Hicks' testimony at page 12, line

18   23?  And you don't have that in front of you, Mr. Davis, so

19   you're just going to have to look at the monitor on the

20   right-hand side there.

21        MS. DINCMAN:  Objection, Your Honor, I think it's

22   improper to comment on other witness' testimony.  There haven't

23   been excerpts offered for this, and Ms. Hicks has not yet been

24   called as a witness.

25        MR. BEENEY:  Your Honor, the witness just described a

1  conversation with Ms. Hicks.  Ms. Hicks gave sworn testimony. I

2  just want to ask the witness if this is what Ms. Hicks told

3  him.

4         MS. DINCMAN:  Your Honor, she's here, she's available

5  for live testimony.

6         THE COURT:  I think this is proper.  He was asked if

7  he interviewed any of the faculty, and then I think he

8  volunteered, no, not en masse, but Ms. Hicks, is that correct?

9         MR. BEENEY:  Yes, Your Honor.

10         THE COURT:  I'm going to allow this.

11  BY MR. BEENEY:

12  Q.  So do we have 12:23?  I'm sorry, I think I may need to

13  go up to -- Your Honor, let me fix this and we'll come back to

14  it.  I don't want to take up more time.

15     Mr. Davis, how many classes do you have during a week at

16  PDL?

17  A.  There are seven classes per day.

18  Q.  So there would only be 49 classes going on during the week

19  at PDL?

20  A.  Say again?

21  Q.  There would only be 49 classes going on during the course

22  of an entire week at PDL?

23  A.  If you've got seven classes at five days, that's 35, am I

24  right?

25  Q.  I'm sorry, you're right.  I did the math wrong.  So you

1    only have one class going on at one time for the entire school?

2    A.  No, that's not true.  There are various students engaged in

3    various disciplines in the school at any given period.

4    Q.  Tell me, though, how many classes you have -- you're the

5    principal.  Tell me how many classes you have going on during

6    the course of a week.  Just give me an estimate.  I'm not going

7    hold you to a fine number.

8    A.  Do the math.  Seven periods a day, five days a week.  At

9    any given time there's -- what I would give you would be a mere

10   guess.  I wouldn't know how to answer that.

11   Q.  Well, you've got grades 6 through 12.  Are each one of

12   those grades in a class seven times a day?

13   A.  Yes, of one sort or another.

14   Q.  So that would be 42 a day times five, so we're talking

15   about a couple hundred classes a week?

16   A.  Yes, maybe.

17   Q.  So out of those 200 classes that were held at PDL during

18   the course of a week, and that would be 800 or so during the

19   course of September, one of those was disrupted and you spoke

20   to one teacher about it?

21   A.  I recall one teacher, yes, Ms. Hicks, coming to report that

22   sort of thing to me.

23   Q.  And nobody else?

24   A.  That's true.

25   Q.  And in fact you even went to a teacher and said, "Hey, I

1    hear your class was disrupted because someone was making up a

2    sign," and he said, "That's news to me."

3    A.   That's exactly right.  I went to that teacher, and the

4    student said that as he would -- he would correct the students

5    who were making -- were doing things other than the assignment,

6    the student told me just as soon as he turned his back, they

7    continued on doing what they were doing.

8    Q.   But he never noticed it?

9    A.   He didn't notice it.  Students are very creative.

10   Q.   Okay.  Now, let's go back to Ms. Hicks, the one teacher you

11   did speak with, because I've now got the page I want to look

12   at.  So are we able to put up 12:07?

13       Mr. Davis, you don't have this, sir, but this is Mrs. Hicks

14   telling us under oath what happened in her class.  I'm going to

15   start with line 6:

16       "Question:  Sure."

17       And then she gave an answer:  "It just didn't happen that

18   way.  And then I said, 'Okay, guys, I've got to call roll."

19   A.   Excuse me, let me interrupt.  My screen is -- where are you

20   now?

21   Q.   Is your screen the same thing as up at the big one there?

22   A.   It is now.

23   Q.   I'm sorry if we didn't get it up there quickly.  So I'm

24   going start with the "Sure" on line 6, Mr. Davis.

25       "Answer:  And it just didn't happen that way.  Then I said,

1       'Okay, guys, I've got to call roll.'  And in trying to call

2       roll they continued to talk and discuss it.  And that group of

3       girls sits on one side of the classroom and M. sits on another

4       side of the classroom.  They weren't -- they're not even close

5       together, and they were not saying anything to her, but it was

6       more of a, Hey, let me tell you what just happened in gym type

7       of thing, and still discussing it and discussing it, and of

8       course the boys got in on it, and they wanted to know what

9       happened.

10          "Question:  About how long had they been talking about it

11      before you went over and asked them to settle down?

12          "Answer:  Probably just a couple minutes, two or three

13      minutes, trying to give them a chance to come and sit down, but

14      I would say probably ten minutes into the classroom before I

15      could get class started that day.

16          "Question:  Okay, how did you manage to get it started?

17          "Answer:  I basically just had to get ugly.

18          "Question:  What do you mean?

19          "Answer:  Well normally you try to be nice to a student.

20      You try to say, 'Please sit down, be quiet, hush.'  But

21      unfortunately we live in a society where kids don't understand

22      those terms anymore, it's basically just, 'Sit down and shut

23      up.'

24          "Question:  Did it work?

25          "Answer:  That day it worked.  And I remember having to

1    back and forth, say, Jxxxxx, you need to hush."

2        Is that what Ms. Hicks told you about that one class?

3    A.  There are components of that that she told me.

4    Q.  So what she told us under oath doesn't completely coincide

5    with what she told you?

6    A.  That's true.

7    Q.  If she told you what she told us under oath, would you have

8    still thought this was a big disruption in September of '07 at

9    PDL?

10   A.  I wouldn't consider it a big disruption.  I would certainly

11   have concerns that a teacher would allow ten minutes of class

12   to go along without getting down to business.

13   Q.  So you agree with me, though, that this is not a big

14   disruption?

15   A.  I would not agree with you.  That is a big disruption.  Ten

16   minutes of class was missed because of disruption.

17   Q.  And that's a big disruption?

18   A.  Any disruption is a disruption.

19   Q.  Is this a material and substantial disruption in your

20   understanding?

21       MS. DINCMAN:  Objection, calls for a legal conclusion,

22   Your Honor.

23       THE COURT:  Overruled.

24   BY MR. BEENEY:

25   Q.  If you have any understanding.

1   A.   I called it disruption.

2   Q.   Okay.  Now, Mr. Davis let me turn to another topic, which

3   is, you know, not what did and didn't happen at PDL in

4   September of 2007, but what was the cause of the events of

5   September of 2007?  What did the kids tell you about why they

6   were writing "GP" or "Gay Pride" and threatening to leave an

7   assembly?  Why did they tell you they were doing that?

8   A.   The kids told me that the first student who came to my

9   office, that I had -- that they had told that I had screamed at

10  her, questioned her about her sexuality, threatened to suspend

11  her, and in fact did suspend her, those kind of things.

12  Q.   Right.  And again, we can do this in greater detail, but

13  really the point I want to make is that the kids said they were

14  doing this because, really, of their perception that you had

15  done things that were anti-gay, isn't that right?

16  A.   They were, yes, being incited by misinformation and such

17  things.

18  Q.   And I'm not expecting you to admit certainly that you're

19  anti-gay, sir, but the point is, is that that's what the kids

20  were reacting to, their belief that this is what had happened?

21  A.   I can't tell you what the kids believed.  I can tell you

22  that they had no basis for that belief.

23  Q.   But they did tell you that the reason they were doing what

24  you thought they were doing was because they thought you had

25  suspended C.W. because she identified as a lesbian and because

1  you were interrogating children about their sexual orientation.

2  That's what they told you, right?

3  A.  That was not the context in which they told it to me, no.

4  Q.  Regardless of context, that's what they told you?

5  A.  That's not exactly what they told me, no.

6  Q.  Okay, let's look at your notes.  And Mr. Davis, those are

7  Exhibit 13.  And first I want to go to your interview of F.C.,

8  and again, Mr. Davis, I'm going to mention the numbers at the

9  bottom of the page, 661?

10  A.  Yes.

11  Q.  And you'll see under (5)(2), there's the words "trying to

12  get them suspended," or right in front of that, "People were

13  saying that I was trying to get them suspended," "them" meaning

14  gay people, right?

15  A.  Yes.

16  Q.  And that's what F.C. told you, right?

17  A.  Yes.

18  Q.  If you go to the interview on the next page, 662, and under

19  No. 2, under C.M., you'll see it says, "C. told me that I was

20  trying to expel kids from school.  'I didn't think it was

21  right.'"  And she told you that, right?

22  A.  That's what the -- yes, that kid, particular kid, told me

23  that.

24  Q.  And I can go through a lot of these, Mr. Davis.  So the

25  point I'm trying to make is, is that the kids told you that

1    they were reacting to the perception, right or wrong, that you

2    had suspended someone because they were gay and because you

3    were inquiring about kids' sexual orientation, isn't that

4    right?

5    A.   This particular --

6    Q.   No, Mr. Davis, listen to my question, sir.

7    A.   Sure.

8    Q.   And we can go through a lot of these comments, but the only

9    question I want to know is, the kids told you, whether it was

10   right or wrong, that they were reacting to rumors, stories,

11   whatever you want to call it, that you had suspended a girl

12   because she identified as a lesbian and you were inquiring

13   about children's sexual orientation; isn't that what they told

14   you?

15   A.   Several kids told me that.

16   Q.   So they -- no one told you that anything that happened in

17   September of 2007 had anything to do with anybody wearing

18   anything like any of the symbols or phrases on Exhibit 2,

19   right?

20   A.   Right, had nothing to do with wearing something.

21   Q.   Now, the rumor that you had suspended a student because she

22   identified as a lesbian, did you think that was ridiculous?

23   A.   Yes.

24   Q.   Now, again, we can go through your notes, but would you

25   agree with me that you did tell several students that you

1    interviewed during the course of the September investigation

2    not to discuss their sexual orientation?

3    A.   I did tell them that, with the understanding of those

4    things I've already mentioned before, about sexual harassment

5    issues.  We had this issue at hand that I was attempting to --

6    Q.   Again, sir, I'm sorry to interrupt you, and I don't mean to

7    do it because I think it's rude, but I really just need you to

8    answer my question, which is:  You did tell several students

9    not to discuss their sexual orientation?

10   A.   I did, yes, sir.

11   Q.   Now, I want to talk a little bit about how it could have

12   been that a rumor got started that you had suspended a student

13   because she was a lesbian.

14       On Monday, September 10, you called C.W. into your office

15   because of the report you had gotten from Ms. Harris about C.W.

16   saying she was being teased because she was a gay, right?

17   A.   Yes.

18   Q.   And you -- and Ms. Harris, who reported the conversation

19   that C.W. had confided in her, said that the anti-gay comments

20   had upset C.W., right?

21   A.   Repeat that, please.

22   Q.   Ms. Harris, who had spoken to C.W., told you that C.W. had

23   said she was upset by the anti-gay comments that she had heard?

24   A.   Well, she told me that she didn't know what to say or do.

25   Ms. Harris was a beginning teacher aide, and I'm sure it was

1    the first time she had ever been confronted with --

2    Q.  Sorry, Mr. Davis, the question, sir, is:  Ms. Harris told

3    you that C.W. had said she was upset by what the kids had said

4    to C.W.?  I know it's a little bit of an involved question.

5    But you understand where I'm going?

6    A.  No, it's not clear to me where you're going.

7    Q.  C.W. spoke to Ms. Harris?

8    A.  Yes.

9    Q.  Ms. Harris spoke to you?

10   A.  Yes.

11   Q.  One of the things Ms. Harris said to you was that C.W. was

12   upset because the kids had taunted her about being --

13   identifying as a lesbian?

14   A.  I don't recall her saying she was upset.

15   Q.  You don't recall her saying that C.W. was upset?

16   A.  Right, I don't recall it.

17   Q.  Did you know that C.W. was upset?

18   A.  No, I don't recall that.  She evidently had concerns, or

19   she wouldn't be reporting it.

20   Q.  Do you remember Christa Harris telling you that the reason

21   C.W. didn't want to report this is because she didn't want her

22   grandmother to know that she identified as a lesbian?

23   A.  No.

24   Q.  You asked C.W. -- withdrawn.  I want to talk to you a

25   little bit about your side of the conversation with C.W. on

1    September 10 when you called her into the office.  You asked

2    her several times, "What's the point --"

3    A.   Yes.

4    Q.   "-- of telling Ms. Harris that you identified as a

5    lesbian?"

6    A.   Right.

7    Q.   And you knew that she was confiding in that conversation to

8    an aide that she had been taunted because of her sexual

9    orientation?

10   A.   No, I didn't know that.

11   Q.   Ms. Harris didn't tell you that?

12   A.   No.

13   Q.   What did Ms. Harris tell you that C.W. had told her?

14   A.   That she was a lesbian and that some girls had been teasing

15   her; that she was a lesbian and another student was as well.

16   Q.   And that's all she told you?  That's all Ms. Harris told

17   you about her conversations?

18   A.   She told me that kids were telling her that there was some

19   misconduct, sexual misconduct, going on in the bathrooms, and

20   that these students that you mentioned were meeting middle

21   school kids in the bathroom regularly.

22   Q.   But she didn't tell you that C.W. was upset about being

23   teased that she was a lesbian?

24   A.   I don't recall her saying that, no.

25   Q.   Okay.  But in any event, we can agree that during the

1  conversation with C.W., you asked her several times, "What's

2  the point of telling Ms. Harris you're a lesbian"?

3  A.  "Why are you telling her?"

4  Q.  In fact you said, "What's the point," right?

5  A.  That means "Why were you telling her?"

6  Q.  Whatever it means to you, what you told her was, "What's

7  the point"?

8  A.  That's exactly it.

9  Q.  Okay.  And you asked her if she is a lesbian?

10 A.  No, I did not.

11 Q.  You did not.  But you told her not to discuss her sexual

12 orientation in school, and you asked her the phone number of

13 her grandmother so you could tell her grandmother about the

14 incident, right?

15 A.  I don't recall why I took the number.  I don't recall.

16 Q.  But you admit that you asked C.W. for the phone number of

17 her grandmother?

18 A.  Yes.

19 Q.  And can we also agree that at some point you spoke to

20 C.W.'s guardians to inform them for the first time that C.W.

21 identified as a lesbian?

22 A.  I don't recall that, no.

23 Q.  You don't recall talking to Mr. W. and Mr. W. telling you

24 that he had had a very hurtful conversation with his daughter

25 because, in effect, you had outed her to her family?

1    A.  No, that was not the conversation.

2    Q.  Do you disagree, sir, or do you deny that you were the

3    first one that told C.W.'s family that she identified as a

4    lesbian?

5    A.  I don't recall how the conversation -- are you referring to

6    the conversation I had with her father?

7    Q.  Either her grandmother or her father.  The purpose of my

8    question, sir, was just to see whether you deny --

9    A.  I didn't talk to the grandmother.  I talked with her father

10   some time later.

11   Q.  And you told her father that C.W. identified as a lesbian?

12   A.  I can't recall.

13   Q.  Well, do you remember C.W.'s father telling you that as a

14   result of what you told him, he threatened to kick C.W. out of

15   the house?

16   A.  There was some conversation to that regard, and I -- we --

17   I told -- spoke to him about that, and how that would be

18   devastating to Cxxxxx, and -- but I can't remember just exactly

19   how the conversation went.  I would have to refer back to my

20   notes.

21   Q.  Now Mr. Davis, you told C.W. not to tell anybody at school

22   that she identified as a lesbian.  What was the educational

23   purpose of your telling her father that she was a lesbian?

24   A.  I don't know that I told him that.

25   Q.  You certainly discussed the fact and you remember that

1  Mr. W. learned that from you, right?

2  A.  I don't know that he learned that from me.  I do not

3  believe that he did.

4  Q.  Would you agree that suspending someone from school because

5  they identify as gay or lesbian would be wrong?

6  A.  I don't suspend children from school for identifying

7  themselves as gay or lesbian.

8  Q.  And it would be wrong to do that, wouldn't it?

9  A.  It would violate School Board -- it would violate the

10 integrity of my office, yes.

11 Q.  What about your own beliefs, sir, do you believe it would

12 be wrong -- I've had to ask you this question three times now.

13 A.  Do I believe it would be wrong?

14 Q.  Yes, to suspend someone because they identify as being gay

15 or lesbian?

16 A.  Yes, it would be wrong.

17 Q.  So at least on that principle, you agree with the students

18 you suspended, because they were reacting to the rumor that

19 that's what you had done.  So you agreed with them?

20 A.  No, I do not agree with them.  That's a misrepresentation

21 of what they were doing.

22 Q.  But they told you that that's what they believed?

23 A.  But your interpretation of that information is not

24 accurate, I don't believe.

25 Q.  Well, regardless of my interpretation, because that doesn't

1    matter, what they -- again, they told you was, they were

2    reacting to the fact that they felt that you had suspended C.W.

3    because she identified as a lesbian?  We've been through that.

4    A.  Yes, they did tell me that.

5    Q.  And they thought that was wrong?

6    A.  Some of them expressed that, yes.

7    Q.  And you agree that that's wrong?

8    A.  I agree that it's wrong to suspend kids for being gay and

9    lesbian, yes.

10   Q.  Now, Mr. Davis, in light of knowing all this, that these

11   kids were reacting to the fact that they thought you had taken

12   anti-gay actions, did you think this is a great time for a

13   learning opportunity to teach tolerance?

14   A.  What I know is what took place.

15   Q.  Sir, my question, listen to my question.

16   A.  I do not believe this is a good time to teach tolerance.  I

17   do not believe in teaching tolerance to misbehavior.

18   Q.  But you didn't think that you could go to these students

19   and say:  This rumor is crazy.  I would never suspend anybody

20   because of their sexual orientation.  We should accept people,

21   gays, straights?  Did you ever think of doing that?

22   A.  I told numerous students, told numerous students, that this

23   had nothing to do with gay and lesbian issues.  My generic

24   answer to any student who mentioned those issues was that gay

25   and lesbianism is not the issue here.  If that's an issue, it's

1    a parental issue.  My concerns is a disruption of the

2    educational process and the things that took place at the

3    school.

4    Q.  And that disruption had nothing to do with gay rights?

5    A.  I think they rallied around that issue, yes.

6    Q.  But that was not really the substance of the issue?

7    A.  Not to me, no.

8    Q.  Now, would you agree with me, sir, that nowhere, not in any

9    place in the -- I don't know, 40 or so pages of your notes, of

10   your investigation in September of '07, nowhere is there any

11   indication in there at all that anywhere in the course of any

12   of your 40 odd interviews that you ever said to any student, "I

13   would never suspend somebody because they're gay.  That would

14   be wrong"?

15   A.  It is not in my notes, no.

16   Q.  Now, generally you've got the ability to control the spread

17   of rumors at PDL?

18   A.  That's what I attempted to do.

19   Q.  And you've got the ability to do that?

20   A.  You can't stop children who are intent upon spreading

21   rumors from doing that, no.

22   Q.  So you don't have the ability to control the spread of

23   rumors?

24   A.  Not when kids have that intent, no.

25   Q.  Would you take a look at page 325 of your deposition, sir?

1    A.   Page 325?

2    Q.   Yes, sir, page 325.  And I'm going to start reading at line

3    6.  325, line 6.  "Okay, so it's fair to say that when rumors

4    are spreading around the school" --

5    A.   I don't have the page.

6    Q.   I'm sorry, I didn't notice you weren't done.

7    A.   I said, I don't have a 325.

8    Q.   I'm sorry, let me correct that immediately.

9         MR. BEENEY:  Your Honor, may I approach?

10        THE COURT:  Yes.

11   BY MR. BEENEY:

12   Q.   Mr. Davis, sorry for the form that this is in, but we don't

13   have it here either.

14   A.   No harm done.  We're all human.

15   Q.   Sorry.  I'm just going to pass on that impeachment and

16   let's get on to something else.

17        Now I want to look at the second reason that the students

18   told you they were doing the stuff that you investigated back

19   in September, and that's the assembly.  And the students told

20   you that they were going to leave an assembly if there was an

21   anti-gay preacher at the assembly, right?

22   A.   They said that was the intent, yes.

23   Q.   Now, an assembly had been arranged for September 12th,

24   correct?

25   A.   That's true.

1    Q.   And in PDL you have a school bulletin that you send around

2    from time to time?

3    A.   That's true.

4    Q.   And this assembly had been advertised in the school

5    bulletin, right?

6    A.   It was addressed to the teachers, yes.

7    Q.   And I would like to ask you to look at Exhibit 11, if you

8    would, in your binder, Mr. Davis, and hopefully you have that.

9    And do you recognize the two documents in Exhibit 11, sir?

10   A.   Yes.

11   Q.   And what are they?

12   A.   They are daily bulletins that goes out to teachers each

13   day.

14            MR. BEENEY:  Your Honor, I offer Exhibit 11.

15            MS. DINCMAN:  No objection, Your Honor.

16            THE COURT:  Be admitted.

17        **(Plaintiff Exhibit No. 11 received in evidence.)**

18   BY MR. BEENEY:

19   Q.   Mr. Davis, if you'd turn to the second page of the

20   September 11 bulletin, and under the bullet, "Teachers" -- it's

21   actually two up from there, I'm sorry.  It's the fourth bullet

22   down.  And you had written here that there was going to be a --

23   is "pastor" the right word?  What's the right word to describe

24   Mr. Williams?

25   A.   A speaker.

Q.  What -- I'm a speaker, you're a speaker, we're all

speakers.  But what is he?  What's the correct phrase to use

for him?  He comes from the Carmel assembly of God Church.  Is

he a pastor or a reverend?

A.  I didn't get that information from them when they came to

schedule this meeting.  I was just -- I was -- I was given

information about his presentations at the schools and such.

Q.  Okay.  Let's just call him Mr. Williams, then.  And you

advertised Mr. Williams was going to be the guest speaker from

the Carmel assembly of God Church, and that the presentation

will, quote, "will consist of issues of morality," quote.

A.  Right.

Q.  And those are the words that you used, "issues of

morality"?

A.  Yes.

Q.  Now in the context of other things that were going on at

the time, the children you interviewed told you that they

thought issues of morality meant that Mr. Williams was going to

say things that were anti-gay, right?

A.  No, sir, they did not say that.

Q.  What did they tell you?  I thought we just agreed that they

told you that they were going to leave the assembly if the

speaker was anti-gay?

A.  They did, but they didn't say anything about issues of

morality.

1    Q.  You're absolutely right.  But kids told you they were going

2    to leave the assembly if there was an anti-gay preacher, and

3    you knew that before the assembly occurred?

4    A.  Yes, and I expressed that to some students that it had

5    nothing to do with that.

6    Q.  Well, you didn't express that in your notes.

7    A.  Well, it's not necessary to express everything I say in my

8    notes.

9    Q.  I agree.  I'm just trying to establish that it's not in

10   your notes.  Now, did you think that -- PDL has got a public

11   address system, right?

12   A.  It does.

13   Q.  In light of everything that was going on and the rumors

14   that were started, did you ever think about getting on the PA

15   system and say, "This assembly we're having is going to be

16   drunk driving and how you recover from a tragedy"?

17   A.  I did not do that because I felt like that information was

18   already out there.

19   Q.  Even though the kids told you there was a rumor that the

20   preacher was going to be anti-gay -- I'm sorry, the speaker,

21   was going to be anti-gay?

22   A.  They did tell me that, but I didn't believe that.

23   Q.  So you didn't believe --

24   A.  I didn't believe they thought that.

25   Q.  You didn't believe they thought that?

1   A.  No.

2   Q.  So you didn't believe that, but you did believe when they

3   told you these kids were doing all this stuff that they said

4   they did?

5   A.  I didn't believe that these kids were ignorant to what it

6   was about, because all the teachers knew, and all they had to

7   do to find out was ask.

8          THE COURT:  Mr. Beeney, when you are at a convenient

9   break point, we'll take our afternoon break.

10         MR. BEENEY:  Yes, Your Honor.

11         THE COURT:  Let's take our break for 15 minutes and

12  start back up at 3:15.

13         MR. BEENEY:  Thank you, Your Honor.

14     **(Recess from 3:00 p.m. until 3:15 p.m.)**

15         THE COURT:  Be seated.

16         MR. BEENEY:  Thank you, Your Honor.

17  BY MR. BEENEY:

18  Q.  All set, Mr. Davis?  There's just a couple questions more

19  about this assembly.  The children that told you that they

20  would leave an assembly if there was an anti-gay speaker, you

21  thought that the rumor was silly, right?

22  A.  The rumor was what?

23  Q.  Silly.

24  A.  I can't remember what I thought about that.

25  Q.  You thought it was humorous?

1    A.   I can't remember what I thought about that.

2    Q.   Turn to your deposition on page 126, Mr. Davis.  Okay, and

3    line 16:

4        "Question:  There were a lot of rumors rolling around at

5    the time?

6        "Answer:  In fact I was talking to various students and

7    they mentioned -- they mentioned the assembly and such things.

8    It was kind of humorous, you know, that things could get that

9    far off track.  Of course, in a school setting truth has a --

10    has difficulty remaining truth as it's being told.  Of course,

11    that's probably true with all humanity."

12        So you thought it was humorous that the students thought

13    that there would be an anti-gay preacher?

14    A.   You're misrepresenting the context of what I'm saying.  I

15    thought it was humorous that things could get that far off

16    track and that something as simple as an assembly could get

17    that distorted.

18    Q.   It was so distorted that actually, before Mr. Williams

19    spoke, you went to speak to him to make sure he wasn't going to

20    say anything anti-gay, right?

21    A.   I didn't go to speak to him to make sure he wasn't going to

22    say anything anti-gay.  I had concerns.  I didn't want him to

23    inadvertently go in that direction to cause a situation to

24    escalate.

25    Q.   Intentionally, or inadvertently, you went to him and you

1  said, "You don't plan to say anti-gay things, do you?"  You

2  said that to him, right?

3  A.  What I said to him was that there's been rumors.

4  Q.  Can you answer my question, sir:  Did you say that to him

5  or no?

6  A.  I'm explaining what I did say.

7          THE COURT:  No, sir, please answer his question.

8          THE WITNESS:  Let me hear it again.  I'm sorry.

9  BY MR. BEENEY:

10  Q.  Did you say to Mr. Williams, "You don't plan to say

11  anti-gay things, do you?"  Did you say that to him?

12  A.  Something similar to that, yes, sir.

13  Q.  And you also told him before Mr. Williams spoke that you've

14  got some issues going on with some students about the gay and

15  lesbian group?  You told him that, right?

16  A.  Something similar to that, right, yes.  I can't recall my

17  exact words.

18  Q.  And the reason you said to Mr. Williams you don't plan to

19  say anything anti-gay, because you had some concern or some

20  doubt that he might say something that was anti-gay?

21  A.  Absolutely not.

22  Q.  Turn to page 134, sir, of your deposition.

23  A.  Sure.

24  Q.  Line 20 of 134:

25          "Question:  Part of the reason you asked him" -- and him is

1    Mr. Williams -- "whether he was going to talk about gay and

2    lesbian issues is because you were concerned that students were

3    going to walk out if gay and lesbian issues were discussed?

4        "Answer:  I didn't want to give them -- first of all, I

5    wanted to make sure.  I had a -- evidently a bit of doubt -- or

6    I had concern, I should say, to some degree, enough of a

7    concern to mention it to him.  Because I wanted to make sure

8    that that -- that nothing -- that would keep him from alluding

9    to anything that could be interpreted that way."

10        Were you asked those questions and did you give that

11   answer?

12   A.  I did, yes.

13   Q.  All right.  Now, Mr. Davis, I want to move on to another

14   topic.  And that topic has to do with the symbols on

15   Plaintiff's Exhibit 2 which have been banned in Holmes County

16   schools.

17        Now, you can't explain, can you, sir, any connection

18   between those symbols and the events at PDL in September of

19   '07?

20   A.  There is a connection because one in particular, the first

21   one, was what I would call the rallying cry, so to speak, for

22   lack of a better term.

23            MR. BEENEY:  Could I have that answer read back?

24        (Record read.)

25   BY MR. BEENEY:

1   Q.  And is it only the first one that you believe you can

2   connect to the events of September of 2007?  I mean, for

3   example, Mr. Davis, let's take, "I Support Equal Marriage

4   Rights."  You can't explain any connection of that to any

5   events of September 2007, can you?

6   A.  Connection in the sense of it's of the same context, the

7   same content.

8   Q.  Would you turn to your deposition on page 84, Mr. Davis?

9   And line 20 is where I'm going, sir.  On line 20:

10       "Question:  Okay, can you explain any connection between

11  that slogan" -- and that is the one right above that line 17,

12  "I support equal marriage rights" -- "Can you explain any

13  connection between that slogan and the events of September 2007

14  regarding the gay pride movement?"

15       "Answer, on line 25:  "No, I can't explain that."

16       Were you asked that question and did you give that answer?

17  A.  I did in fact, yes.

18  Q.  Now, Mr. Davis, I want to ask you some questions about a

19  conversation that you had on September 12th with M.M.  And I'm

20  going to ask you to look at your notes so you can refresh your

21  recollection about that conversation.

22  A.  Notes are under what heading now?

23  Q.  Thirteen, sir.  And I'll try to find you the page that I'm

24  talking about.  I think if you go to the back, you see you've

25  got your typed notes?  You see your typed notes there,

1    Mr. Davis?

2    A.  Yes.

3    Q.  And go in two pages and you'll see on the left-hand side

4    there's a conversation you had with M.M.

5    A.  I apologize, I'm just not --

6    Q.  It's hard to get through.  I know.  You got 13, right?

7    Exhibit 13, Mr. Davis?

8    A.  Yes.

9    Q.  Go to your typed notes and then go backwards a couple

10   pages.

11        MS. DINCMAN:  Are you talking about backwards from the

12   beginning?

13        MR. BEENEY:  Backwards from the typed notes, yeah.

14   There's no lawyer's number on there, but you'll see on the

15   bottom it says Gillman Exhibit 19.

16        THE WITNESS:  Yes.

17   BY MR. BEENEY:

18   Q.  You got that page?

19   A.  Yes, yes.

20   Q.  Can we put that up, please?  And I'm talking about the top

21   half, the interview that you had with M.M.  And just take a

22   moment to read that and refresh your recollection, and I want

23   to ask you some questions about it.

24   A.  I'm trying to locate M.M. on mine.  I don't see that.

25   Q.  On the top of the page, 9/12, 10:25.

1    A.   It looks like Cd.M., is that what you're referring to?

2    Q.   I'm sorry, yes, sir.  I don't know why mine says M.M., but

3    in any event that is the one I'm referring to.  It's on your

4    screen too, Mr. Davis, just to make sure we've got the right

5    one.

6    A.   Yes.

7    Q.   Now, the incident that's reflected in this interview of

8    Cd.M. concerns heterosexual talk, right?

9    A.   Yes.

10   Q.   Basically, what the incident here was is some kid offering

11   another kid $5 if he would ask M.P. for the opportunity to get

12   into her pants.

13   A.   That's true.

14   Q.   Now Mr. Davis, surely you would agree with me that that

15   conversation is far more sexually explicit than anything on

16   Plaintiff's Exhibit 2, is that right?

17   A.   I agree with you.

18   Q.   And your notes indicate that there were several people

19   involved, and the ones in particular that I'm talking about

20   here is the list, you've got boys involved in daring, No. 1,

21   C.W., No. 4, C.S., No. 5, J.J., No. 6, C.M.  Do you see that?

22   A.   Yes.

23   Q.   Now, were any of these children that I just mentioned, were

24   they warned not to discuss heterosexual issues at PDL?

25   A.   These people were not warned not to express heterosexual

1  speech at PDL because these people, it could not be confirmed

2  they were guilty of what they were charged.

3  Q.  When you say they were not -- couldn't be confirmed, you've

4  got here a report from the student that you're talking to that

5  these were the boys that were involved, right?

6  A.  Yes.

7  Q.  And that's exactly what you relied on in the investigation

8  of all the other students that were suspended, what one kid

9  said about another?

10  A.  But it was an accumulation of children who gave me the same

11  information repeatedly.

12  Q.  So you would not rely on it when one child told you that,

13  but you would when a couple did?

14  A.  There are some children in my school I rely on anything

15  they told me.  Others I would not rely on anything they said.

16  Q.  And what about the person that gave you this information,

17  where does she fit in that continuum?

18  A.  The young lady in this case?

19  Q.  Yes, sir.

20  A.  I'm not that familiar with her.  She's kind of a new

21  student and so I don't have a background on her.

22  Q.  But in any event, you spent a lot of time investigating

23  children having "Gay Pride" written on their hand, but not so

24  much when a kid offers another girl $5 to get into her pants?

25  A.  Because I had all the facts in a short time.

1    Q.   About what?

2    A.   About the issue at hand here.

3    Q.   Well, did you talk to C.W.?

4    A.   Who is C.W.?

5    Q.   Well, one of the boys that were involved, No. 1, C.W. --

6    Ch.W. I think is written there -- did you talk to him about

7    offering a kid $5 to get into somebody's pants?

8    A.   I don't recall all that I said to these children.

9    Q.   There's nothing in your notes that you spoke to C.W.

10   A.   I can't -- it's hard to recall all of the content and what

11   all was said there.

12   Q.   Did you speak to --

13   A.   They certainly -- they certainly knew my feelings and my

14   thoughts in regards to asking a young girl such a question.

15   Q.   But you didn't even speak to them, whereas you were really

16   out there talking to those kids that had "Gay Pride" written on

17   their hand?

18   A.   But I did speak to these children for the most part.

19   Q.   Mr. Davis, are you testifying under oath that you spoke to

20   the kids that are listed here?

21   A.   What I'm telling you is that I heard enough from these kids

22   to understand that I couldn't make it come to a conclusive end

23   as to whether or not they were guilty of what was said about

24   them.

25   Q.   We'll agree you didn't continue your investigation to

1    follow the thread where it might have led?

2    A.  Right.  What I didn't -- it was no intentional thing.  I

3    felt like I had all the information that I needed to make a

4    judgment about what took place.

5    Q.  Now, as opposed to not even talking to these kids that some

6    students reported were offering a kid $5 to get into somebody's

7    pants.  I would like to just ask you to take a look at T.B. and

8    we can go to your typed pages for this.

9    A.  I'm not telling you -- you said -- you're putting -- making

10   statements that may not be accurate.  I didn't say that I did

11   not talk to these children.

12   Q.  Well, you can't remember -- let's just see if --

13   A.  What I said is I can't remember if --

14           THE COURT:  Time out.  Time out.  Let's ask the

15   question.  Listen carefully.  Answer the question and then

16   we'll move on.

17           THE WITNESS:  I apologize.

18           MR. BEENEY:  Thank you, Your Honor.

19   BY MR. BEENEY:

20   Q.  You have no recollection of talking to these children about

21   making that suggestion?

22   A.  I have a recollection of talking to some children, but

23   exactly which ones and how long, I can't say.

24   Q.  And there's nothing in your notes that reflects any

25   conversation --

1    A.   Nothing in my notes, right.

2    Q.   Let's turn to the last page of this exhibit.  And

3    Mr. Davis, can we agree that the six items -- the last page of

4    Exhibit 13.

5    A.   The typed pages?

6    Q.   Yes, sir.

7    A.   Yes.

8    Q.   Can we agree that the six items you've listed there under

9    T.B., those are the reasons that you suspended T.B. for five

10   days?

11   A.   Yes, this is the information.

12   Q.   Not only is this the information; this is the reason you

13   suspended T.B. for five days?

14   A.   This is the information I used to suspend, yes.

15   Q.   And what's there is that T.B. was reported -- in the first

16   line, you've got a teacher saying what a kid was saying about

17   what T.B. was doing, right?

18   A.   Yes.

19   Q.   And the second line you've got another kid saying that T.B.

20   had asked her if she was against gays, right?

21   A.   Yes.

22   Q.   And the third line is basically another kid saying that

23   T.B. was among those going around saying "Gay Pride"?

24   A.   Yes.

25   Q.   And the fourth line is that some other kid said that T.B.

1    asked that kid if he was supporting gay stuff?

2    A.   Yes.

3    Q.   And fifth line, another kid said that T.B. was going to

4    walk out of the assembly with other students in protest, and he

5    saw "GP" on her hand?

6    A.   Yes.

7    Q.   And the final one is that C.B. said he saw T.B. making

8    posters with "Gay Pride" and rainbows?

9    A.   Yes.

10   Q.   And that she asked him to draw one?

11   A.   Yes.

12   Q.   And for those offenses you suspended T.B. for five days?

13   A.   There is one I evidently failed to put in there.

14   Q.   Let me rephrase my question if there are things you failed

15   to put in here.

16        When you wrote down the reasons that you suspended T.B.,

17   that's it, right?

18   A.   That is what I typed out of my notes, yes.

19   Q.   And in fact, you submitted an affidavit to the court saying

20   that this was the basis, 1 through 6, on which you decided to

21   suspend T.B.  Do you remember that?

22   A.   I'm sure I did.  I signed several affidavits.  So I'm sure

23   I did.

24   Q.   Okay.  Mr. Davis, on the topic of your affidavit, let's

25   turn to that and I think you'll find it, sir, under Exhibit 25.

1    Let me ask you, sir, if you recognize Exhibit 25.

2    A.   Yes.

3    Q.   And that's the affidavit you signed?

4    A.   Yes.

5    Q.   Now, I want to direct your attention to paragraph 35, which

6    is toward the end.  And the last sentence of paragraph 35,

7    "what happened in September of 2007 was so disruptive to the

8    school environment that I believe if the symbols and slogans

9    are allowed in school, the same kind of disruption will occur

10   again."  Is that what you believe, Mr. Davis?

11   A.   Yes.

12   Q.   Isn't it true though, sir, contrary to your affidavit, you

13   don't even know what you would anticipate what would happen at

14   PDL if Ms. Gillman wore a "Gay Pride" T-shirt today?

15   A.   I could speculate as to what might happen.  There are --

16   you got to consider all the possibilities because kids' safety

17   and the security of our school and the educational process must

18   be preserved.

19   Q.   Okay, now, I've got a whole list of questions here, but I'm

20   going to try to see if we can do this in kind of a shorthand

21   fashion.  You used the word "speculate."  And we're talking

22   about using the events of September 2007 to predict what might

23   happen if any student wore the symbols and phrases in

24   Exhibit 2?

25   A.   Right.

1    Q.  Would you agree with me that that speculation is really

2    about as certain as you can get about predicting the future if

3    students wore Exhibit 2 phrases and symbols?

4    A.  Yes.  You have to draw from experience.  You draw from

5    knowing children, and you make your best judgments of that.  A

6    principal must make proactive and never reactive.

7    Q.  But we agree it's speculation about what will happen in the

8    future?

9    A.  Well, based on the knowledge that I have, yes.

10           THE COURT:  Mr. Davis, was there ever some prior

11   incident, for the lack of a better word, where other mottos or

12   slogans, or whatever, actually caused disruption at the school?

13   Was there some prior experience that you were relying on?

14           THE WITNESS:  No, sir.  What I was -- Your Honor, I

15   was relying on knowing the sentiments of the children and

16   knowing their thoughts, hearing them speak out at such things,

17   and I realized it was certainly a risk.

18           THE COURT:  Did you ever hear any reports of threats

19   by other students against these people who would be wearing

20   these statements and T-shirts?

21           THE WITNESS:  I've heard -- I've heard not threats, as

22   injury type threats --

23           THE COURT:  Anybody say we're going to beat these

24   people up because they're advocating homosexual issues?

25           THE WITNESS:  No, sir.  What I have heard is -- is

1    students speak with some degree with disgust, and what I

2    believe, with some degree of anger, and said, "Well, if they

3    can wear their slogans, then we're going to wear our slogans

4    that are contradictory to that," and I can see how that can end

5    up in a situation that would have a devastating impact on our

6    school.

7            THE COURT:  Speaking of slogans, do you have a student

8    parking lot?

9            THE WITNESS:  Yes, sir, we do.

10           THE COURT:  Do you ever go and see what kind of bumper

11   stickers are on these student cars?  See what type of

12   inflammatory stuff -- you'll agree with me the stuff we see on

13   bumper stickers gets pretty bad?

14           THE WITNESS:  You're certainly right, sir.

15           THE COURT:  Are you all keeping a close eye on bumper

16   stickers in the student parking lot?

17           THE WITNESS:  We attempt to do that, and Mr. Jones is

18   out and about frequently among the students, among the parking

19   lot.

20           THE COURT:  Do you have a rule no bumper stickers on

21   cars that students drive?

22           THE WITNESS:  No, sir, but I would apply that same

23   rule to all these other slogans, that if it violated School

24   Board policy, it would not be acceptable.  I'm not aware of any

25   rule.  I should say that.

1      THE COURT:  All right, counsel.

2   BY MR. BEENEY:

3   Q.  And Mr. Davis, just to follow up on one of His Honor's

4   questions, the only incident, however you want to characterize

5   it, that had anything to do with gay pride, or indeed anything

6   else on Plaintiff's Exhibit 2, is what happened in September of

7   2007 at PDL?

8   A.  Yes, that's my only experience I recall.  I have had

9   experiences where children have said derogatory things toward

10  other students, and it would upset them, and of course when

11  children get upset, then they go to class, it makes learning

12  become very difficult for them.  And so where I find these

13  infractions, I try to deal with those in appropriate manners.

14  Q.  But you haven't found any student coming to you and say, "I

15  can't learn because somebody is wearing a 'Gay Pride' T-shirt"?

16  A.  No, sir.  I have not had a student come and tell me that.

17  Q.  And you've never had a teacher tell you that?

18  A.  I've never had a teacher tell me that, no.

19  Q.  All right, Mr. Davis, I hope you'll bear with me, sir,

20  while I conduct my duty to represent Ms. Gillman.  I would like

21  to ask you some questions about your belief about gay and

22  lesbian persons.

23  A.  Sure.

24  Q.  You believe that the phrase, "U have Gay Pride," -- quote,

25  "You have Gay Pride," has a sexual connotation?

1    A.   Yes, sir, I'm certain that it does.

2    Q.   And if one student said to another, "I am gay," that could

3    constitute sexual harassment in your view?

4    A.   If it's spoken to the -- to a person who is unwilling, or a

5    person who has already said, "Please don't talk to me about

6    those issues," it could become sexual harassment and become an

7    issue.

8    Q.   By simply saying, "I'm gay"?

9    A.   All depends on who they're saying it to.

10   Q.   You also believe that displaying the phrase "Gay Pride"

11   could cause students to act out in a sexual way?

12   A.   What I am saying is I'm very much aware that what children

13   hear have an impact upon them.  And oftentimes children play

14   out fantasies that -- because they have a hard time separating

15   fantasy from reality, and they have -- don't have the capacity

16   to anticipate in the future how that might affect their lives.

17   Q.   But you do believe, then, that someone displaying the

18   phrase "Gay Pride" could cause students to act out in a sexual

19   way?

20   A.   Well, I suppose -- I don't think that the majority of

21   students would act out in a sexual way.  I do think the

22   possibility that some would, yes.

23   Q.   Mr. Davis, sir, would you mind just turning to page 253 of

24   your deposition?  253.  And I'm reading, sir, on page 253 from

25   line 13:

1    "Question:  Okay.  So you are saying that gay pride could

2    have the possibility of encouraging students to act out in some

3    sort of sexual way?

4    "Answer:  It could.  The possibility is there, yes."

5    Mr. Davis, were you asked that question and did you give

6    that answer?

7    A.  You're reading from where, please?

8    Q.  I'm sorry, 253, line 13.

9    A.  Okay.

10   Q.  "Question:  So you're saying that gay pride could have the

11   possibility of encouraging" --

12   A.  Hang on just a minute.  I'm sorry, I'm not seeing what

13   you're seeing.

14   Q.  Are you on page 253 with me?

15   A.  Yes.

16   Q.  Does line 13 start with:  "Question:  Okay"?

17   A.  Line 13 on 253 starts with going to argue that there

18   were --

19        MR. BEENEY:  Can we put up 253?  Thirteen and 16.  I'm

20   sorry, Mr. Davis.  Somehow we've got two different versions.

21        THE WITNESS:  No problem.

22        (Videotape played as follows:

23        "Question:  So, you're saying that gay pride could

24   have the possibility of encouraging students to act out in some

25   sort of sexual way?

1           "Answer:  It could.  The possibility is there, yes."

2    BY MR. BEENEY:

3    Q.  And as we just saw, Mr. Davis, you were asked that question

4    and gave that answer?

5    A.  Yes.

6    Q.  Now you also believed that a student mentioning a gay

7    sexual orientation could lead students to engage in gay

8    behavior, isn't that correct?

9    A.  I suppose -- you say just mentioning?

10   Q.  Yes, sir.

11   A.  I suppose some kids if it's mentioned often enough would

12   certainly --

13   Q.  Would occasion someone to actually engage in gay behavior?

14   A.  It could, I suppose.

15   Q.  Do you believe that someone saying to another student, "I'm

16   straight," would that lead someone to engage in heterosexual

17   sex?

18   A.  If you continued in the context of that, yes.

19   Q.  Now, Mr. Davis, you believe that homosexuality is a sin, is

20   that right, sir?

21   A.  I believe that the Bible declares homosexuality is a sin,

22   yes.

23   Q.  And you believe in the Bible?

24   A.  I absolutely do.

25   Q.  So you believe that homosexuality is a sin?

1    A.   I do indeed.

2    Q.   And the Bible teaches that gays are not intended to marry,

3    so you believe they should not?

4    A.   I lay no claim to expertise on this issue because there are

5    people who are far more able to make that kind of determination

6    than I.  But you're asking for my personal beliefs?  Did I

7    understand you are asking for my personal belief?

8    Q.   Yes, sir.  Yes, sir.

9    A.   My personal belief is that gays should not marry and it

10   would be at this time a violation of the law.

11   Q.   And you think it's in fact foolish to disagree with

12   anything in the Bible, isn't that right, sir?

13   A.   I do think it's foolish to disagree with anything in the

14   Bible.  That's true.

15   Q.   And you consider yourself to be an evangelical spreading

16   the gospel to those who will receive it?

17   A.   Yes.

18   Q.   And you believe that homosexuality is an abomination?

19   A.   I believe that the Bible says that homosexuality is an

20   abomination, yes.

21   Q.   And you believe in the Bible?

22   A.   I believe in the Bible, yes.

23   Q.   So you believe that homosexuality is an abomination?

24   A.   I believe what the Bible says, yes.

25   Q.   And that includes that homosexuality is an abomination?

1    A.  What I believe is the Lord is expressing his view, his

2    knowledge of what homosexuality is, that's what I believe, and

3    I teach what the Lord says.

4    Q.  Mr. Davis, regardless of the source of your belief, you

5    believe that homosexuality is an abomination?

6    A.  I believe the Bible is true when it says homosexuality is

7    an abomination.

8          THE COURT:  Sir, you need to answer the question

9    directly.

10         THE WITNESS:  Yes.  I'm sorry.

11   BY MR. BEENEY:

12   Q.  And you believe that God punishes homosexual behavior?

13   A.  I believe that God will punish all sin, yes.

14   Q.  Including homosexual behavior?

15   A.  Any sin that is unforgiven, yes.

16   Q.  Does that include homosexual behavior?

17   A.  That includes homosexual behavior, yes.

18   Q.  I know this is a hypothetical, but you also would not

19   follow a law that you believed to be immoral, is that correct?

20   A.  If a law was so immoral that it's against all rationale, I

21   would not follow that law.  For example, if the law said that

22   we were going to euthanize all people over 80 years old, I

23   certainly wouldn't comply nor follow that law, because my

24   mother is 82 years old and I certainly would not follow that

25   law.  I would be on the streets to protest that law.

1   Q.  And in determining which law you would follow and what you

2   wouldn't, you would be the one making the judgment as to

3   whether that law was immoral?

4   A.  I would be making that judgment according to -- according

5   to what I believe is moral, yes.

6   Q.  All right.  Mr. Davis, let me move on to another topic.  I

7   want to talk to you about how the information about what

8   happened at PDL in September of 2007 got to the School Board.

9   A.  How the information got to the School Board?

10  Q.  Yes, sir.  Do you know that it did?  Did the School Board

11  get any information about what happened at PDL in September of

12  2007?

13  A.  I didn't talk with the School Board members until sometime

14  later.  I did convey with Mr. Griffin at various times about

15  the circumstance and what I was --

16  Q.  I'm sorry again, sir, I apologize for interrupting --

17  A.  I'm sorry, yes, I did -- I don't know.

18  Q.  You don't know if they got information about what happened?

19  A.  I'm sure they did because they mentioned it to me.

20  Q.  So we know the School Board did get information?

21  A.  Eventually, yes.

22  Q.  Now during the course of your September 2007 investigation,

23  you spoke to Superintendent Griffin, who is sitting here?

24  A.  Yes, I did.

25  Q.  And you kept him informed?

1    A.   Yes.

2    Q.   And you talked about what you were doing and what you were

3    hearing from the kids you were interviewing?

4    A.   I didn't go into great detail, but I gave him the gist of

5    what was going on, yes.

6    Q.   And you certainly didn't talk to him every day?

7    A.   I can't recall if I talked every day.  I wouldn't think

8    that I did because I wasn't investigating it every day, so I'm

9    certain that I didn't.

10   Q.   Did you talk to him every day of your investigation?  Your

11   investigation, you'll recall, Mr. Davis, I think you said, went

12   from September 12th to, you believe, September 24th.  Did you

13   talk to him every day in those 12 days?

14   A.   I can't recall whether I talked to him every day or not.

15   Q.   Would you turn to page 31 of your deposition, Mr. Davis?

16   And are you at page 31, sir?

17   A.   Yes.

18   Q.   Go down to line 22.

19       "Question:  Okay, how often -- did you talk to him every

20   day while this was happening?

21       "Answer:  No."

22       Were you asked that question?  Did you give that

23   information -- that answer?  Sorry.

24   A.   Yes, I did.

25   Q.   Mr. Davis, when is the last time you read your deposition

1    in this case?

2    A.  Last night.

3    Q.  Now, you certainly spoke to Mr. Davis -- I'm sorry, you

4    certainly spoke to Superintendent Griffin more than once during

5    this period of time?

6    A.  Yes.

7    Q.  But you're not sure if it was as much as five times?

8    A.  I don't know how many times.  I just talked to him as often

9    as I felt like I needed to.

10   Q.  Can you say today that you're not sure that it was as much

11   as five?

12   A.  I can't recall.

13   Q.  Okay, take a look at page 31, sir.

14   A.  Okay.

15   Q.  And at the bottom of page 31:

16       "Question:  Okay, did you talk to him more than once?

17       "Answer:  I feel fairly confident saying yes, I talked to

18   him more than once.

19       "Question:  Okay, more than five times?

20       "Answer:  I can't answer that.  I don't know."

21       Were you asked those questions and did you give those

22   answers?

23   A.  I did, yes.

24   Q.  Now, you don't in fact have a clue as to how long your

25   conversations were with Superintendent Griffin, do you?

1    A.   No, sir.

2    Q.   And you don't recall how the conversations went?

3    A.   No, sir, other than just giving some general information.

4    Q.   And you didn't bother to give Superintendent Griffin a lot

5    of detail, did you?

6    A.   I gave him all the pertinent detail, I'm sure.

7    Q.   Didn't give him a lot of detail, did you?

8    A.   I gave him pertinent detail, I'm sure.

9    Q.   Let's turn to page 33 of your deposition, sir.

10   A.   Okay.

11   Q.   And line 21:

12       "Question:  Okay, and you make it a practice not to

13   withhold information that you think he ought to know?

14       "Answer:  Well, I don't bother him with a lot of detail

15   because he's a very busy man.  I take care of my school.  But

16   if I have issues or things he needs to know, I certainly give

17   him that information."

18       Were you asked those questions and did you give those

19   answers?

20   A.   I did.

21   Q.   Now, Mr. Davis, you mentioned just a minute or so ago that

22   you've spoken with School Board members about the activities at

23   PDL in September of 2007?

24       MS. DINCMAN:  Objection, mischaracterizes his

25   testimony, assumes facts not in evidence.

1     MR. BEENEY:  I'm sorry, I thought that that's what you

2   said.  I'll ask the question without trying to characterize

3   what you said.

4         THE WITNESS:  Please.

5   BY MR. BEENEY:

6   Q.  Have you spoken with any School Board member about the

7   events at PDL in September of 2007.

8   A.  Yes.

9   Q.  And you conveyed to them --

10  A.  I've never spoken to them in any great detail about it.

11  Mr. Vernon Lewis came by one day and spoke with me briefly

12  about it.

13  Q.  And you conveyed to the School Board member that you spoke

14  with your views as to what happened at PDL in September of

15  2007?

16  A.  I can't recall exactly how the conversation went.  So I

17  can't speak --

18  Q.  I'm not asking you kind of line by line.  But what I want

19  to know is whether -- without remembering exactly what you

20  said -- you conveyed to the School Board member what you

21  believe happened in September of 2007 at PDL?

22  A.  I don't think we went line by line to speak of it in that

23  regard.  It's just -- I just can't recall enough about the

24  conversation to speak as to what the -- what the gist of the

25  conversation was about.

1    Q.  But the topic of the conversation was what happened at PDL

2    in September of 2007?

3    A.  I don't know there was a topic of the conversation.  We

4    were -- he was just by a day to visit the school and just

5    talked in general about several things.

6    Q.  Well, let me just go back to the first question I asked you

7    about ten minutes ago:  Did you talk to any School Board member

8    about the events of PDL in September of 2007?

9    A.  Are you speaking of during the time the events were

10   unfolding?

11   Q.  Anytime, sir.

12   A.  Anytime?

13   Q.  Yes, sir.

14   A.  I did not talk to the School Board members about the

15   events.  I --

16   Q.  So you have never spoken to any member of the Holmes County

17   School Board about the events at PDL in September of 2007?

18   A.  I can't recall speaking to anybody, any of the School Board

19   members in any kind of detail, no.

20   Q.  Now, with regard to PDL -- and again, Mr. Davis, this is

21   somewhat of a different subject -- you don't recall any

22   training at all that you've had with regard to the rights of

23   students under the First Amendment of the United States

24   Constitution to express themselves?

25   A.  I've never had training in that regard, no.

1   Q.  Do you agree that students have First Amendment rights

2   under the U. S. Constitution to express their views?

3   A.  There are limitations as placed on them.  In other words,

4   children can't engage in profanity and such things, but as a

5   general rule, yes.

6   Q.  Now, when you spoke to Superintendent Griffin about the

7   events at PDL in September of 2007, did you tell him that you

8   had only spoken to a couple of adults about the events and that

9   the rest of what you're reporting all came from, as it were,

10  the mouths of babes?

11  A.  I don't think I talked to him about not speaking with

12  teachers.  I believed I had enough information to make

13  judgment.

14  Q.  And did you tell Superintendent Griffin that the totality

15  of the classroom disruptions as a result of the events of

16  September of 2007 was one day, one class, ten minutes?

17  A.  I did not tell him that.

18  Q.  Did Superintendent Griffin ask you the source of your

19  information or what was the basis of your conclusions?

20  A.  I don't recall him asking that question.  I'm sure we

21  talked about things that he had any concerns about.

22  Q.  Did you show him your notes, Exhibit 13, of those

23  investigations?

24  A.  Did I show him my notes?

25  Q.  Yes, sir.

1    A.   No.

2    Q.   Did you tell him that you had notes?

3    A.   He knows I keep notes.

4    Q.   Did he ask you for the notes?

5    A.   He did not.

6    Q.   Superintendent Griffin agreed with what you did with

7    respect to the events of September 2007?

8    A.   Yes, I feel like he did.

9    Q.   And you also spoke to another person in the district

10   office, a Mr. Brown, about the events of September 2007?

11   A.   That's true.

12   Q.   But you don't recall what you said to him?

13   A.   I didn't meet specifically with Mr. Brown in his office.

14   Mr. Griffin and Mr. Brown and I, I believe, were the three, we

15   talked, at -- in Mr. Griffin's office one time about it, and I

16   was expressing all that I -- that I had come to know through

17   the investigation, and such, and we talked about it and kind of

18   determined what we should do.

19   Q.   Okay, Mr. Davis, as far as you know, do you know of any

20   source of information that either Superintendent Griffin or the

21   Board had about the events of September 2007 other than what

22   you told them?

23   A.   None other than what I told them, that's true.

24   Q.   And since September of 2007, at PDL, there have been no

25   disruptions whatsoever related to equal rights for gay and

1    lesbian persons?

2    A.   There has not.  I've heard recently that there was issues,

3    but I haven't confirmed that.

4    Q.   Now, Mr. Davis, would you agree that in all of your notes

5    of the investigation -- and take a look at them if you like,

6    sir, it's PX-13 -- that there is nothing in any of those 40 or

7    so pages of notes about any class being disrupted?

8    A.   There is several kids who told me they were making posters

9    and such in class.  And so with several children telling me the

10   same story, I don't have to ask if there's disruption.  I can

11   understand that if several children are not engaged in work

12   they're assigned to do, then that class has been disrupted.

13   And if they're asking kids to sign their names on posters, I

14   don't have to ask if it's been disrupted; I know it's been

15   disrupted.

16   Q.   My question, sir, was whether there's anything in your

17   notes about --

18   A.   Those things are in my notes.

19   Q.   Anything in which you said the class was disrupted in your

20   notes?

21   A.   Not specifically saying the class.  I drew inference -- I

22   drew conclusions from what I was told.

23   Q.   In fact, about the poster issue, you did go to the teacher

24   whose class you believe was disrupted by the poster incident,

25   right?

1    A.   I didn't say the class was disrupted.  I just asked him was

2    he aware they were doing that.

3    Q.   What did he tell you?

4    A.   He said he wasn't aware that they were doing that.

5    Q.   And did that cause you to maybe second guess your

6    conclusion that the class had been disrupted when the teacher

7    didn't know they were doing it?

8    A.   Absolutely not.

9    Q.   You concluded the class must have been disrupted even

10   though the teacher never saw it?

11   A.   I was fully confident that it was disrupted.

12   Q.   Based on what the kids told you, which the teacher never

13   saw?

14   A.   Yes, they were making posters, signing posters, those kind

15   of things.

16   Q.   But the kids told you that, and the teacher never saw it?

17   A.   There are things that go on regularly in classes that

18   teachers don't see or know about.

19   Q.   Mr. Davis, final topic, would you agree with me that the

20   best way to predict what might happen if something occurs is to

21   look at what actually does happen when it occurs?

22   A.   That's taking a reactive approach, and reactions many times

23   can get children hurt or put children in danger.

24   Q.   I'm sorry, I don't understand if that's agreeing or

25   disagreeing with what I just said.  Maybe I'll ask you again.

1        As a general matter -- and maybe I'll ask it this way,

2     because I think you'll be able to agree with it this way:  A

3     good, great predictor of what might happen if something occurs

4     is in fact what did happen if something occurs; wouldn't you

5     agree with me?

6     A.   That would certainly -- you could draw some -- yes, you

7     could draw some conclusions from that.

8     Q.   And you know now that Heather Gillman and other students

9     have worn, at Ponce De Leon High School, shirts that say "I

10    Support Gays" and rainbow belts and other things that are now

11    banned that are in PX-2, you're aware of that, right?

12    A.   I was aware of what children told me.

13    Q.   You're aware that's what they told you?

14    A.   I'm aware that that's what they told me.

15    Q.   And you're also aware that when other students saw any of

16    the symbols on PX-2, you're aware they didn't engage in any

17    sexual activity?

18    A.   I'm not aware of whether or not they did.

19    Q.   You think they did?

20    A.   Probably not.

21    Q.   You can't say with certainty?

22    A.   You can never say with certainty.

23    Q.   And you also agree with me that there were no arguments or

24    disruptions that resulted from someone seeing any of the

25    symbols or phrases on Exhibit 2?

1    A.  There were an incident in the gymnasium where an argument

2    became fairly heated, and an altercation could have easily

3    ensued from that process.  And I've heard children say things

4    that make me think that they were angry about what the

5    situation is.

6    Q.  And because someone might be angry at Heather wearing a

7    rainbow, it's banned?

8    A.  That's not the reason it's banned, no.

9         MR. BEENEY:  I have no further questions.

10        Your Honor, I do have one issue I would like to raise

11   with the court that has to do with cross-examination.  And I

12   don't know if you would rather have it at sidebar or in open

13   court.  I think it's okay to have it in open court, if that's

14   what Your Honor would like.

15        Your Honor, Mr. Davis has just testified that he did

16   not see, with one exception, any handwritten "Gay Pride" or

17   "GP."  He did not see any of the posters, he did not see

18   anybody leave an assembly.  I can go through them all, but he

19   said he didn't see any of this.  The only source of his

20   information is what he heard second, third and fourth hearsay.

21   And if the cross-examination is intended to elicit what

22   happened at PDL for the truth of the matter, it's all hearsay,

23   and it should be stricken.

24        MS. DINCMAN:  Your Honor, I do intend to go through

25   Mr. Davis' notes with him to go over what was reported to him.

It is not for the truth of the matter asserted; it is for what was reported to him and his reliance thereon in taking the actions that he took.

We've been very generous with opposing counsel, though, in allowing multiple layers of hearsay to come in given the fact -- the nature of this case.  So I expect we would be allowed the same leeway.

MR. BEENEY:  I withdraw the issue.  If nothing Mr. Davis says about the events of September 2007 are being offered for the truth of what happened, I have no objection.

THE COURT:  That doesn't give me a whole lot to go on on either side.  I think we're just going to have to see what the questions are and see how the responses go, and we'll take it --

MS. DINCMAN:  All right.

THE COURT:  Let me ask you something, Mr. Davis.  You said that things got heated a couple of times.  And you were concerned about that.  Did you consider any other way to deal with this situation -- maybe some pushing and shoving going on, even if it got to that -- other than simply banning the use of these words and these symbols?

THE WITNESS:  Sir, these words and symbols were banned by the School Board and not by me.  These slogans fall within the category of a dress code, where it said suggestive slogans would not be permitted.  And I interpreted and I see these as

sexually suggestive, and I would not allow these, nor would I allow any heterosexual slogans that might be -- that would take a child's mind from what a common -- what a child would commonly be thinking to engage in thoughts of sexual acts.

THE COURT:  What did you do to deal with the potential hotheads?

THE WITNESS:  When I found out about it, brought to my attention, it was after the fact.  And I've told a lot of children we're not going to have anybody arguing about this issue.  They go on and do -- continue to have class and let me worry about these kinds of things.

THE COURT:  You found out about it after it was all over with?

THE WITNESS:  After the fact, yes, sir.

THE COURT:  So all that brave pushing and shoving never amounted to anything?

THE WITNESS:  I assure you, sir, the person that was involved in this would have only taken a suggestion to engage.

THE COURT:  This is a person disagreeing with the message?

THE WITNESS:  Yes, and would -- and there was profanity back and forth toward one another.

THE COURT:  Is this somebody you were familiar with?

THE WITNESS:  Yes, sir.

THE COURT:  So you knew that was a troublemaker.

1          THE WITNESS:  Yes, sir, I knew that -- well, I can't

2     say she's a troublemaker.  I just know she's the kind of girl

3     that will take you to task without a second thought.

4          THE COURT:  Did anybody take her aside and say,

5     "That's enough"?

6          THE WITNESS:  When this all come to the teacher's

7     attention, it happened inside the gym locker room when they

8     were getting dressed.  I don't remember -- I believe it was as

9     they were leaving for class when all these things came about.

10    They were dressing and getting ready to go to class.

11         THE COURT:  And she apparently was in disagreement to

12    this message?

13         THE WITNESS:  I don't remember just exactly how the

14    conversation all came about, but it involved these things, and

15    then, you know, it involved their stance on homosexuality, yes.

16         THE COURT:  Was it reported to you that she threatened

17    violence?

18         THE WITNESS:  No, sir, it wasn't any threats of any

19    sort.  It was just back and forth with profanity and such.

20         THE COURT:  A little heated debate?

21         THE WITNESS:  And some friends took her by the arm and

22    went outside -- yes, sir, it was kind of like a little -- it

23    wasn't a long -- it wasn't something they continued doing over

24    any long period of time.  I'm not talking about like two or

25    three minutes of debate, it was just a few exchanges, and the

1    girls took her by the arm, I think, and took her outside, and

2    that was it.

3              THE COURT:  Any other similar incidents reported to

4    you?

5              THE WITNESS:  None reported to me, sir.

6              THE COURT:  Ms. Dincman?

7                         **CROSS-EXAMINATION**

8    BY MS. DINCMAN:

9    Q.  Good afternoon, Mr. Davis.  I know you've had a long day,

10   so I'm going to try to be as quick as I possibly can.

11       Mr. Davis, when we look at the symbols and slogans that are

12   contained in Exhibit 2 that there's this enlargement of here,

13   you're familiar with your Student Code of Conduct, aren't you?

14   A.  Yes, ma'am.

15   Q.  Nowhere in your Student Code of Conduct -- these specific

16   symbols and slogans are not addressed by name in your Student

17   Code of Conduct, isn't that correct?

18   A.  That's correct.

19   Q.  And they're also not contained in the School Board's Policy

20   Manual?  The Policy Manual itself does not make a statement

21   explicitly about these symbols and slogans; is that correct as

22   well?

23   A.  That's correct.

24   Q.  So is the first time that you're aware that the Board

25   addressed these specific symbols and slogans was in the

 1    November 12th, 2007 letter from Board counsel to the

 2    plaintiff's attorneys?  Isn't that right?

 3    A.  That's correct.

 4    Q.  That's the first time they had ever said anything about

 5    these specific symbols and slogans?

 6    A.  Specifically, yes.

 7    Q.  And when they sent that letter to plaintiff's counsel,

 8    nobody on the School Board asked for your input in making that

 9    decision, did they?

10    A.  No, ma'am.

11          MR. BEENEY:  Your Honor, I have refrained, but every

12    question is leading by definition.

13          MS. DINCMAN:  Well, this is cross-examination.

14          THE COURT:  But not of your own witness.

15          MS. DINCMAN:  Okay.  All right, very well, Your Honor.

16    BY MS. DINCMAN:

17    Q.  Who is your supervisor?

18    A.  Mr. Steve Griffin.

19    Q.  And who -- are you also ultimately responsible to the

20    Board?

21    A.  Yes, I'm ultimately responsible to the School Board, yes.

22    Q.  And if your supervisor tells you what a policy is, are you

23    bound to enforce it in the manner that he tells you?

24    A.  Yes, ma'am.

25    Q.  And would the same be true of Board policy?

1    A.   Yes, ma'am.

2    Q.   Now, some testimony was elicited about your interpretation

3    of what Board policy is, and that there may be some conflict

4    between what Board policy is versus what you think Board policy

5    is.  If you're wrong about that, what controls?

6    A.   What controls is the School Board's interpretation.  I

7    follow whatever directives they hand down to me.

8    Q.   And do you know whether there is an ability for students to

9    file a grievance or to appeal any decision that you make?

10   A.   Yes, ma'am, it's outlined in the Student Code of Conduct

11   book.

12   Q.   And so if somebody takes issue with a decision that you've

13   made, what can they do?

14   A.   They can -- they can follow the appeals process as is

15   outlined in the Student Code of Conduct.

16   Q.   All right.  And if they -- and do you know what the first

17   step of that is?

18   A.   Yes.  They're to resolve it at the school level.  They're

19   to report their writing within three days after the event

20   occurred, and I'm to look at that and report back to the

21   student within five days after I receive the -- after I receive

22   the grievance.

23   Q.   And if they're still dissatisfied, anything else they can

24   do?

25   A.   Yes, they can appeal that on to Mr. Griffin at the district

1    level.

2    Q.  And if they're dissatisfied after that, is there anything

3    else they can do?

4    A.  Yes, they can follow on to the School Board, yes.

5    Q.  And before the events of September 2007, had you not ever

6    been presented with an issue of a student wearing a pro-gay

7    slogan in your experience?

8    A.  No, ma'am.

9    Q.  That was the first time you had to deal with that?

10   A.  Yes, ma'am.

11   Q.  And I know that you testified about this not being linked

12   to gay rights, but given what was reported to you, did students

13   use certain symbols that were contained on Exhibit 2 as a means

14   to cause disruption in the school?

15          MR. BEENEY:  Objection, calls for speculation about

16   what was on students' minds.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes.

19   BY MS. DINCMAN:

20   Q.  And which one of those symbols and slogans were some of the

21   ones that were purported to you as being used by students or

22   pictures?

23   A.  The first slogan there, "Gay Pride" or "GP."  May I

24   stand -- Your Honor, may I stand and see the bottom of it?

25          THE COURT:  Sure.

 1          THE WITNESS:  The one symbol with an arrow attached, I

 2    was -- that was reported to me.  I was unfamiliar that it had

 3    anything to do with gay issues.  And also the upside down

 4    triangle, I came to know that as well.  And both those were the

 5    ones, and the rainbow, those were the ones that were primarily

 6    used.

 7    BY MS. DINCMAN:

 8    Q.   And the students had used or reported to you that they were

 9    using rainbows and drawing rainbows on themselves?

10    A.   That's correct.

11    Q.   And you were also asked about when a speaker makes a

12    peaceful statement and others react negatively, that you would

13    punish those who reacted in a negative way.  Is there a

14    difference between that when the -- when the person who is

15    doing the speaking is using the speech itself to cause a

16    disruption?

17    A.   It would be different, yes.

18    Q.   That's a world of difference between that and someone who

19    reacts negatively to someone's speech -- otherwise peaceful

20    speech?

21    A.   Yes.

22    Q.   And in September of 2007, was it reported to you that the

23    students were actually using the symbols and slogans to cause

24    the disruption?

25    A.   Yes, it was.

1        MR. BEENEY:  Your Honor, these are all leading

2   questions.  We're getting testimony from the attorney.

3        THE COURT:  I think this is fair enough to try to move

4   things along.  I don't think this is really the make-or-break

5   issues.

6        MS. DINCMAN:  Thank you, Your Honor.

7   BY MS. DINCMAN:

8   Q.  You also were asked about the Confederate flag, and I think

9   you testified that the Confederate flag, students would be

10  allowed to wear that at Ponce de Leon?

11  A.  They wear it as a -- again, as a production brand or

12  manufacturer's brand that they use on -- on their clothes

13  nowadays, yes, sir.

14  Q.  Have you ever had any disruptions caused at the school in

15  response to students wearing the Confederate flag?

16  A.  Never heard it mentioned.

17  Q.  You interviewed quite a few students in the course of your

18  investigation?

19  A.  Yes, ma'am.

20  Q.  Is that right?  And when you're running the school, by

21  necessity, you're not able to be all over the place all the

22  time, are you?

23  A.  That's certainly correct.

24  Q.  And do you have to rely on the information that you get

25  from students?

A.  Yes, because, again, I can't be everywhere all the time in every place to witness everything that takes place.

Q.  And, you know, in this particular investigation, why did you interview as many students as you did?

A.  Because, as I interviewed students, more names would be presented or manifest themselves as the process progressed, and I wanted to be sure that I had all the details and knew all the information involved so that I could make an informed decision.

Q.  And when you do that, or when you did that in this particular instance, did you keep seeing the same names coming up over and over and over again?

A.  Yes, ma'am.

Q.  And did you also keep seeing the same types of disruptive behavior about those students coming from multiple different sources?

A.  Yes, ma'am.

Q.  Did you satisfy yourself through your investigation that you had reliable information because of the repetitious nature of it?

A.  Yes, ma'am.  It's been my experience that no more than -- the students -- well, it's been my experience that students can't tell the same story twice exactly the same way unless it's true.  And so when I have several students telling me the same -- or giving me, providing me the same information, I can be certain or very confident that it's true.

1    Q.   Okay.  And some of the things that were reported to you,

2    had it been reported to you that students were writing "Gay

3    Pride" symbols and slogans in their books?

4    A.   Yes, ma'am.

5    Q.   And had it also been reported to you by multiple students

6    that students were using class time to make signs and posters?

7    A.   Yes, ma'am.

8    Q.   And had it been reported to you that students were writing

9    not only on their hands but also across their foreheads?

10   A.   Yes, ma'am.

11   Q.   And had it been reported to you that they were walking

12   around at school and in class with things written across their

13   foreheads?

14   A.   Yes, ma'am.

15   Q.   And you were in the classroom for a long time, weren't you?

16   A.   Yes, ma'am, several years.

17   Q.   Is that something that if a kid was sitting in there with

18   stuff written across their forehead, it would be disruptive?

19   A.   It would be very disruptive, yes.

20   Q.   Had it been reported to you that students were yelling "Gay

21   Pride" and jumping up and down in the hallways?

22   A.   Yes, ma'am.

23   Q.   And had it been reported to you that students were outside

24   during PE class chanting "Gay Pride" out in front of the

25   school?

1    A.   Yes, ma'am.

2    Q.   And even though you were able, it sounds like, to stop the

3    planned walkout of the assembly, did you get a lot of

4    information from students that that was planned?

5    A.   Yes, ma'am.

6    Q.   And had you also gotten reports from students that there

7    were activities taking place off campus to plan what was going

8    to happen on campus?

9    A.   Yes, ma'am.

10   Q.   What type of reports had you gotten on that score?

11   A.   Students were -- had met with the -- and discussed

12   whether -- or what the strategy would be to gain more

13   membership, and they were saying that, you know, we got a few

14   but we need a lot more because we -- to -- to carry out what

15   they intended to do.

16   Q.   And did -- were students talking about using words like

17   "join"?

18   A.   Yes.

19   Q.   And did they use words like "member"?

20   A.   Yes, ma'am.

21   Q.   And did some students report to you that they had "dropped

22   out"?

23   A.   Yes, ma'am.

24   Q.   And that other people were disappointed in them for

25   dropping out?

1    A.   Yes, ma'am.

2    Q.   Nobody ever came to you and tried to form what would be

3    considered to be a legal organization or a club?

4    A.   No, ma'am.

5    Q.   And there's a guideline and a procedure for how you go

6    about doing that?

7    A.   Yes, ma'am.

8    Q.   And legal organizations and clubs, those that are not

9    disrupting the educational process?

10   A.   That's true.

11   Q.   Had students also reported that there were plans to spray

12   paint your office?

13   A.   Yes, ma'am.  A student reported -- two students, I believe,

14   in fact reported that the plan was was to distract my attention

15   so they could go in and spray paint "Gay Pride" on the side of

16   my walls in my office.

17   Q.   They were going to use the slogan "Gay Pride"; that was

18   what was reported to you?

19   A.   Yes, ma'am.

20   Q.   And did you take that seriously?

21   A.   Yes, ma'am.

22   Q.   Were students making reports to you that they were actually

23   making plans to have future protests and walkouts on campus?

24   A.   Yes, ma'am.  But that was beyond the protest at the

25   meeting, yes, sir.  These were additional protests.

1    Q.  And were students reporting to you that they were pulling

2    other students aside in the hallways?

3    A.  Yes.

4    Q.  And did some students report to you that they didn't --

5    that they told other students who were doing that to leave them

6    alone, but the students who were having a view about gay pride"

7    or gay pride issues that kept pushing that view on them?

8    A.  Yes.

9          MR. BEENEY:  Your Honor, I don't mean to try Your

10   Honor's patience, but we are really getting testimony just from

11   the examining attorney.

12         MS. DINCMAN:  It will move along so very much faster,

13   Your Honor, if I can be granted a little leeway.

14         THE COURT:  Well, I think you pushed the margins here

15   in the last two minutes.

16         MS. DINCMAN:  All right.  I'm just about finished with

17   it anyhow.  I'll move on, Your Honor.

18   BY MS. DINCMAN:

19   Q.  Mr. Davis, what exactly did Ms. Hicks report to you when

20   she came -- when she came to you?

21   A.  She reported to me that there was -- that there was a

22   movement going on that the kids had told her about, and she

23   mentioned something about they had planned to riot, I believe

24   is the word she used.  And she said, "We can't have class, this

25   thing is getting all over the school," or something to that

1    extent.

2         And so I asked her, I said, "Well, tell me about it.

3    What's going on?"  And that was where my -- really my first

4    knowledge of how serious it was.

5    Q.  Was Ms. Hicks the one who first -- her information is what

6    prompted you to first start the investigation?

7    A.  Yes, ma'am.  I knew that I had to intervene, yes, ma'am.

8    Q.  The reports that you got from students, that information --

9    you're very familiar with the school and how things function

10   normally at the school?

11   A.  Yes, ma'am.  Yes, ma'am.

12   Q.  Based on your experience as an administrator there, as

13   assistant principal there, and as a former teacher at Ponce de

14   Leon, is that what you consider to be the normal ebb and flow

15   of student interaction at the school?

16   A.  Are you speaking of the events of -- during the time of --

17   Q.  Yes, sir.

18   A.  Absolutely not.  It was extraordinary.

19   Q.  And if you have students who do things like yell across the

20   hall to each other, you know, "Hi, what's going on tonight?"

21   "What are you doing this weekend?" is that comparable -- that

22   type of isolated incident, is that comparable to what was being

23   reported to you as what was going on at the school in September

24   of 2007?

25   A.  No, ma'am, there was no comparison at all.

1    Q.   Does it get compounded when you have multiple incidents and

2    repeat infractions by students?

3    A.   Yes, ma'am.  It can cause some severe disorder, yes.

4    Q.   And you now know, I take it, that the plaintiff was in fact

5    planning to walk out of the assembly herself?

6    A.   I've been told that.

7    Q.   And you know, given that, is there a concern in your mind

8    that if these symbols and slogans are allowed, that she herself

9    might use these in a manner that's disruptive to the school?

10   A.   That would certainly be a consideration, yes.

11             THE COURT:  Let me ask you this, Mr. Davis:  If the

12   plan was to walk out, obviously students getting up and leaving

13   the room is, to some degree, disruptive, but why, if they have

14   any of these statements or symbols on their clothing or their

15   head, does it become more disruptive?

16             THE WITNESS:  Because --

17             THE COURT:  What's the difference?

18             THE WITNESS:  Because the children, when they read

19   these things, they associate messages and their conversations

20   digress into sexual activity, it's been my experience, and

21   especially when you get into where most of this was going on in

22   a middle school setting.  If you ever -- it's so easy to lose

23   children, and especially -- people who never taught school

24   maybe won't know this, but if a sexual issue comes up --

25             THE COURT:  My question was:  What's the difference?

1     Why is it more disruptive when they get up and leave the

2     auditorium that they have on just a plain white T-shirt or a

3     T-shirt with these statements and symbols?

4            THE WITNESS:  If they get up and walk out, what's the

5     difference?  That's the question?  The difference is the manner

6     in which they plan to do that.  They planned to stand up, and

7     as the students reported to me, or several students reported to

8     me, stand up, yell, "Gay Pride," and walk out.  It is

9     disruptive.  It's disrespectful to the speaker.  It's defiance,

10    and those things I couldn't tolerate and maintain order in the

11    school.

12           THE COURT:  Okay.

13    BY MS. DINCMAN:

14    Q.  And on that point, Mr. Davis, to follow up on the -- His

15    Honor's questions to you, if you would turn to tab 13, your

16    notes, and look in from the back about 13 pages for page No.

17    1399.

18    A.  We're in 13, and looking for 1399?

19    Q.  Yes, sir.  It's a mostly white piece of paper and there is

20    a square on it.

21    A.  Yes, ma'am.

22    Q.  You found that?

23    A.  Yes, ma'am.

24    Q.  At some point during your investigation, did you go into a

25    student, F.C.'s, locker based on reports that he had some

 1    materials in his locker related to gay pride?

 2    A.   Yes.  I went there because they told me that he had some

 3    posters in his locker and I went there to see if in fact they

 4    were there.  And I wanted to -- the kids had told me when they

 5    found out, that, "Hey, Mr. Davis knows, you better get rid of

 6    your posters," why they told me that he began to discard them

 7    in all sort of manners to make sure I didn't see any of them.

 8    Q.   Had it also been reported that he had pictures of nudity in

 9    his locker as well?

10    A.   He did.  In fact I confiscated those, yes.

11    Q.   We don't get a very clear picture of this from the reader,

12    but -- Your Honor, have you spotted that spot in there, because

13    I don't think I can get a very good picture on the document

14    reader of what it is here exactly.  You can't see the detail.

15    It's 13 pages in from the back.

16            THE COURT:  I've got it.

17            MS. DINCMAN:  Have you found it?  And counsel, have

18    you found what I'm talking about?

19    BY MS. DINCMAN:

20    Q.   If you'll look at that, Mr. Davis; is this one of the items

21    that you have confiscated from F.C.'s locker?

22    A.   Yes, ma'am.

23    Q.   And it might help if you flip it over a little bit, just

24    flip the page upside down.  Do you see on there where it says,

25    "U have Gay Pride"?

1   A.   Yes.

2   Q.   And does it also contain some other statements on here that

3   are plainly obscene and offensive?

4   A.   Yes, ma'am.

5   Q.   I don't want to be gratuitous here, but does it say "U ate

6   S.," "Suck my nipples," "Bite me," and "U suck ass"?

7            MR. BEENEY:  Your Honor, I'm going to object to the

8   relevance of this.  Nobody saw it, and I'm not sure what it's

9   got to do with any issue in this case.

10           THE WITNESS:  Yes.

11           THE COURT:  Mr. Davis, F.C. is a male, right?

12           THE WITNESS:  Yes, sir.

13           THE COURT:  And two pages back he's got some pin-up

14  photographs of females?

15           THE WITNESS:  Yes, sir.

16           THE COURT:  And I can't tell whether he was supporting

17  or mocking the homosexual issues.

18  BY MS. DINCMAN:

19  Q.   Well, based on your interviews of F.C., Mr. Davis, was he

20  someone who has lined himself up in support of or in opposition

21  to gay pride?

22  A.   In support of.

23  Q.   Okay.  And you've testified that students a lot of times

24  will take symbols and slogans and go -- I guess for lack of a

25  better word -- to the lowest common denominator and revert to

1    base and lewd sexual references?

2    A.  Yes, ma'am, that's definitely true.

3    Q.  Is this an indicator of that sort of thing to you?

4    A.  Yes, it is.

5         MR. BEENEY:  I object to that, Your Honor.  If there's

6    some suggestion that the reason there are lewd phrases on this

7    document has anything to do with gay rights, that's pure

8    speculation.

9         THE COURT:  I'm having problems seeing that.  What's

10   this, a 13-year-old boy, and he's got some pin-ups in his

11   locker?

12        MS. DINCMAN:  And he also has this that I believe is

13   some sort of game, and it certainly bears the "Gay Pride"

14   slogans and symbols.  I think it's a prime example of how

15   students were in fact using those symbols and slogans in and

16   around September 2007.

17        MR. BEENEY:  Your Honor, I think it's offensive to

18   suggest that this document which has got "Bite me" on it is in

19   any way related to equal support for gay rights and lesbians.

20   If that's the suggestion, not only is it irrelevant, but it's

21   offensive.

22        THE COURT:  I don't see that.  And I think all you all

23   are doing is are hypothesizing or speculating what this young

24   teenager -- what in the world this has to do with it.

25   Obviously the obscenity part of it is not an issue with what I

1    think has been presented here that was part of the

2    communication that the plaintiff was involved with, or the

3    people.

4          Now tell me why we need to get sidetracked on this

5    stuff, which is, you know, kind of the level of what you find

6    under a 13-year-old's mattress?

7          MS. DINCMAN:  Well, Your Honor, the 13-year-old is

8    certainly involved in this.  And this young man was involved in

9    it, and I believe that the plaintiff is in fact one of his very

10   close friends.  But I'll move on, Your Honor.

11         THE COURT:  I think we need to.

12         MS. DINCMAN:  Okay.

13   BY MS. DINCMAN:

14   Q.  Mr. Davis, you were asked some questions about your

15   conversation with C.W.  Why was it that you felt that it was

16   important that you call C.W. into your office?

17   A.  Well, it was important because, again, I knew some events

18   that had happened in the past with her, and I knew that they

19   were extraordinarily stressful and things that most young

20   ladies don't have to experience in a lifetime.

21         And I knew that -- having spoken with her on several

22   occasions -- the depths of how it had hurt her and how that --

23   what her mind set was, and the things she was trying to endure

24   with those issues and still attend school.

25         And so if there were kids, as I say, adding misery to

1    misery, I wanted to make sure that I stopped that and --

2    because every child has a right to come to school without being

3    harassed or their sexual orientation being discussed among

4    other students.

5        Another reason was, was because it had been reported that

6    she and another student, middle school student, had been

7    meeting regularly in the -- in the bathrooms, in the '06,

8    '07 school year.  It was very prominent in my mind, and fresh

9    in my mind, I should say, the events that the former principal,

10   Mr. Buddy Brown, had experienced between two kids who were --

11   it was alleged was actually assaulted in the bathrooms.  And I

12   saw what he suffered and saw the anguish that he endured for

13   some time because, you know, in spite of all you can do, you

14   feel in some way responsible.

15            THE COURT:  Mr. Davis, you brought up the question of

16   an assault earlier this afternoon.  Were these heterosexual or

17   homosexual assaults?

18            THE WITNESS:  Yes, sir, it was homosexual assaults.

19            THE COURT:  Males or females?

20            THE WITNESS:  Males, sir.  And that was prominent in

21   my mind, and I wanted to make sure, or do all I could to make

22   sure that if any of those things were happening, that I stopped

23   it and -- because it's my -- one of my primary responsibilities

24   is to assure the safety and security of our students at school.

25

BY MS. DINCMAN:

Q.   And has Ms. Harris also reported to you that there was

another student, A.H., who there had been reports of some

inappropriate conduct in the bathroom?

A.   Yes, ma'am.

          MR. BEENEY:  Your Honor, I'm sorry, I need to object

to the question because the question used the word "also" as if

it was a suggestion that what Mr. Davis just testified to was

what Ms. Harris reported, and that is not accurate.

BY MS. DINCMAN:

Q.   Had Ms. Harris --

          THE COURT:  Ms. Dincman, it seems to me these matters

of assaults and whatnot is a totally different picture than

what we are dealing with here, which is speech.

          MS. DINCMAN:  Well, Your Honor, it goes to the context

of the comments that Mr. Davis made to Ms. Wxxx and his

discussions with her and what his state of mind and intent was

in making those comments.

          THE COURT:  The other thing I don't follow is, is

anybody here qualified -- I don't -- I can't imagine that

anybody could be -- that will say that this type of symbol and

this type of phrases drive people to physical assaults,

heterosexual or homosexual?  That's not what this case is

about.

          MS. DINCMAN:  No, and that's not what we're offering

1    it for, Your Honor.

2            THE COURT:  Why are we getting into it?

3            MS. DINCMAN:  To ask Mr. Davis why he gave Ms. Wxxx

4    instruction to stay away from middle school girls.  That's the

5    purpose of which it was offered, Your Honor.

6            THE COURT:  Well, I would like to hear a thoughtful

7    basis why he thinks there's some connection between that and

8    the First Amendment issues.

9            MS. DINCMAN:  And that's not the reason that we're

10   offering it, Your Honor.  The reason we're offering it, there's

11   been an allegation that he made comments to her about staying

12   away from middle school girls and that was somehow in relation

13   to trying to violate someone's First Amendment rights when in

14   fact he has a completely different state of mind that he wants

15   to testify to and to what his reasoning was for asking her to

16   stay away from middle school girls.

17           THE COURT:  I think you need to quickly move on back

18   to the First Amendment issue.

19   BY MS. DINCMAN:

20   Q.  All right, Mr. Davis, when you told Ms. Wxxx to not be

21   hanging around middle school girls, what was your intent?

22   A.  My intent was to instruct them not to be meeting middle

23   school girls in the bathroom during middle school breaks.  My

24   purpose was was to make sure, or make as certain as I could,

25   that another event was not repeated as it was in '06, '07.

1  Q.  Was your purpose to try to get her to not associate with

2  middle school children at all?

3  A.  Absolutely not.

4  Q.  And you -- some testimony was elicited about your personal

5  beliefs regarding homosexuality.  Do you impose those beliefs

6  on students at the school?

7  A.  No, ma'am.  I govern school by School Board policy.  I

8  don't allow my religious beliefs, or my political beliefs, or

9  my personal beliefs for that matter, to enter into my

10 decision-making at school.  That would violate the integrity of

11 my office.

12    While I disagree with the homosexual life-style, I

13 certainly don't hate people, and I've given my entire life to

14 try to assist people in whatever manner I can.

15    So I'm just as opposed to mistreating people because of

16 their preferences as I am any other harassment that may take

17 place at school.

18 Q.  Okay, and you don't -- do you personally discuss your

19 religion with students?

20 A.  No, ma'am, I don't make a practice of discussing any of

21 those sort of things.

22 Q.  All right.  And do you believe that all people should be

23 treated fairly, even if they are gay, or lesbian, or without

24 regard to their sexual orientation?

25 A.  Yes, ma'am.

1    Q.  There was some testimony elicited regarding your interviews

2    of students, and one particular student, Cd.M., in relation to

3    offering $5 to get into some girl's pants.  That didn't have

4    anything to do with what was going on in terms of your

5    investigation into gay pride?

6    A.  No, ma'am, that was a separate issue.

7    Q.  But I wanted to ask you, did some of the students, or one

8    of the students at least, who was involved in that, did that

9    student in fact get punished for making some kind of comment

10   like that to a girl?

11   A.  Yes.  That student was suspended from school.

12   Q.  That was Cd.M.?

13   A.  I apologize, I forget his name.  I can't think of what his

14   name is.  He's a 6th grader and I haven't learned all their

15   names yet.

16   Q.  And when the students that you had, that you told to not be

17   discussing sexual things with other kids, were some of them in

18   the context of -- did that arise in the context, at least in

19   the instance of F.C., in profanity and the nude pictures and

20   things that you had found in his locker?

21   A.  Yes, ma'am.  I -- I'm amazed at the children who come to

22   school, or who are in school, who doesn't have any restraint

23   when it comes to speaking of these kinds of things.  And so the

24   situation was, I wanted to make sure that there's no more of

25   this type of harassment going on.  It was kind of his word

1    against another kid's word as to what took place.  And he never
2    would admit having any involvement at all, and -- although I
3    believed at the time he did.  But nevertheless, the point was,
4    was to prevent this kind of event from happening again.
5    Q.  And do you feel like that if the symbols and slogans in
6    Exhibit 2 are introduced, that students are going to use them
7    in order to cause more disruption?
8    A.  I believe that they would, yes.  Some students would, yes.
9    Q.  And the students who were involved in the disruptions in
10   September of 2007, have they since then been engaging in any
11   behavior that makes you think that they would specifically?
12   Have students been trying to wear clothing that may not, on its
13   face, be a similar slogan of gay rights, but they're giving it
14   some meaning to that?
15   A.  That's the way I view it.  They wear a shirt that's
16   called -- that's got "Pink Floyd" on it.  I wasn't familiar
17   with who Pink Floyd was.  So in the beginning it didn't mean
18   much until I saw the rainbow symbol, then I saw the triangles
19   on there, and I spoke with the kids -- a couple of kids in
20   particular that I spoke with.  I think Mr. Jones spoke with
21   some students about it as well.
22   Q.  And --
23   A.  But not --
24   Q.  You may not have known this at first, but isn't Pink Floyd
25   a rock band?

A.  Yes, ma'am.

Q.  Doesn't have anything on its face to do with gay or lesbian rights or issues, does it?

A.  That's the information conveyed to me, yes.

Q.  Has it been conveyed that students are using that as a work-around to try -- and they're giving that symbol meaning even though it wouldn't normally have that?

A.  Yes, ma'am, they were using it for that specific reason, I was told.

Q.  And are they, in your view and experience, doing that because they want to continue to use this to try to make some kind of disruption?

A.  Yes.

Q.  And when these students were doing this in September, 2007, were they doing things to try to cover up and hide what they were doing?

A.  Yes, ma'am.

Q.  Did they -- did they use the -- for instance the "GP" symbol and say that it meant something else if they got caught to try to get out of it?

A.  Yes, ma'am.  We had one student told him, "If Mr. Davis asked what it meant, tell him that it was 'God's Promise,'" and another student said, "Tell him it means 'Gxxxxxx's Party.'"

Q.  Being the name of the student?

A.  Name of a student, yes.

1    Q.  Tried to use it to match the initials of a particular

2    student?

3    A.  The student's name matched the acronyms, yes.

4         THE COURT:  Mr. Davis, suppose the "GP" did stand for

5    those other two examples.  Would that have been disruptive?

6         THE WITNESS:  Yes, sir, because that's the way

7    students would interpret that.

8    BY MS. DINCMAN:

9    Q.  At that time were -- based on the reports --

10        THE COURT:  Wait just a minute.  I mean, suppose this

11   whole issue of sexual preference wasn't even on the scope and

12   you had a couple people, they started going around with "GP"

13   written on their forehead.  And nobody ever said it meant "Gay

14   Pride," they all said it meant "Gxxxxxx" whatever or the other

15   thing.  Would you consider that disruptive?

16        THE WITNESS:  Yes, sir, because anything that's made

17   in print extraordinarily like that, it distracts students to

18   ask questions, talk about it and deviate from the task at hand.

19   Any print to that regard, wouldn't make any difference what

20   they had on their foreheads, if they came in the classroom with

21   it, it would certainly be disruptive.  It would be an issue the

22   teacher would more than likely have to deal with.

23        THE COURT:  That probably wasn't the form of the

24   communication by any means.  But just wondering where you see

25   the sinister potential if there wasn't a sexual connotation at

1    all?

2          THE WITNESS:  I don't know there would be a sinister

3    potential, but I'm just saying there would be a disruptive --

4    it would be a disruptive issue because, again, the teacher

5    would no doubt have to deal with it.

6          See, when kids come into the classroom, the teacher is

7    to have their classes organized.  They have their -- they have

8    their standard written on the board, that they're going to be

9    teaching that day.  They got their objective written there, and

10   they've got what I would call a warm-up session for the kids,

11   as a general rule, when they come into class.

12         So in these cases when kids come in with things

13   written across their forehead, or what have you, instead of

14   getting down to business and doing what they should be doing,

15   being on task, they're going to be discussing these things, and

16   especially in middle school level, it would be made a big game

17   out of it, and the teacher would have to deal with it and get

18   kids back on task.

19         THE COURT:  Matter of maintaining control in the

20   classroom?

21         THE WITNESS:  Yes, sir.  Yes, sir.

22         THE COURT:  Let me ask you this:  Are you familiar

23   with the Supreme Court's decision back in the sixties over the

24   students in school wearing black armbands about the Vietnam

25   war?

1          THE WITNESS:  I wasn't until lately when I've been

2     told a time or two about kind of what was the gist of it.

3          THE COURT:  I may be the only one old enough to

4     remember that, but that was a bitter, bitter divisive issue in

5     this country.

6          THE WITNESS:  Yes, sir, I'm well aware because I was

7     part of it.

8          THE COURT:  Far more than the question of sexual

9     preference.  How do we square what the School Board has done on

10    these statements and those symbols where the Supreme Court said

11    in the context of even the divisive days of Vietnam that

12    students could wear a black armband?

13         THE WITNESS:  Yes, sir, I experienced those days, I

14    was there, by the way, and I recall.  But anyway, to answer

15    your question, sir, is that a black armband will not cause

16    children's lives to be disrupted through pregnancy and other

17    things, and I don't think the scope of the black armband would

18    have nearly the impact that children --

19         THE COURT:  Talking about homosexuality here, nobody

20    is getting pregnant.

21         THE WITNESS:  But what I'm saying, when we're

22    considering homosexuality, I'm considering heterosexuality as

23    well, it's a sexual issue, because what applies to

24    homosexuality applies to heterosexuality as well.  What I'm

25    saying is there's a vast difference in wearing an armband and

1    how it can impact the future of a child's life and sexual

2    issues.

3            If sexual issues become common, and if children cannot

4    anticipate or can't -- can't sort out in their mind through

5    wisdom the impact or the consequences of their actions, that

6    would certainly have a much broader impact and negative and

7    adverse impact on children than a black armband.

8            THE COURT:  Well, the question of homosexual rights

9    is -- has been an issue for several years now in a number of

10   state legislatures, in a number of Supreme Courts in several

11   states.  It's part of the -- really, been a significant issue

12   of public debate.

13           Now tell me why we can have our judicial system and

14   our government and our legislatures debating it fervently, but

15   it's off limits for our high school students, and for many of

16   them it is likely to be their last exposure with education.

17           THE WITNESS:  Yes, sir, I'm not saying it in the high

18   school situation that these issues are off limits.  In the

19   appropriate context it would be appropriate to talk about these

20   things, especially in the study of government and study of

21   Constitution and such things, it would be appropriate.  What

22   I'm speaking of is just the blatant disregard for other people,

23   blatant disrespect for others when they're talking these issues

24   without regard for other people's feelings and what other

25   people -- other students may -- may not want to hear about such

1    things.  I'm not saying that --

2          THE COURT:  Are you saying this should be off limits

3    because it might offend other students?

4          THE WITNESS:  I'm not saying it should be off limits

5    because it might offend other students.  What I'm saying is,

6    just as we would not like to take religious issues and impose

7    them upon students, we don't want to take homosexual issues and

8    impose them upon those who does not agree with that position.

9          At school, when we talk about school children debating

10   an issue, you talk about the legislature debating an issue,

11   you're talking about whole different -- apples and oranges.  I

12   see the legislature as being men who are mature minded, men who

13   can envision and can determine what the consequences of their

14   actions are, whereas school children, school-age children,

15   especially the middle school and the lower level high school

16   students, are not able to see that, not able to comprehend that

17   and anticipate and get the full extent of what these practices

18   could do to them, or -- and so school is a place, I think,

19   where we're therefore educating our children, and so we

20   wouldn't want to introduce anything to our children we feel

21   like would take away from that process of educating them.

22         THE COURT:  Ms. Dincman, go ahead.

23   BY MS. DINCMAN:

24   Q.  Mr. Davis, is there a difference between in how the message

25   is presented, to take the Tinker example, when you have a black

1   armband, is there, in your mind, a qualitative difference in

2   the level of disruption that may be caused, without regard to

3   the message, between doing something like that and writing

4   something across your forehead?

5   A.  Yes, ma'am, there is a difference, because the armband,

6   while it may draw some attention, it was something that a kid

7   would look at and may question a little and just forgot about.

8   A sexual issue within a school setting is not something a kid

9   is going to mention and let it lie and let it die at that.

10  It's going to be an ongoing thing until it's generally dealt

11  with by the teacher.

12  Q.  And take sex out of it, not even sex, in any message, fill

13  in the blank with whatever the message is; is it somehow -- is

14  it more disruptive if a child puts a message across their

15  forehead, a middle school child, and sits in a middle school

16  class, that as opposed to just wearing a T-shirt or an armband?

17  A.  Yes, ma'am, because it's more prominent and would draw more

18  attention.

19  Q.  And you've got a school at Ponce de Leon that's not just

20  high school; it encompasses middle school as well?

21  A.  Yes, ma'am.

22  Q.  And do you find that based on your experience, the

23  difference in the maturity level, in how students react to how

24  a message -- without regard to what it is, whether it's sex or

25  what else -- is being displayed?

1    A.  Yes, ma'am, to -- there's a vast difference in the maturity

2    level and a vast difference in the way children would react,

3    let's say a 7th grade child, as opposed to a senior or a

4    junior.

5    Q.  Would you say that the middle school students that you have

6    are more easily distracted, or less able to come back together,

7    back to the lesson, after they see something like that?

8    A.  If you've ever spoken to a middle school student --

9    student -- a middle school teacher, I'm sorry -- one of the

10   great issues of being a middle school teacher is trying to

11   eliminate all the distractions, because middle schoolers are so

12   prone to get distracted over the least things, and certainly

13   it's a challenge to all of our middle school teachers.

14   Q.  And you've got --

15        THE COURT:  Ms. Dincman, I don't recall that much of

16   the action surrounding this really involved the middle school,

17   talking more about the high school.

18        THE WITNESS:  No, sir, they were 7th graders

19   primarily, sir.

20        THE COURT:  There were some in there.

21        THE WITNESS:  No, sir, it was primarily 7th graders.

22   I'm talking about the event of September '07.

23        THE COURT:  I really wonder, are we into an area of

24   junk science.  I haven't heard anybody with any qualifications

25   of early childhood psychology, or whatever.

1          MS. DINCMAN:  Well, Your Honor, I think the majority

2     of the students who were involved in this were in the middle

3     school age.

4          THE COURT:  I understand it's 12 to 14, roughly, but

5     wasn't it the high school that was going to have the assembly

6     with the minister?

7          MS. DINCMAN:  No, Your Honor.  I think the testimony

8     has been that it was a school-wide assembly.

9          THE COURT:  School-wide?

10          MS. DINCMAN:  Right, and that it was all the students.

11          THE COURT:  I don't know how much further you need to

12     go in this question about, you know, how this is going to

13     affect their development.  The focus needs to be on disruption.

14          MS. DINCMAN:  Fine, Your Honor.  I'll move on.  I'm

15     just about finished anyhow.

16     BY MS. DINCMAN:

17     Q.  Mr. Davis, I just want to clarify.  You are not the person

18     within the Holmes County School Board who makes policy?

19     A.  No, ma'am.

20     Q.  Your job is to implement the policy that the School Board

21     makes?

22     A.  Yes, ma'am.

23     Q.  And you don't have any say-so whatsoever --

24     A.  No, ma'am.

25     Q.  -- in making the policy?  And you didn't have any say-so in

 1   making the policy that's at issue in this case, specifically

 2   the School Board's letter to -- to Ms. Gillman's counsel?

 3   A.   No, ma'am.

 4        MS. DINCMAN:  A moment to confer, Your Honor?

 5   **(Pause)**

 6        MS. DINCMAN:  I don't have any other questions for

 7   this witness, Your Honor.

 8        THE COURT:  I think this is an appropriate time to

 9   stop then.  We're within four minutes of 5:00 before we -- no

10   point in getting started on your redirect.

11        MR. BEENEY:  Your Honor, I can finish in four minutes.

12        THE COURT:  Beg your pardon?

13        MR. BEENEY:  I can finish in four minutes, if you

14   like.

15        THE COURT:  If you can.

16        MR. BEENEY:  I never say my last question, but I give

17   Your Honor my promise I'll be done in four minutes.

18                     **REDIRECT EXAMINATION**

19   BY MR. BEENEY:

20   Q.   Mr. Davis, what have you and the School Board done since

21   September of 2007 to make PDL a place that is conducive to

22   someone who wishes to wear "Gay Pride" without causing any

23   disruption?

24   A.   We have taken no measures to my knowledge to that extent.

25   Q.   Have you ever discussed with anybody taking measures to try

 1   to make PDL a place where someone who wants to, in a

 2   nonviolent, supportive, affirmative way just simply wear a "Gay

 3   Pride" T-shirt?

 4   A.  No, sir, I have not because it would violate School Board

 5   policy and dress code.

 6   Q.  And final question:  Mr. Davis, in your mind, you're able

 7   to make the connection between a rainbow sticker on a notebook

 8   and teen pregnancy?

 9   A.  That's something I've never given any thought to, so I

10   don't make any connection, no.

11           MR. BEENEY:  I have nothing further, Your Honor.

12           THE COURT:  All right, let's stop for the day.

13           Mr. Davis, you're finished.  You may step down.

14           THE WITNESS:  Thank you, sir.

15           THE COURT:  And let's be ready to start with the next

16   witness at 8:30 in the morning.  Okay?

17           MR. BEENEY:  Your Honor, it goes without saying that

18   the rest of our witnesses will be much quicker than this one.

19           THE COURT:  Are you on, ahead or behind schedule?

20           MR. BEENEY:  Well, we are behind because I thought we

21   would be done with at least a couple more witnesses today.  But

22   I do believe, Your Honor, that, at least on direct, I think

23   we're talking about the rest of our case, an hour and 15

24   minutes, I'm hoping.

25           THE COURT:  Okay.

1    MS. DINCMAN:  If the plaintiff sticks with that, I

2  think we should be able to finish our case tomorrow.

3    THE COURT:  We need to finish tomorrow, or else it

4  will be -- this is it for this week.  Okay?

5    MR. BEENEY:  Your Honor, just to maybe throw the issue

6  out, not to discuss it today, but PDL closes for the year on

7  June 4th, I believe.  And I think at the end of the trial we

8  would like to address with Your Honor what impact that has on

9  the schedule.

10    THE COURT:  The fact that the school year is drawing

11  to a close?

12    MR. BEENEY:  Yes, Your Honor.  We would like, if

13  there's any way of doing it, to petition in some way for relief

14  before the school year ends.

15    MS. DINCMAN:  I believe that the act of filing this

16  lawsuit is in fact petition for relief, and certainly we want

17  to conclude the hearing today.

18    MR. BEENEY:  Just something to throw out and this is a

19  consolidation of a motion for a preliminary injunction as well

20  as the trial on the merits.  And I just want to have a

21  discussion of that, if we may, with Your Honor before we close.

22    THE COURT:  All right.  I'll see everybody at 8:30.

23  **(Proceedings adjourned at 5:00 p.m.)**

24

25

**********

         I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.


**S/Lisa Girod Jones**
_____          _____
LISA GIROD JONES, RPR, RMR, CRR                Date
Official Court Reporter

**INDEX**

<u>**OPENING STATEMENTS**</u>
  By Mr. Beeney          12
  By Ms. Dincman         21


<u>**WITNESSES FOR THE PLAINTIFF**</u>     <u>**PAGE**</u>

HEATHER DANIELLE GILLMAN
  Direct Examination By Ms. Sun    27
  Cross-Examination By Mr. Freeman   52

C.W.
  Direct Examination By Ms. Miller   72
  Cross-Examination By Ms. Dincman   82
  Redirect Examination By Ms. Miller  95

DAVID HILTON DAVIS
  Direct Examination By Mr. Beeney   98
  Cross-Examination By Ms. Dincman  240
  Redirect Examination By Mr. Beeney  273

**CERTIFICATE OF REPORTER**       **276**


**PLAINTIFF EXHIBITS**

<u>**NO.:**</u>               <u>**RECEIVED**</u>

1   9/24/07 C.W.'s Suspension Letter   81

2   November 2, 2007 Letter from Benjamin  33
    Stevenson, ACLU, to Brandon Young

3   November 12, 2007 Letter from Brandon  32
    Young to ACLU

4   Heather Gillman's T-shirts    29

10  Student suspension letters    131

11  Ponce de Leon High School Bulletin 201
    Regarding September 12, 2007 Assembly