IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

HEATHER GILLMAN, through next      )
friend and mother, Ardena Gillman; )
                                   )  5:08CV34/RS
               Plaintiff,          )  May 13, 2008
vs.                                )  8:30 a.m.
                                   )  Panama City, FLORIDA
SCHOOL BOARD FOR HOLMES            )
COUNTY, FLORIDA; and DAVID         )
DAVIS, in his official capacity as )
principal of Ponce de Leon High School, )
                                   )
               Defendants.         )
_____)

TRANSCRIPT OF SECOND DAY OF TRIAL
BEFORE THE HONORABLE RICHARD SMOAK
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:        GARRARD R. BEENEY
                          MAURA EILEEN MILLER
                          MEG DANA HOLZER
                          Attorneys at Law
                          Sullivan & Cromwell LLP - New York NY
                          125 Broad Street
                          New York, New York 10004

                          CHRISTINE P. SUN
                          ACLU LGBT Project
                          P. O. Box 120160
                          Nashville, Tennessee 37212

                          BENJAMIN JAMES STEVENSON
                          American Civil Liberties Union
                            Foundation of Florida
                          P. O. Box 12723
                          Pensacola, Florida 32591-2723

APPEARANCES:  (Continued)


FOR THE DEFENDANT:        HOLLY A. DINCMAN
                          DONALD FREEMAN
                          MICHAEL PATRICK SPELLMAN
                          Attorneys at Law
                          Coppins, Monroe, Adkins
                            Dincman & Spellman
                          1319 Thomaswood Drive
                          Tallahassee, Florida 32308

PROCEEDINGS

1  **(Call to Order of the Court)**

2  THE COURT:  Good morning.

3  MR. BEENEY:  Good morning, Your Honor.

4  MS. DINCMAN:  Good morning, Your Honor.

5  THE COURT:  Ready to proceed?

6  MR. BEENEY:  We are, Your Honor.  Our next witness is
Ms. Teresa Cottle, who will be examined by Ms. Sun, if that's
all right, Your Honor.

7  MS. SUN:  Good morning, Your Honor.  May I place a
copy of her deposition?

8  DEPUTY CLERK:  Please raise your right hand.

9  **TERESA COTTLE, PLAINTIFF WITNESS, DULY SWORN.**

10  DEPUTY CLERK:  You may be seated.  Please state your
full name and spell your last name for the record.

11  THE WITNESS:  My name is Teresa Cottle, C-O-T-T-L-E.

12  **DIRECT EXAMINATION**

13  BY MS. SUN:

14  Q.  Good morning, Ms. Cottle.  My name is Christine Sun and I
represent Heather Gillman in this lawsuit.

15      We have a protective order in place, meaning that students
who are under 18 should not be referred to by their full name.
And I know you have a daughter at PDL; and, if you could, if
you could remember to refer to her as M. instead of her full
name.  Could you try to do that?

1    A.  Yes, ma'am.

2    Q.  Could you sit a little bit closer to the microphone so

3    everyone can hear you?

4    A.  Yes, ma'am.

5    Q.  Okay.  Thank you very much.

6        So, Ms. Cottle, you have a daughter who attends Ponce De

7    Leon High School in Florida?

8    A.  Yes, I do.

9    Q.  And do you have any other children who attend Ponce De Leon

10   High School?

11   A.  Yes, I do, I have a son.

12   Q.  If I refer to Ponce de Leon as PDL, you know what I'm

13   referring to?

14   A.  Yes, ma'am.

15   Q.  Okay.  How old is your daughter?

16   A.  Thirteen.

17   Q.  What grade is she in?

18   A.  Seventh.

19   Q.  How old is your son?

20   A.  Fourteen -- excuse me, 15.  He just turned 15.

21   Q.  Okay.  And what grade is he in?

22   A.  Seventh also.

23   Q.  So this lawsuit is premised on -- well, let me ask you:  In

24   September of 2007, did you have any occasion to meet with the

25   vice principal at PDL to discuss concerns that you had with

1    your daughter, M.?

2    A.   I spoke with him by phone.

3    Q.   And just for the record, who is the vice principal?

4    A.   Todd Jones.

5    Q.   Okay.  So tell me how it came about that you spoke to

6    Mr. Jones by telephone.

7    A.   I received several phone calls after I arrived home from

8    work from other kids, and I just called him the next morning

9    about something that I was told on the phone.

10   Q.   What was it that you were told on the phone by other kids?

11   A.   That my daughter had wrote something on the wall.

12   Q.   And what -- what caused concern for you in terms of your

13   daughter writing something on the wall?

14   A.   The nature of what was wrote --

15   Q.   Okay.

16   A.   -- the word.

17   Q.   So the kids gave you an idea of what --

18   A.   Yes.

19   Q.   -- had been written?

20   A.   Yes, ma'am.

21   Q.   And can you describe -- I know it's a little awkward --

22   could you describe what that was?

23   A.   I was told that Mxxxxxx had wrote -- can I say that word?

24   Q.   What did they say?

25   A.   "Fuck you" --

1    Q.  Okay.

2    A.  -- on the wall.  And I said, "With what?"  And nobody could

3    really give me a definite answer of what was used to write this

4    on the wall with.

5        And I had called him to talk to him about it, and I -- he

6    asked me what did I want to do.  And I said, "If she's done

7    this," you know, "I'll check into it."

8        And he said, "Okay."

9        I said, "If she says she's done it," I said, "I would like

10   her to scrub it clean."

11   Q.  Let me just -- so the record is clear, were you reporting

12   this to Vice Principal Davis or were you responding to his

13   phone call?

14   A.  Not responding to his phone call, no.

15   Q.  Okay.  You -- so you were reporting this to Vice Principal

16   Davis?

17   A.  Yes.

18   Q.  I'm sorry, Vice Principal Jones?

19   A.  Yes, to Mr. Jones.

20   Q.  Did you have any other conversations with Vice Principal

21   Jones?

22   A.  He called me later on that afternoon at work, and he told

23   me Mxxxxxx had never admitted to it, but she cleaned it.  And

24   he said that that and a few other things that had been going

25   on, he never specified the other things, but she was being

1    suspended.

2    Q.  And did you have any other conversations with Vice

3    Principal Jones?

4    A.  I don't remember.

5    Q.  Did you have any meetings or conversations with Principal

6    David Davis?

7    A.  After Mxxxxxx returned to school.

8    Q.  Okay.  Tell me about that meeting.

9    A.  It was quite a long one.  We were talking about Mxxxxxx's

10   behavior.  And he said, "Yeah, good girl gone bad.  A good girl

11   gone bad," is what he said.  He said that he could send her off

12   to a private Christian school down in Tallahassee; and he said

13   that if she doesn't straighten up he would send her to JDC and

14   I would not know about it.

15       And he said, "Furthermore, Ms. Cottle," he said, "if there

16   was a man in your house, your children were in church, you

17   wouldn't be having any of these gay issues."

18   Q.  Did he say anything else?

19   A.  I got kind of hot and I kind of like sat on my hands.

20   Q.  Okay.  What was your reaction to what he was saying?

21   A.  I said, "I don't think so."

22   Q.  Okay.  Was Mr. Davis taking notes during your meeting with

23   him?

24   A.  Yes, ma'am.

25   Q.  And who was present in this meeting?

1    A.   Him, myself, and my sister-in-law.

2    Q.   Is that it?

3    A.   Yes, sir.

4    Q.   Yes.  Okay.  And how many note -- he was taking notes.  Do

5    you recall on how many notebooks he was taking notes on?

6    A.   There was a white tablet, a yellow tablet, and then he had

7    a -- he had reached down -- if you were facing his desk, it

8    would be the left-hand side and he pulled out another binder

9    and he was writing notes on that.

10   Q.   Okay.  Was he -- to the best of your recollection, was he

11   writing notes in three separate notebooks or just one notebook?

12   A.   Three separate tablets.  One was kind of like a binder

13   piece thing.  And then one was a white tablet like the -- you

14   can get them anywhere.  And then there was a yellow one.  They

15   were legal-sized.

16   Q.   Okay.  So you recall him taking notes contemporaneously in

17   three different notebooks?

18   A.   Yes, ma'am.

19   Q.   Have you ever had any conversations with Superintendent

20   Griffin about your daughter's attendance at PDL?

21   A.   Yes, ma'am.

22   Q.   What conversations -- what conversations have you had with

23   Mr. Griffin?

24   A.   I went to his office one morning and I had to wait to see

25   him.

1   Q.   Why were you there to meet with him?

2   A.   Because of problems that I was having at PDL over M.

3   Q.   Okay.  And when was this meeting?

4   A.   Shortly after her -- she -- her return from her suspension.

5   Q.   In September 2007?

6   A.   Yes, ma'am.

7   Q.   And what happened in that meeting?

8   A.   I was told don't worry about it, it would be taken care of.

9   Q.   Told by whom?

10  A.   Mr. Griffin.

11  Q.   What did you explain to him were the issues relating to M.

12  at school?

13  A.   That I didn't like the way she was being handled or -- and

14  nothing was being done about the problems I was bringing to

15  him.  And I felt like nothing was being resolved.

16       I also told him that I was tired of the boys grabbing at

17  Mxxxxxx inappropriately; and he said, "Oh, don't worry about

18  it, Mr. Davis will take care of it," which never was.

19       I didn't like the name calling that was going on as well,

20  and I wished that he would fix something.  I said, I've gone

21  above his head for something to be fixed and I -- he said he

22  would, you know, look into it.

23  Q.   So when you're referring to "he," I'm sorry, you're

24  referring to?

25  A.   Mr. Griffin.

Q.   Superintendent Griffin?

A.   Yes, ma'am.

Q.   And what -- what's the name calling that you -- actually, strike that.

     What generally were the problems that you were bringing to him with respect to M. at PDL?

A.   All of them, the name calling, the problems with the behavior in school, that I had brought to Mr. Davis.

Q.   What behaviors in school?

A.   Kids were harassing her.

Q.   Boys or girls?

     MR. FREEMAN:   Your Honor, I'm going to have to object. I think if this testimony has some sort of relationship to the First Amendment claims in this case, great, but I think we're getting into issues that have nothing at all to do with the issues in this case.

     THE COURT:   Let me hear some more.   Overruled.

     THE WITNESS:   Can you ask me that question again, please?

BY MS. SUN:

Q.   Yes.   Apologize for the interruption.

     I just asked generally what were the problems you brought to Superintendent Griffin's -- you brought to Superintendent Griffin that you wanted him to correct?

A.   The way Mr. Davis was talking to me that morning when we

1    had our meeting.  And I told him I didn't like the way he spoke

2    to me about -- that if there was a man in my house there

3    wouldn't be like any gay issues.  I told him I didn't

4    appreciate that.

5        I told him also that I want him to stop the harassment with

6    my daughter, and the -- the -- I call it name calling.  I don't

7    know how to say it any other different than that.

8    Q.  That's fine.  And just in terms of harassment, was that

9    from other girls or other boys, to your knowledge?

10   A.  Both.

11   Q.  Both.  Okay.  What kind of -- in terms of -- okay.  In

12   terms of the name calling, or --

13   A.  For M.?

14   Q.  Yes.

15   A.  "Dolly Parton, Jr."  "Bounce them a little harder."  It was

16   just -- they were all little derogatory remarks and stuff.

17   Q.  Did -- after your meeting with Superintendent Griffin, did

18   anything change at school in terms of the way -- in terms of

19   addressing your concerns concerning M.?

20   A.  No, no, ma'am.  No change.

21         MS. SUN:  No further questions.

22         THE COURT:  Counsel, before you stop, I think we

23   waited for you to drop the other shoe.  What is the harassment

24   and what is the connection to the issues of this case?

25         MS. SUN:  There's no connection, Your Honor.  It's

1  merely to -- it's merely offered as evidence concerning

2  Principal Davis' authority at PDL and the lack of supervision

3  concerning his activities.

4          THE COURT:  This is a dissatisfied parent.

5          MS. SUN:  Right.

6          THE COURT:  Okay.  We need to stay -- with the limited

7  amount of time we have, we need to stay focused on the First

8  Amendment issues.

9          MS. SUN:  Absolutely, Your Honor.  Thank you

10  Ms. Cottle.

11          MR. BEENEY:  May I add one sentence to that, if I may?

12          I think the fact that there was nothing done when a

13  child is harassed about her anatomy really does go to our

14  viewpoint of discrimination.  That when there are children in

15  the school that have "Gay Pride" written on them, the attention

16  of the principal is jumped right to that; but when the School

17  Board hears about being told that you should send your child to

18  church and then you won't have a problem with gay issues, or

19  that a child is being teased about her anatomy, nothing is

20  done.  Thank you.

21                     **CROSS-EXAMINATION**

22  BY MR. FREEMAN:

23  Q.  Good morning, Ms. Cottle.

24  A.  Good morning.

25  Q.  In addition to receiving phone calls from Vice Principal

1    Jones, you also received a letter in relation to M.'s

2    suspension, correct?

3    A.  Yes, sir.

4    Q.  Okay.  I'm going to show you what has already been entered

5    into evidence in Plaintiff's Exhibit 10 and just ask you if you

6    recognize that, with the caveat that M.'s name has been

7    redacted and your address has been redacted from the letter.

8    A.  Yeah.

9    Q.  Is that the letter that you received?

10   A.  Yes.

11   Q.  Okay.  Now, this letter was hand-delivered to you by M.

12   when she came home from school on September 13th, correct?

13   A.  Yes, sir.  I received two letters.

14   Q.  Did you receive two letters on the 13th?  Or just one?

15   A.  One.

16   Q.  Okay.  Was this the one that you received on the 13th?

17   A.  Yes, sir.

18   Q.  All right.  Now, when M. came home from school that day,

19   you talked to her about what had happened, correct?

20   A.  Yes.

21   Q.  And you asked her if she had vandalized school property,

22   correct?

23   A.  Yes.

24   Q.  And she told you that she had not?

25   A.  Correct.

1    Q.  And when she told you she had not, you believed her, right?

2    A.  Yes, sir.

3    Q.  And you asked her if she had directed profane language

4    toward a School Board employee and she said she had not,

5    correct?

6    A.  Correct.

7    Q.  And you also asked her if she had given false information

8    to a School Board employee and she said she had not, correct?

9    A.  No, I didn't ask her that.

10   Q.  Did she tell you that the accusation that she had given

11   false information to a School Board employee was the result of

12   her denying to the school administration that she had written

13   "FU" on the columns at school?

14   A.  I had asked Mxxxxxx -- excuse me -- M. if she had that

15   evening and she told me no, she had not.

16   Q.  No, she had not what?  No, she had not written --

17   A.  Wrote that on the wall, whatever.

18   Q.  Right.  And she also told you that she was accused of

19   giving false information to a School Board employee because she

20   denied to the school officials that she had written that and

21   they thought she was lying, correct?

22   A.  Yes.

23   Q.  All right.  And you also asked her about the participation

24   in the student disorder and she denied that she did that too,

25   correct?

1    A.   When I inquired about it, M. said there was no student

2    participation.

3    Q.   Did she tell you what the whole -- what the whole student

4    disorder was in reference to?

5    A.   She said she had no idea.

6    Q.   No idea.

7    A.   She said there was not one.

8    Q.   Did you have any idea what it was in reference to?

9    A.   No.

10   Q.   Did you give a deposition in this case?

11   A.   Yes, sir.

12   Q.   Do you have a copy of it right in front of you?

13   A.   No, sir.

14   Q.   You did not give a deposition?

15   A.   No, I did.  But copy?  I'm asking.

16        MS. SUN:  It's in front of you.

17        MR. FREEMAN:  It's right in front of you.

18   BY MR. FREEMAN:

19   Q.   If you could turn to page 10, when you have a chance, in

20   your deposition.  And look at line No. 17.  Did you find it?

21   A.   Uh-huh.  Yes.

22   Q.   "Prior to receiving the suspension letter, had you had any

23   interaction with school personnel about the events leading up

24   to the suspension?

25        "Yes, ma'am.

1          "Tell me what that was.

2          "Vice principal.

3          "Assistant Principal Jones?

4          "Yes, ma'am.

5          "What kind of interaction did you have with Assistant

6     Principal Jones?

7          "He called me at work and told me that Mxxxxxx was

8     suspended over the, he said, supposedly gay rights thing that

9     went on at school and supposedly vandalism and not speaking the

10    truth to a Board member -- a school member -- to a school

11    member."

12         Were you asked those questions and did you give those

13    answers in your deposition?

14              MS. SUN:  Your Honor, I have to note a couple of

15    objections.  One, I don't think that this testimony is

16    inconsistent with what she has said.  Because if you look at

17    the next couple of lines, 13 through 16, she was asked whether

18    he gave -- whether Vice Principal Jones gave her any details

19    about the gay rights thing at school.

20              So if Mr. Freeman is contending that she has some sort

21    of independent basis other than the fact that her daughter was

22    suspended, then I think this is an improper impeachment --

23    attempt at impeachment.

24              MR. FREEMAN:  I wasn't done yet, Judge, if I can

25    continue.

1            THE COURT:  Well, where -- where is the inconsistency

2    here?

3            MR. FREEMAN:  Well, basically what she just said was

4    she had no prior knowledge of the existence of any sort of

5    student disorder; she had no idea what that was in reference

6    to.

7            MS. SUN:  I don't -- I don't think that that's what

8    she testified.  I think the issue -- I mean, certainly, she got

9    a letter saying that she -- that Mxxxxxx was allegedly

10   participating in student disorder.  I don't think that's any

11   different than the phone call that Vice Principal Jones gave to

12   her.

13           So to the extent that -- again, to the extent that

14   Mr. Freeman is implying that she had some sort of independent

15   knowledge of the alleged disorder, this testimony is not

16   inconsistent.

17           MR. FREEMAN:  If I can continue with the impeachment,

18   Your Honor.

19           THE COURT:  I think you need to have some clear

20   inconsistencies here; otherwise, let's move on to something

21   else.

22   BY MR. FREEMAN:

23   Q.  Can you turn to page 16 of your deposition?  And if you can

24   start reading at line No. 11.

25   A.  You want me to read it?  Is that what you asked?

1    Q.  No, just read it to yourself, please.

2    A.  Okay.

3    Q.  And then go on through page 18, line No. 10.

4    A.  You said continue on to 18?

5    Q.  Eighteen, line 10, please.

6         THE COURT:  Mr. Freeman, we really need to get on to

7    the crux and not be parsing long passages of the deposition

8    where they really don't seem to have a great bearing.

9         MR. FREEMAN:  I understand, Your Honor.  The reason I

10   did that was because --

11        THE COURT:  She's here, let's have her testify; and if

12   there is a material inconsistency, then bring it out.  Let's

13   not split hairs.

14        MR. FREEMAN:  Well, I understand, Your Honor, but --

15        THE COURT:  Move on.  Move on.

16        MR. FREEMAN:  Okay.

17   BY MR. FREEMAN:

18   Q.  On the evening of September 13th, 2007, you and Mxxxxxx

19   discussed whether or not she had participated in any -- in some

20   sort of gay rights protest at school, correct?

21   A.  Correct.

22   Q.  And she denied that she had done so?

23   A.  In her roundabout way, yes.

24   Q.  Okay.  And she had told you that during the course of the

25   day Mr. Jones had asked her to lift up her shirt so he could

1    look at her arms to see if she had anything written on her

2    arms, correct?  Oh, I'm sorry, not Mr. Jones, Mr. Davis.

3    A.  He didn't ask her to lift, he did it.

4    Q.  He did it.  Okay.  And you took issue with that, didn't

5    you?  You took issue with Mr. Davis lifting up your daughter's

6    sleeves to look at her arms?

7    A.  Yes.

8    Q.  Okay.  And M. also told you that Mr. Davis didn't just lift

9    up her sleeves, he also had other students lift up their shirts

10   so he could look at their stomachs to see if they had writing

11   on their stomachs, correct?

12   A.  Correct.

13   Q.  And you also took issues with that, correct?

14   A.  Because of what my daughter told that he had done on her.

15   Q.  Right.  And you thought that Mr. Davis had no right to be

16   inspecting students' bodies, correct?

17   A.  My daughter's body.

18   Q.  Right.  So you wanted to confront him about it, didn't you?

19   A.  No, I wanted to ask him about it.  I didn't want to

20   confront, I wanted to ask.

21   Q.  Okay.  Well, ask him about it.  And so eventually you went

22   and did ask him about it, didn't you?

23   A.  Yes, sir.

24   Q.  Was that the following morning after September 13th?

25   A.  Yes.

1   Q.  You went the following morning, after --

2   A.  It was like after her suspension was over.

3   Q.  All right.  Now, how long was she suspended for?

4   A.  I believe it was five days.

5   Q.  Was she -- do you -- and you can look at the letter.  Do

6   you recall the date she was supposed to return to school?

7   A.  No, I cannot.

8   Q.  Can you take a look at Plaintiff's Exhibit 10 and see if

9   that refreshes your recollection.

10  A.  Okay, "She may return to school on Friday, the 21st."

11  Q.  Okay.  Now, you had this conversation on the 13th.  And

12  then you waited until after the suspension was over, which

13  would have been the 21st.  Did you go to see her on the -- did

14  you go to see Mr. Davis on the 21st?

15  A.  I had to wait until my day off.

16  Q.  When was that?

17       THE COURT:  Mr. Freeman, I'm really instructing you to

18  move on to substance.  I think you need to be focusing on the

19  issue of disruption and other key elements here.  I think

20  you're essentially doing what we do in a discovery deposition.

21  I mean, I really urge you to get focused.

22       MR. FREEMAN:  Okay.  Sorry, Your Honor.

23  BY MR. FREEMAN:

24  Q.  You had this meeting with Mr. Davis; and the meeting lasted

25  three hours, correct?

1    A.   Yes.

2    Q.   And he said these -- you know, he said the things that you

3    described in your direct testimony during that meeting,

4    correct?

5    A.   Correct.

6    Q.   Now you didn't leave that meeting and go directly to the

7    superintendent's office, did you?

8    A.   I know I went to see him.  But whether I did after that

9    meeting, I don't remember.

10   Q.   So you're saying it's possible it could have been the very

11   same day as that meeting?

12          THE COURT:  Mr. Freeman, this is a --

13          MR. FREEMAN:  Okay.  I'm sorry, Your Honor.

14          THE COURT:  -- a really -- you saw the limited purpose

15   that they presented her for.  You're wandering off into a

16   discovery deposition and we don't have time for that.  Now if

17   you've got something that you really want to get to that's

18   material, please do it and do it succinctly.

19          MR. FREEMAN:  I'm sorry.  One more question, Your

20   Honor.

21   BY MR. FREEMAN:

22   Q.   You say that Mr. Davis threatened to lock your daughter up

23   in the JDC?

24   A.   Correct.

25   Q.   And you say that he said all these offensive things to you;

1    you said the School Board didn't do anything about it.  Your

2    daughter still goes to Ponce de Leon?

3    A.  Correct.

4    Q.  You haven't taken her out of school?

5    A.  Correct.

6              MR. FREEMAN:  Nothing further.

7              MS. SUN:  No further questions, Your Honor.

8              THE COURT:  Ma'am, you may step down and leave the

9    courtroom.

10             Next witness?

11             MR. BEENEY:  Next witness is Steven Griffin.  And

12   he'll be examined by Mr. Stevenson, if Your Honor will allow.

13             DEPUTY CLERK:  Please raise your right hand.

14   **STEVEN EARL GRIFFIN, PLAINTIFF WITNESS, DULY SWORN.**

15             DEPUTY CLERK:  You may be seated.  Please state your

16   full name and spell your last name for the record.

17             THE WITNESS:  Steven Earl Griffin, G-R-I-F-F-I-N.

18                         **DIRECT EXAMINATION**

19   BY MR. STEVENSON:

20   Q.  Good morning, Mr. Griffin.  My name is Benjamin Stevenson,

21   I represent Heather Gillman.

22   A.  Good morning.

23   Q.  Before I start, I just want to reiterate what you've

24   probably heard a number of times:  Please identify students

25   with their first and last name initials, if you would.

1    Are you the superintendent of the -- of schools for the

2 Holmes County School District?

3 A.  Yes, I am.

4 Q.  Okay.  I would like to start by what has already been

5 admitted as Plaintiff's Exhibit 2.  This is a letter that

6 Ms. Gillman sent to the Holmes County School Board, and the

7 letter is dated November 2nd.  If you turn to Plaintiff's -- I

8 think there's a binder that says Plaintiff's Exhibit 2 or

9 Plaintiff's Exhibits.  If you turn to the second tab,

10 Mr. Griffin?

11 A.  Yes.

12 Q.  Do you receive -- do you remember receiving this document

13 on or about November 2nd?

14 A.  Yes.

15 Q.  Did you understand this letter to be seeking guidance from

16 the School Board about what expressions Ms. Gillman can display

17 on a T-shirt at Ponce De Leon High School?

18 A.  Yes.

19 Q.  After you received the November 2nd letter from

20 Ms. Gillman, is it correct that you individually asked each

21 School Board member how he believed the School Board should

22 respond to the letter?

23 A.  Yes.

24 Q.  Is it true that each of the School Board members responded

25 that the expressions would not be permitted because they

1   violated then-existing School Board policy?

2   A.  Yes.

3   Q.  Is it your understanding it still violates School Board

4   policy?

5   A.  Yes.

6   Q.  Is it correct that Brandon Young, the School Board

7   attorney, had authority to respond to Ms. Gillman's letter?

8   A.  Yes.

9   Q.  And he did so with a letter that was dated November 12th?

10  A.  I believe that's the date, yes.

11  Q.  I would like to direct your attention to what's been

12  previously marked as Plaintiff's Exhibit 3.  Is this the letter

13  by which Mr. Young responded to Ms. Gillman's letter?

14  A.  Yes.

15  Q.  Did you review the letter to make sure it was correct

16  before Mr. Young sent it?

17  A.  I believe so, yes.

18  Q.  Is it correct that the School Board's response in the

19  November 12th letter, that's Plaintiff's Exhibit 3, properly

20  reflected the School Board's position?

21  A.  Yes.

22  Q.  Does it continue to reflect its position?

23  A.  Yes.

24  Q.  The School Board does not permit Heather Gillman to express

25  beliefs through the phrases and symbols listed on the

1    November 2nd letter?  That's Plaintiff's Exhibit 2, which is

2    also displayed over here.

3    A.   That's correct.

4    Q.   Did the School Board ever discuss as a group its position

5    regarding the gay rights expressions listed in the November 2nd

6    letter?

7    A.   No.

8    Q.   So if Gary Scott, one of the School Board members, stated

9    that you were present at an executive session starting in

10   November during which the School Board discussed its position

11   and direction, he would be incorrect?

12   A.   I do not recall that.

13   Q.   Would he be incorrect if he stated as much, that you were

14   present in an executive session of the School Board in

15   November?

16   A.   Yes.

17   Q.   The next several questions I have are going to relate to

18   what I'm going to call the events of September 2007.  And I'm

19   going to characterize that very quickly, that they involve the

20   discipline and suspension of a number of students at Ponce De

21   Leon High School in September 2007.

22        Are you clear with what I mean by events of September 2007?

23   A.   Yes.

24   Q.   Thank you.  Is it correct that the expressions of gay civil

25   rights in the November 2nd letter, these expressions being

1    displayed over here, were prohibited by the School Board policy

2    one year ago today?

3    A.   I do not recall that.

4    Q.   You do not recall?

5    A.   Could you repeat your question?

6    Q.   Yes.   Is it correct that the expressions of gay civil

7    rights in the November 2nd letter, these expressions right over

8    here, were prohibited by School Board policy one year ago

9    today?

10   A.   When we received the letter -- I believe it's Exhibit 2 --

11   from the ACLU -- I'm sorry.   Do you have the November 2nd

12   letter in here?

13   Q.   The November 2nd letter should be marked as Plaintiff's

14   Exhibit 2.   Should be at tab 2.

15   A.   When the Board made a decision, it was based on a

16   combination of issues.

17   Q.   Mr. Griffin, I appreciate that and I'm probably going to

18   get to that, and I certainly appreciate your attorneys are

19   going to get to that.   My question is:   As of one year ago

20   today, at approximately May 2007, were the gay rights civil --

21   or the gay civil rights expressions that are listed in Exhibit

22   2, these expressions right over here that are on the placard,

23   were they prohibited by School Board policy?   That is my

24   question.

25   A.   We did not have such a policy regarding pro-gay or anti-gay

1    speech in -- a year ago today.

2    Q.  Am I to understand that these were not then prohibited a

3    year ago today?

4    A.  That's correct.

5    Q.  Okay.  I would like to direct you to your deposition.

6         MR. STEVENSON:  Your Honor, if I could approach the

7    witness and give him his deposition?

8         THE COURT:  All right.

9    BY MR. STEVENSON:

10   Q.  I would like you to -- to direct you to page 122 of your

11   deposition.  Are you there?

12   A.  Yes.

13   Q.  I'm going to start reading at line 13.

14        "Question:  Were the expressions of each of the phrases and

15   symbols on Exhibit 1" -- which was Exhibit 1 to the deposition

16   and Exhibit 1 to the complaint, which is Exhibit 2, Plaintiff's

17   Exhibit 2 in the trial here -- "the 16 phrases and symbols

18   prohibited by School Board policy in April 2007, approximately

19   one year ago today?"  I'm sorry, "one year ago?"

20        "Answer:  As far as -- as far as I recall, yes.

21        "Question:  Okay.  One -- so one year ago a student would

22   have been reprimanded if the student would have gone to school

23   with a 'Gay?' question mark, on his T-shirt?

24        "Answer:  That's correct.

25        "That answer is correct the same -- I can list each of

1    these 16, but it sounds like it's going to be the same answer

2    for each of the 16.

3        "Answer:  Yes, sir."

4        Did you give -- did I ask you those questions and did you

5    give that answer?

6    A.  Yes, I did.

7    Q.  In fact, even before the events of September 2007 happened,

8    these gay civil rights expressions were banned under School

9    Board policy, is that correct, Mr. Griffin?

10   A.  Yes.

11   Q.  I would like to direct you to your -- the exhibit binder,

12   Plaintiff's Exhibit binder, Exhibit 7, go to tab 7.  Can you

13   please identify what is at tab 7?

14   A.  Tab 7 is a Code of Student Conduct book.

15       MR. STEVENSON:  I would like to enter that into

16   evidence, Your Honor.

17       MS. DINCMAN:  No objection, Your Honor.

18       THE COURT:  Be admitted.

19     **(Plaintiff's Exhibit No. 7 received in evidence.)**

20   BY MR. STEVENSON:

21   Q.  I would like you to move to Plaintiff's Exhibit 6, which is

22   one tab back in that same binder.  I'm going to have some

23   questions about both of them, so both of them there.

24       Can you identify what is at tab Plaintiff's Exhibit 6,

25   Mr. Griffin?

1    A.   Tab 6 is Student Control, 5.30 School Board policy.

2    Q.   And that's the School Board policy for the Holmes County

3    School Board, the defendant in this case?

4    A.   That's correct.

5          MR. STEVENSON:   I move that that exhibit be admitted

6    into evidence.

7          MS. DINCMAN:   No objection, Your Honor.

8          THE COURT:   It will be admitted.

9        **(Plaintiff's Exhibit No. 6 received in evidence.)**

10   BY MR. STEVENSON:

11   Q.   Has the School Board incorporated the Code of Student

12   Conduct what is marked as Plaintiff's Exhibit 7 into its

13   official policy?

14   A.   Could you repeat the question?

15   Q.   Has the School Board incorporated the Code of Student

16   Conduct, what has been marked as Plaintiff's Exhibit 7 --

17   A.   Yes.

18   Q.   -- into its official policy?

19   A.   Yes.

20   Q.   And did the School Board officially incorporate the Code of

21   Student Conduct through policy No. 5.30?

22   A.   Yes.

23   Q.   Is it true that one reason the School Board drafted the

24   Code of Student Conduct was to provide guidance to students

25   about what conduct is proscribed and what conduct is allowed?

1   A.   Yes.

2   Q.   Is it correct that Ms. Gillman's political expressions

3   listed in the November 2nd letter would independently violate

4   the School Board's policy against disruptions, illegal

5   organizations, and hazards student -- to student safety?

6   A.   Could you repeat the first part of that question?

7   Q.   Is it correct that Ms. Gillman's political expressions

8   listed in the November 2nd letter would independently violate

9   the School Board's policy against disruptions, illegal

10  organizations, and hazards to student safety?

11  A.   Independently, no.

12  Q.   Independently, no.  Would it independently violate its

13  policy against disruptions?

14  A.   Independently, no.

15  Q.   Standing alone, if there were no other School Board

16  policies, this is not sufficient to -- this is not in and of

17  itself -- I apologize.

18      The policy against disruptions is not the only -- cannot

19  alone singlehandedly prohibit these expressions, is that

20  correct?

21  A.   Those expressions were sent to us in a letter that I

22  believe is Exhibit 2 and asked the School Board attorney to

23  respond to that.  And it brought in -- I think it was coming on

24  the heels of a suspension, a major disruption at Ponce De Leon

25  High School five weeks prior.

1    Q.  Mr. Griffin, I do plead with you.  We are trying to get

2    this testimony in as best we can.

3    A.  Go ahead, sir.

4         MS. DINCMAN:  Objection, Your Honor, he was responding

5    to the question.

6         THE COURT:  Let's keep moving.

7         MR. STEVENSON:  Keep moving?

8    BY MR. STEVENSON:

9    Q.  So, standing alone, the School Board's policy against

10   disruptions would not prohibit these expressions, is that

11   correct?

12   A.  That's correct.

13   Q.  Standing alone, the School Board's policy against illegal

14   organizations would not prohibit these expressions, is that

15   also correct?

16   A.  That's correct.

17   Q.  And standing alone, the hazards to student safety do not

18   violate these -- or would not prohibit these expressions, is

19   that also correct?

20   A.  Standing alone, yes.

21   Q.  But when they're all married together in conjunction and

22   read together, then these expressions are prohibited, is that

23   also correct?

24   A.  That's correct.

25   Q.  Thank you.  And as the School Board -- I want to turn to

1   the School Board policies regarding illegal organizations,

2   which is defined in Plaintiff's Exhibit 7.  It's on page 9.

3   And if you would, I would appreciate it if you follow along.

4   It is defined as "any attempt to use the school day for

5   activities that are not school related or school sponsored."

6        So I want to parse this out.  Is it correct to say that the

7   lunch period is part of the school day?

8   A.   That's correct.

9   Q.   So students talking over the lunch table is use of the

10  school day?

11  A.   Sure.

12  Q.   Students talking about political discussions at Ponce De

13  Leon High School, is that right?

14  A.   Sure.

15  Q.   May even talk about politics and have political discussions

16  at lunch, is that also correct?

17  A.   Could talk about a John McCain rally, sure.

18  Q.   Okay.  And if they were going to talk about a John McCain

19  campaign platform but the discussions were not an extension of

20  their classwork, then it would not be school related or school

21  sponsored, would you agree?

22  A.   Students can discuss those issues at lunch.

23  Q.   I appreciate that.  My question is:  If their discussions

24  about a John McCain platform and campaign is not related to a

25  school assignment -- that is, a classwork assignment -- then it

1    is not school related or school sponsored?

2    A.   That's correct.

3    Q.   Okay.   Therefore, on its face, the rule against illegal

4    organizations prohibits non-school related political

5    discussions at lunch.   Is that also correct?

6    A.   No it does not say political organizations.

7    Q.   Okay.   Then let me ask you this:   Therefore, on its face,

8    the rule against illegal organizations prohibits these

9    political discussions, is that correct?

10   A.   I don't see it that way, no.   It doesn't talk about

11   political organizations.   It talks about illegal organizations,

12   which you have to tie back in on page -- I believe it's 15 of

13   the same document that defines what a student club and

14   organization is.

15   Q.   Are you familiar with the anti-marriage ballot initiative

16   to amend the Florida Constitution which we will all vote on in

17   November of this year?

18   A.   I'm not familiar with it, no.

19   Q.   It's an amendment -- and I will proffer that it's an

20   amendment to change the Florida Constitution so that marriage

21   is defined as a union between a man and a woman only.

22        MS. DINCMAN:   Objection, relevance, Your Honor.

23        THE COURT:   Overruled.

24   BY MR. STEVENSON:

25   Q.   Does a student wearing a shirt imprinted with, quote,

1    "Support Equal Marriage Rights, Vote No on Amendment 2" violate

2    School Board policy?

3    A.   Offhand, I don't know.

4    Q.   You're not sure?  Okay.

5    A.   If it did not create a disruption at school.

6    Q.   My question, sir, is:  Can Ms. Gillman wear a shirt

7    tomorrow that says, "Support Equal Marriage Rights, Vote No on

8    Amendment 2"?

9    A.   If she wants to.

10   Q.   She's permitted?

11   A.   If she wants to do that.

12   Q.   Can she wear a shirt tomorrow that says "Pro-Gay Marriage"?

13   A.   Those 16 expressions on the Exhibit 2 were -- are not

14   allowed --

15   Q.   Okay.

16   A.   -- by the School Board.

17   Q.   I understand.

18   A.   They're not allowed because they do not comply with policy.

19   So no, she could not wear "Pro-Gay Marriage" --

20   Q.   Okay.  But --

21   A.   -- T-shirt.

22   Q.   -- but she could wear a shirt that says, "Support Equal

23   Marriage Rights, Vote No on Amendment 2"?  That's okay?

24   A.   I think it goes back to your discussion earlier when you

25   were talking about political discussions at the cafeteria.

1   Q.  Is it my -- is it your understanding that the School Board

2   is not in -- does not interpret the phrase "Pro-Gay Marriage"

3   as a political expression?

4   A.  Those expressions were tied back into the events of 2007,

5   September 2007.

6   Q.  Is it your understanding the School Board does not

7   understand that "Pro-Gay Marriage," that expression, is somehow

8   not political?

9   A.  I'm not tying it to political.  I'm tying it to those

10  expressions dealing with the disruptions of 2007, September, at

11  Ponce De Leon High School.

12  Q.  I'm just trying to parse this out.  One reason that you

13  said that, "Support Equal Marriage Rights, Vote No on Amendment

14  2," would be permitted, that Ms. Gillman can wear that tomorrow

15  on a T-shirt, is because you said that's political.  And now I

16  guess I'm just trying to understand:  Is it the School Board's

17  position that none of these expressions --

18  A.  That's correct.

19  Q.  -- are political?

20  A.  Excuse me.  The School Board's position is those 16

21  expressions are not allowed.

22  Q.  Is it the School Board's position that none of these

23  expressions are political?

24  A.  You would have to ask them.  I cannot answer for them.

25  Q.  You don't know, then.  You have not asked them?

1    A.    I have not discussed their political --

2    Q.    I'm not asking about their political beliefs.

3    A.    You asked School Board.

4    Q.    I'm asking if they considered these beliefs political

5    beliefs.

6    A.    I cannot answer that for them.

7    Q.    You do not know?

8    A.    I do not know.

9              MR. STEVENSON:  Thank you.

10             THE COURT:  Let's drop the other shoe.  Why are they

11   not allowed according to the School Board?

12             THE WITNESS:  Judge, the reason they're not allowed,

13   the School Board looked back to the events of 2007 and felt

14   like the only one that was presented at the school was the

15   first one, "Gay Pride" or "GP."  The other 15 expressions were

16   not.  However, they all tie in and relate to the same issues,

17   and the events that occurred in September of 2007 created major

18   issues.

19             THE COURT:  Well, what does that mean?  I guess I'm

20   always confused with the way people use the word "issues"

21   anymore.  That used to mean "topic," but now it seems to be

22   "problems," and God knows whatever else.

23             What was the problem with this in 2007 as far as the

24   School Board was concerned?  I mean, be specific.

25             THE WITNESS:  The problems the School Board were

1   looking at were the disruptions of the school, with our middle

2   school, the information that I received that there were a lot

3   of problems going on, instruction being interrupted.

4           THE COURT:  We've had evidence so far that ten minutes

5   at the beginning of one class.  It took the teacher ten minutes

6   to get everybody settled down.  I mean, what other problems,

7   specifically?

8           THE WITNESS:  Specifically, I think, Judge, the

9   biggest issue was the unrest among the students, our middle

10  school students.

11          THE COURT:  Were there any fights?

12          THE WITNESS:  Not that I'm aware of.

13          THE COURT:  Anybody assault a teacher who tried to

14  restore order?

15          THE WITNESS:  Not that I'm aware of.

16          THE COURT:  Some people called out "Gay Pride" in the

17  hallway?

18          THE WITNESS:  I was told that, yes.

19          THE COURT:  Anything more specific than that?

20          THE WITNESS:  In regards to the "Gay Pride" being out,

21  Mr. Davis, I believe his concern, what he had spoken to me, was

22  just do I allow other students to retaliate?  Do I allow other

23  students, if they say "Gay Pride" -- whatever the opposite of

24  that would be, I don't know -- but do I allow them to express

25  their opinion to create chaos of, "All right, you get your

1    buddies, I'll get my buddies, and we'll settle it the old

2    fashioned way"?  That was his concern -- which would bleed into

3    the classrooms, which would bleed into creating chaos and not

4    allowing instruction.

5         THE COURT:  But the -- for the extent of time that

6    people were there for whatever number of days, it was

7    relatively peaceful?

8         THE WITNESS:  Within that window of time, from what

9    Mr. Davis has expressed to me, he was very concerned that the

10   atmosphere, the environment, was not conducive to learning.

11        The impression that I got, that if you walk into a

12   room -- we've talked about John McCain.  Whether it's Obama,

13   Hillary, whoever, if you walk into a room and you're wearing an

14   Obama button and all you see is Hillary supporters, that unrest

15   or feeling you would have like, "Hey, everyone's against me,"

16   that is the unrest -- the impression that I got from Mr. Davis.

17        THE COURT:  Okay.  So if 29 members of a class wore an

18   Obama button and one person walked in with a Clinton button,

19   that would set off the alarms for Mr. Davis, if I'm

20   understanding you, that has the potential of getting out of

21   hand?

22        THE WITNESS:  That's correct.

23        THE COURT:  So the implementation of the School Board

24   policy would be not to permit 29 Obama buttons and one Clinton

25   button?

1        THE WITNESS:  It would be a situation of, whether it's

2   Obama versus Hillary, on the surface, sure, it's fine.  You

3   support who you want; I support who I want.  But if we -- if it

4   gets into a situation where 25 kids begin to wear this one, and

5   30 kids wear this one, and then we're going around and say,

6   "Hey, let me give you this T-shirt, wear this tomorrow.  I give

7   you this, wear it tomorrow," then it is where it leads to a

8   disruption.

9        And that is what Mr. Davis expressed to me that he was

10  facing in September of '07, that students were beginning to pit

11  each other against each other.  And that was the concern of the

12  Board when they said we're not going to allow these 16

13  expressions because they tie back into No. 1, which is the only

14  one that was expressed at the school; however, they had the

15  same implications.

16       And that's what Mr. Davis had expressed to me.

17       THE COURT:  Okay, but the campaign buttons would fall

18  into the same category?

19       THE WITNESS:  If it led to a major disruption, yes,

20  sir.

21       THE COURT:  If it was an imbalance and 29 had one

22  candidate's button and one had the other candidate's button,

23  that would sound the alarm of it might turn into a shoving

24  match and everybody would be disarmed of their campaign

25  buttons?

1          THE WITNESS:  Yes, sir.

2   BY MR. STEVENSON:

3   Q.  You're just trying to avoid the controversy of one student

4   on one side and the other students on the other?

5   A.  That's correct.

6   Q.  Please explain why these symbols were not permitted one

7   year ago today?

8   A.  They may have been.

9   Q.  Okay.

10  A.  I don't know.

11  Q.  I would like to go back to then --

12  A.  It's --

13  Q.  Okay.  I'm sorry, please finish.

14  A.  Go ahead.

15  Q.  Would you agree that the phrase "Support Equal Marriage

16  Rights," which does appear on Plaintiff's Exhibit 2, is -- is

17  certainly similar or associated with the phrase that

18  Ms. Gillman now is permitted to wear, "Support Equal Marriage

19  Rights, Vote No on Amendment 2"?  Are those similar or

20  associated?

21  A.  I think they are, yes, sir.

22  Q.  They are?

23  A.  Yes, they are.  Yes, they are.

24  Q.  Okay.  And then if they are, then she is also allowed to

25  wear "Pro-Gay Marriage" on a T-shirt or not?

1    A.   Those 16 statements are not allowed by the Board because

2    they were tied back into No. 1, which is tied back into the

3    September 2007 events at Ponce De Leon High School which

4    created a major disruption at the school.

5         If H.G. was allowed to wear the T-shirt you're talking

6    about, and she wears it to school and it gets to a problem of

7    where it is creating problems, then we would have to address

8    it.

9    Q.   Okay, I'm just trying to focus on this phrase here, "I

10   Support Equal Marriage Rights."  You say that's similar or

11   associated with the phrase.  I would like to -- for you to turn

12   to your deposition, page 101, line 12.

13        "Question:  Statements that are similar or associated with

14   these statements," and we were discussing Exhibit 1, "are

15   likewise banned, even though they are not on Exhibit 1?

16        "Answer:  Yes."

17        Did I ask you that question, did you give that answer?

18   A.   Yes.

19   Q.   Do you have students of voting age at Ponce De Leon High

20   School?

21   A.   I'm sure we do.  I don't know their ages specifically.

22   Q.   You have no reason to think that you don't, right?

23   A.   That's correct.

24   Q.   Is it also correct that a student would violate the School

25   Board policy if they wore a shirt that was imprinted with,

1  quote, "Protect the Sanctity of Marriage, Vote Yes on Amendment

2  2"?

3  A.  Could you repeat the first part of that question?

4  Q.  Is it correct that students would violate the School Board

5  policy if they wore a shirt that said, quote, "Protect the

6  Sanctity of Marriage, Vote Yes on Amendment 2"?  Would that

7  likewise be banned?

8  A.  Correct me if I'm wrong, didn't we just talk about H.G.

9  being allowed to wear the "Vote No" T-shirt?

10  Q.  Okay.

11  A.  So if she can wear the no, then student A can wear the yes.

12  Q.  Okay.

13  A.  If it becomes an issue, a disruption, they would not be

14  allowed to wear it.  And that's what -- this happened.

15  Q.  Then how about a phrase, "Anti-Gay Marriage," are students

16  permitted to wear, under School Board policy, a T-shirt that

17  says "Anti-Gay Marriage"?

18  A.  No.

19  Q.  Okay.

20  A.  Just as pro-gay is not, anti-gay is not because we do not

21  want to create disruption in the classroom.  That's the issue

22  at hand is the disruptions, not these statements.  But because

23  of what happened after one was introduced and you -- and the

24  letter, I think it's Exhibit 2, maybe 3, this letter here, sent

25  these statements, we coupled them together as being the same as

1   one --

2   Q.  Okay.

3   A.  -- was that it would lead to a disruption, and that was the

4   issue.

5   Q.  Was it also correct that on May 2007, one year ago today,

6   before the events of 2007 ever happened, that the School Board

7   policy prohibited a student from peacefully expressing her

8   religious beliefs with the following phrase on a T-shirt,

9   "Homosexuality is a sin and against the Bible"?

10  A.  I'm not aware of that.

11  Q.  You simply do not know?

12  A.  I do not know if a student wore that.  Is that what you're

13  asking, or would we allow?

14  Q.  My question is:  One year ago today, was that permitted

15  under School Board policy?

16  A.  We didn't have anything specifically addressing that.

17  Q.  But you did have something specifically addressing

18  pro-gay --

19  A.  No --

20  Q.  -- civil rights?

21  A.  No, sir.  It's in the letter --

22  Q.  You did not --

23  A.  -- that we did not have a pro-gay or anti-gay policy.

24  Q.  Okay.  I guess I'm a bit confused by that, but --

25      I thought we went over this, but I direct your attention to

1   your deposition, page 122.  Page 122, looking at line 13.

2       "Question:  Were the expressions of each of the phrases and

3   symbols on Exhibit 1, the 16 phrases and symbols, prohibited by

4   the School Board policy in April 2007, approximately one year

5   ago?"  Do you remember going over this?

6   A.  Yes.

7   Q.  Were they prohibited or were they not prohibited?

8   A.  Yes.

9   Q.  They were prohibited?

10  A.  Yes.

11  Q.  Okay.  My question is:  Were anti-gay statements likewise

12  prohibited?

13  A.  Yes.

14  Q.  Thank you.  Is it true that you did not know how students

15  at Ponce De Leon High School would react if a student wore a

16  swastika on a T-shirt to school?

17  A.  I do not know that, yes.

18  Q.  Therefore, it's fair to say that you cannot say whether

19  wearing a swastika would cause a disruption?

20  A.  That's correct.

21  Q.  Or indicate membership in an illegal organization?

22  A.  That's correct.

23  Q.  Is it fair to say there's nothing inherently disruptive

24  about a swastika?

25  A.  That's correct.

1    Q.  And absent disruption, illegal organization, or safety, it

2    is permitted under the School Board policy?

3    A.  That's correct.

4    Q.  Is it also correct that you have the same opinion about a

5    Confederate flag; that a student can wear a Confederate flag on

6    a T-shirt so long as it does not create a disruption, indicate

7    a illegal membership in a society, or create a hazard to the

8    students?

9    A.  That's correct.

10   Q.  Now, I want to turn to your conversations with Mr. Davis at

11   this point.  Is it true the first time Mr. -- Mr. Davis called

12   you about the events of September 2007, it was to relay to you

13   that a student had told a teacher's aide during lunch that the

14   student self-identified as a lesbian?

15   A.  Yes.

16   Q.  Since -- since then, you have spoken with Mr. Davis about

17   the events of September 2007 a handful of times?

18   A.  Yes.

19   Q.  Is it correct that Mr. Davis told you about how many --

20   about how students rumored that the speaker at a September 12th

21   assembly would berate gays and lesbians?

22   A.  Yes.

23   Q.  But you did not inquire about the foundation of the rumor,

24   is that correct?  You didn't ask Mr. Davis, "Why do you think

25   that?"

1    A.  I did not ask Mr. Davis, no.

2    Q.  Okay.  I would like to move to Plaintiff's Exhibit 8.

3    Mr. Griffin, if you could turn to Plaintiff's Exhibit 8.  This

4    has not been introduced yet.

5        Can you identify what is marked as Plaintiff's Exhibit 8?

6    A.  Exhibit 8 is a letter from the ACLU representing students

7    A.H. and H.G. and their parents.

8    Q.  Did you receive a copy of this letter?

9    A.  Yes, I did.

10   Q.  Does that appear to be a true and accurate copy of the

11   letter you received?

12   A.  It looks like it, yes, sir.

13           MR. STEVENSON:  I move to enter Plaintiff's

14   Exhibit 8 into evidence.

15           MS. DINCMAN:  No objection.

16           THE COURT:  Be admitted.

17       **(Plaintiff's Exhibit No. 8 received in evidence.)**

18   BY MR. STEVENSON:

19   Q.  Did you understand that this letter -- that in this letter

20   there is an allegation that Mr. Davis told students that it is

21   wrong to be gay and asked students if they were gay?

22   A.  Yes.

23   Q.  Is it fair to say that you did not investigate the

24   allegations contained in the September 25th letter, the letter

25   that's been marked as Exhibit 8, that Mr. Davis had asked

1  students if they were gay and told students it was wrong to be

2  gay?

3  A.  I asked Mr. Davis if he said that and he said no.

4  Q.  But was that the extent of your investigation?

5  A.  Yes.

6  Q.  But you have authority to investigate these allegations, do

7  you not?

8  A.  I have the authority.  But when I have 3400 students, 500

9  employees, I don't have the time to personally investigate.

10  Q.  Do you consider these serious allegations that a principal

11  at your high school is asking students whether they are gay or

12  lesbian?

13  A.  That is very serious.

14  Q.  Okay.

15  A.  But when I asked Mr. Davis, he told me no, he had not done

16  that.  And I have no reason not to trust him.

17  Q.  The investigation was over?

18  A.  That's correct.

19  Q.  All right.  You could have asked students to ask their side

20  of the story?  You could have, right?

21  A.  I could have, but I normally do not do that.

22  Q.  And you could have asked teachers, is that right?

23  A.  I could have, but I normally do not do that.

24  Q.  Okay.  And you could have visited the classroom?

25  A.  I do visit the classrooms.

Q.  Observed the decorum of Ponce De Leon High School to find
out what may be going on?

A.  I do observe classrooms.  I do not go in and see what the
kids are wearing.

Q.  You didn't observe the classrooms or go to Ponce De Leon
High School because you wanted to investigate this, though, did
you?

A.  No, I did not.

Q.  Okay.  And you -- and you could have asked for Mr. Davis'
notes, is that also right?

A.  That's correct.

Q.  But you didn't?

A.  I had no reason to distrust what he had told me.

Q.  Approximately how many people work for you at the district
office?

A.  Twenty-five.

Q.  Okay.  And you could have directed a number of those people
at the district office to investigate these serious
allegations, which you've said are serious allegations, is that
correct?

A.  Yes, I could.

Q.  But you did not?

A.  I did not.

Q.  And is it true that you believe that the government should
not treat gay and lesbian persons as equal to straight men and

1    women?  For example, you believe that gay and lesbian persons

2    should not be permitted to marry, is that correct?

3    A.   That's correct.

4    Q.   Okay.

5    A.   As far as to part B of your question, that's correct.

6    Q.   Are you taking issue with of how the government is treating

7    its citizens?

8    A.   Should treat everybody the same.

9    Q.   Isn't marriage a contract with the state as well?

10   A.   I believe so, yes.

11   Q.   Okay.  So is it correct that you disagree with the

12   viewpoint of at least a few of the gay right civil -- or the

13   gay civil right phrases that are listed on Exhibit 2, on

14   Ms. Gillman's letter, these are the expressions that

15   Ms. Gillman wants expressed?

16   A.   My personal opinion does not affect how I make a decision.

17   Q.   My question is:  Do you disagree with at least some of the

18   phrases that Ms. Gillman would like to express?

19   A.   Yes, that's correct.

20   Q.   Okay.  Is it also true that you found acceptable Mr. Davis'

21   conclusion that the future student expressions of gay civil

22   rights should be banned?

23   A.   Repeat the question, please.

24   Q.   That you found it acceptable -- did you find it acceptable

25   that Mr. Davis' conclusion that the expressions for gay civil

1    rights should be banned at Ponce De Leon High School?

2              MS. DINCMAN:  Objection, assumes facts not in evidence

3    in terms of Mr. Davis' -- his reliance -- there's lack of

4    foundation for his reliance on whatever Mr. Davis' conclusions

5    were in terms of any recommendation he may have made to the

6    Board.

7              MR. STEVENSON:  Your Honor, I'll clear that up.

8    BY MR. STEVENSON:

9    Q.  Did Mr. Davis -- does Mr. Davis think these phrases and

10   symbols should be banned at the high school?

11   A.  That was not Mr. Davis' call; that was the School Board's

12   call.

13   Q.  The question is:  Does Mr. Davis agree with that position?

14   A.  Mr. Davis is going to enforce policy.

15   Q.  Did -- does Mr. Davis agree with the position that these

16   phrases and symbols should be banned at the high school?

17             THE COURT:  Counsel, we pretty much got the answer to

18   that yesterday.

19             MR. STEVENSON:  Okay.

20   BY MR. STEVENSON:

21   Q.  To your knowledge, did any School Board members undertake

22   or direct an independent investigation of the events of

23   September 2007?

24   A.  No, sir, not that I'm aware of.

25   Q.  To your knowledge, they were all satisfied with the

1    information you and the school -- or they were all satisfied

2    with the information that they had considered in reaching their

3    discussion about Mr. Davis -- let me just strike all that.

4         To your knowledge, they were all satisfied with the

5    information you and the School Board members considered in

6    reaching the decision about student expressions of gay civil

7    rights came from Davis?

8    A.   Yes.

9    Q.   Mr. Davis, who has been accused of telling students it was

10   wrong to be gay?  They were satisfied with relying on

11   Mr. Davis -- Mr. Davis' conclusion, when Mr. Davis has been

12   accused of telling the students it was wrong to be gay?

13        MS. DINCMAN:  Objection, assumes facts not in

14   evidence.  Assumes that the school -- there's lack of

15   foundation that the School Board did in fact rely on anything

16   Mr. Davis said or that he had any input.  I think his testimony

17   yesterday was that he had no input whatsoever into the Board's

18   decision to ban the symbols, that nobody consulted with him.

19        MR. STEVENSON:  I am simply trying to point out that

20   there was -- inasmuch as there was no independent

21   investigation, they were simply recommending upon information

22   that was relied -- relayed from Mr. Davis to Mr. Griffin and

23   then to the School Board, and that they were certainly happy to

24   just go along with what Mr. Davis had relayed.

25        THE COURT:  Why don't you ask your question in that

1    form?

2              MR. STEVENSON:  Okay.

3              MR. BEENEY:  Your Honor, I hate to pile on but can I

4    just make one statement in response?  And that is that --

5              MS. DINCMAN:  Your Honor.

6              MR. BEENEY:  -- the evidence is is that the School

7    Board says that they banned these symbols because of the events

8    of September of 2007.  Every bit of information they had about

9    what happened in September of 2007 came from Mr. Davis to

10   Mr. Griffin to the Board.  So to say that the Board -- that

11   Mr. Davis had nothing to do with this decision is semantical,

12   charitably described.  So -- well, sorry.

13             THE COURT:  Ms. Dincman.

14             MS. DINCMAN:  I just object to having two counsel

15   responding to everything that one witness says, and having to

16   deal with multiple lawyers.

17             THE COURT:  Well, he was talking to me.  I'm the one

18   that has to endure that.

19             I think I got the picture yesterday from Mr. Davis'

20   testimony that he was the source of information for the Board's

21   decision.

22             THE WITNESS:  Yes, sir.

23             THE COURT:  Is that correct, Mr. Griffin?

24             THE WITNESS:  Yes, sir.

25             THE COURT:  There's no independent investigation;

1    there were no statements, no investigators, or anything like

2    that?

3            THE WITNESS:  That's correct.

4    BY MR. STEVENSON:

5    Q.  Has -- had the School Board requested, you would have

6    conducted an independent investigation on their behalf in

7    September of 2007, is that correct?

8    A.  Say that again.  Would they allow?  Would they ask?

9    Q.  Had the School Board requested, you would have conducted an

10   independent investigation of the events of September 2007?

11   A.  Yes.

12   Q.  Okay.  Looking at Plaintiff's Exhibit 8, did you treat the

13   September 25th letter as an appeal of the suspension of A.H.?

14   A.  No, sir.

15   Q.  Is the sole reason you did not treat the letter as an

16   appeal of A.H. because she employed the assistance of legal

17   counsel to draft the appeal?

18           MS. DINCMAN:  Objection.  He just said he didn't treat

19   it as an appeal.

20   BY MR. STEVENSON:

21   Q.  The question is:  Is the reason you did not treat it as an

22   appeal because A.H. employed the assistance of legal counsel to

23   draft the appeal?  Is that the reason you did not?

24   A.  That was part of it, yes.

25           THE COURT:  I'm not sure that's particularly

1    pertinent.

2            THE WITNESS:  What I think -- what, Mr. Stevenson,

3    you're referring to is our grievance procedure and our School

4    Board policy and Code of Conduct.  There is a procedure that

5    students have the right to make an appeal and we try to resolve

6    it at the lowest level.

7            THE COURT:  I understand, Mr. Griffin.  I'm just not

8    sure this has a bearing on the issues I'm going to have to

9    decide.

10           MR. STEVENSON:  Your Honor, I think it goes directly

11   to whether Mr. Davis is a final decision maker in this matter.

12   Whether he has the ability to make these decisions by himself

13   or whether there is an appeal process by which the School Board

14   reviews and can correct his actions.

15           THE COURT:  Your focus was on, did they not treat

16   your -- this letter as a request for an appeal?

17           MR. STEVENSON:  Yes, it was.  Okay.

18           THE COURT:  Why does that have a bearing on --

19           MR. STEVENSON:  I appreciate it.  I'll move on.

20   BY MR. STEVENSON:

21   Q.  Lastly, I want to talk to you about David Griffin, a

22   teacher at Ponce De Leon High School.  Is there a relationship

23   between you and David Griffin?

24   A.  No, sir.

25   Q.  Is it right that you worked with Mr. Griffin when you were

1   the principal at Ponce De Leon High School some years ago?

2   A.  Yes, sir.

3   Q.  Do you trust Mr. Griffin's, David Griffin's,

4   characterizations of the students and his -- and of their

5   discipline?

6   A.  Yes.

7   Q.  He's a strict teacher?

8   A.  Yes.

9   Q.  Can David Griffin handle discipline problems in his

10  classroom?

11  A.  Sure.

12      MR. STEVENSON:  That's all the questions I have, Your

13  Honor.

14                      **CROSS-EXAMINATION**

15  BY MS. DINCMAN:

16  Q.  Good morning, Mr. Griffin.

17  A.  Good morning.

18  Q.  As we get started, how long have you been in education, all

19  together?

20  A.  Since March of '85.

21  Q.  Okay.  So that's 20 --

22  A.  Twenty-three years.

23  Q.  Twenty-three plus years.  And was there a time when you

24  were an administrator at Ponce de Leon?

25  A.  I was assistant principal five and a half years and

1    principal for two years.

2    Q.   And how long all together were you an administrator?

3    A.   Approximately 11, 11 years.

4    Q.   All right.  And what -- what exactly is the role of the

5    School Board, as you understand it in law?

6    A.   School Board is charged to develop policy, establish

7    policy.

8    Q.   And what is the role of the superintendent as compared to

9    the role of the School Board?

10   A.   Superintendent's role is the administrator over the

11   operations of the school system.

12   Q.   And does that involve -- does that involve a lot of

13   different categories?  What all are the categories of things

14   that you have to oversee as a superintendent?

15   A.   I'm charged by the State Board of Education rules, School

16   Board policy, probably primarily there's about seven or eight

17   areas dealing with budget, dealing with finance, curriculum,

18   federal programs, Title I programs, which are the same,

19   facilities maintenance, lunchroom, curriculum, food service,

20   transportation.

21   Q.   Okay.  You were -- you testified that when you got the

22   letter of September 25th making allegations that Mr. Davis had

23   said and done certain things in the classroom, that you called

24   him and talked with him about that.  Is that right?  And did

25   he -- did he say anything about the truth of those allegations?

1    A.   In regards to the allegations that the students made?

2    Q.   Yes.

3    A.   He said he didn't say any of those things.

4    Q.   Okay.  And you didn't go behind that.  Can you explain why

5    you did not feel the need to go behind what Mr. Davis was

6    telling you?

7    A.   Mr. Davis is one of several administrators that I have.

8    And there's no reason for me not to believe what he told me.

9    You know, in dealing with whether it's a district level

10   administrator or school-based administrator, I rely upon them

11   to be my eyes at the schools.

12   Q.   And are you -- given the nature of your job, do you have to

13   rely on your administrators to do that?

14   A.   They're to report back to me if there's concerns in their

15   particular area, whether it's at the school base or whether

16   it's at the district level.

17   Q.   What if anything had happened up until that point in your

18   relationship with Mr. Davis to cause him -- cause you to doubt

19   the veracity of what he was telling you or his response?

20   A.   There had been nothing to cause me to doubt what he was

21   telling me.

22   Q.   Okay.  I wanted to ask you:  You said that the symbols and

23   slogans would have been prohibited under School Board policy a

24   year ago in this particular case.  Did you have a -- did you

25   have a School Board policy prior to the issuance of the

1    November 12th letter from Mr. Young that specifically addressed

2    those 16 symbols and slogans?

3    A.   No, we did not.

4    Q.   And I would like to refer you to the Code of Conduct that's

5    Plaintiff's Exhibit 7.  We talked generally about some things

6    that -- did you have general policies that addressed disruptive

7    behavior in the school system as expressed in the Code of

8    Conduct?

9    A.   On page 8, letter A at the top of the page, "Distraction of

10   Other Students.  Any behavior that alters the teaching process

11   in the classroom or educational activity."

12   Q.   Hang on one second.

13   A.   Letter C, "Non-conformity to Dress Code."

14   Q.   You're referencing, sorry, I have to do it on here,

15   letter A.  What is it?  "Distraction of other students,

16   interfering with the teaching process of the classroom or

17   educational activity."  What was the letter that you were

18   referring to?

19   A.   Letter C, "Non-Conformity to Dress Code.  Any dress that is

20   disruptive to the educational setting or is a hazard to the

21   health or safety of the student."

22   Q.   Okay.  And I would also refer you to page 1, the preamble.

23   I would refer you to the first and second paragraphs of this

24   document.

25   A.   These are our guidelines that we follow with all students

1    of recognizing fully the constitutional rights of students

2    enrolled in its schools.  The second paragraph begins to talk

3    about discipline, hopefully building character within the

4    students of them being able to self-discipline theirselves.

5    "However, behavior and discipline policies shall, therefore,

6    demonstrate recognition both of individual students'

7    constitutional rights and of the paramount need for maintaining

8    a proper and safe atmosphere for learning within the school."

9    Q.  And does that -- does that key in on -- in those sections

10   of the policy, does that key in on the speech of students and

11   the behavior of students in the context of whether it causes a

12   disruption to the learning process?

13            MR. STEVENSON:  Objection, Your Honor.  I'm not sure

14   what the relevancy of this is.  I mean, I think the School

15   Board can promulgate school rules saying that they're going to

16   protect the Constitution, but I think that's the reason we're

17   here.

18            MS. DINCMAN:  Your Honor, it's directly relevant to

19   how they interpret speech.

20            THE COURT:  All right, overruled.

21   BY MS. DINCMAN:

22   Q.  As I -- as I had asked you, the policies that you rely on

23   in the Student Code of Conduct, do they key in on the necessity

24   of maintaining order and decorum in the schools?

25   A.  Yes.

1    Q.   And do they relate and focus on whether behavior or speech,

2    or whatever the case may be, deals with disruption?

3    A.   Yes.

4    Q.   And, you know, you didn't have a policy prior to

5    November 12th, 2007, that specifically prohibited these symbols

6    as exhibited in Exhibit 2, or as set out by the ACLU in

7    Exhibit 2?

8    A.   That's correct.

9    Q.   Now, you've testified that they would have been prohibited.

10   But would they have been prohibited absent causing some kind of

11   disruption in your school?

12   A.   No.

13   Q.   Okay.  So is it your testimony that the plaintiff could

14   have worn those prior to November of 2007 -- or I should say

15   prior to September of 2007 -- if there was no disruption that

16   was going along with that?

17        MR. STEVENSON:  Objection, Your Honor, a

18   mischaracterization.

19        THE COURT:  Overruled.

20        THE WITNESS:  That's correct.

21   BY MS. DINCMAN:

22   Q.   And is that the same reason why you would have to allow

23   someone to wear a Confederate flag at school if there had not

24   been any disruption that had gone along with the wearing of the

25   Confederate flag?

1   A.   That's correct.

2   Q.   I would like to refer you in terms of the Code of Conduct,

3   page -- page 9, "Major Offenses."  Can you turn to that?

4   A.   Yes.

5   Q.   Okay.  And will you look at your illegal organizations

6   policy?

7   A.   Okay.

8   Q.   There was some questions about whether going to -- talking

9   about politics at school would fall within the lines of an

10  illegal organization.  And I think you had said no, generally

11  it would not.

12  A.   That's correct.

13  Q.   Okay.  Do you -- do you -- when you're trying to look and

14  see if something is or could be an illegal organization, do you

15  just look only at that policy as it presents right there?

16  A.   No.  It ties back into page -- under "Student Clubs and

17  Activities," I believe.

18  Q.   And is that on page 15?

19  A.   Yes.

20  Q.   And when you say that, are you talking about "Student

21  Activities" here on page 15 that talks about what activities

22  are?

23  A.   Yes.

24  Q.   And that focus is on legal clubs and organizations and what

25  the requirements for them are?

1  A.  It describes that and it also talks about what the focus or

2  emphasis should be of the club.

3  Q.  And what are the requirements for students to form a club?

4  A.  The focus or emphasis should be on academics.  But in

5  that -- in that second paragraph, it talks about they have to

6  have a time, a place, a faculty advisor that's provided.

7      To remain active the club has to have specific goals, a

8  direction, objectives, and a yearly evaluation.  If at the end

9  of that time, if at the end of the year, the annual review, the

10 club is not meeting its goals, then it would be disbanded.

11 Q.  Okay.  And so to figure out what an illegal organization is

12 do you look at what this definition implicitly of a legal

13 organization would be?

14 A.  Yes.

15 Q.  And based on the information that you had from Mr. Davis,

16 did you have any information that -- that students were in fact

17 organizing for some purpose?

18 A.  Yes, they were.

19 Q.  And what was that?

20 A.  They were -- they were organizing to form a protest at the

21 assembly.

22 Q.  And what would that be -- what was their rallying cry, as

23 you understand it?

24 A.  "Gay Pride," in support of gays.

25 Q.  And did they in fact use some of the symbols that were in

1  this letter from the ACLU?

2  A.  Yes, they did.

3          THE COURT:  Mr. Griffin, let me ask you something.

4  How do you tell the difference between a member of an

5  organization that you all envision a secret organization, and

6  simply a supporter of some idea or team or candidate?  Where do

7  you -- where do you stop being just a supporter and become a

8  member?

9          THE WITNESS:  Your Honor, I think that's what

10  Mr. Davis struggled with when he interviewed, I think, 45

11  students.

12          THE COURT:  Who came up with this argument of a secret

13  organization?

14          THE WITNESS:  That was the word, buzz word, phrase,

15  I -- I think I was given.

16          THE COURT:  I just want to know who was the genius who

17  came up with this was a good argument?  I mean, these are 12-

18  and 14-year-olds.

19          THE WITNESS:  Sure.  I think Mr. Davis, when he was

20  looking at our policies when it talked about illegal

21  organizations --

22          THE COURT:  Decided that this fits a secret or illegal

23  organization?

24          THE WITNESS:  Well, it talks -- that second part says,

25  "Students shall not wear any color, clothing, insignia, emblem,

1    jewelry, or other object in such a manner as to indicate

2    membership or association with any secret organization."

3              Your Honor, I don't -- I can't say as to whether it

4    was a secret organization, but it was an organized group of

5    students that were planning the protest.  And it fell under --

6              THE COURT:  So by saying, "Hey, wear your 'Gay Pride'

7    rainbow tomorrow," that then brings us into the school system's

8    rule against secret organizations?

9              THE WITNESS:  Yes, sir.

10             THE COURT:  Okay.

11   BY MS. DINCMAN:

12   Q.  And to follow up on that, Mr. Griffin, do you know if

13   Mr. Davis -- did he share with you that it was more than just

14   "Wear your 'Gay Pride' rainbow," that students were engaging in

15   other types of behavior that show that they were acting in an

16   organized fashion, such as meeting off campus and making plans

17   or denying people --

18             MR. STEVENSON:  Objection, Your Honor.

19   BY MS. DINCMAN:

20   Q.  -- membership or to be joined in some group?

21             THE COURT:  Overruled.

22             MR. STEVENSON:  I don't believe the foundation for

23   this question has been entered.

24             MS. DINCMAN:  I'm asking him what he knew.  He said he

25   had conversations with Mr. Davis.

1          THE COURT:  Let me be a little more blunt.  I think I

2     was trying to suggest that I'm not real proud of this secret

3     organization argument.  You can develop it some, but I think

4     it's a stretch.  I think our focus needs to be on whether these

5     were proper topics and whether there was the requisite

6     potential for disruption.

7          THE WITNESS:  Middle school students were making

8     posters in addition to T-shirts, and they were talking in

9     school, out of school, as to what they were going to do.

10    BY MS. DINCMAN:

11    Q.  Making plans for the next disruptive activity?

12    A.  Yes.

13    Q.  Okay.

14         THE COURT:  Well, if they're talking out of school,

15    how does the School Board have any interest or control over

16    that under any circumstance?

17         THE WITNESS:  No, sir, unless they're on campus, we do

18    not.

19    BY MS. DINCMAN:

20    Q.  Well, if students are making plans off campus to take

21    action that ends up disrupting your classes, or events and

22    things that you have planned at the school, does that not, to

23    the extent it causes disruption on campus, bring their actions

24    within the purview of the school's authority to deal with that?

25    A.  If it created a major disruption we did have -- we would

1   have to look into it.

2          THE COURT:  Let me ask you this.  Unless -- say they

3   met off campus, somebody's house, and, you know, came up with

4   some plans but they never -- never got to it.  You're not going

5   to suspend them for that, are you?

6          THE WITNESS:  No, sir.

7   BY MS. DINCMAN:

8   Q.  If you -- if you have information, though, that students

9   are planning to do something like walk out of an assembly and

10  you get -- you get -- it's -- the plan, which would have

11  otherwise happened, is able to be stopped because of some

12  intervention, does that -- does that make it any less offensive

13  or inappropriate that the -- that they're planning to disrupt

14  an assembly?

15  A.  No, it does not.

16  Q.  And you -- you have students that are painting things

17  across their forehead.  You've spent a lot of time in the

18  education system both as a teacher and an administrator.  Is

19  that something that even just a child wearing -- regardless of

20  what the message says -- wearing something across their

21  forehead into class, is that going to materially disrupt class?

22  Based on your experience.

23  A.  It would, especially with middle school students.

24  Q.  And why especially with middle school students as compared

25  to high school students?

1    A.   Hormones are flying, their bodies are changing, their minds

2    are changing.  They're developing -- beginning to find

3    identities for themselves.

4    Q.   In your -- in your mind, are they more easily distracted

5    than high school students?

6    A.   Sure.

7    Q.   And do they tend to run with that distraction and carry it

8    to the point that it interferes with the rest of the school

9    day, based on your experience?

10   A.   Yes.

11   Q.   I want to make sure I understand:  Did Mr. Davis ever

12   discuss any of his own personal views about gay or lesbian

13   issues with you?

14   A.   No, he did not.

15   Q.   Did you have any knowledge about that?

16   A.   No, ma'am.

17   Q.   And understanding what your personal views are, do you --

18   did you bring those into this case in terms of gathering

19   information or the decisions that you made?

20   A.   No, I did not.

21   Q.   Do you generally allow your personal views on a subject to

22   control how you deal with students?

23   A.   No, I do not.

24   Q.   Even if you disagree with what the student's view is?

25   A.   I follow State Board of Education rules, School Board

1   policy.

2   Q.  Okay.  I want to show you what's been marked as Plaintiff's

3   Exhibit 2.  This is the November 2nd, 2007, letter.  This came

4   on the heels of suspensions that were handed out in late

5   September, so just a few weeks after that.

6       Did this -- the timing of that impact this decision in any

7   way as far as you know?

8   A.  Yes.  I -- with the "Gay Pride" or "GP" being on the

9   letter -- matter of fact, being the first slogan that was

10  listed -- I felt it was directly tied back to the events that

11  had occurred at Ponce De Leon High School September of '07.

12  Q.  And had Mr. -- we talked about evidence that one class was

13  disrupted for ten minutes, and basically that that's it.  But

14  is that the information that you were getting from Mr. Davis in

15  terms of the extent of the disruption?

16  A.  No.  There was a lot of unrest.

17  Q.  Were you getting information that there was a lot more

18  going on than just ten minutes of interruption of one class

19  period?

20  A.  Yes.

21  Q.  And was -- did you get the impression that there was many

22  classes and activities that were going on that were being

23  disrupted at the school?

24  A.  Yes.

25  Q.  And given the timing of this, did you -- did you have it in

1    your mind that this would result in future disruption if you

2    allowed this?

3    A.   Yes.

4    Q.   Okay.  As you look at this, did it -- did you also consider

5    who the letter -- on whose behalf the letter was sent?

6    A.   Yes.

7    Q.   I mean, you didn't -- is this student, A.H., is she a

8    student who was actually involved in the disruptions, to your

9    knowledge, that occurred in September of 2007?

10   A.   Yes.

11   Q.   And did that play in some way in your belief that this

12   was -- that this was directly related to those disruptions and

13   a further extension of those disruptions?

14   A.   Yes, it did.

15   Q.   And when you talked to the individual Board members,

16   Mr. Griffin, did you -- you didn't know what Mr. Davis'

17   personal views on any of these issues were?

18   A.   No, I did not.

19   Q.   And you didn't convey those to the Board members in any

20   way?

21   A.   No, I did not.

22   Q.   And did any of the Board members in your discussions with

23   them ask you, "What does Mr. Davis think that we ought to do in

24   this situation?"

25   A.   No, they did not.

1  Q.  Did you even ask Mr. Davis, "What do you think we ought to

2  do here with this?"

3  A.  No, I did not.

4  Q.  That wasn't a consideration?

5  A.  No.

6  Q.  And is that because Mr. Davis is not the one who decides

7  what the Board's policy is going to be?

8  A.  That's correct, the School Board does.

9  Q.  His job is to enforce the policy?

10  A.  Yes.

11  Q.  And Mr. Davis doesn't have a say-so in what goes into the

12  Student Code of Conduct?

13  A.  The principals, we have a March meeting and we discuss the

14  Code of Student Conduct book and ask for any suggestions they

15  may have or any problems that they're having in the schools

16  that might need to be addressed the previous year.

17      Mr. Davis, at our -- he began in -- he would not have

18  attended that meeting in the springtime, so Mr. Davis would not

19  have had any input in that.

20  Q.  Had never participated in that?

21  A.  He had not.

22  Q.  Never had made any suggestions or changes for anything

23  relating to the Student Code of Conduct?

24  A.  No, he had not.

25  Q.  And even if he had, that's still something that's subject

1    to the Board; the Board has the final say-so in how that's

2    handled?

3    A.   The Board has to approve final policies.

4    Q.   All right.  You heard Mr. Davis' testimony yesterday that

5    these symbols and slogans would have been banned before

6    September of 2007.  Did you agree with that, absent some kind

7    of disruption?

8    A.   No.

9    Q.   There would have to be a disruption that goes along with it

10   before the Board makes a decision to ban the speech?

11   A.   That's correct.

12   Q.   And I just want to clarify:  Yesterday, I think Mr. Davis

13   had testified that these symbols and slogans were in some way

14   inherently sexual in that they implied some sort of -- or made

15   kids think of a sex act.  Do you agree or disagree with that

16   analysis?

17   A.   I disagree.

18   Q.   To the extent that they may say "gay" or "straight" or

19   "lesbian," does that connote something to you in terms of

20   sexual orientation?

21   A.   I think they refer to sexual orientation, not a sexual act.

22   Q.   Not a sex act -- not that the symbols and slogans standing

23   by themselves are somehow directly related to a sex act?

24   A.   That's true.

25              THE COURT:  Mr. Griffin, let me ask you something.  I

1    think you mentioned, maybe Mr. Davis yesterday mentioned, that

2    these were middle school and that there was a nearby elementary

3    school.  Obviously, the topic of homosexuality in young school

4    children are likely to provoke strong reactions.

5              But how do we square these relatively innocuous

6    statements with the fact that on just about any day of the week

7    on prime time television we've got soap operas or situation

8    comedies, I think is what I need to say, that portray

9    characters who are homosexuals in mainstream American life

10   roles?  And goodness knows the American families stay glued to

11   the prime time sitcoms.

12             THE WITNESS:  Your Honor, I would hope our parents

13   would have those discussions with their students -- their

14   children.

15             THE COURT:  I'm trying to get a better grasp on this

16   fear that I think has been articulated that seems to go to the

17   age of the children as much as anything.

18             THE WITNESS:  That's our concern.  You know, ideally,

19   I would love to have our middle school kids separated from our

20   high school kids, and we have a three-bell system that helps in

21   that.  But in regards to buses in the morning and in the

22   afternoon, they're going to -- their paths cross.

23             THE COURT:  Well, that's a concern to me.  Because I'm

24   not sure any of the real key appellate decisions give me a

25   whole lot of help on this issue of the age of the children.

1    You all be thinking about that.

2            MS. DINCMAN:  I don't have any further questions for

3    you.

4            MR. STEVENSON:  Your Honor, if I could have just a few

5    more.

6                        **REDIRECT EXAMINATION**

7    BY MR. STEVENSON:

8    Q.  I want to follow up what you were talking about with

9    Mr. Davis and whether these phrases and symbols listed on

10   Plaintiff's Exhibit 2 are sexually suggestive.  And I guess my

11   question is:  What kind of response -- do you think that

12   students at Ponce de Leon High School are going to have a

13   reactionary response in that it may incite their morals or

14   their values?  Is that the concern here?

15   A.  I think it's based on what happened in 2007, September, is

16   what our concern is, when "GP" and "Gay Pride" was introduced,

17   what followed.

18   Q.  You don't think they have -- there's a sexual connotation

19   to these phrases, is that correct?

20   A.  I think it has to do with the sexual orientation.  As far

21   as the sex act, I don't think so.  I mean when you look at

22   these expressions, you know, "I'm Straight, But I Vote

23   Pro-Gay," they're talking about how they are -- how -- what

24   their sexual orientation or their preference is.

25   Q.  But not a sexual connotation?

1    A.   That's correct.

2    Q.   I would like to direct you to your testimony on page 164 of

3    your deposition.

4         MS. DINCMAN:   Your Honor, I am going to object to this

5    as improper impeachment.  Sexual connotation could include

6    sexual orientation.

7         THE COURT:   I'm sorry, Ms. Dincman, you're parsing

8    things a little too finely for me.

9    BY MR. STEVENSON:

10   Q.   On -- I'm going to read a question beginning on line 20.

11        "Are any of the symbols and phrases in Exhibit 1 sexually

12   suggestive?  Do you disagree with Principal Davis'

13   characterization that some of the symbols or phrases in Exhibit

14   1 as being sexually suggestive?"

15        Skip down to page 165, line 4.  "If I look at these 16

16   statements, they all -- they refer -- have sexual connotations

17   to them.  If my middle school students see them, they take a

18   whole different picture.

19        "Question:  What picture do they take?

20        "Answer:  Reactionary.  And in the processing of their

21   minds, they can't respectfully disagree as you and I, adults --

22   to me, it incites, perhaps their upbringing, perhaps their

23   morals, their values."

24        MS. DINCMAN:   Your Honor, I'm going to object, that

25   under Rule 106, in fairness, the questions on page 162 and 163,

1    Lines 15 through 4, also be read into the record, his prior

2    response to similar questions.  This was the second go-round on

3    this question.

4            THE COURT:  All right, let's do that.

5            MR. STEVENSON:  Ms. Dincman, would you like to do

6    that?

7            MS. DINCMAN:  Yes.

8                    **VOIR DIRE EXAMINATION**

9    BY MS. DINCMAN:

10   Q.  Can you turn to page 162 and 163, Mr. Griffin?

11   A.  Okay.

12   Q.  And starting at line 15, it says, "I'm going to represent

13   to you that Mr. Davis said some of the symbols and phrases in

14   Exhibit 1" -- that's what is now labeled Exhibit 2, "could --

15   be prohibited under School Board policy because they are

16   sexually suggestive.  Do you have any reason to doubt his

17   judgment?

18       "Answer:  I can't speculate on what Mr. Davis was thinking

19   about.

20       "Question:  Could some of the phrases and symbols on

21   Exhibit 1 be prohibited under School Board policy because they

22   are sexually suggestive?

23       "Answer:  When you look at those 16 expressions, 'Gay?

24   Fine by Me!' doesn't that reference to sexual orientation?

25       "Question:  Is that a yes then?

1      "Answer:  I'm asking you.

2      "Question:  I think gay refers to sexual orientation.

3   Yes."

4      Five.

5      "Answer:  If you would repeat your question to me now.

6      "Question:  Do you believe that the symbols and phrases in

7   Exhibit 1 could be prohibited under School Board policy because

8   they are sexually suggestive?

9      "Answer:  I think we've already discussed that."

10      MR. STEVENSON:  Thank you, Ms. Dincman.

11              **REDIRECT EXAMINATION (CONTINUING)**

12   BY MR. STEVENSON:

13   Q.  Did the School Board create new policy so that it could

14   specifically ban the phrases and symbols contained in

15   Plaintiff's Exhibit 2?

16   A.  No.

17   Q.  So this is the same School Board policy that was in

18   existence with respect to banning symbols and expressions on

19   T-shirts; the School Board policy hasn't changed in a year, is

20   that correct?

21   A.  That's correct.

22   Q.  Now, everything you and the Board heard about the events of

23   September of 2007, you heard from Mr. Davis, is that correct,

24   to the best of your knowledge?

25   A.  That's correct.

1   Q.  And do you know whether he saw or perceived anything

2   himself personally?

3   A.  Whether Mr. Davis saw?

4   Q.  Yes.  Whether Mr. Davis saw and heard things personally as

5   opposed to, you know, hearing things from students?

6   A.  Mr. Davis investigated.  I believe that's what he testified

7   yesterday, he investigated the events of '07, September of '07.

8   Q.  Are you aware that Mr. Davis saw or heard any infraction

9   personally as opposed to hearing it from the students?

10  A.  I don't recall Mr. Davis saying, "I heard specifically this

11  student yell this," or something of that nature.  Does that

12  answer your question?

13  Q.  Thank you.  Has any of the testimony that you've heard from

14  parents or from students about Mr. Davis sharing his personal

15  anti-gay views with parents and students raise concerns for

16  you?

17  A.  When I asked Mr. Davis if he said those things, he said he

18  did not.

19  Q.  I'm asking today.  Have they raised some concerns for you?

20  A.  I have previously spoken with the first witness and so I --

21  I'm privy to that information prior to today.

22          MR. STEVENSON:  Okay.

23          That's all the questions I have, Your Honor.

24          THE COURT:  All right, Mr. Griffin, you may step down.

25          THE WITNESS:  Thank you.

1    THE COURT:  You have another witness?

2    MR. BEENEY:  Your Honor, may we have just a couple

3    minutes to speak with co-counsel and our clients?

4    THE COURT:  All right.  Why don't we take 15 minutes

5    and have our midmorning break now.

6    MR. BEENEY:  Thank you.

7    **(Recess from 10:15 a.m. until 10:32 a.m.)**

8    THE COURT:  Ready for your next witness?

9    MR. BEENEY:  Your Honor, the plaintiff is prepared to

10   rest.  However, one of the additional witnesses we would have

11   called, had we elected to proceed, is a woman that Your Honor

12   may wish to hear from.  She'll take about 15 minutes.  Her name

13   is Gloria Pipkin; she represents the Florida Council of

14   Teachers of English.

15   THE COURT:  I'm familiar with her by reputation, and

16   her role in this community in past years.

17   MR. BEENEY:  Then I don't have to tell Your Honor who

18   she is.  She is aware of the organization's award to

19   Ms. Gillman.  She's prepared to explain why they gave that

20   award to Ms. Gillman and the value to the educational process

21   of Ms. Gillman's efforts, and she may be able to address Your

22   Honor's questions with regard to middle schoolers.  So shall we

23   put her on?

24   THE COURT:  If you can keep it brief.

25   MR. BEENEY:  Okay.  Thank you.  The next witness will

1   be Gloria Pipkin; and with Your Honor's permission, she'll be

2   examined by Ms. Holzer.

3           THE COURT:  If you would focus on the younger children

4   issue.  The question about the award, I think I got that

5   yesterday.

6           DEPUTY CLERK:  Please raise your right hand.

7       **GLORIA PIPKIN, PLAINTIFF WITNESS, DULY SWORN.**

8           DEPUTY CLERK:  You may be seated.  Please state your

9   full name and spell your last name for the record.

10          THE WITNESS:  Gloria Pipkin, P-I-P-K-I-N.

11                      **DIRECT EXAMINATION**

12  BY MS. HOLZER:

13  Q.  Good morning, Ms. Pipkin.

14  A.  Good morning.

15  Q.  My name is Meg Holzer, and I'm one of the attorneys

16  representing Heather Gillman in this case.  I would like to ask

17  you a few background questions.  Do you have knowledge of an

18  award recently given to Ms. Gillman?

19  A.  Yes, I do.

20  Q.  And how do you have that knowledge?

21  A.  Because I was part of the group, part of the Intellectual

22  Freedom Commission of the Florida Council of Teachers of

23  English that gave the award.

24  Q.  What is the Florida Council of Teachers of English?

25  A.  The Florida Council of Teachers of English is a

1    Professional organization that supports knowledge and

2    communication among English teachers and language arts teachers

3    from K through university.

4    Q.  And do you have teaching experience?

5    A.  Yes, I do.  I taught in Florida public schools for more

6    than 20 years; and after that I was involved in public

7    education in a variety of ways, and still am.  Actually, I edit

8    books for teachers now.

9            MR. SPELLMAN:  Your Honor --

10   BY MS. HOLZER:

11   Q.  And what grade --

12           MR. SPELLMAN:  Your Honor, excuse me.  I just wanted

13   to object.  I thought Your Honor wanted the witness not to

14   concentrate on the award, but the specific issue.

15           THE COURT:  We're barely 60 seconds into it.

16           MR. SPELLMAN:  I understand.

17   BY MS. HOLZER:

18   Q.  Can you tell me what grade level experience you have

19   teaching?

20   A.  Most of my experience, full-time teaching, all but one year

21   was in middle school.  One year was in high school.

22   Q.  And can you explain to us -- the Intellectual Freedom

23   Commission is the commission that gave Ms. Gillman the award?

24   A.  Yes.

25   Q.  Can you just briefly explain why they decided to give

1   Ms. Gillman this award?

2           MR. SPELLMAN:  Objection, Your Honor, relevance.

3           THE COURT:  Go ahead.

4           THE WITNESS:  We gave the award because the very

5   reason we exist is to address issues of intellectual freedom,

6   which are twofold from the perspective of an English teacher.

7           English teachers care about protecting the selection

8   of instructional materials, of course, but we also are very

9   firmly committed to free expression in public schools.  And

10  when we saw -- I saw the news about the case first, and then

11  the Intellectual Freedom Commission was formed later, and it

12  seemed to me obvious that this was a courageous young woman who

13  deserved recognition.

14  BY MS. HOLZER:

15  Q.  Why is intellectual freedom something that should be

16  encouraged in public schools?

17  A.  In a diverse, complex society, and an increasingly flat

18  world, it's more important than ever that we're able to deal

19  with our deepest differences in a civil way.  And that

20  responsibility for that falls largely to the public schools.

21  And with teachers who are trained and teachers who have control

22  in the classroom, we can address both the rights and

23  responsibilities of citizens in a way that all opinions and all

24  ideas, old and new, can be examined, critiqued, analyzed and,

25  even when we disagree, we can learn to disagree agreeably in a

1    classroom.

2    Q.  What is the position of the commission with respect to what

3    ages of school children freedom of expression would benefit in

4    a public school environment?

5    A.  Of course those decisions are made on an individual basis

6    based on the age of the children and on the teacher's knowledge

7    of their maturity level.  But after 20 years in public schools

8    and continuing to work with adolescents after that point, I

9    would say there are very few cases in which I wouldn't feel

10   comfortable discussing most any issue that seemed important to

11   the students in a controlled situation.

12   Q.  And would that include the speech that you understand

13   Ms. Gillman to desire to express?

14   A.  Yes.

15   Q.  And we're talking about middle school age and any other

16   age?

17   A.  Definitely middle school age, and even with younger

18   children, with -- if the context were carefully controlled and

19   the terms of the discourse were chosen carefully.

20   Q.  And speaking just generally, issues that might be

21   controversial or issues that might cause discourse you believe

22   have the same benefit in a middle school as a high school?

23   A.  Absolutely.

24            MS. HOLZER:  I don't have anything further.

25            THE COURT:  Cross?

1      **CROSS-EXAMINATION**

2   BY MR. SPELLMAN:

3   Q.   Good morning, Ms. Pipkin.

4   A.   Good morning.

5   Q.   My name is Michael Spellman and I'm one of the lawyers

6   representing the School Board.

7        Tell me again the organization that you are with, the

8   Florida --

9   A.   The Florida Council of Teachers of English.  And then the

10  Florida Council of Teachers of English has a Commission on

11  Intellectual Freedom and I am the co-chair of the Commission on

12  Intellectual Freedom.

13  Q.   That, the Florida Council, is a statewide organization?

14  A.   Yes, it is.  It's a statewide organization of English and

15  language arts teachers from kindergarten, even pre-K, through

16  university level.

17  Q.   And what is the charge of the Commission on Intellectual

18  Freedom?

19  A.   To promote communication, understanding, professional

20  development among teachers of language arts and English at all

21  levels.

22  Q.   Isn't it just to offer assistance to the Florida's English

23  teacher arts -- Florida's English language arts teachers with

24  any censorship-related matter?

25  A.   No.  It isn't.  Not for the Florida Council of Teachers of

1   English.  And as I explained earlier, the Commission on

2   Intellectual Freedom also addresses not only material selection

3   and review but also freedom of expression for both teachers and

4   students.

5   Q.  Ms. Pipkin, I'm going to try to use this technology here.

6   You have a screen to your right.  I'm going to show you what

7   appears to be the newsletter for the Florida Council of

8   Teachers on English from Winter 2008.  Do you mind looking at

9   your monitor?

10      Do you recognize that?  Does that look like the newsletter

11  that the FCTE puts out?

12  A.  Yes, it does.

13  Q.  Let me show you the next page, which is on page 12 of that

14  document -- on that newsletter, there's a section on the

15  Commission on Intellectual Freedom.  Do you see that?

16  A.  Yes, I do.

17  Q.  And the FCTE represents that that commission is to offer

18  assistance to Florida's English language arts teachers with any

19  censorship-related matter, right?

20  A.  We also believe that censorship extends to restrictions on

21  freedom of expression within schools for both teachers and

22  students.

23  Q.  But that's not what the FCTE put out in its newsletter,

24  correct?

25  A.  That's implicit.

1    Q.  But that's not what's in the document, correct?

2    A.  Yes, your reading of the actual words is correct.

3    Q.  And this is a publication of the FCTE.

4    A.  Yes, it's a single publication of the FCTE.

5    Q.  That went out to its statewide membership?

6    A.  Yes.

7    Q.  Ms. Pipkin, you've been involved in education most of your

8    life, correct?

9    A.  Yes.

10   Q.  And over the last ten years or so, you've been actually an

11   advocate for certain matters like censorship, correct?

12   A.  I don't think I've ever advocated censorship.

13   Q.  I mean against censorship, you're right, excuse me.  But

14   you've advocated against censorship, is that correct?

15   A.  Yes, I have.

16   Q.  From the book bans in certain schools to other matters, is

17   that right?

18   A.  Yes.

19   Q.  And throughout that time you've published different

20   materials on basically guidelines for teachers or others on how

21   to object to censorship, is that right?

22   A.  Yes, how to deal with challenges to instructional

23   materials.

24   Q.  And part of your instructions have been to contact the

25   American Civil Liberties Union, is that right?

1   A.   And other organizations that provide support under similar

2   circumstances, yes.

3   Q.   And including the ACLU?

4   A.   (Nods affirmatively.)

5   Q.   Ms. Pipkin, have you ever taught in the Holmes County

6   system?

7   A.   No, I have not, although I moved to Holmes County when I

8   was two years old after my father graduated from the University

9   of Florida.  Both my parents were born and raised, as we say,

10  in the South and --

11  Q.   Right.

12  A.   -- and in Holmes County and I attended all the way through

13  high school, graduated from Holmes County High School.

14  Q.   Your father in fact was a teacher in the Holmes County

15  school system?

16  A.   Yes, he was.

17  Q.   And he was part of the massive 1968 walkout or resignation,

18  is that correct?

19  A.   Yes, he was.

20  Q.   And as a result of that, he was ostracized by many in the

21  community, wasn't he?

22  A.   Yes, he was.

23  Q.   And in fact the superintendent reprobated him or accused of

24  him being a Communist, didn't he?

25  A.   Yes, he did.

1    Q.  And after the governor and legislature --

2              MS. HOLZER:  Your Honor, I don't see the relevance --

3              MR. SPELLMAN:  It's bias to the Holmes County --

4              THE COURT:  This ought to play pretty good to a jury,

5    but give me a little credit, counselor.

6              MR. SPELLMAN:  Your Honor, I just bring it up because

7    Ms. Pipkin posted something on the internet talking about how

8    her father and mother had to leave Holmes County where they

9    were born and raised and built a house -- her father built with

10   his own hands -- and had to move because of the Holmes County

11   system.  I think it goes to potential bias.

12             THE COURT:  Okay, I think you've done it.

13   BY MR. SPELLMAN:

14   Q.  Is all that true?  Your parents had to move out of Holmes

15   County and out of the house they built with their own hands?

16   A.  Yes.  And I'm incredibly proud of my father's courage and

17   commitment.

18   Q.  Ms. Pipkin, you've published a book -- copublished a book

19   called At The Schoolhouse Gate, is that right?

20   A.  Yes, I have.

21   Q.  And that -- that's about censorship, is that correct?

22   A.  Yes.  It's a chronicle of our struggles in the school

23   system to protect the freedom to read and the freedom to write.

24   Q.  Now, in that book, and then today, I believe you said --

25   and correct me if I'm wrong, but you said -- that one of the

1    keys is to learn to disagree agreeably, correct?

2    A.   Yes.

3    Q.   And you mentioned that the maturity level is very

4    important, correct?

5    A.   Yes.  And those decisions are made on an individual basis.

6    Q.   And I think you talked about that the situation needs to be

7    controlled, and that the context is carefully controlled, is

8    that right?

9    A.   Within the classroom, yes, of course, there should be

10   organization and decorum and certain rules.  Just as we honor

11   those in this courtroom, we do in the classroom as well.

12   Q.   Do you think the educational process is solely limited to

13   what happens in the classroom, or do you think it happens from

14   the time the kids arrive at school to the time they go home?

15   A.   It certainly encompasses those other times.  But what

16   happens in the classroom also has a great deal of effect on

17   what happens outside the classroom.

18       And perhaps in allowing open, civil discourse, allowing

19   students to talk about the things that concern them in a

20   structured way with adult leadership, that we can model and

21   demonstrate how to deal with these issues so that they don't

22   become extremely contentious once outside the classroom.

23   Q.   But the key is, the students can act maturely and

24   professionally, is that right?

25   A.   Yes.  Students are certainly capable of acting maturely.

1    Q.  They're capable of doing that, but it's important that they

2    do that in order for the discourse to be civil and for people

3    to learn to disagree agreeably, correct?

4    A.  Yes.  Of course when you're dealing with younger children

5    they're often silly and funny, and they act out, so you might

6    not consider it civil in that sense; but, yes, they're capable

7    of civil discourse in a classroom.

8    Q.  Well, would you agree with me that committing acts of

9    vandalism is not civil discourse or an act of maturity?

10   A.  Yes, I would agree with you that vandalism is not civil

11   discourse.

12   Q.  How about if students write slogans on their head as a form

13   of communication, do you think that's part of civil discourse

14   or acting maturely?

15   A.  Having lived with middle schoolers for so long, I don't

16   know that I would consider that to be an egregious offense.

17   Q.  That wasn't the question, ma'am:  Do you think that that's

18   acting maturely or professionally or learning to disagree

19   agreeably?

20   A.  I don't really have an opinion one way or another, it would

21   depend on the circumstances.

22   Q.  How about students that conspire together to violate the

23   Code of Conduct of the school, do you think that's

24   professional, or mature?

25   A.  I would have to know more about the circumstances before I

1    made a judgment.  What's a conspiracy to one person may be an

2    act of resistance to an illegal act, considered through another

3    lens.

4    Q.   How about writing profanity about the principal?

5    A.   Absolutely --

6    Q.   Do you --

7    A.   -- profanity is not acceptable in a school environment.

8             MR. SPELLMAN:  Thank you very much.

9             THE COURT:  Redirect?

10            MS. HOLZER:  Just one question, Your Honor.

11                        **REDIRECT EXAMINATION**

12   BY MS. HOLZER:

13   Q.   Ms. Pipkin, would you take a look at Plaintiff's Exhibit 2.

14   It's also blown up on the exhibit in front of you and you have

15   a book of exhibits.

16   A.   Oh, I'm sorry, in front of me here?  There's so many things

17   in front of me I don't know which one I'm supposed to be

18   looking at.  Okay.  Now I do.

19   Q.   Now you see it?

20   A.   Yes, thank you.

21   Q.   And the symbols are also enlarged in the exhibit leaning

22   against the jury box that you can see here.

23        Could you just look through the symbols and the phrases

24   that are displayed there and then I'll just have the question

25   for you about them.

1          MR. SPELLMAN:  Your Honor, I believe this is beyond

2     the scope of cross, certainly extends direct, and is well

3     beyond what counsel said this witness would be proffered for.

4          MS. HOLZER:  Your Honor, the witness was asked

5     specifically about things that were alleged to have taken place

6     in September of 2007 and what she -- what her thoughts were

7     about that.  And we are curious what her opinion is as to the

8     speech Ms. Gillman would like to express.

9          This is also the basis of the Intellectual Freedom

10    Commission's discussions of Ms. Gillman and has been reviewed

11    by them.  I just have one question about it.

12         THE COURT:  All right.  Let me hear it and I may give

13    you an opportunity.

14    BY MS. HOLZER:

15    Q.  You let me know when you've had a chance to look at them.

16    A.  Yes, I have had a chance.

17    Q.  In your experience teaching in middle schools, can you

18    envision any harm to the educational process of a middle school

19    student viewing any of these symbols or phrases displayed on

20    another student?

21    A.  None whatsoever.

22         MS. HOLZER:  Thank you.

23         THE COURT:  Mr. Spellman, do you want another

24    opportunity?

25         MR. SPELLMAN:  No, Your Honor.

1        THE COURT:  Ms. Pipkin, you may step down and leave

2   the courtroom.

3        MR. BEENEY:  Your Honor, is Ms. Pipkin released?

4        THE COURT:  Yes.

5        MR. BEENEY:  Your Honor, Plaintiff Heather Gillman

6   rests her case in chief.

7        THE COURT:  Ms. Dincman, ready to proceed?

8        MS. DINCMAN:  Your Honor, our first witness will be

9   G.P.

10        DEPUTY CLERK:  Please raise your right hand.  Stand

11   up.

12        THE WITNESS:  I'm sorry.

13        DEPUTY CLERK:  That's okay.

14   **G.P., DEFENSE WITNESS, DULY SWORN.**

15        DEPUTY CLERK:  You may be seated.

16                    **DIRECT EXAMINATION**

17   BY MS. DINCMAN:

18   Q.  Good morning, Miss P.

19   A.  Good morning.

20   Q.  I'm Holly Dincman, and I'm one of the attorneys for the

21   School Board.  And before we get started, are you nervous?

22   A.  Yes, ma'am.

23   Q.  Okay.  Don't worry, it's not going to be anything

24   difficult.  Let me ask you to do this, can you scoot forward a

25   little bit?  Because it's important that you talk into the

1   microphone and you can adjust it and get it close to your

2   mouth.

3   A.   Like that?

4   Q.   Yeah.  And make sure that you speak loudly when I ask you

5   questions so that our court reporter can hear and the Judge can

6   hear what it is that you're saying.  All right?

7   A.   Yes, ma'am.

8   Q.   And we are under a protective order and we're referring to

9   students in this case; and so I would ask that if you use a

10  student's name or feel the need to call someone by name, that

11  you not call their full name, that you go and refer to them by

12  initials.  Can you do that?

13  A.   Yes, ma'am.

14  Q.   And I'll -- if I have to refer to you by name, I'll refer

15  to you as Miss P.  Okay?

16  A.   Okay.

17  Q.   Tell us how old you are.

18  A.   I am 14 years old.

19  Q.   And what grade are you in?

20  A.   I'm in 7th grade.

21  Q.   And that was the same grade you were in in September of

22  2007?

23  A.   Yes, ma'am.

24  Q.   Okay.  Where did you go to school in 2007, Ponce de Leon?

25  A.   Yes, ma'am.

1    Q.  I'll probably call Ponce de Leon PDL.  Will you know what

2    I'm talking about if I do that?

3    A.  Yes, ma'am.

4    Q.  Are you still a student in Holmes County anymore?

5    A.  No, ma'am.

6    Q.  And what county do you go to school in now?

7    A.  I don't know the county.  I know the name of the school.

8    Q.  What's the name of your school?

9    A.  Rocky Bayou Christian Academy.

10   Q.  Do you know where it's located?

11   A.  It's in Niceville.

12   Q.  When was the last time you were a student in the Holmes

13   County school system?

14   A.  September of 2007.

15   Q.  Did you finish out the end of September of 2007?

16   A.  Yes, ma'am.

17   Q.  All right.  And in September of 2007, did you become aware

18   that some students were taking action related to gay and

19   lesbian rights?

20   A.  Yes, ma'am.

21   Q.  How did you become aware of that?

22   A.  A girl -- or, I'm sorry, S.W., called me --

23   Q.  Is that S.W. or C.W.?

24   A.  I think it's an S, might be a C.

25       She called me and said that A.H. had been suspended by the

1    principal for being gay.

2    Q.  And do you now know whether that was in fact true or not?

3    A.  The principal said that --

4            MS. MILLER:  Objection, Your Honor.  There is no

5    evidence that the Board ever heard any evidence from Miss P.

6    regarding the events of 2007, so there's no evidence at all

7    that anything that Miss P. has to say about the events of 2007

8    had an impact on the Board's decision to ban Ms. Gillman's

9    speech.

10           THE COURT:  Okay.  I'm --

11           MS. DINCMAN:  There is -- there is a --

12           THE COURT:  -- going to overrule your objection.  Let

13   me see where you're going on this.

14           MS. DINCMAN:  Okay.

15   BY MS. DINCMAN:

16   Q.  Did Ms. -- did C.W. indicate to you when she called you

17   that she was going to be calling other people?

18   A.  No, ma'am, she did not.

19   Q.  And, well, did she -- what else did Ms. C.W. tell you

20   during that conversation?

21   A.  She told me to wear to school the next day a shirt with

22   rainbows on it that said "Gay Pride," and any other things that

23   were rainbow that I could find, and to pass the word to some of

24   my friends.

25   Q.  Okay.  And did you follow those instructions?

1    A.   I tried.

2    Q.   Okay.  Did you make a -- you made a shirt?

3    A.   I did make a shirt.

4    Q.   And did you try -- you tried to wear it to school?

5    A.   I tried.  I couldn't get it past my mother.

6    Q.   And did you pass the word on to other friends and

7    associates?

8    A.   Yes, ma'am.

9    Q.   Who all or how many?  Well, instead of calling them by

10   name, why don't we say how many other students you did?

11   A.   Three or four.

12   Q.   And were they all middle school students?

13   A.   Yes, ma'am.

14   Q.   Did they indicate to you whether they were going to follow

15   those instructions as well?

16          MS. MILLER:  Objection, Your Honor, hearsay.

17          THE COURT:  Sustained.

18   BY MS. DINCMAN:

19   Q.   When you -- when you went to school the next day, did you

20   observe people wearing shirts at school that were similar to

21   the shirt you had made?

22   A.   I saw people wearing shirts with rainbows, I didn't really

23   see any that said "Gay Pride."  Some has "GP" on them.

24   Q.   And about how many did you see?

25   A.   One or two.  Not very many.

1    Q.   Did you -- do you know if there -- during the time of

2    September 2007, was there a group that made plans to do things

3    in support of gay and lesbian rights?

4    A.   Could you define "group"?

5    Q.   Well, what does a group mean to you?

6    A.   An organization of people, a cluster of people.

7    Q.   And were there a cluster of people that made plans to do

8    things in support of gay and lesbian rights?

9    A.   Yes, ma'am.

10   Q.   And how many people would you say total were in that

11   cluster and group?

12   A.   Thirteen or 14.

13   Q.   And did they have a symbol or slogan that they used?

14   A.   "Gay Pride."

15   Q.   Anything else?

16   A.   No, ma'am.

17   Q.   What about "GP"?

18   A.   That was the initials for "Gay Pride."

19   Q.   Oh, that symbolized -- "GP" symbolized "Gay Pride"?

20   A.   Yes, ma'am.

21   Q.   Did they use anything like rainbows or any of that in

22   showing their pride?

23   A.   Some people did.  The group itself did not, but some people

24   in the group did.

25   Q.   And would you say that "Gay Pride" was the group's motto?

1    A.   Yes, it was.

2    Q.   And what type of activities did the group plan to do?

3    A.   They planned to chant.  They would pull people out in the

4    hallways and ask them if they were for gay people or against

5    gay people.  They would -- there was going to be a meeting

6    held, or an assembly at the school, and they had planned to

7    stand up and shout "Gay Pride" and leave.

8    Q.   And they were going to yell, is that your understanding of

9    what the plan was?

10   A.   Yes, ma'am.

11   Q.   When you say that they made plans to chant, chant where?

12   A.   We would chant around the -- where the buses park at the

13   school, we would walk around there chanting at our PE class.

14   Q.   And that was during your class time?

15   A.   Yes, ma'am.

16   Q.   That's not -- who's the teacher for that class?

17   A.   I don't remember.

18   Q.   Was it Donna Hicks?

19   A.   No, ma'am.

20   Q.   Somebody other than her?

21        MS. MILLER:  Your Honor, I'm going to renew the

22   relevance objection I entered earlier regarding the events of

23   September 2007.  Miss P. did not tell the Board anything about

24   what happened in September of 2007.  The only information that

25   the Board received about the events of September 2007 was from

1   Principal Davis.  So I have no idea what the relevance of

2   anything that Miss P. has to say has to do with anything that

3   the Board is trying to prove today.

4           THE COURT:  Ms. Dincman, why is it relevant?

5           MS. DINCMAN:  If you'll allow me, Your Honor, I'm

6   going to --

7           THE COURT:  I want you to tell me first.

8           MS. DINCMAN:  She talked to Principal Davis and she

9   told him all of these things that I'm eliciting from her that

10  did in fact happen.

11          MS. MILLER:  I think that that was something that she

12  could have elicited from Principal Davis yesterday and we could

13  have heard that from him directly as opposed to hearing from

14  Miss P. what she told Principal Davis so that he could have

15  told the superintendent so that he could tell the School Board

16  so that they could decide to ban speech.

17          THE COURT:  Certainly wasn't any testimony -- unless

18  that you're going to call Principal Davis back to say that --

19          MS. DINCMAN:  Well, Your Honor --

20          THE COURT:  -- I think he sort of foreclosed that in

21  his testimony, though.

22          MS. DINCMAN:  Well, Your Honor, in his testimony,

23  Principal Davis of course said that he investigated and took

24  from students and an objection was made to that being for the

25  truth of the matter asserted and that it was hearsay, but that

1    he relied on those statements from students like Miss W. in his

2    investigation and in making the conclusions he did.

3           In fairness, we should have an opportunity to prove

4    that these disruptions did in fact occur separate and apart

5    from the reports that Mr. Davis took.

6           MS. MILLER:  Your Honor, we have all of Mr. Davis'

7    notes.  And Ms. Dincman yesterday had a long time to talk with

8    Principal Davis about all the individuals that he spoke with,

9    and I don't think that Miss P. has anything to add because I'm

10   sure that Principal Davis told us everything that he based his

11   decision on about why these symbols needed to be banned.

12          MS. DINCMAN:  Mr. Davis talked generally about the

13   things that had been reported to him.  But, Your Honor, I don't

14   know about the "long time."  He was on the stand for a long

15   time yesterday; but in terms of having a long time to go

16   through every single student and say this student said this and

17   this student said that, I disagree.  And I just reassert that

18   we deserve an opportunity to prove that these disruptions did

19   in fact occur.

20          MS. MILLER:  I think that Principal Davis was the

21   person who determined whether these disruptions actually

22   occurred.  And he did that based on a lot of interviews with a

23   lot of students.  It certainly was not based on one student's

24   statements.

25          THE COURT:  I see that she -- is it her name that is

1   in the list of people in the decoding that follows --

2          MS. MILLER:  Yes.

3          THE COURT:  -- Davis' deposition?

4          MS. MILLER:  Yes.  So we certainly have --

5          MS. DINCMAN:  Principal Davis talked to this witness

6   multiple times, and much of the information that he had came

7   from this student.

8          MS. MILLER:  So then is the defense willing to state

9   that most of the information that they got regarding how to ban

10  this speech only came from one student?

11         MS. DINCMAN:  No, no, that's not what I said.

12         MS. MILLER:  Oh, okay.

13         THE COURT:  Okay.  Well, let me see.  I'm sort of

14  curious how one middle school student influenced the events.

15  Let's see what you have to offer.

16         MS. DINCMAN:  And, Your Honor, my testimony -- the

17  testimony is not that it's just one middle school student but

18  that some of the information did come from this student and

19  that her testimony will prove up that these disruptions did in

20  fact occur and will -- and go directly to the materiality of

21  the disruptions that took place.

22         MS. MILLER:  My relevance objection still stands, Your

23  Honor.

24         THE COURT:  It's overruled.  You know, it needs to be

25  on her personal observations.  You sort of got started off -- I

1   kept waiting for the hearsay objection of the telephone call

2   and things like that.

3          MS. DINCMAN:  Well, the telephone call, Miss W. -- it

4   goes to impeachment of Miss W. because Miss W. was the very

5   first witness, Your Honor --

6          THE COURT:  You can't do that by this witness

7   testifying to hearsay.

8          MS. DINCMAN:  That directly contradicts Miss W.'s

9   direct testimony.

10         THE COURT:  Her testimony has got to be competent.

11         MS. DINCMAN:  All right.  Well, I will focus on what

12  this witness personally observed, Your Honor.

13         THE COURT:  Unless she has personal knowledge of it,

14  I'm not -- I'm not interested unless there are communications

15  attributable to the plaintiff.  You're going to have to show me

16  an exception to the hearsay rule to let her recount other

17  conversations.

18         MS. DINCMAN:  Very well, Your Honor.

19  BY MS. DINCMAN:

20  Q.  When you were -- Miss P., when you were at school, what

21  behaviors did you individually engage in?  You talked about

22  chanting at PE.  Did you personally chant during a physical

23  education class?

24  A.  Yes, ma'am.

25  Q.  And when you did that, what were the chanting?

1    A.  You mean what we were saying?

2    Q.  Yes.

3    A.  "Gay Pride." "Gays Rule."  Don't -- we had something along

4    the lines of, "Don't discriminate against gays."  "It's okay to

5    be gay."

6    Q.  And were you yelling that out at Phys Ed class?

7    A.  Yes, ma'am.

8    Q.  And did you observe others yelling that as well?

9    A.  Yes, ma'am.

10   Q.  Okay.  And did you observe the impact that that had on

11   other students?

12   A.  Do you mean as in them looking at us and seeing what we

13   were doing as in distracting them?

14   Q.  Yes.

15   A.  Yes, ma'am.

16            MS. MILLER:  Objection, Your Honor --

17   BY MS. DINCMAN:

18   Q.  And what did the other students --

19            MS. MILLER:  I'm sorry.  Objection, Your Honor.

20   Miss P. cannot testify to whether other students were

21   distracted.

22            THE COURT:  She can testify about what she observed.

23            MS. DINCMAN:  She can testify about seeing --

24   BY MS. DINCMAN:

25   Q.  Did you see other students stop what they were doing to

1   watch you?

2   A.  Yes, ma'am.  Yes, ma'am.

3   Q.  And did you witness arguments between and amongst students?

4   A.  I witnessed one.

5   Q.  Tell me about that.

6   A.  Two girls got into an argument because one agreed with the

7   gay pride movement and one disagreed.  And it wasn't a fight;

8   it was a verbal argument basically telling each other to shut

9   up and that they were very stupid for believing that it was

10  okay to be gay.

11  Q.  And were they rude to each other coming from both sides?

12  A.  Yes, ma'am.

13  Q.  What about your own behavior?  Did you -- did you talk to

14  people about gay pride and gay rights during this time frame?

15  A.  Yes, ma'am.

16  Q.  And were you courteous to everyone that you talked to?

17  Were there ever times when you were rude to others?

18  A.  Yes, ma'am.

19  Q.  And tell us about that.

20  A.  There would be times where people would blurt out for us to

21  shut up or they would have some names to call us, as in being

22  rude; and we would scream out or I would scream out things to

23  them like, you know, "Bite me," or, "Shut up," or just being

24  not exactly polite.

25  Q.  And where would that take place?

1   A.   In the hallways.

2   Q.   How many times did that happen?

3   A.   Several.

4   Q.   Several times?

5   A.   Yes, ma'am.

6   Q.   And did you actively approach other people and try to get

7   them to join the group that you talked about?

8   A.   Yes, ma'am.

9   Q.   And when you say "join the group," what did you mean by

10  that?

11  A.   We would ask them if they were against gay people or if

12  they were for gay people.  And if they said that they were for

13  gay people, then we would ask them if they would help us with

14  our chanting and making posters, and we had a petition that we

15  would ask them to sign.

16  Q.   And did you circulate a petition?

17  A.   What do you mean?

18  Q.   Did you take a petition and pass it around?

19  A.   I did not, but I did see someone.  I was there when it was

20  made and I was there for some of the times that it was passed

21  around.

22  Q.   And was it passed around during class time when class was

23  supposed to be going on?

24  A.   No, ma'am, it was passed around during lunch.

25  Q.   I see.  Were there ever times when you saw people passing

1    notes -- you observed people passing notes or had a note passed
2    to you about gay pride during class time?
3    A.   I had a note passed to me about gay pride, I don't know
4    about passed to other people.
5    Q.   And were you -- were there times when you were whispering
6    and talking in class when a lesson was going on about gay
7    pride?
8    A.   Yes, ma'am.
9    Q.   And how long did that go on?
10   A.   I'm not sure.  At least a week.
11   Q.   At least a week.  And would -- you know, you have seven
12   classes a day.  How often was that going on during your
13   classes?
14   A.   Pretty much every class.
15   Q.   And you're in the 7th grade, right?
16   A.   Yes, ma'am.
17   Q.   And you're -- and there's how many sections of 7th grade?
18   A.   I think there are three.
19   Q.   And the people that were involved in this group, do you
20   know what other sections they were in, or were they all in the
21   same section as you?
22   A.   There were two people who were in the same section as me.
23   The others, I do not know what section they were in.
24   Q.   Did the group that you were in have a goal and purpose, as
25   you understood it?

1    A.   To get people angry at Mr. Davis.

2    Q.   And how were they -- how were they to go about getting

3    people angry at Mr. Davis?

4    A.   Could you simplify your question?

5    Q.   Well, what sort of things did you do to try to get people

6    angry at Mr. Davis?

7    A.   We basically told them what was going on; and that in

8    itself was either enough to get them either mad at us for

9    supporting gay people or to get them mad at him for what had

10   happened.

11   Q.   And were you trying to get people in school in an -- in an

12   uproar?

13   A.   Yes, ma'am.

14   Q.   Were you trying to make it where school wouldn't operate as

15   it normally would?

16   A.   Yes, ma'am.

17           MS. MILLER:  Objection, Your Honor, she's leading the

18   witness.

19           THE COURT:  Sustained.

20   BY MS. DINCMAN:

21   Q.   What were you -- what were you trying to do, specific

22   activities that you would do to get people angry at Mr. Davis?

23   A.   We would, like I had said, tell them what had happened.  We

24   would -- sometimes we would call them very rude names.  I don't

25   remember anything else that we had done.

1  Q.  What sort of rude names were you calling him?

2  A.  Mr. Fat Guy, the fat pig, the fat jerk, the big fat

3  butt-hole.

4       THE COURT:  Ms. Dincman, things have changed very

5  little in 7th grade in 52 years, whispering and talking and

6  passing notes and trashing the principal.  I mean, if you've

7  got some real substance here, I think you need to switch over

8  to it.

9  BY MS. DINCMAN:

10  Q.  The group that you were involved in, were there -- were

11  there times when you all would meet and talk about whether

12  other people could or couldn't be in your group?

13  A.  Yes, ma'am.

14  Q.  And tell me about that.  How would that work?

15  A.  We would all meet up in the cafeteria and we would have a

16  list of people who had said that they were for gays.  And we

17  would talk amongst ourselves, you know, What about this person?

18  Do you think so-and-so should come in?

19       And if we thought they might be someone who was just in on

20  this to go back to Mr. Davis and tell Mr. Davis what was

21  happening, we'd be like, "No, no, those are snitches, we're not

22  going to let them in."

23       At the end of our conversation, we would throw our papers

24  away to where they couldn't be found.  We would --

25  Q.  And the papers were people's names who wanted to be part of

1   the group?

2   A.  Yes, ma'am.  We would either rip them up and put them in

3   the trash can or flush them or dispose of them to where they

4   wouldn't be found.

5   Q.  And did you also tell -- were there people that you told

6   that, "No, you can't be part of it"?

7   A.  Yes, ma'am.

8   Q.  And how many people did you tell that?

9   A.  I don't know how many.  There were quite a few.

10  Q.  Okay.  Now, at some point did you make a decision to drop

11  out of the group?

12  A.  Yes, ma'am.

13  Q.  And did you communicate that in terms of, "I'm dropping out

14  of this, I don't want to do -- I don't want to be part of this

15  group anymore"?

16  A.  I basically told C.W. that I was out, that I wanted nothing

17  else to do with it, and that I was going to try and save my

18  butt before I got in trouble.

19  Q.  Were there negative consequences for you for dropping out

20  of the group?

21  A.  I had people tell me they were disappointed in me for

22  stepping down off of what I believed in.

23  Q.  Did they say that we're disappointed in you for dropping

24  out?

25  A.  Yes, ma'am.

1   Q.  Did they -- were they encouraging you to do more things?

2   A.  They tried.

3           MS. MILLER:  Your Honor, this is hearsay.

4           THE COURT:  What's your objection?

5           MS. MILLER:  I object to hearsay in that she's

6   reporting statements that other people said to her.

7           THE COURT:  I'm going to sustain the hearsay

8   objection.  Not hearsay, but leading, primarily; and then you

9   have hearsay also.

10  BY MS. DINCMAN:

11  Q.  And Miss P., I understand that you met with Mr. Davis on

12  several occasions to talk about the observations that you had

13  of what was going on in the school.

14  A.  Yes, ma'am.

15  Q.  And did he focus on what was -- what was going on and what

16  the disruptions were?

17  A.  Yes, ma'am.

18  Q.  And did you tell him all of the things that you told me

19  here today?

20  A.  That, and then some.

21  Q.  Did you tell him what you -- you told him things that other

22  people had said --

23  A.  Yes, ma'am.

24  Q.  -- to you?  Okay.  And was his focus on what the disruption

25  was that was going on in the school?

1   A.  I'm sorry?

2   Q.  Was his focus when he talked with you on what the

3   disruption that was going on in the school?

4          MS. MILLER:  Your Honor, I object.  This calls for

5   speculation.  How can Miss P. testify to what Principal Davis'

6   focus was on?

7          MS. DINCMAN:  Well, if you're having a conversation

8   with someone and they're asking you questions --

9          THE COURT:  Then you get hearsay.

10         MS. MILLER:  Then you get hearsay.

11         MS. DINCMAN:  All right.  I'll move on, Your Honor.

12  BY MS. DINCMAN:

13  Q.  When you met with Mr. Davis, did he ever yell at you?

14  A.  No, ma'am.

15  Q.  Was he always calm with you?

16  A.  He was very calm.  Very quiet.

17         MS. MILLER:  Your Honor, Ms. Dincman keeps eliciting

18  hearsay testimony from this witness.

19         THE COURT:  I think she's talking about his actions

20  right now --

21         MS. DINCMAN:  Right.

22         THE COURT:  -- so it's overruled.

23         MS. DINCMAN:  His behavior.

24  BY MS. DINCMAN:

25  Q.  And did he use profanity with you?

1    A.   No, ma'am.

2    Q.   I want to talk about what you were doing in your classes a

3    little bit more.  When you were talking in your classes about

4    gay rights or what the plan was for what the group was going to

5    do next, were you paying attention to your lessons?

6    A.   No, ma'am.

7    Q.   And would that go on through what amount of time?  You

8    know, is that something that was limited to just the beginning

9    or the end of class?

10   A.   It went on through the majority of the class.  We'd just

11   sit there and talk back and forth and we would draw and just

12   really ignore what the teacher had to say.

13   Q.   And did you observe people making posters in class?

14   A.   Yes, ma'am.

15   Q.   And did you also observe people during this time in the

16   name of gay pride and gay rights vandalizing the school?

17   A.   Yes, ma'am.

18   Q.   And you saw -- you saw -- what vandalism did you see?

19   A.   M.C., I was with her whenever she put some "FU Mr. Davis"

20   on the pole at school.

21   Q.   And did she also write "Gay Pride"?  Did you see her write

22   "Gay Pride" somewhere?

23   A.   I did not.

24   Q.   You did not.  Okay.  Did you observe people walking around

25   with "GP" or "Gay Pride" written on their body?

1    A.   Did I observe this?

2    Q.   Yes.

3    A.   Yes, ma'am.

4    Q.   Did you draw on yourself at any point?

5    A.   Yes, ma'am.

6    Q.   And how many days did you wear this sort of stuff on you?

7    A.   I think it was only one.

8    Q.   And did you wear it in the class?

9    A.   Yes, ma'am.

10   Q.   And did -- did it -- did people talk to you about it while

11   the class was going on?

12   A.   I would have people lean over and ask me why I had --

13        MS. MILLER:  Your Honor, this is hearsay.  I object to

14   the hearsay that Ms. Dincman is eliciting.

15        THE COURT:  Sustained.

16        MS. DINCMAN:  Well, it's not going to the substance of

17   what they said.  Just that were they during class making some

18   sort of comment to her, not as to the substance of what they

19   were saying.

20        THE COURT:  She started to say, "I would have people

21   lean over and ask me why I had --"

22        MS. DINCMAN:  Well, I'll ask it a different way.

23   BY MS. DINCMAN:

24   Q.   Did people pay any attention to you because of what you had

25   on?

1    A.  Yes, ma'am.

2    Q.  And were there people that were in the group that kept

3    trying to bring the issue up over and over again?

4    A.  Yes, ma'am.

5         MS. MILLER:  Your Honor, I object.

6    BY MS. DINCMAN:

7    Q.  And who were they?

8         MS. MILLER:  This line of questioning, it continues to

9    attempt to elicit hearsay from Miss P.

10        THE COURT:  Well, I don't think she quite got to that

11   point yet.  Overruled.

12   BY MS. DINCMAN:

13   Q.  Who were the people that kept re-raising the issues?

14   A.  Initials?

15   Q.  Yes.

16   A.  C.W., F.C. and M.C.

17   Q.  And were they all middle school students?

18   A.  No, ma'am.

19   Q.  And what -- C.W. was a high school student?

20   A.  Yes, ma'am.

21   Q.  And of the people that you saw doing things in class --

22   like wearing T-shirts or talking in class, or any of the

23   behaviors that you described to me -- were the majority of them

24   middle school students?

25   A.  Yes, ma'am.

1    Q.  And about how many people in your middle school would you

2    say were involved, that you personally saw doing something in

3    support of gay pride or gay rights at school that were of

4    middle school age?

5    A.  There were a lot.  I don't know a number.

6    Q.  Would you say half of the -- half of the 7th grade?

7    A.  The majority of it, yes, ma'am.

8    Q.  And do you know how big the 7th grade is?  Is that more

9    than 50 students?

10   A.  I don't know.

11   Q.  And when you were talking to people, I think that you had

12   said that you had said some things that were rude to others.

13   Can you tell us about what the things were that you said that

14   were rude?

15   A.  Do you mean what I said to them?

16   Q.  Yes.

17   A.  I would tell them, "Bite me," and call them fat or ugly or

18   just very hurtful names, just to try to get a rise out of them.

19   Q.  And was that if they said anything in disagreement with you

20   about what -- what you were advocating for?

21   A.  Yes, ma'am.

22   Q.  And did you see anybody else engaging in any arguments

23   other than -- I mean, anywhere -- anywhere else?

24   A.  No, ma'am.

25   Q.  Didn't see anything in the -- in the gym?

1   A.   In the locker room, that one argument that --

2   Q.   That's what you already told me about?

3   A.   Yes, ma'am.

4   Q.   And just to finish up:  How many students altogether did

5   you all reject from the group that you had?

6   A.   I don't know.

7   Q.   Would you -- can you give me an estimate?

8   A.   Fifteen, 16.

9   Q.   Fifteen or 16?

10  A.   Yes, ma'am.

11          MS. DINCMAN:  I don't have any other questions.

12          THE COURT:  Cross.

13          MS. MILLER:  Your Honor, may I give the witness a copy

14  of her deposition?

15                       **CROSS-EXAMINATION**

16  BY MS. MILLER:

17  Q.   Good morning, Miss P.  I'm Maura Miller and I'm one of the

18  attorneys who represent Heather Gillman.  And Ms. Dincman just

19  asked you some questions about some things that happened at

20  Ponce de Leon back in September 2007.

21  A.   Yes, ma'am.

22  Q.   And now I'm going to ask you a few questions about that

23  time as well, okay?

24  A.   Okay.

25  Q.   Okay.  And just like you did with Ms. Dincman, I need you

1    to answer them as honestly and completely as you can.  Okay?

2    A.  Okay.

3    Q.  Okay.  At some point in September 2007, you heard that a

4    student at Ponce de Leon had been suspended for being gay,

5    correct?

6    A.  Yes, ma'am.

7    Q.  Okay.  And you believed that that student had been

8    suspended because she was gay, correct?

9    A.  Yes, ma'am.

10   Q.  And then also in September 2007, you were called into

11   Principal Davis' office several times because of your

12   involvement with this gay pride group at Ponce de Leon,

13   correct?

14   A.  Yes, ma'am.

15   Q.  Okay.  And during one of those meetings with Principal

16   Davis about the gay pride issues at Ponce de Leon in

17   September 2007, Principal Davis asked you if you were gay,

18   correct?

19   A.  Ye- -- well, he didn't ask it in a way as wanting to know

20   in my business if I were gay.  It was more of, "If you're gay

21   -- if you're not gay, then why does it matter to you what's

22   going on in the school?"

23   Q.  I think that I'm going to have you turn to page 34 of your

24   testimony, line 8.

25   A.  Where is the page number?

1    Q.  Okay, they're in the bottom corner of each page.  I'll show

2    you.  I'm sorry, I gave you the wrong -- 78.  Sorry, I want you

3    to turn to page 78, line 6.

4        Okay.  I'm going to read this.  I'm going to -- you were

5    asked:  "I'm going to represent to you that Mr. Davis was

6    similarly deposed like you are being deposed right now and

7    asked a number of questions under oath, and he stated that he

8    never asked a student whether he or she was gay or lesbian."

9        And you said, "Okay.

10       "You seem to have a different opinion about that.

11       "Yes, sir.  Because he did ask me if I was gay.  Because

12   his words to me whenever he first pulled me into this thing

13   was-- by 'this thing,' I mean the meeting -- was, 'Why does

14   this make you so mad?'

15       "And I said, 'Because it's not right.'

16       "And he asked me, 'Are you gay?'

17       "And I said, 'No, sir, I am not.'

18       "Then he said, 'Well, then why does what someone says about

19   gay people offend you?'  That's what he said."

20       And then you said --

21            MS. DINCMAN:  Objection, Your Honor, improper

22   impeachment.  In fairness, there's another portion of the

23   deposition that needs to be read into this that directly

24   responds to that, on page 34, lines 5 --

25            THE COURT:  I think you can do that on redirect.

1          MS. DINCMAN:  All right.

2          THE WITNESS:  I think I'm on the wrong page.  You told

3     me 78?

4          MS. MILLER:  And you can also see it right there.

5          THE WITNESS:  Oh, okay.

6          MS. MILLER:  And then it started right there.

7          THE WITNESS:  I'm so sorry.

8          MS. MILLER:  That's all right.

9     BY MS. MILLER:

10    Q.  Okay.  I'm just going to read that to you again because you

11    didn't have it in front of you.  So we're going to do that one

12    more time.  Okay?

13    A.  Okay.

14    Q.  You were asked:  "I'm going to represent to you that

15    Mr. Davis was similarly deposed like you are being deposed

16    right now and asked a number of questions under oath.  And he

17    stated that he had never asked a student whether he or she was

18    gay or lesbian.

19        "Answer:  Okay.

20        "Question:  You seem to have a different opinion about

21    that.

22        "Answer:  Yes, sir.  Because he did ask me if I was gay.

23    Because his words to me whenever he first pulled me into the

24    thing was -- by 'thing,' I mean the meeting -- was, 'Why does

25    that make you so mad?

1     "I said, 'Because it's not right.'

2     "And he asked me, 'Are you gay?'

3     "And I said, 'No, sir, I am not.'

4        "Then he said, 'Well, then why does what someone says about

5     gay people offend you?'  That's what he said.

6     "And what was your answer?

7     "Because it's not right.

8     "What is not right?

9     "Suspending someone for being gay."

10       Were you asked those questions and did you give those

11    answers?

12    A.  Yes, ma'am.  The --

13    Q.  I'll ask you some more questions in a second.

14       Principal Davis also asked you if S. was gay, correct?

15    A.  I do not remember.

16    Q.  Okay.  We're going to -- I want you to turn to page 85 of

17    your deposition, line 19.  You see the numbers along the side?

18    A.  Yes, ma'am.

19    Q.  And you were asked a question that said, "Did Mr. Davis ask

20    you if other students were gay or lesbian?"

21       And your answer was, "He asked me if S. was."

22    A.  Okay.

23    Q.  Were you asked that question and did you give that answer?

24    A.  In the deposition or with Mr. Davis?

25    Q.  In this deposition?

1    A.  Yes, ma'am.

2    Q.  Okay.  And now during one of your meetings with Principal

3    Davis, he told you that he did not believe in being gay,

4    correct?

5    A.  Yes, ma'am.

6    Q.  Okay.  And also in one of your meetings with Principal

7    Davis, he told you that he thought being gay was not right

8    because being gay is against the Bible, correct?

9    A.  Yes, ma'am.

10   Q.  Okay.  I'm going to move on to another topic, okay?

11   A.  All right.

12   Q.  Okay.  You've also testified here today that you talked to

13   students in the hallway in Ponce de Leon about equal rights for

14   gays and lesbians, is that correct?

15   A.  Yes, ma'am.

16   Q.  Okay.  When you talked to students in the hallways at Ponce

17   de Leon about equal rights for gays and lesbians back in

18   September of 2007, those students could walk away from you at

19   anytime, isn't that true?

20   A.  You said they could?

21   Q.  Yes, they could just walk away?

22   A.  Yes, ma'am, they could just turn and leave.

23   Q.  Okay.  Isn't it common for students in -- at Ponce de Leon

24   to talk in the hallways?

25   A.  Yes, ma'am.

1   Q.  Okay.  Isn't it common for students at Ponce de Leon to

2   talk in class?

3   A.  Yes, ma'am.

4   Q.  And isn't it true that you testified that when you talked

5   about gay pride issues in class, in contrast with other issues

6   that y'all would talk about in class, students would be quieter

7   than normal than they were when talking about other topics?  Is

8   that true?

9   A.  You mean we would talk lower to where people couldn't hear

10  us, as in the people who were talking were more quiet?

11  Q.  Yes.

12  A.  Yes, ma'am.

13  Q.  When you talked about gay pride issues in class you were

14  quieter about it, is that right?

15  A.  Yes, ma'am.

16  Q.  Okay.  So when you -- because you were quieter about

17  talking about gay pride issues in class, drew less attention to

18  yourself, right?

19  A.  Yes, ma'am.

20  Q.  So you said that, you know, you talked in class about gay

21  pride issues during every single class, all seven classes, for

22  a whole week, right?

23  A.  The majority of our classes, yes, ma'am.

24  Q.  So that's about 35 classes, right?

25  A.  Yes, ma'am.

1  Q.  Okay.  And during any one of those classes, did a teacher

2  ever reprimand a student for talking about gay pride issues in

3  class?

4  A.  Yes, ma'am.

5  Q.  Who did that?

6  A.  I don't remember the specific teacher's name.

7  Q.  So one teacher did?

8  A.  There -- yes, ma'am.

9  Q.  Okay.  So one teacher said, "Hey, y'all, you've got to stop

10  talking about gay pride issues in class"?

11  A.  She told -- well, I think it was she told us that if we

12  were going to talk about it, then we needed to go to the office

13  and take it up in there.

14  Q.  Okay.  So she said you needed to check with Principal Davis

15  before you were allowed to talk about gay pride issues?

16  A.  That we needed to take it to the office.

17  Q.  Is "the office" Principal Davis?

18  A.  Yes, ma'am.

19  Q.  So if -- when that teacher told you guys to stop talking

20  about gay pride issues in class, did you stop?

21  A.  No, ma'am, we just waited for them to turn back around.

22  Q.  And then you talked real quiet about it?

23  A.  Yes, ma'am.

24  Q.  And when you were talking about gay pride issues in class,

25  that one class where you were reprimanded, how many other

1   people were you talking to about it?

2   A.   One or two.

3   Q.   Okay.  So in -- when you were talking about gay pride

4   issues in class every day for a week, you know, in each of your

5   classes, about how many other people were you talking to about

6   gay pride issues in that class?

7   A.   I don't know.  It would have not been very many in class

8   because we tried to only talk to people that were sitting

9   either right in front of us, right behind us, or kind of the

10  sides.

11  Q.   So you only really talked with the people kind of right

12  around you, right?

13  A.   Yes, ma'am.

14  Q.   So the other people in the class, they were probably

15  watching whatever the teacher was doing or they were talking

16  about other stuff?

17  A.   Yes, ma'am.

18  Q.   Okay.  You know, you said that you would walk around a

19  circle in PE, is that right?

20  A.   Yes, ma'am.

21  Q.   That's one of the regular options you can do in PE is walk

22  around in a circle if you don't want to play sports or

23  something like that?

24  A.   If you don't dress out or if you don't really want to do

25  the whole exercise thing.

1    Q.  And normally when y'all are walking around in a circle in

2    PE because you don't want to play sports, would you guys talk

3    to each other?

4    A.  Yes, ma'am.

5    Q.  Okay.  So when you were talking to each other about gay

6    pride issues in PE class, that was kind of like every other day

7    that you would talk about other stuff?

8    A.  Yes, ma'am.

9    Q.  And did the PE teacher tell you to stop talking about GP or

10   gay pride stuff in gym class?

11   A.  I think there was a couple times where that happened

12   because we were being so loud.

13   Q.  Did you like interrupt the other game or something like

14   that?

15   A.  I'm not really sure.

16   Q.  Okay.  You were just being loud?

17   A.  Yes, ma'am.

18   Q.  And he told you to hush up?

19   A.  Yes, ma'am.

20   Q.  Okay.  Okay, we're going to move on another topic.

21       You stated that there was a group of students at Ponce de

22   Leon acting together to support gay pride, is that right?

23   A.  Yes, ma'am.

24   Q.  But you also testified that the students supporting equal

25   rights for gays and lesbians, they weren't organized, were

1   they?

2   A.   We didn't really have a official plan.

3   Q.   Okay.  So you weren't organized?

4   A.   No.

5   Q.   Okay.  And you also said that the other students who

6   expressed equal rights for gays and lesbians at Ponce de Leon,

7   you didn't plan out what you were going to do every day to show

8   your support for gay pride, right?

9   A.   Correct.

10  Q.   So you didn't do that?

11  A.   No.

12  Q.   So you said that this was like a group of students

13  together.  And did you -- you know, did you have to like fill

14  out a form or anything to join this group of students who were

15  supporting gay pride?

16  A.   No, ma'am.

17  Q.   Okay.  And did you have like a clubhouse or anything --

18  A.   No, ma'am.

19  Q.   -- where y'all met together and talked about gay pride and

20  stuff?

21  A.   Just the lunch room.

22  Q.   Okay.  So you just talked together at lunch and about, you

23  know, some ideas that you might want to show gay pride about?

24  A.   Yes, ma'am.

25  Q.   Okay.  So did you ever like have an official meeting on

1   campus at PDL about, you know, "We all support gay pride," and,

2   you know, elect a president and vice president or officers or

3   anything like that?

4   A.  No.

5   Q.  Okay.  Did you ever have a meeting off campus, you know,

6   where you all get together and talked about how, you know, you

7   were going to plan to do stuff at school?

8   A.  No, ma'am.

9   Q.  So when you said you dropped out of the whole gay pride

10  thing, you were just saying that you were stopping showing

11  support for gays and lesbians at Ponce de Leon, right?

12  A.  I was saying that I'm not going to go around the school

13  chanting and hollering and stand up in the middle of an

14  assembly and shout "Gay Pride" and walk out.

15  Q.  Okay.

16  A.  My opinion did not change about being gay is -- there's

17  nothing wrong with being gay.  I just discovered that I needed

18  to find a more orderly, more correct, way to go about it.

19  Q.  Okay.  You know, you mentioned an assembly?

20  A.  Yes, ma'am.

21  Q.  And there -- and there was an assembly in early September

22  2007, wasn't there?

23  A.  Yes, ma'am.

24  Q.  And I think you also mentioned that you were planning or

25  you and this group of people that supported gay pride were

1  planning on walking -- leaving that assembly, is that correct?

2  A.  Yes, ma'am.

3  Q.  And why were you planning on leaving that assembly?

4  A.  Well, if I told you, it would be because somebody else told

5  us, and that would kind of be hearsay.

6     **(Laughter)**

7  A.  I'm not being smart.

8       MS. DINCMAN:  Objection, Your Honor, calls for

9  hearsay.

10      THE WITNESS:  I'm not being a smart aleck --

11      MS. MILLER:  That's absolutely correct, you shouldn't

12 give me any hearsay.

13 BY MS. MILLER:

14 Q.  So it was just rumors going around the school?

15 A.  Yes, ma'am.

16 Q.  What if I -- what if I told you that I heard that the

17 reason why some students were planning on walking out of an

18 assembly at Ponce de Leon was because they heard that it was

19 going to be a preacher saying how gay rights were wrong or that

20 being gay was wrong?

21 A.  That's correct.

22 Q.  So that would probably be why you guys were planning on

23 walking out of that assembly, right?

24 A.  Yes, ma'am.

25 Q.  Okay.  Did anybody walk out of that assembly?

1    A.   Not that I know of.

2    Q.   Okay.  How come?

3    A.   Because it wasn't what it was supposedly going to be.

4    Q.   What was that assembly about?

5    A.   It was about drunk driving and being thankful for what you

6    have.

7    Q.   Okay.  I'm going to have you look at this exhibit right

8    over here.  It's also Exhibit 2 in your binder if you want to

9    look at it up close.

10   A.   I saw it whenever we had to go to the -- I can't think of

11   what it's called, whenever -- this thingy (indicating).

12   Q.   The deposition?

13   A.   The deposition.

14   Q.   So you're real familiar with all this?

15   A.   Yes.

16   Q.   Okay.  So would you just look over all of those symbols

17   real quick for me?  Just read about them and think about them

18   to yourself.

19   A.   Oh, yes, ma'am.  I'm sorry.

20   Q.   No, just take a second and let me know when you're done.

21   A.   Okay.

22   Q.   Okay.  So do any of these phrases or symbols encourage you

23   to engage in sexual conduct?

24   A.   No, ma'am.

25   Q.   Okay.  Do any of these phrases or symbols encourage you to

1    be gay?

2    A.   Not that I know of.  I don't think so.

3    Q.   I don't think so either.

4            MS. DINCMAN:  Objection, counsel is testifying.

5            MS. MILLER:  I'm sorry, Your Honor, withdrawn.

6    BY MS. MILLER:

7    Q.   Okay.  So you left Ponce de Leon High School right when you

8    were suspended in September of 2007, right?

9    A.   Yes, ma'am.

10   Q.   And you were suspended for your participation in showing

11   support for gays and lesbians at Ponce de Leon, right?

12   A.   I was suspended for being disruptive to the school.

13   Q.   And your parents took you out of Ponce de Leon and they

14   made you go to another school, didn't they?

15           MS. DINCMAN:  Objection, impermissible character

16   evidence.

17           MS. MILLER:  Your Honor, this is not being admitted --

18   I'm sorry -- this is not being admitted for character evidence

19   in any way whatsoever.  Part of the defense's burden is showing

20   that they can predict that there will be disturbances at Ponce

21   de Leon in the future and I'm just saying this witness no

22   longer goes to Ponce de Leon, so anything she has to say

23   couldn't help them predict what's gonna happen.

24           MS. DINCMAN:  Your Honor --

25           THE COURT:  Let's move onto something else.

1          MS. MILLER:  Okay.  I think that's all I have, Your

2    Honor.

3          THE COURT:  Ma'am, let me ask you some questions.

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Is this an issue that you gave a good bit

6    of thought to over time to, you said, to arrive at your

7    opinions, which you kept even though you decided not to be

8    active in the protest?

9          THE WITNESS:  What do you mean?

10         THE COURT:  Have you -- did you give a lot of thought

11   to this issue about fair treatment for lesbians and gay people?

12         THE WITNESS:  Do you mean after it happened?

13         THE COURT:  No, as -- leading up to the events last

14   September.

15         THE WITNESS:  No, sir.

16         THE COURT:  How did you get involved?

17         THE WITNESS:  I got the phone call.

18         THE COURT:  How did you get concerned, because of the

19   phone call?

20         THE WITNESS:  Yes, sir.

21         THE COURT:  Did you talk to your parents about those

22   concerns.

23         THE WITNESS:  I talked to my mom.

24         THE COURT:  Is that -- and does this still concern

25   you?

1                    THE WITNESS:  No, sir.

2                    THE COURT:  You have come across as a very -- I think,

3         mature.  Sort of looked to me like you made your own decisions.

4         Is that a fair understanding on my part?

5                    THE WITNESS:  Yes, sir.

6                    THE COURT:  Were there some people who seemed to be

7         too strident and too loud, and did you discount them as being

8         someone you wanted to listen to?

9                    THE WITNESS:  Yes, sir.

10                   THE COURT:  You were able to listen and make your own

11        decisions?

12                   THE WITNESS:  Yes, sir.

13                   THE COURT:  All right, counsel.

14                   I am impressed because in the general context of how

15        middle school has been brought up, this witness has given me a

16        different mental image of the ability and maturity of perhaps

17        how these students would react.

18                   MS. DINCMAN:  Very well, Your Honor.

19                            **REDIRECT EXAMINATION**

20        BY MS. DINCMAN:

21        Q.  Miss P., you testified that you -- sometimes you were

22        quieter in class when you were discussing gay pride.  Why was

23        it that you were being quieter?

24        A.  We didn't want to get in trouble for being rude or

25        disrespectful in class.

1   Q.   Were there things you and the group did to try to cover up

2   and hide what you were doing?

3   A.   Excuse me.  I'm sorry.  Yes, ma'am.

4   Q.   And what were those?

5   A.   Any, I guess you'd call it, documentation of anything we

6   did, any notes that were passed to us, we would immediately

7   dispose of them.  We would throw them away or, like I said,

8   flush them or put them in our locker and wait until we got home

9   to throw them away.

10  Q.   And did you observe other members of the group doing things

11  in class?

12  A.   Do you mean as far as passing notes or as far as disposing

13  of evidence of things happening?

14  Q.   Either.  Doing things in support of gay pride or gay rights

15  that were happening in class?

16  A.   Yes, ma'am.

17  Q.   And what were those things that they were doing, that you

18  saw them doing?

19  A.   They would -- I had notes passed to me, and sometimes I

20  would pass notes, and then --

21       THE COURT:  Ms. Dincman, we've already been down this

22  route.  And I've already told you that things have not changed

23  in middle school in over a half a century.  Let's do something

24  else.

25       MS. DINCMAN:  All right.  I'll move on, Your Honor.

1  BY MS. DINCMAN:

2  Q.  Miss P., you said you were suspended for being disruptive;

3  that was your testimony.  Did you believe that you were in fact

4  disruptive?

5  A.  Yes, ma'am, I do.

6  Q.  And did -- do you agree with the basis of the suspension?

7  A.  Yes, ma'am, I did.

8       MS. DINCMAN:  I don't have any other questions of this

9  witness.

10       THE COURT:  Ma'am, you may step down.  May she be

11  released?

12       MR. BEENEY:  Yes, Your Honor.

13       MS. DINCMAN:  Yes, Your Honor, our next witness is

14  C.B.

15       MS. SUN:  Your Honor, may I approach about one issue?

16  We have a similar objection about Miss Bxxx's testimony, and

17  that would be --

18       THE COURT:  Is she a student?

19       MS. DINCMAN:  Yes.

20       THE COURT:  Well, Ms. Dincman, I don't need to hear

21  anything more about the usual, you know, life in 7th grade.  It

22  really goes to this question of a significant disruption and if

23  they have firsthand knowledge.  But the usual pinching, giggle,

24  note passing, and stuff like that, I think we all know what

25  that amounts to.

1    MS. DINCMAN:  Could we have a moment to confer, Your

2    Honor, before we begin the questioning?

3         THE COURT:  Let's try to tailor this to what the

4    appellate courts have said really counts.  And you know, I --

5    just the usual background disruption in classes with that age

6    of people, I want to hear something different.

7         MS. DINCMAN:  Okay, Your Honor, that's fine.  The --

8    the appellate courts, I think, have talked about that it

9    doesn't take a huge -- a lot of disruption for the school to

10   meet its burden under Tinker.  And if it takes away from the

11   time of the class, that -- even in a small manner -- that that

12   may satisfy the Tinker burden.

13        But, Your Honor, I will certainly go through the

14   things with Ms. Bxxx that she personally observed.

15        THE COURT:  Well, let me tell you, what the Supreme

16   Court said in Tinker was, "Any departure from absolute

17   regimentation may cause trouble.  Any variation from the

18   majority s opinion may inspire fear.  Any words spoken, in

19   class, in the lunchroom, or on the campus, that deviates from

20   the views of another person may start an argument or cause a

21   disturbance.  But our Constitution says we must take this

22   risk."

23        So I really don't want to -- think I need to hear the

24   ash-and-trash, pushing-and-shoving that goes on in 7th grade.

25   Let's get to what is really a serious and substantial risk of

1   disruption.  And giggling and whispering and passing notes, I

2   don't think, meet that standard.

3        MS. DINCMAN:  Could I have a moment to confer, Your

4   Honor?

5        **(Pause)**

6        THE COURT:  Ms. Dincman, I had two teenage daughters a

7   long time ago and I remember trying to drive more than two

8   blocks with a station wagon full of 12-year-old girls, and the

9   decibel level always got up to the threshold of pain.  And --

10       MS. DINCMAN:  I understand that, Your Honor.  And I

11  will say that at this point the defense is prepared to rest its

12  case, but I have an objection that I need to make for the

13  record.  And I want to preserve it and do so respectfully, Your

14  Honor, because, you know we feel strongly that we would have

15  presented -- we chose to present the testimony of what was

16  going on in the school and the disruptions upon which the

17  school relied through the live witnesses as opposed to having

18  Principal Davis come up here and go through each witness and

19  what they told him, which would have been a -- drawn a hearsay

20  objection and which in fact did draw a hearsay objection as to

21  the truth of the matter asserted.  So we --

22       THE COURT:  If you have eyewitnesses who will testify

23  of what they observed disruption.  And I've urged you that I

24  don't need to hear the usual background chatter or noise of

25  middle school or high school; but stuff that would have raised

1    legitimate concerns of a substantial disruption, please move

2    ahead with that.

3         MS. DINCMAN:  Well, Your Honor, respectfully, we

4    believe that the -- that under the appellate standard as set

5    forth by Tinker and its progeny, the information that we would

6    have elicited, while you characterize it as the normal

7    background and chatter, does in fact meet the standard of

8    Tinker.  So we do that respectfully.

9         We -- we are not going to call those witnesses in the

10   sense that we think that it will be similar --

11        THE COURT:  Will it vary significantly from this last

12   witness?

13        MS. DINCMAN:  It will be similar to the things that

14   Miss P. said during her testimony of a similar nature.  And we

15   don't want to do that, but we do want to preserve our objection

16   because we -- it will -- it will be further confirmation of

17   what was going on in the school of the nature of what Miss P.

18   presented.

19        And we don't want to go against Your Honor's

20   instruction to present anything of that; however, we want to

21   preserve our objection for the appellate record to the extent

22   that we respectfully take issue as to whether that meets the

23   Tinker standard.

24        THE COURT:  I am not going to prohibit you from

25   presenting your witnesses.  I urged you and tried to give you

1  guidance that I am not putting very much weight at all into

2  kind of what we've just heard, whispering, talking loud,

3  passing notes.

4          MR. BEENEY:  Your Honor, we may be able to help here

5  on this because we are prepared to stipulate to many of these

6  things.  We'll stipulate that there was whispering.  We'll

7  stipulate that there was loud talking in the hallway.  We'll

8  stipulate that there may have been some note passing.  And if

9  there are other things that the defense -- they want to bring

10  to your attention, rather than preserving a record for appeal,

11  we may be able to stipulate to those as well.

12          THE COURT:  I think, you know, let's deal with it.

13  But those type of things are things that I think school

14  teachers and principals and assistant principals, that's part

15  of their daily job is dealing with that type of stuff.

16          MR. BEENEY:  To add to Your Honor's quote from Tinker,

17  there's a quote from Holloman from 1272 to 73:  "By focusing

18  entirely on whether students may have been momentarily

19  distracted rather than on whether the distraction or disruption

20  was material or substantial is to send -- is insufficient

21  protection to students' First Amendment rights and incorrectly

22  applies our precedence."

23          MS. DINCMAN:  Your Honor, I don't think that we can

24  enter into the stipulations.  I don't believe that there's any

25  way we can reconcile the presentation of our witnesses with

1  your instructions and we really would like to just preserve our

2  objection for the record --

3            THE COURT:  Well, that's not going --

4            MS. DINCMAN:  -- and wrap.

5            THE COURT:  -- that's not going to work because I'm

6  telling you:  If you have evidence of material and substantial

7  disruption, you need to present it now.  You can't have it both

8  ways, Ms. Dincman.

9            MS. DINCMAN:  Well, we -- we believe that the evidence

10  that we have presented and would continue to present from

11  Ms. Bxxx is -- meets the standard of material and substantial

12  disruption, and I gather that Your Honor does not.  But we

13  don't want to just put on duplicative evidence or repeat the

14  evidence that Miss P. has already put on in violation of Your

15  Honor's instructions.

16            THE COURT:  How many more of those witnesses do you

17  have?

18            MS. DINCMAN:  Just one.

19            THE COURT:  Let's put her on.  We've come this far.

20  We're not going to do this over again simply --

21            DEPUTY CLERK:  Please raise your right hand.

22      **C.B., DEFENSE WITNESS, DULY SWORN.**

23            DEPUTY CLERK:  You may have a seat and could you

24  please tell me your initials?

25            THE WITNESS:  C.N.B.

## DIRECT EXAMINATION

BY MS. DINCMAN:

Q.  Good morning.

A.  Good morning.

Q.  Miss B., how are you doing?

A.  Good.

Q.  I'm Holly Dincman.  I'm one of the lawyers for the School Board.  And before we get started with questions, I just want to give you a couple of instructions.

You'll need to make sure that you, when you talk, you're moving close to the microphone so that we can hear you in the courtroom and hear what your answers to the questions are.  And we are using the -- under a protective order and so we're calling students by their initials.  And I know that may be a little bit difficult; but if you have to refer to a student when you give an answer to a question, what you need to do is try to use that person's first and last initial.

Just like the court reporter asked you your first and last initials, we want to do the very -- you to do the very same thing when you respond.  Do you think you can do that?

A.  Yes, ma'am.

Q.  All right.  And how old are you, ma'am?

A.  Fourteen.

Q.  And who do you -- who do you live with?

A.  My parents.

1    Q.   Okay.  And where -- what grade are you in?

2    A.   Seventh.

3    Q.   Is that at Ponce de Leon?

4    A.   Yes, ma'am.

5    Q.   And how long have you gone to Ponce de Leon?

6    A.   Since kindergarten.

7    Q.   Okay.  And I understand that in September 2007, did you

8    become aware that students were taking actions supportive of

9    gay pride or gay and lesbian rights or issues?

10   A.   Yes, ma'am.

11   Q.   And did you take part of that?

12   A.   Yes, ma'am.

13   Q.   And what -- what sort of things did you personally do?

14   A.   Signed a petition.

15   Q.   And did you -- and did you also write all over yourself?

16   A.   No, ma'am.

17   Q.   Did you observe other people writing all over themselves?

18   A.   Yes, ma'am.

19   Q.   And where on their bodies were they putting this

20   information?

21   A.   Hands and faces.

22   Q.   And what sort of things were they writing?

23   A.   "Gay Pride."

24   Q.   Anything else?

25   A.   (Indicates negatively.)

1    Q.   Any pictures, rainbows, things like that?

2    A.   Rainbows.

3    Q.   And when you saw people doing that, where were they doing

4    that?

5    A.   At the school.

6    Q.   And was some of that taking place during class time?

7    A.   Yes, ma'am.

8    Q.   And was some of it taking place while lessons were going

9    on?

10   A.   Yes, ma'am.

11   Q.   And were you also aware of a plan to walk out of an

12   assembly?

13   A.   Yes, ma'am.

14   Q.   And were you -- did you participate in that plan to walk

15   out of the assembly?

16   A.   No, ma'am.

17   Q.   Were you doing things in the hallways and being louder than

18   you otherwise normally would in support of gay pride?

19   A.   Yes, ma'am.

20   Q.   Can you tell me about that, what you were doing exactly?

21   A.   We were yelling in the hallway.

22   Q.   And when you say you were "yelling in the hallway," were

23   there other things going on besides yelling?

24   A.   No, ma'am.

25   Q.   Did people -- did you see people jump up and down or did

1    you jump up and down?

2    A.   No, ma'am.

3    Q.   And what was being yelled in the hallways?

4    A.   Just yelling at each other, talking about Mr. Davis and

5    stuff.

6    Q.   And were you -- were they yelling -- were you yelling "Gay

7    Pride"?

8    A.   Yes, ma'am.

9    Q.   And what -- when you were yelling about Mr. Davis, what

10   kind of things were being yelled about Mr. Davis?

11   A.   How he shouldn't tell them what to do.

12   Q.   Were the students reacting to that in a -- in a negative

13   way that you could observe?

14   A.   Yes, ma'am.

15   Q.   Tell me about what you observed the other students'

16   reaction?

17   A.   They were getting mad about it.

18   Q.   And were they arguing and fighting?

19   A.   Arguing, but not fighting.

20   Q.   No fist fights that you saw?

21   A.   Right.

22   Q.   How many arguments would you say that you saw going on

23   during that time frame?

24   A.   Just about every day.

25   Q.   And for how long a period of time were you seeing that?

1   A.   A few weeks.

2   Q.   A few weeks?  Okay.  And were you personally going to

3   people and trying to get them to do things in support of gay

4   pride?

5   A.   No, ma'am.

6   Q.   Okay.  Were you doing things to people or talking to them

7   during class about gay pride?

8   A.   Yes, ma'am.

9   Q.   And tell me about that.  What sort of things were you

10  doing?

11  A.   Just talking about it.

12  Q.   And was it -- was it taking away from your classwork?

13  A.   Yes, ma'am.

14  Q.   In what way?  Were you not paying attention to your

15  lessons?

16  A.   Yes, ma'am.

17  Q.   And were students who were talking about gay pride,

18  particularly you, were you -- were you, in the way you were

19  talking about it, were you rude and disrespectful to others?

20  A.   No, ma'am.

21  Q.   Did you ever get in any arguments with anyone?

22  A.   No, ma'am.

23  Q.   And did you also during class time write a petition and

24  hang it in the bathroom?

25  A.   Yes, ma'am.

1    Q.  And that happened -- did you get out of class to go and do

2    that?

3    A.  No, ma'am.

4    Q.  Well, was it put up during class time?

5    A.  During break.

6    Q.  I see.  And I understand that -- did Principal Davis call

7    you into his office at some point?

8    A.  Yes, ma'am.

9    Q.  And what did you tell Mr. Davis about what was going on?

10   A.  He just asked what I could help him get to the bottom of

11   this with.

12   Q.  Get to the bottom of what?

13   A.  All the disruption and who was causing it.

14   Q.  Okay.  And what all did you tell him about what was going

15   on?

16   A.  I told him that everybody was getting mad because he

17   wouldn't let them wear stuff at school and disrupt everybody.

18   Q.  And did you tell him about any of the things that you had

19   seen people doing?

20   A.  Writing on themselves.

21   Q.  Anything other than that?

22   A.  No, ma'am.

23   Q.  Okay.  And did you see other students using class time to

24   write on -- write on their clothing?

25   A.  No, ma'am.

1  Q.  Okay.  Did you see people using school time to write on

2  their clothing?

3  A.  Yes, ma'am.

4  Q.  Who was that?  Use the initials, please.

5  A.  B.B.

6  Q.  Pardon me?

7  A.  B.B.

8  Q.  B.B.  And did you see students with slogans taped on their

9  shirt on the bus?

10  A.  Yes, ma'am.

11  Q.  Were they related to "Gay Pride"?

12  A.  Yes, ma'am.

13  Q.  And did they have vulgar and offensive slogans on their --

14  A.  Yes, ma'am.

15       MS. SUN:  Objection, Your Honor.  None of the slogans

16  or symbols that Ms. Gillman wants to wear are vulgar or

17  offensive or lewd, and that has already been established

18  through interrogatory answers from the defendant.  So whether

19  they --

20       THE COURT:  I'm going to overrule the objection.

21  That's something you can go into on cross on specifically what

22  she thought, whether she thinks those are.

23  BY MS. DINCMAN:

24  Q.  And can you tell us what the slogan was that you saw on the

25  girl's shirts on the bus?

1    A.   "We eat out every night."

2    Q.   And what did you -- what did you -- did you understand that

3    to be some sort of reference to oral -- oral sex?

4    A.   Yes, ma'am.

5              MS. SUN:  Objection, relevance, Your Honor.

6              THE COURT:  Overruled.

7    BY MS. DINCMAN:

8    Q.   And when you saw -- how many girls did you see with that on

9    their shirts?

10   A.   There were two or three.

11   Q.   Two or three.  Were they all on the bus at that -- at that

12   time when you saw them?

13   A.   One was on the bus.  The other ones were at school.

14   Q.   And when you saw the other ones at school, where were they?

15   A.   In the hallway at gym.

16   Q.   During gym class?

17   A.   (Nods affirmatively.)

18   Q.   And the ones that were on the bus, when they -- when you --

19   when you get on the bus in the afternoon, is it just Ponce de

20   Leon High School students that are on that bus?

21   A.   Ponce de Leon, middle school, and elementary kids.

22   Q.   And so there could be kids as young as kindergarten age on

23   the bus?

24   A.   Mostly it is kindergarten and 1st.

25   Q.   How much of those would you say are on the bus is

1    kindergarten and elementary school kids?

2    A.   Over half of it.

3    Q.   More than half.  All right.  And did you see people

4    vandalizing the school in the name of gay pride or gay rights?

5    A.   Yes, ma'am.

6    Q.   And who did you see doing that?

7    A.   I didn't see it, but I saw what was on the stuff.

8    Q.   Okay.  You observed the aftereffects of the vandalism.  Do

9    you -- where was it and what was it?

10   A.   On the lockers at school in gym on the shower stalls.

11   Q.   And what were the words?

12   A.   "Gay Pride" and "Lesbos."

13   Q.   Okay.  And when -- when did you see those things?

14   A.   The last week and a few months ago.

15   Q.   So last week you saw where somebody had written "Gay Pride"

16   on lockers?

17   A.   Yes, ma'am.

18   Q.   And where -- where was that?

19   A.   The middle school hallway.

20   Q.   And how big was that written on the lockers?

21   A.   It took up almost two lockers.

22   Q.   Two whole lockers?  Did it cover any more than just the two

23   lockers?  Was there stuff that went along with that?

24   A.   There was streaks down the locker.

25   Q.   And what was it written in?

1    A.   Red permanent marker.

2    Q.   And do you -- do you have any knowledge of when that was

3    put on there?

4    A.   When class was going on.

5    Q.   How do you know that it happened when -- during class time?

6    A.   Because we have breaks between each class and it wasn't

7    there the break before that.

8    Q.   And do you know if the school had to do anything to correct

9    that?

10   A.   Paint over it or somehow scrubbed it off.

11   Q.   I see.  And did you observe anybody trying to rub -- rub

12   that off?

13   A.   There were some kids trying to rub it off, some boys.  I

14   don't remember who they were.

15   Q.   I see.  And you talked about another set of lockers that

16   you saw "Gay Pride" written on.  Where are those lockers

17   located?

18   A.   Right beside those, but a little down the hallway.

19   Q.   And when did you observe those slogans put on the lockers?

20   A.   It was the same day.

21   Q.   Same day?  So within the past week to two weeks?

22        THE COURT:  Ms. Dincman, why is that material if it's

23   just in the last week?  Because that's during the period of

24   time that the School Board's ban is in effect.

25        MS. DINCMAN:  Well, I think it goes to the prediction

1    of future disruption, Your Honor, that if these things are

2    happening at the school now even with the ban in place that --

3         THE COURT:  So certainly not due to these statements

4    and symbols because nobody can wear them.

5         MS. DINCMAN:  Well, the symbols and statements that

6    she's alleging are on the lockers are in fact some of the

7    symbols and statements that are in the letter, Your Honor.

8         THE COURT:  It's not because those things are being

9    worn at school.  I mean, just because somebody gets an idea at

10   home or on the street and comes in and acts out in the school,

11   that's not what we're talking about.  We're talking about this

12   communication on the school property being the cause of a

13   material disruption.  And obviously, it's not been on the

14   school property for, what, eight or nine months now.  So why

15   does it have any connection whatsoever with recent vandalism?

16        MS. DINCMAN:  Respectfully, Your Honor --

17        THE COURT:  I would suggest to you that just the --

18   this pending trial may well have been sufficient to provoke it,

19   or it seems to be a whole bunch of explanations.  But since it

20   comes well after the ban has been in effect, I don't find it to

21   be material.

22        MS. DINCMAN:  I understand, Your Honor.

23   BY MS. DINCMAN:

24   Q.  Miss B., when you met with Mr. Davis regarding the events

25   that were going on in 2007, did Mr. Davis ask you whether you

1    were gay or lesbian?

2    A.    No, ma'am.

3    Q.    Did he talk about whether being gay or lesbian was right or

4    wrong or against the Bible?

5    A.    No, ma'am.

6    Q.    What did he tell you?

7    A.    He told me that we shouldn't be doing it at school because

8    we were disrupting everybody and they couldn't get their work

9    done.

10   Q.    Okay.  And you were suspended as a result for a week?

11   A.    Yes, ma'am.

12   Q.    Did you agree with the suspension?

13   A.    Yes, ma'am.

14   Q.    Did you feel like you were disruptive to school and what

15   was happening at school?

16   A.    H'm.

17   Q.    Did you feel like you were disrupting school?

18   A.    Yes, ma'am.

19   Q.    And did you -- did you feel compelled to apologize to

20   Mr. Davis?

21   A.    Yes, ma'am.

22   Q.    And how did you -- how did you do that?

23   A.    I wrote him a letter.

24   Q.    And did you take it in and read it to him?

25   A.    Yes, ma'am.

1    Q.  All right.

2              MS. SUN:  Objection, relevance.

3              THE COURT:  Overruled.

4    BY MS. DINCMAN:

5    Q.  Given the fact that you are in school and you've had pretty

6    much your entire educational career at Ponce de Leon and you

7    were there during September 2007, was what was going on and

8    what you observed, was it more than the normal back-and-forth

9    between students that you would see on a day-to-day basis?

10   A.  Yes, ma'am.

11             MS. SUN:  Objection vague.

12             THE COURT:  Overruled.

13   BY MS. DINCMAN:

14   Q.  I asked if it was more than the normal back-and-forth

15   between students that you would see on a regular basis.

16   A.  Yes, ma'am.

17   Q.  Was it more argumentative and --

18             MS. SUN:  Objection, leading.

19             THE WITNESS:  Yes.

20             THE COURT:  Sustained.

21   BY MS. DINCMAN:

22   Q.  You see in school that sometimes the hallways may be loud

23   on occasion, is that correct?  And did you -- did you observe

24   that while this was going on, that the school -- I mean, would

25   you say that the school was in an uproar while this was going

1  on?

2  A.  Yes, ma'am.

3  Q.  And was it -- was it just limited to one grade as far as

4  you could see and who was involved?

5  A.  It was -- it was involving the whole school.

6  Q.  Okay.  Did you see people writing rainbows all over

7  themselves?

8  A.  No.

9       MS. DINCMAN:  I don't have any other questions for

10  this witness.

11       THE COURT:  Cross-examine.

12       MS. SUN:  Your Honor, may I have a moment to confer

13  with my counsel?  Thank you.

14       Your Honor, I could elicit from this witness more

15  information about the general nature of middle school.  I

16  believe that that's cumulative.  With respect to -- actually

17  there was one set of questions I want to ask her about her

18  testimony that I believe is different than her deposition

19  testimony; but with respect to the events that she testified, I

20  believe they were cumulative to the testimony that's already

21  been elicited.

22       THE COURT:  If you have any cross-examination, let's

23  ask it now.

24                    CROSS-EXAMINATION

25  BY MS. SUN:

1   Q.  Hello, C.B.  My name is Christine Sun.  I represent Heather

2   Gillman in this case.  We met a couple of weeks ago.  Do you

3   remember that?

4   A.  Yes, ma'am.

5   Q.  And you remember I took your deposition?

6   A.  Yes, ma'am.

7   Q.  So I just have a few questions for you.

8       I believe that you testified to Ms. Dincman that you

9   believe that some of the things that were going on in September

10  were more than the usual atmosphere for the middle school.  Do

11  you remember that?

12  A.  Yes, ma'am.

13  Q.  That testimony?  Okay.  And you said that you and some

14  other students may have been yelling in relation to gay rights?

15  A.  Yes, ma'am.

16  Q.  And I notice that you are a very soft-spoken person, is

17  that correct?

18  A.  No, ma'am.

19  Q.  You're not a soft-spoken person?

20  A.  (Indicates negatively.)

21  Q.  Okay.  Well, when you're using the word "yelling," you mean

22  talking above your normal soft-spoken voice?

23  A.  Yelling.

24  Q.  Okay.  Do you remember having your deposition taken?

25  A.  Yes, ma'am.

1        MS. SUN:  May I approach the witness, Your Honor?

2        THE COURT:  Yes.

3   BY MS. SUN:

4   Q.  Miss B., I have placed in front of you a copy of your

5   deposition transcript, and I'm going to ask you to please turn

6   to the page and try to read along with me.  Could you turn to

7   page 32, please?  Do you see lines 10 through 12?

8   A.  Yes, ma'am.

9   Q.  Okay.  I'm going to read from your deposition a question

10  starting at line 10 on page 32.

11       "And I don't mean this to be -- I don't mean this with any

12  disrespect, but you are very soft-spoken, is that right?

13       "Answer:  Yes, ma'am.

14       "Question:  And I take it that your parents teach you to be

15  respectful of adults and to be generally a soft-spoken person?

16       "Answer:  Yes, ma'am.

17       "Question:  And you said before that you were -- you were

18  yelling, your friends were yelling about gay rights and all of

19  that stuff.  When you say 'yelling,' you mean just talking

20  above your normal, soft-spoken voice?

21       "Answer:  Yes, ma'am."

22       Did I ask you those questions and did you give those

23  answers?

24  A.  Huh?  I can't find it on this page.

25       MS. SUN:  I'm going to try to help out.

1          THE COURT:  You want to show her on which page?

2          THE WITNESS:  Didn't you say page 32?

3          MS. SUN:  Yes.

4          THE WITNESS:  Yeah, I can't find it.

5     BY MS. SUN:

6     Q.  Would you look at that screen?  There's a screen actually

7     next to you.

8     A.  Oh.

9     Q.  And I apologize.  I'm going to read it again, just so that

10    you can follow along.

11         "Question:  And I don't mean this with any disrespect, but

12    you are very soft-spoken, is that right?

13         "Answer:  Yes, ma'am.

14         "Question:  And I take it that your parents teach you to be

15    respectful of adults and to be generally a soft-spoken person?

16         "Answer:  Yes, ma'am.

17         "Question:  And you said that -- before that you were --

18    you were yelling, your friends were yelling about gay rights

19    and all of that stuff.  When you say 'yelling,' do you mean

20    just talking above your normal, soft-spoken voice?

21         "Answer:  Yes, ma'am."

22         Did I ask you those questions and did you give those

23    answers at your deposition?

24    A.  Yes, ma'am.

25    Q.  And is it fair to say that it's not unusual for students to

1    yell, using your definition, at school during lunchtime?

2    A.   Huh?

3    Q.   Is it fair to say that it's not unusual for students to

4    yell at each other during lunchtime?

5    A.   I don't get what you're saying.

6    Q.   Okay.  Do students -- do students commonly yell at each

7    other in the hallways and at lunchtime at PDL?

8    A.   Very rarely.

9    Q.   Okay.  Well, isn't it true, that in your experience as a

10   student, that students commonly yell at each other because, in

11   your words, the school is very loud?

12   A.   It's loud, but not -- they talk to each other but it can

13   get loud.

14   Q.   Okay.  So are you saying that in your experience the school

15   is not very loud?

16   A.   Not all the time.

17   Q.   But there are times where -- you have described your school

18   as very loud, is that correct?

19   A.   (Nods affirmatively.)  Yes, ma'am.

20   Q.   In your experience, students like to yell at each other and

21   play around?

22   A.   They do, but that's not like --

23   Q.   I just want you to --

24        THE COURT:  Counsel, I think we need to find something

25   with more substance.

1    MS. SUN:  Sure.  Okay, you're right, Your Honor.  I

2  think we've established that middle school is middle school and

3  it hadn't changed in 50 years, so I have no further questions

4  for this witness.

5    THE COURT:  Redirect?

6    MS. DINCMAN:  I don't have any questions for the

7  witness.

8    THE COURT:  Ma'am you, may step down and leave the

9  courtroom.

10    Ms. Dincman.

11    MS. DINCMAN:  Your Honor, at this time the defense

12  would rest.

13    THE COURT:  All right.  Mr. Beeney?

14    MR. BEENEY:  Your Honor, the plaintiff's rebuttal case

15  consists of two interrogatory responses.

16    THE COURT:  All right.  Can we get those out of the

17  way before we break for lunch?

18    MR. BEENEY:  Absolutely, Your Honor.  Would Your Honor

19  like me to read them into the record or refer to them?

20    THE COURT:  If you'll refer to them.

21    MR. BEENEY:  Okay.

22    THE COURT:  Can you put them on the display?

23    MR. BEENEY:  Yes, we can, Your Honor.  Let me do this.

24  The -- do you -- I'm sorry, we can do this.  Plaintiff's

25  Exhibit 19, please.  First page.

"Identify all students suspended from Ponce de Leon during the period September 12 through September 30 for engaging in material disruption, disruption, illegal organizing, or participating in a secret society.  For each student suspended, provide the name of the student, the dates of suspension, the length of suspension, the reason for suspension, the dates of the infraction, and the school official responsible for the student at the time of the infraction," is the question of Defendants' First Set -- of Plaintiff's First Set of Interrogatories.

And the answer is on the next page.  And in particular, Your Honor, we are submitting this in our total case for the dates of the infraction which are listed as five days, as well as for footnote 2, which specifies that all of the incidents are contained in plaintiff -- I'm sorry -- in Principal Davis' notes, which are entered as Exhibit 13.

The second interrogatory, Your Honor, answer, that we would submit in our rebuttal case is -- Exhibit 21, please, page 6.  Yeah, page 6.

And Your Honor, this is Defendants' Response to Plaintiff Gillman's Second Set of Interrogatories, No. 15.  And the question is:  "For each phrase or symbol listed in paragraph of the complaint, which are the same symbols in Plaintiff's Exhibit 2, indicate whether the phrase is:  Lewd, vulgar, profane, obscene, advocates a political view and/or

1   plainly offensive."

2        And in particular, Your Honor, we're submitting this

3   response for paragraph 2 which states that, "The Board's

4   decision to prohibit display of the phrases and symbols was not

5   based upon any perception that the phrases and symbols standing

6   alone are inherently lewd, vulgar, profane, obscene, political,

7   or plainly offense.  In September 2007, students used similar

8   slogans and symbols, combining them with disruptive actions to

9   materially and substantially disrupt the educational process.

10  These disruptions served as the basis for the Board's ban of

11  the phrases and symbols, as it reasonably forecasts future

12  disruptions of a similar nature if the identified phrases and

13  symbols are permitted to be displayed in the school setting."

14       And that concludes our rebuttal case, Your Honor.  And

15  I don't know if Your Honor wants to entertain a motion at the

16  close of the evidence or not.

17       THE COURT:  You can do it for the record, but I think

18  since we're without a jury we'll get the same thing.

19       MR. BEENEY:  Thank you, Your Honor.  Plaintiff would

20  move for judgment based on the evidence.

21       THE COURT:  I will defer ruling on that.

22       Ms. Dincman, you have anything further?

23       MS. DINCMAN:  Yes, Your Honor.  We would also move for

24  a ruling on -- a judgment under the evidence as to the

25  viewpoint discrimination claim as inadequate evidence has been

1   elicited to demonstrate ratification or deliberate indifference

2   on the part of the School Board.

3           THE COURT:  Again, I'll defer.  I will suggest let's

4   break for lunch until, say, 1:30.

5           Well, I'm going to go ahead and deny both motions.  On

6   that basis, I think it's prudent now not to stop at that point,

7   but to go ahead and consider the record as a whole.  And on

8   that basis, I will certainly weigh all of the evidence.  I

9   would like to hear some final comments from the lawyers when we

10  come back.

11          You all have plowed a considerable amount of ground,

12  but I think the stuff is fairly clear.  I would like you all to

13  focus particularly on the proof of -- or lack of proof of the

14  requirement that there be a substantial and material

15  disruption.

16          And unless you have some strong protest, can you say

17  what you need to say in 30 minutes each?

18          MS. DINCMAN:  Oh, absolutely, Your Honor.

19          MR. BEENEY:  Yes, Your Honor.

20          THE COURT:  No problem?  All right.  Well, let's be

21  ready to go at 1:30 then.

22      **(Recess from 12:20 p.m. until 1:30 p.m.)**

23          THE COURT:  Good afternoon.  Mr. Beeney, are you

24  ready?

25          MR. BEENEY:  Thank you, Your Honor.

1    Your Honor, just one brief housekeeping matter.

2 Plaintiff's Exhibit 13, which are Mr. Davis' notes, there was a

3 standing objection about the redactions which I believe the

4 defendant is now satisfied that they were just the names.

5    MS. DINCMAN:  That's correct.  We don't have any

6 objection to the entry.

7    THE COURT:  It will be admitted.

8    **(Plaintiff's Exhibit No. 13 received in evidence.)**

9    MR. BEENEY:  Thank you, Your Honor.

10    Your Honor in some respects I think I have been a

11 cause of disservice to the Court and to the First Amendment.

12 By, I think, arguing back and forth about whether students may

13 have passed notes or whispered in class, we may have lost sight

14 of the law given to us by Tinker and Holloman.

15    The words of Tinker at 509 are instructive about the

16 law and the role of a district court in a case such as this.

17 At 509, the Supreme Court in Tinker said, "Certainly where

18 there is no finding and no showing that engaging in the

19 forbidden conduct would materially and substantially interfere

20 with the requirements of appropriate discipline in the

21 operation of the school, the prohibition on speech cannot be

22 sustained."

23    The Court went on to note that the district court had

24 made no findings that the School Board had met its burden of

25 showing a material and substantial disruption that interferes

with the requirements of the operation of the school.

Holloman followed the Tinker rationale.  Holloman states, at 1272 to 73, "By focusing entirely on whether students may have been momentarily distracted, rather than on whether the distraction or disruption was material or substantial, the dissent gives insufficient protection to students' First Amendment rights and incorrectly applies our precedence."

Holloman at 1273:  "To the degree the ruling below is based on the principle's abstract concerns, it is patently inconsistent with the principle articulated in Tinker, Burnside, and numerous other cases discussed throughout this subsection, that there must be a real or substantial threat of actual disorder as opposed to the mere possibility of one."

And finally, Holloman at 1274:  "Where students' expressive activity does not materially interfere with the school's vital education mission and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably might have such an effect."

Your Honor, before discussing the evidence in the case, it may be useful to review with Your Honor some of the cases that have upheld and rejected school boards' bans on First Amendment expression.  A school ban on speech was rejected by this circuit in Burnside, notwithstanding evidence that a teacher had reported that 30 to 40 students were causing

a commotion by wearing the freedom buttons at issue.  The Court
found, nevertheless, that the students' speech did not hamper
the school in carrying out its regular schedule of activities.

Similarly, the District of Rhode Island in <u>Fricke v.
Lynch</u> rejected a ban on a male student bringing a same sex date
to the prom, notwithstanding that the same conduct in the prior
year had led to actual violence and the need for the school to
provide additional security and to organize an escort system
for the student at issue.

Likewise, in <u>Chambers v. Babbitt</u>, a School Board ban
against a "Straight Pride" sweatshirt was rejected by the
District of Minnesota, notwithstanding evidence of gay bashing
speech, the defacing of a gay student's car, and 14 physical
fights at school over other speech-related issues.

In contrast, Your Honor, cases that have upheld the
ban on speech have required both that the school's prediction
of future disruption as a result of prior incidents --
justification relied on here by Holmes County School Board --
be inexorably tied to the speech at issue and that the
disruption involves substantial acts interfering with school
activities.

For example, in <u>Blackwell v. Issaquena</u>, which is the
case the School Board primarily relies on, the Court upheld the
ban on freedom buttons in light of evidence that 150 students
accosted and pinned buttons on other students, making at least

one of the other students cry, disrupted classes by barging into them and telling other students to leave.  Two hundred students were involved in that activity.

Similarly, in <u>Scott</u>, the Board was permitted to ban the Confederate flag because of existing racial tensions in the school, physical fights in school during the months preceding the case which appeared to be racially biased, and the inherent quality of the Confederate flag which the Court found can by its nature cause, quote, "hurt feelings, emotional trauma, and outright violence."

In other gay rights cases, courts have rejected disruptive and even sometimes violent actions from other students to base a ban on speech:  <u>Henkle v. Gregory</u> in the District of Nevada, permitting students to state that they are openly gay; <u>Fricke v. Lynch</u>, the case I just cited to Your Honor, the District of Rhode Island, the same sex date; <u>Boyd County High School</u>, the Eastern District of Kentucky, the formation of a gay/straight alliance to promote tolerance among gay and straight students.

Now, as to the evidence, Your Honor, the defendant has elected to try to meet its very substantial burden under <u>Tinker</u> and <u>Holloman</u> by offering testimony through hearsay and what kids said about what other kids have done.  We have only one bit of evidence from a teacher at the school at issue here.  One bit of evidence.  And that evidence is is that one class on

one day was disrupted for ten minutes until that teacher said to the kids, "Shut your mouth," and the class went back to normal operations.

That is the only evidence in this record of any adult witnessing any act of disruption other than Principal Davis, who saw one student having "Gay Pride" on his hand which he, of course, immediately had washed off.

The only other evidence of any other kind of view expressed by a teacher was when Mr. Davis asked, "Did you see your class disrupted by making posters?" And the teacher said, "No."

I think a reasonable inference can be drawn as to why Principal Davis did not ask any other teacher about any other alleged disruption, because he did not get the answer he liked from the first one. There is no other plausible explanation as to why the Board would come before Your Honor and not present a single teacher to testify to any of the disruptions it claims occurred at Ponce de Leon High School in September of 2007.

Now, what do the kids say? They saw kids in an oral argument -- I think there was testimony about two or perhaps three separate ones -- oral arguments about a controversial topic.

Your Honor, that's what the Constitution protects, not justification for banning speech. There was note passing, there was loud talking in the hallways while students were

walking around in a circle in gym class as well.  There's
evidence, I believe, of one or two signs as opposed to a bunch
of people saying that they made them.  There was whispering in
class and a vulgarity was put on school property having nothing
to do with any of the symbols in Plaintiff's Exhibit 2 and
having nothing to do with the issues in this case.

        That I believe, Your Honor, is the sum and substance
of the evidence that the Board has presented to you to meet its
burden of banning speech under the First Amendment of our
Constitution.  It fails miserably to meet that burden and to
try to demonstrate any kind of justification for the School
Board's ban on speech.

        Where is the evidence that was accepted in <u>Blackwell</u>
to support a student's ban on speech of students being accosted
in the hallway?  G.P. told Your Honor today that if the kids at
school didn't like stuff people were saying about gay rights
they could walk away.  Peaceful discussion, precisely what the
First Amendment protects.

        Where is the evidence accepted in <u>Blackwell</u> of
students barging into classrooms or students getting others to
walk out?  Where is the evidence of 200 students disrupting
class?  It is not in this record, Your Honor.

        There is no evidence of even the slightest physical
altercation.  There was evidence of a fight that C.W. got into,
but that was because she was suspended and had nothing to do

with the symbols here.  There's not even evidence of pushing,

shoving.  No evidence of classes not held.  No evidence of

classes disrupted except for our ten minutes.  No threats of

violence.

Your Honor, if the defendant could meet its burden,

you would have heard from teachers who would testify about

disruptions at PDL.  It simply did not occur.

It's defendants' burden to meet the substantial test

imposed on defendants under Tinker and Holloman; but even taken

in the light most favorable to defendants, there was simply

nothing that occurred at school that wasn't consistent with

what always goes on at Ponce de Leon.

Even if there was a disruption, Your Honor -- and

defendants, I submit to Your Honor, have failed miserably to

demonstrate that there was -- that is far from the end of

defendant meeting its burden in this case.  Tinker and

Blackwell in particular specifically require that the

disruption be tied inexorably to the banned speech.

Blackwell at 754:  "Defendant must show that the

banned speech and the disruptive conduct, quote, 'are not

separable,'" quote.  There has been no evidence that the

conduct that defendants would like Your Honor to accept is

inseparable from the speech that they have banned.

Indeed, Your Honor, the evidence is overwhelming to

the contrary that what happened at the time in September of

2007 at Ponce de Leon High School was not even related to the symbols that are on Exhibit 2 and have been banned. They were related, rather, to Vice -- to Principal Davis' actions with respect to some students' displaying support for gay pride rights.

Principal Davis himself admitted in court, Your Honor, that what happened in September of 2007 had nothing to do with the speech that the School Board has banned. And Your Honor, I've got some excerpts from yesterday's transcript with the timing on it and we'll try to tie them up to the page and line number when that's available. But at 15:43:04, the question was asked Principal Davis:

"Question: So no one told you that anything that happened in September of 2007 had anything to do with anybody wearing anything like any of the phrases or symbols on Exhibit 2, right?

"Answer: Right, had nothing to do with wearing something."

These were children reacting to what they perceived to be as a crusade to stop expressions of support for equal rights. Mr. Davis repeatedly admitted that that is precisely what the students told him, and his notes of those conversations in Plaintiff's Exhibit 13 demonstrate that that is indeed precisely what the students said they were reacting to.

1    The events in September of 2007 were a reaction to --

2  and again, truth or rumor, it really doesn't matter because

3  it's the burden of the District to show that the events in 2007

4  were tied to these symbols and they were not, they were tied to

5  the students' reaction to a truth or a rumor.

6    As a result of those students' reaction to the

7  evidence that we heard -- to passing notes, to whispering in

8  class, to threatening to walk out of an assembly if the speaker

9  was anti-gay -- those students were punished severely;

10  confirming, if nothing else, that even under the Board's

11  unsupportable view of the evidence, Ponce de Leon High School

12  can deal with what they refer to as a disruption.  There is no

13  need to silence the speaker.

14    Your Honor, yet another independent reason to grant

15  Ms. Gillman relief is that the defendants have admitted that as

16  of September of 2007 -- I'm sorry, strike that.

17    Another independent reason to grant Ms. Gillman relief

18  is that defendants are unable to demonstrate that they can

19  predict, as required by the law, from the events of

20  September 2007 to any disruption arising from the wearing of

21  the symbols and phrases at issue here.

22    In Holloman, in terms of the connection between the

23  events and the ability to predict, in Holloman, the Eleventh

24  Circuit rejected, "the theoretical possibility of discord"; the

25  "insubstantial impact in classroom decorum"; "hostile remarks

by students"; "discussions out of classrooms" "by other students"; "abstract concerns"; "mere possibilities"; and the potential impact of prior conduct all were rejected as a basis to support a prediction of substantial and material disruption as a result of the banned speech.

Defendants have failed to meet this requirement. And this is the third independent basis on which Your Honor may afford the relief Ms. Gillman is seeking. They have failed to demonstrate that they are able to predict with the certainty that the law requires that the events of 2007 give rise to a prediction that if these symbols and phrases are displayed there will be a material disruption.

In order to meet the school's burden that a ban may be justified only if there is a real or a substantial threat of actual disorder, Principal Davis told Your Honor that his belief that these symbols would lead to disruption was based on speculation coming from his experience. And again, this is around 16:34 of yesterday's transcript:

"Question: Isn't it true, sir, contrary to your affidavit, that you don't even know what you would anticipate what would happen if at PDL Ms. Gillman wore a 'Gay Pride' T-shirt?

"Answer: I could speculate as to what might happen."

I'm going to skip some colloquy and some other substance of an answer.

1    "Question:  Would you agree with me that speculation

2    is really about as certain as you can get about predicting the

3    future if students wore Exhibit 2 phrases and symbols?

4    "Answer:  Yes.  You have to draw from experience.  You

5    draw from knowing children, you make judgments based on that.

6    A principal must be proactive and never reactive.

7    "Question:  But we agree it's speculation about what

8    will happen in the future?

9    "Well, based on the knowledge that I have, yes."

10   Your Honor, that exchange with Mr. Davis is sufficient

11   to reject the School Board's defense in this case.  Speculation

12   from what happened in 2007 as to what will happen now if

13   Ms. Gillman wears the phrases and symbols does not meet the

14   independent legal burden imposed on the School District by

15   Holloman and other cases.

16   Your Honor, the Board elected not to subject any

17   School Board member to the antiseptic of cross-examination or

18   to allow Your Honor to hear even one of them.  Based on that,

19   and Mr. Davis' comments that he is the School Board in effect,

20   his admission is sufficient to grant Ms. Gillman relief.

21   Now, Your Honor, in terms of the viewpoint

22   discrimination issue, I would like to just for a few moments

23   review that evidence.  Principal Davis agreed that if one held

24   up one's fists during the Pledge of Allegiance and someone

25   caused a disruption as a result of that, that you would punish

1  the disrupters, but you silence the speaker if it's a matter of

2  gay rights.  And that's at 12:57.  I'll skip the interchange.

3        Principal Davis suspended children for five days who

4  asked others about their views of gay rights, who wore "Gay

5  Pride," without the hint of a suggestion of a disruption, while

6  not even talking to the kids he listed as taunting C.W. because

7  she was gay.

8        He did not suspend the kid who threw a rock through a

9  bus window and he didn't even follow through with kids who were

10 offering another money to ask a young woman to get into her

11 pants.

12       The reason Principal Davis says that he didn't suspend

13 the kid for throwing a rock through a bus window is because at

14 14:46, quote, "that's because I could never come to a

15 conclusion for certain that the student was guilty of doing

16 that."

17       So the standard Principal Davis used when he's

18 examining conduct such as throwing a rock through a bus window

19 is whether he could come to a conclusion for a certainty.  The

20 standard he uses to punish students expressing support for gay

21 rights is based on what another kid told him.

22       The Confederate flag is fine at Ponce de Leon; a pink

23 triangle is not.  I believe Superintendent Griffin today even

24 told Your Honor that a swastika is fine at Ponce de Leon, but

25 wearing a pink armband is prohibited.

1    PDL has a Youth for Christ club.  Principal Davis

2 would have to investigate and seek counsel before allowing a

3 club to promote gay/straight tolerance.

4    The very fact that Principal Davis thinks that phrases

5 such as, "I'm Straight, But I Vote Pro-Gay," "Equal, Not

6 Special Rights," and "God Loves Me Just the Way I Am" suggest

7 sex is about as clear as evidence as one could have of

8 viewpoint discrimination.

9    You heard Principal Davis say, Your Honor, that "God

10 Loves Me" is fine, but not "God Loves Me Just the Way I Am."

11    Mr. Davis' response to a lesbian student who said she

12 was taunted was to tell her father that the student was a

13 lesbian, with the father then threatening to kick the student

14 out of the house, PX-13, Bates Nos. 1200 to 1201.

15    Now, before getting to why the Board is responsible

16 for this viewpoint discrimination, Your Honor, I would just

17 like to briefly address the issues that have been raised about

18 the middle school.

19    First, as we read to Your Honor in the interrogatory,

20 the school is not taking the position that this speech can be

21 banned because it's lewd or offensive.

22    Second, Ms. Gillman explained to Your Honor the types

23 of materials that the administration at Ponce de Leon makes

24 available to middle school students in the form of magazines in

25 the library.

As Ms. Gillman told Your Honor, they include things like *Cosmogirl!*, *Teenage Vogue*, *Seventeen*, and *Bmx Rider*. And Ms. Gillman testified as to what's in those magazines that the administration makes available to the middle school at 11:10:58, quote, "dating, sex education stuff, style, and stuff like that." Those are the materials that the administration makes available to middle school students, but it objects to someone wearing a phrase that says "Equal, Not Special Rights."

Ms. Pipkin explained to Your Honor, at least her view, about how middle school students can handle this. And G.P., as Your Honor noted, was a mature middle schooler who easily can handle the issue of deciding what to do about these issues, perhaps more so than even some of the adults that testified before Your Honor.

The School Board would have Your Honor believe that G.P. can't handle a rainbow when she's up there making hearsay objections when counsel asked the question. She's competent to handle a rainbow.

Now, why, Your Honor, is the School Board responsible for Principal Davis' viewpoint discrimination? First, in PX-8, the Board was alerted to allegations that Principal Davis told students that being gay was wrong, and students told Your Honor that that is indeed what he did; that he had banned rainbows only when he learned of its equal rights message.

He told students not to say that, quote, "I identify

as a lesbian."  He asked students if they were gay and expressed personal objections to students being gay and lesbian.  And that's all contained in PX-8 which was submitted to the Board on September 25th.

What was the Board's response to the demand for an investigation?  It was to have a two-sentence conversation with Principal Davis as Superintendent Griffin testified to:

"Mr. Davis, did you do this?

"Nope."

That was the end of the investigation.

Your Honor, if that is not deliberate indifference, nothing ever will be deliberate indifference to being put on notice, particularly in light of all the other things that have been presented to the Board.

Superintendent Griffin was told by a parent that Principal Davis had told her that he would send her daughter to, in effect, reform school; that she would not have these gay problems if she were married and went to church.

That was told to Superintendent Griffin.  And what did he do about the allegations that are in PX-8?  Asked the question:

"Did you say it?"

Got the answer, "No."  And he moved on.

Basically what Superintendent Griffin said in cross-examination by the School Board was that the reason he

believes Principal Davis is because Principal Davis works for
him.  I wish my boss had the same standard:  All he has to do
is ask and he understands that anything that comes out of
Principal Davis' mouth is the truth.

Now, what's the evidence of the Board's deliberation,
discussion, decision-making process in order to take away
Ms. Gillman's First Amendment rights?  They got a phone call
from Superintendent Griffin, who explained what happened
according to Principal Davis, who was relying on what kids told
him; and they made the decision on that basis to ban these
symbols and phrases under the First Amendment.

They wholesale adopted Principal Davis' description of
the events of September 2007 and that is an admitted fact.  And
by adopting wholesale Principal Davis' description of events,
they thereby adopted wholesale the inadequacy of his
investigation.

The Board never asked to speak to Principal Davis.
The Board never asked to look at Principal Davis' notes.  The
Board never asked to speak to a teacher.  The Board never asked
to speak to another administrator.  The Board never asked to
speak to a student.  The Board never asked to speak to a
parent.

The Board cannot exercise its responsibility under the
First Amendment rights with such abrogation, delegation, and
abdication.

1    Your Honor, as a whole, the evidence is, is that if

2 you wish to speak at PDL, you'd better agree with what everyone

3 else has to say.  That's basically what Superintendent Griffin

4 told Your Honor.  Twenty-eight Clinton buttons and one Obama

5 button, nobody can wear buttons.  That's not the law.  And we

6 respectfully ask Your Honor to restore law to the Holmes County

7 School District and restore plaintiff Gillman's First Amendment

8 rights.

9    Your Honor, when we conclude, I would just like to

10 raise a couple of issues with Your Honor about irreparable harm

11 and some of students' fears about issues of retaliation.

12    Thank you, Your Honor.

13    MS. DINCMAN:  Your Honor, as we begin our closing

14 arguments, I want to focus on what Ponce de Leon is and some of

15 the unique features of Ponce de Leon.  It is a unique school

16 setting.  It's a combined school where we have middle school

17 and high school students put together, students as young as 11

18 years old combined with 18-year-olds.  And these students are

19 riding the bus on a daily basis with children that are in

20 kindergarten and elementary school students.  So it's a daily

21 interaction with children, running from age 6 all the way up to

22 children as old as age 18 having interaction on a day-to-day

23 basis.

24    When we look at what the school day is for students at

25 Ponce de Leon, it's not confined to the four corners of the

classroom.  Florida law and the School Board policies state
that the school day starts when students get on that school
bus, and it doesn't end until they get off that school bus or
until they leave school-sponsored activity or extracurricular
activity.

The School Board has not only the right, but really
the obligation to ensure that that school day, all part of it,
from start to finish, are safe and an orderly environment where
learning can take place.

And when we look back to September of 2007, we -- I
think it is helpful to address the law that surrounds this
issue.  And before we even had Tinker, Your Honor, we had
what's called the Blackwell/Burnside diad.  And those are the
freedom button cases, Your Honor, that came from the Fifth
Circuit.  They preceded Tinker by about two years.

And in those cases what you had was the Fifth
Circuit -- and, of course, those opinions have been adopted by
the Eleventh Circuit and are still binding precedent in this
court -- where students wore these freedom buttons to school
with a pair of hands interclasped together.  And in both
instances, Blackwell and Burnside, that was what students
presented with, a large number of students.

But the Court issued two opinions on the same day that
came to the opposite result, even though they dealt with the
same issue, freedom buttons, and the school's decision to ban

students from wearing the freedom buttons.  And what the difference was in _Blackwell_ and _Burnside_ was a focus on disruption, and that the use of the speech was accompanied with actions combined with the speech in order to create a disruption.

And I would quote from _Blackwell_:

"The District Court was presented with evidence of numerous instances where students conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with the proper decorum and discipline of the school, and disturbed other students who did not wish to participate in the wearing of the buttons.

"In the instant case, as distinguished from the facts in _Burnside_, there was more than a mild curiosity on the part of those who were wearing, distributing, discussing and promoting the wearing of buttons.  There was an unusual degree of commotion, boisterous conduct, a collision with the rights of others, an undermining of authority, and a lack of order, discipline and decorum."

And those cases are still binding, and they still are instructive to the Court in the case before it.  And I think if you take those two cases and you look at them side by side and you look at the evidence that's been presented in this case, we are far more closely aligned with the facts that were presented in _Blackwell_ than those that were presented in _Burnside_.

1	And great effort has been made to diminimize every

2	instance of conduct or mis- -- disorder and disruption that

3	students engaged in in September of 2007.  And I'll be the

4	first to acknowledge, Your Honor, that if you take and break

5	down every single yell across a hallway, or a note passed in

6	class, or students who didn't pay attention to the teacher's

7	lesson because they were consumed with their discussions about

8	gay and lesbian rights, or passing notes that said "Gay Pride"

9	or "We're going to make a petition" -- if you take each one of

10	those and you break them down in isolation and you look at it

11	by itself and say, "Well, that occurred during a free period,"

12	or, "That happened while you were at lunch," or.  "You really

13	were quieter than you would normally be," yes, you can look at

14	each one of those and say, if we look at this by itself, it

15	doesn't rise to the level of substantial and material

16	disruption.

17	But the law requires that the -- that the situation be

18	considered as a whole and that a careful review be undertaken

19	of all of the evidence in the case.  I like to think of it in

20	terms of, if you look at a computer image on a screen and you

21	pull back far enough, what it turns into is a bunch of pixels,

22	little squares of color.  And you can pull out any little

23	square of color and look at it and say, "There's no picture

24	here.  There's nothing.  This amounts to nothing."  But what

25	you have to do is go in closer, look closer, and then the

1    picture becomes clear.

2         And what the School District was presented with in

3    September 2007 was what they felt like was a substantial and

4    material disruption.

5         Now we've had a full complement of testimony over the

6    past two days regarding activities that students undertook in

7    the name of "Gay Pride" and "GP" and using the slogans and

8    rainbows, some of which are in Exhibit 2.

9         We had the testimony of C.W., who talked about more

10   than half of the school having slogans on themselves; and we

11   talked about the school being in an uproar and that it being

12   all over the school and all anybody could talk about.

13        We heard the testimony of Mr. Davis.  And yes, he did

14   rely on what children told him.  But he interviewed some 45

15   children to try to understand what he was being faced with in

16   the school.

17        And when you're in charge of a school of more than 400

18   students, it is not unreasonable to do that.  As he said, you

19   cannot be in every single place at every single moment.  You

20   cannot personally observe every single thing.  It's not

21   unreasonable for him to conduct his investigation to determine

22   what's going on in the school in that manner.

23        And a careful review of those notes and the testimony

24   of particularly the student witnesses, C.W., G.P., and C.B.,

25   showed that there was a great deal of evidence of disruption

going on at the school.  There was confirmed vandalism of the

school.  There were confrontations and verbal arguments between

students in which angry words were exchanged over the issue of

gay rights, and people were calling other people "stupid" and

telling them to "shut up" and going down into making fun of

each other on both sides of the issue, whether they were

pro-gay rights or against gay rights.

There's evidence coming from a teacher whose class was

disrupted for ten minutes, and she had to get ugly in order to

restore order to the classroom; and both from G.P. and from

C.B., that the activities that were happening outside of the

classroom bled into the classroom, and that children's

attention was diverted away from their lessons due to the

issue.  Even if the teachers did not directly perceive what was

going on, it doesn't change the fact that it was going on.

There's -- you heard both of G.P. and C.B. testify

that they were rude and -- to other students in expressing

their views, and that they were disruptive.  They both felt

like that they had in fact disrupted school, and that the

punishment that they were given was deserved.

You have evidence of students writing all over their

body.  I think it is important to note that the manner in which

this has been requested and presented is not just that these

slogans would be worn on T-shirts or an armband.  Students are

asking to come in and write this all over their bodies, all

1    over their foreheads, to tattoo it on themselves.

2           That in and of itself, without regard to what it may

3    say, what the message may be -- fill in the blank, it could be

4    any message.  To have students sitting in the class and walking

5    around the school with things written all over their bodies and

6    their foreheads when that is not something that's allowed on a

7    regular basis at Ponce de Leon for any message -- something

8    that's reserved only for pep rallies or special occasions -- in

9    and of itself is going to be disruptive to the school system.

10          THE COURT:  Why?  Why is a rainbow on your forehead

11   disruptive?

12          MS. DINCMAN:  Because of the reaction that it will

13   engender in the other students.  If -- if Your Honor grants

14   relief in this case and students show up on Monday morning with

15   their bodies covered in rainbows and on their foreheads, that

16   is going to probably bring a shutdown on the school.

17          I -- I am doubtful that the students will react in

18   what Ms. Pipkin called a mature and professional manner when

19   we've seen that there were reactions of vandalism and yelling

20   and confrontations between students.  And that there will be

21   reaction to that that is negative across the board.

22          THE COURT:  Are you telling me that there will be

23   chaos if the plaintiff prevails?

24          MS. DINCMAN:  I believe so, Your Honor.  I think there

25   will be chaos.

1    THE COURT:  And the school cannot be prepared for it?

2    MS. DINCMAN:  You know, I think that that's a very

3    challenging issue.  And I think that that's a very good point

4    you raise, Your Honor, what will happen if this is allowed and

5    how is this -- how exactly is this going to be presented?

6    Because we may find ourselves back here if widespread

7    chaos breaks out at Ponce de Leon because the School District

8    is going to have to do something in order to deal with it.

9    And I don't -- I don't stand here today and pretend to

10   have the solution to that or to know exactly how they can or

11   will respond to it.  But I'll tell you this, it's a very real

12   fear, a very real concern, that that is exactly what will

13   happen if the relief that is asked for in this case is granted.

14   And I will say that there's evidence that students

15   were angry over a perception of what amounted to a false rumor

16   that the -- that the principal had suspended a student for

17   being gay.  And that they took action to rail against the

18   administration in the name of gay rights, using some of the

19   symbols and slogans that are presented in Exhibit 2 of this

20   case.

21   There's evidence that students were planning to stand

22   up and shout and walk out of an assembly.  Now, it didn't

23   happen.  It didn't occur.  But it's clear in the law that --

24   and I'm referring to West v. Derby Unified, that opinion, that

25   the school system does not in fact have to wait for actual

disruption to occur; they can be proactive and take action to prevent it.

And that's exactly what happened in this case, as Principal Davis testified, when he got information that a walkout was being planned. When Ms. Hicks came to him and told him what was going to happen that afternoon, that he took swift action to try to prevent it and was successful in it.

It doesn't somehow minimize or take away from the fact that that was in fact a planned disruption and, absent his intervention, it probably would have occurred. We can't say that it wouldn't have occurred. It was certainly planned; and the plan that students had was to be disruptive, was to stand up and walk and yell and walk out of a planned and scheduled school assembly.

That goes to satisfying the School District's burden in meeting the Tinker analysis.

I want to talk about the age component of this analysis too. And we rely on two -- two cases to say that it does in fact make a difference that these -- this is a school that is made up of middle school and high school students with daily interaction with elementary school students.

I point to the Heinkle v. School Board opinion at 194 F.App. 604, 610. That's an Eleventh Circuit opinion from 2006 where a middle school student wanted to disseminate pro-life literature to her classmates who ranged in age from 11 to 14.

And the school curriculum didn't address birth control and abortion.

And the testimony of a teacher was, "We don't discuss abortion in a school setting because it's a very emotional issue that creates some anger, polarizes a class, and becomes disruptive to the educational setting."  And taking that into account, the Court was persuaded that those concerns were valid and upheld the ban as applied.

It's not much of a stretch -- in fact, it's not a stretch at all -- to go from Heinkel to the case that's presented here, that this issue as it's presented is an emotional issue.  We've seen evidence that when this became an issue in the school in September 2007 that there was anger between students.  And that was confirmed again by Mr. Davis on the stand yesterday, and today by the testimony of G.P. and C.B. describing arguments and confrontations that occurred between the students, and that it can polarize a class and become disruptive to the educational setting.  Those same principles come into play here.

We also rely on the Walker-Serrano ex rel. Walker v. Leonard, 325 F.3d 412 (3rd Cir. 2003).  And the Court in that case -- it's a case where a young woman, she's an elementary school student, was circulating a petition related to the circus' treatment of animals and objecting to the circus' treatment of animals.  And she was doing that in class.

1     She did that in one class.  And the Court found that

2  where students were broken away from their classwork and came

3  over to look at what <u>Walker-Serrano</u> was doing, that that pulled

4  away from class time and was enough of a disruption to satisfy

5  the <u>Tinker</u> standard.  And they found that that was so in the

6  context of the unique school setting when you have younger

7  students.

8     Now, granted, we don't have -- I mean, the students at

9  PDL are not elementary school students.  But they come into

10 contact with elementary school students on a daily basis.  And

11 they're not just high school students.

12    Yes, Ms. Gillman is 17 years old, but it is not -- we

13 can't look only at Ms. Gillman in this case.  We have to look

14 in the context of the larger community at PDL and the realities

15 of life for these students that go there, including the reality

16 that they're going to be riding on a bus every day with

17 students who are kindergarteners.  Combined with evidence in

18 2007 there were young women wearing shirts in the name of "Gay

19 Pride," or at least that's what they purported to be, that had

20 very lewd and offensive slogans on them.  And those students

21 are still there.

22    I think that the school meets its burden in terms of

23 establishing the potential for substantial and material

24 disruption.

25    And I would say also, Your Honor, that the law doesn't

require -- the Tinker standard does not require that the School Board has to be able to predict with 100 percent certainty that disruption will occur.  They're allowed to look back to what happened in the past as a valid predictor of what may occur in the future.

And courts generally give deference to the -- to the opinion and the interpretation of the administration.  They're loathe to go behind what the school system is doing and the school system's belief that there will be disruption in a given setting.  And so the School District does not have to wait for actual disruption to take action.

Also, Your Honor, I think an important distinction needs to be made.  You know, certainly, Tinker is the analysis that sets forth the standard; but Tinker was arising in the context of, well, they said a pure speech claim.  It was a student who was wearing -- or students who were wearing black armbands, nothing more.

Tinker was a case where there was no disruption other than the wearing of the armband that was presented.

And in this case we don't have that.  We're not living in the vacuum of a student who just came and said, "School Board, I would like to wear certain symbols," and the School Board said, "No, we are not going to allow that."

We're looking in the context of actual disruptions that occurred that the School District had to deal with, and

1   that it would take into account --

2          THE COURT:  Ms. Dincman, wearing a black armband in

3   December 1965 was a minority unpopular position in the United

4   States.  That was when Vietnam was just getting started and the

5   American involvement had started really just months before.

6   Those were fighting words back then.

7          MS. DINCMAN:  And, Your Honor, I don't take anything

8   away from that.  But the actual wearing of it, it was -- it was

9   not -- students were not, in <u>Tinker</u>, coming forward with

10  disruptive behavior.  They were not taking that armband and

11  combining it with action on their part, although the armband

12  had great significance in the cultural context that was going

13  on at that time and the controversy that was dividing the

14  country.

15         THE COURT:  A lot of people interpreted it as

16  treasonous.

17         MS. DINCMAN:  And I understand.

18         THE COURT:  That's probably a far more grievous sin

19  than what is alleged here.

20         MS. DINCMAN:  Well, but in this case, Your Honor --

21         THE COURT:  I mean, I don't want you to blow off

22  <u>Tinker</u>.

23         MS. DINCMAN:  Oh no, not by any -- no, no, that's not

24  at all what I'm saying.

25         THE COURT:  I'll give you some historical background

1   on that, having --

2          MS. DINCMAN:  That's not at all what I'm saying, Your

3   Honor.  I'm just saying that there are differences -- there are

4   distinctions.  I'm not trying to disavow Tinker in any way or

5   take away from Tinker; that is not at all what my intention is.

6   Tinker is the standard and we embrace that standard and contend

7   that we have met that standard.

8          But in this case, students were taking tangible

9   action; they were taking the speech and combining it with

10  additional tangible action, disruptive action, and making plans

11  to disrupt the school system.

12         THE COURT:  Why not just punish the misbehavior and

13  not totally ban 16 statements or comments?  And I think, you

14  know, what, do they mention the word "gay" six times and then

15  the rest of it is just the King's English.

16         MS. DINCMAN:  Well, Your Honor, there are cases

17  where -- and the one that comes to mind are cases where a

18  student wears long hair to school and it engenders a negative

19  reaction from the other students.  And the school

20  administration says, "Well, you've got to cut your hair because

21  people are having a negative reaction," and you're punishing

22  the one who wears the long hair who is the speaker.

23         But in this case that -- I would say that that would

24  be an accurate analysis if we didn't have going hand-in-hand

25  with the disruptions that occurred in September of 2007.  If

1  we --

2          THE COURT:  How do we know --

3          MS. DINCMAN:  If we have, in addition --

4          THE COURT:  Time out, ma'am.

5          MS. DINCMAN:  Sorry.

6          THE COURT:  How do we know that the graffiti and the

7  other, I think, serious misconduct was due to what these

8  children were going to wear on their clothes or their body and

9  not the indignation that, you know, got out of control with

10  inaccurate information or rumor:  First, that a minister was

11  going to come and speak and condemn homosexuals; and second,

12  the rumor that the principal had suspended somebody for

13  being -- because they were homosexual?

14          I mean how -- how do we sort it out?

15          MS. DINCMAN:  Well --

16          THE COURT:  I mean, you can understand why either of

17  the other two could upset some people.

18          MS. DINCMAN:  I'll tell you how we sort it out, Your

19  Honor.  I do think that in large part students were reacting to

20  perception that a student had been suspended because she was

21  gay, when in fact -- or one or more students, although that

22  turned out to be false.  And a false perception that a speaker

23  was coming to be -- talk about why it was wrong to be gay.

24          But what students did is they then rallied around

25  these symbols and slogans and they used those symbols and

slogans as not only a way to express support for gay rights,
but it combined and tied in with defiance toward the
administration.

I'm saying that during that time it became part and
parcel.  They became tied together.  And the symbols and
slogans themselves are not just standing for an expression for
support of gay rights; they've taken on a different meaning at
Ponce de Leon because of what happened in September 2007.  And
you can't take it apart and tear it away from that anger at the
administration.

And I would posit to you that the symbols and slogans
at issue in this case still represent that.  They're not just
an expression of support for gay rights.  They also constitute
anger and defiance toward the administration.  And we believe
that that's exactly how they're going to be used again; and
that they have, because of what happened, become tied up
inexorably.  The anger and defiance at the administration has
become tied up inexorably with these symbols and slogans, and
you're going to have the exact same thing occurring again at
Ponce de Leon that you did before.

THE COURT:  Isn't that a matter for education and
leadership and guidance rather than banning?

MS. DINCMAN:  Well, you know, that's a tough question,
Your Honor.  And it's a tough question because the School Board
is in a position where they reasonably believe that they have

1    to take some action.  You can understand the Catch-22 that they

2    find themselves in if this comes in, and let's say on Monday

3    morning these students are allowed to come in with all of this,

4    and widespread fights break out.  They've put themselves in a

5    precarious position if they don't try to take action to prevent

6    that.

7         THE COURT:  Well, why is this not, what you are just

8    saying, exactly what <u>Tinker</u> says when it speaks about -- I am

9    quoting -- "undifferentiated fear or apprehension of

10   disturbance"?  I mean --

11        MS. DINCMAN:  And the reason that it's not, Your

12   Honor, is because it's supported by actual disruption in the

13   past, and they have a reasonable belief that that disruption is

14   going to occur again in the future.

15        It's not -- it's not as if they had received a letter

16   and said, "H'm, I'm just afraid of what's going to happen.

17   H'm, that's a controversial issue.  I just -- I just think

18   that -- I don't know if we'll be able to deal with this."  They

19   have a past experience in dealing with that, Your Honor, and

20   that's -- that's why it is different.

21        And so, you also have to take into consideration, Your

22   Honor, the information that the Board had at the time that it

23   made its decision.  You can't look back through time and say

24   that we now have perfect information.  You have to look at what

25   the School Board knew and how this was presented to them.  It

1    came to them --

2         THE COURT:  Well, your opposing counsel said the

3    superintendent reported to the Board essentially, "I called the

4    principal, the principal said it didn't happen."  And that was

5    as far as the inquiry went.

6         MS. DINCMAN:  And I would be pleased to address the

7    viewpoint discrimination claim and the reasons why the

8    plaintiff cannot meet its burden of showing that there has been

9    a ratification or deliberate indifference on the part of the

10   School Board.

11        And, you know, the evidence -- the uncontroverted

12   evidence is that the School Board asked Steve Griffin to look

13   at this, and that he did contact Mr. Davis and ask him to

14   explain.  And Mr. Davis had denied it.

15        And -- but you have to take that in the context of

16   Mr. Davis' regular reports to Mr. Griffin about what had

17   happened.  And you have to look at it in terms of the -- the

18   superintendent not having any reason to go behind his

19   administrator at that point and his -- it's reasonable for him

20   to believe and to trust what his administrator is telling him

21   given the realities of his job.

22        The law is very clear that for deliberate

23   indifference, it's not -- it's not just what you may take issue

24   with as an inadequate investigation.  Let's just say for the

25   sake of argument that it was an inadequate investigation.

1    There is authority in the law repeated over and over again

2    where courts have said that it has to be -- that a mere

3    negligent investigation or in many cases failure to investigate

4    altogether does not rise to the level of deliberate

5    indifference.

6         The U. S. Supreme Court has characterized deliberate

7    indifference as a stringent standard.  It goes beyond mere

8    negligence, it goes beyond gross negligence either -- even.

9         In the constructs of Section 1983 law, and Section

10   1983 analysis, which apply to the viewpoint discrimination

11   claim, do not go very far to insulate the School Board from

12   what may be a unconstitutional act on the part of one of its

13   subordinate employees.

14        And the case that I'm citing to about the stringent

15   standard of fault, requiring proof that a municipal actor

16   disregarded a known or obvious consequence of his action or

17   inaction is Board of County Commissioners v. Brown, 520 U. S.

18   397 (1997).

19        What this circuit has said is the controlling factor

20   is that the plaintiff has to allege and prove at trial -- and I

21   would remind you that this is the plaintiff's burden and we

22   submit they have not satisfied this burden -- is that the

23   School Board was objectively aware of a risk of serious harm,

24   that they recklessly disregarded the risk of serious harm, and

25   that the conduct was more than merely negligent.

1        Even if the Court takes issue with the

2    investigation -- the quality of Mr. Griffin's investigation

3    into what Mr. Davis did or said in the confines of his office

4    talking to students, you have to look at what information the

5    Board had when it made that decision to see that they were not

6    objectively aware.

7        They had one letter that had been received, and that

8    letter made a demand that they take action before the close of

9    business that day.  That was what they were presented with,

10   one -- one letter.

11       And the School Board -- you haven't heard any

12   evidence, the plaintiff has not put any of the School Board

13   members themselves on to discuss what their motivation was or

14   what they knew or what they didn't know.  The only evidence

15   that you have is that the School Board asked Mr. Griffin to

16   look into it.  He called Mr. Davis.  Mr. Davis denied making

17   those things.  And Mr. Griffin conveyed that back to the School

18   Board.

19       You take issue with that as the -- as the poor quality

20   of investigation, but that is not enough to bring it up to the

21   level of deliberate indifference.

22       And the seminal case on that issue is from the U. S.

23   Supreme Court in City of St. Louis v. Praprotnik, which holds,

24   and I quote:  "The mere failure to investigate the basis of a

25   subordinate's discretionary decisions does not amount to a

1   delegation of policymaking authority, especially where the

2   wrongfulness of the subordinate's decision arises from a

3   retaliatory motive or other unstated rationale."

4           And there's other cases.  Davis v. Williams.  And I

5   have a Lexis citing, 2006 U. S. District, Lexis 88126, a Middle

6   District of Florida opinion from December of 2006.

7           And DeSpain v. Uphoff, 264 F.3d 965, a Tenth Circuit

8   opinion involving an investigation -- a case where there was a

9   lack of investigation or a negligent or poor investigation.

10  And the Court said that it entails something more than mere

11  negligence.

12          They also have to show that it would lead to the known

13  or obvious conclusion that banning these symbols or slogans

14  would result in a violation of plaintiff's constitutional

15  rights.  And we have to take that -- when you look in terms of

16  whether it would result in a known violation of plaintiff's

17  constitutional rights, you still go back to the disruption; you

18  look at the disruption that occurred in September of 2007.

19          And even where -- let's say for the sake of argument

20  that Mr. Davis did make inappropriate or unconstitutional

21  comments about his personal views to students other than

22  Ms. Gillman, that is not a basis to find deliberate

23  indifference where there's material and substantial disruption

24  that occurred independent of any alleged personal view that

25  Mr. Davis may have held -- have held or communicated to

1    students other than the plaintiff.

2          And in this instance, anger at Mr. Davis -- for

3    whatever reason, whether it's true or perceived, and based on

4    falsehoods -- does not give students a free card, a blank

5    check, if you will, to go and begin materially and

6    substantially disrupting the educational process at Ponce de

7    Leon High School.  It simply does not.

8          Finally, Your Honor, addressing ratification.  The

9    school has to know of the subordinate's retaliatory motive, and

10   they have to adopt wholesale the retaliatory motive.  Now,

11   there is evidence here that the School Board relied on

12   Mr. Griffin to look into this and that the information that the

13   School Board had came from Davis' notes.  There is not -- and

14   the record is -- the evidence in the record is uncontroverted

15   that the School Board had any knowledge of any impermissible

16   motivation on the part of Mr. Davis.

17         At the heart and crux of this is plaintiff's argument

18   that Mr. Davis was motivated wholesale by anti-gay animus in

19   the actions that he took against students.  There is no

20   evidence in this record that he ever communicated any of his

21   personal feelings or any personal animus to Mr. Griffin or to

22   any member of the Board.  He said, "I didn't at any point talk

23   to any member of the Board about this, about what my personal

24   views were.  I haven't talked to them about this at all and I

25   wasn't consulted in the decision."

1    And under those circumstances, and under the existing

2    law in this circuit, you cannot find ratification on the

3    viewpoint discrimination claim.

4    And so with that, Your Honor, we respectfully ask you

5    to enter judgment in favor of the School Board.

6    THE COURT:  Mr. Beeney, rebuttal?

7    MR. BEENEY:  If I may, Your Honor, just a couple of

8    minutes.  A couple of disjointed subjects, Your Honor.

9    Your Honor, to say that Henkle has any resemblance to

10   this case at all is not to know Heinkle.  And I would like to

11   hand up to Your Honor the complaint that was filed in Heinkle

12   which had the materials that were supposed to be distributed to

13   middle schoolers which include things like -- the

14   abortionist -- this is a quote.  And it's got a diagram.  "The

15   abortionist jammed scissors in the baby's skull.  The scissors

16   are then opened to enlarge the hole."

17   THE COURT:  I read the copy that you had in your

18   exhibits.

19   MR. BEENEY:  Thank you, Your Honor.

20   Again, to say that this case is like Heinkle is -- you

21   know.

22   And, Your Honor, as to the fact that these symbols

23   allegedly have taken on another characteristic and to complain

24   that there's going to be chaos should Ms. Gillman prevail, you

25   know, I don't want to be flippant but it really does remind me

1    of the story about the child who kills his parents and then

2    asks for mercy because he's an orphan.

3         We're here not because of something that Ms. Gillman

4    did, but we're here because the School Board denied her the

5    right to express her rights under the Constitution.

6         And as to whether these symbols have acquired some

7    other -- some kind of meaning, well, I'm not a principal,

8    although I taught for a while.  But if there's a rumor going

9    around a school that you have suspended a child because she is

10   gay, if anybody created any kind of secondary meaning to these

11   symbols, it was Principal Davis, whose reaction to that rumor

12   was, instead of dispelling it and say, "You're right, nobody in

13   their right mind would ever do that," he brought kids into his

14   office, took out his notebook in front of them, asked them if

15   they were gay, wrote down the names of everybody who had "Gay

16   Pride" on their hands.  Apparently, there's uncontroverted

17   testimony that he lifted up children's shirts to see if they

18   had written on their stomach.

19        I mean, if that's not pouring gasoline on the fire to

20   create some secondary meaning here, it's their responsibility.

21   This is not Ms. Gillman's responsibility.  If there's any kind

22   of secondary message about school authority that's embodied in

23   these symbols, that is laid squarely at the feet of the

24   defendants.

25        Tinker, Your Honor, I just did neglect to note

something I wanted to earlier, which is Mary Beth Tinker was a
13-year-old at the time that she petitioned for relief.  So
this was a very hotly-contested issue in the setting of a
middle school.  And certainly, if middle schoolers are able to
handle the questions of patriotism and the death of service
people and all the other things that were wrapped up in the
Vietnam War, certainly the students that testified from that
witness stand are able to handle "Equal, Not Special Rights."

A couple of other things, if I may, Your Honor.

You know, as to this deliberate indifference, you
know, whatever it means, the School Board can't say, "We're not
subject to a deliberate indifference claim because we stuck our
head in the sand and paid no attention to anything."  And that
basically is the evidence that's in front of Your Honor about
what the School Board did.

The School Board, through Exhibit 8, was put on notice
that Mr. Davis called students into his office to tell them
that it's wrong to be gay; that gay and lesbian students may
not be open about their dating relationship; that when told
that rainbow colors conveyed a message of support for the
rights of gay and lesbian students, Mr. Davis forbade students
to wear any rainbow garment.

Going onto the second page of Plaintiff's Exhibit 8.
He, meaning Davis, asked some of them to reveal their own
sexual orientation and that of the other students, expressed

his personal objection to students being gays and lesbians, and
again prohibited statements of support for equal treatment of
gay and lesbian students, including rainbow-colored clothing.
And the letter went on to demand an investigation.

Now, what other evidence did the Board have in front
of it?  The evidence that the Board had in front of it was
Mrs. Cottle coming to Superintendent Griffin, as she testified
today.  You didn't hear Superintendent Griffin deny it.  What
she told Superintendent Griffin was not only problems with M.
at school that weren't being handled because students were
referring to M.'s anatomy but also that Superintendent --
sorry -- that Principal Davis had told Ms. Cottle that she
wouldn't be having these gay problems if there was a man in her
house and if she sent her daughter to church.

Now, that's the information that the School Board had
in front of it.  And what was its reaction?  Nothing.  It went
to Principal Davis and said, you know, "Did you do it?"

And he said, "No."

Now, you know, an issue about that.  Your Honor, the
School Board presented to Your Honor a couple of witnesses,
students, that they, I assume, submitted to ask Your Honor to
believe them.  They testified that Principal Davis asked them
the very things that are in Plaintiff's Exhibit 8.

There is no way of getting around it.  Either
Principal Davis is lying or those students on the witness stand

were lying.  The School Board put them up there for Your Honor to believe them.

Now with all of this evidence in front of Superintendent Griffin, it is indeed deliberate indifference to simply conduct an investigation by saying to Principal Davis, "Did you say these things?"  Have him say, "No."

And what's the basis for that being a sufficient investigation according to Superintendent Griffin?  "He's one of the people I rely on, so whatever he says has to be the truth."

That is not an adequate investigation under the law. If it was, nobody would ever be held to any kind of lawful standard.

Your Honor, just two final issues.  The Supreme Court in Elrod v. Burns at 427 U. S. 373 stated that, "The loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury."

Every day that goes by until school closes at PDL on June 4th, I believe, constitutes an irreparable injury to Ms. Gillman's First Amendment rights.

I certainly am not in a position to ask Your Honor to do anything, but we would plead with the Court with respect to restoring her rights as we possibly can.

The one -- the one final issue, Your Honor, is that we've spoken to a number of students.  We were prepared to put

a number of additional students on the stand. And the one

thing that we have heard -- and I have no independent basis, I

guess other than what I've observed at trial to substantiate

this -- but those students are concerned about retaliation for

their participation in the case. And I would just like to ask

through Your Honor some representation from the defendant that

under no circumstances is that going to occur.

Thank you very much, Your Honor.

THE COURT: All right, this case presents issues that

are obviously of great concern to any community, and I would

recognize in Holmes County. It's a matter of the issue of

homosexuality, the issue of relatively young children. And I

can understand that to many people that would seem to be an

issue that needed no discussion, that they simply should not be

mentioned in the same breath. And we're talking about students

in middle school and high school.

But I don't think this case -- and I find, that it is

not about the promotion or sanctioning of homosexuality; that

the activity that the plaintiff undertook was to seek the equal

and fair treatment of her homosexual friends.

The speech that is in question, that is Exhibit 2, are

certainly not sexual in meaning. To say that "God Loves Me

Just the Way I Am," to find a sexual connotation in that, I

think just can't be made.

The word "gay" appears a total of six times. Two of

the symbols with the spectrum of the rainbow, it's hard to drive across town without seeing that on the bumper of a car in front of you, and I doubt that this was the first time that these young people had ever seen that.

And I think there were separate issues here, that the evidence established. There was a reaction by the students to two other real or imagined events that really should not have a bearing on this question of the propriety of the banning of this speech. The first was the rumor that a minister would be speaking at the school against homosexuals, and the second were reports, rumors, amongst the students, that the principal had condemned homosexuality, that he may have injected his own religious beliefs into the school, and that he had suspended a student for being homosexual.

I think there was substantial evidence that the vandalism, which consisted of some spray painting, or painting of graffiti; and some disorder -- the most precise description of that disorder were loud voices in the corridors during a change of classes; and a period of about ten minutes of disruption in a class one morning before that teacher, who did not testify, got the matter under control. And I don't think that it is more reasonable to attribute that vandalism and disorder to a reaction against the plaintiff's speech than it is to the indignation that apparently spread through the school about the rumor about the minister which prompted the plan for

1   the students to walk out in protest, and also the rumor that a

2   homosexual student had been expelled because of their sexual

3   preference.

4           I think a more reasonable perception of much that was

5   said about the claimed interruption and disorder was really

6   much the usual background noise of a middle and high school.

7           And I did not hear any evidence of any effort by the

8   defendant to deal with this fear of disorder or interruption by

9   any other reasonable means less drastic than banning the speech

10  and suspending the students who were promoting that speech.

11          And this probably had an opportunity, as the courts

12  have pointed out, in the learning environment of schools, where

13  not just comfortable issues are to be learned or debated, that

14  this would have been an opportunity for leadership, it would

15  have been an opportunity for understanding and an opportunity

16  for civil discourse and a learning opportunity about tolerance

17  and diversity.  Unfortunately those opportunities were missed.

18          Some concern or argument was made yesterday,

19  starting -- and I was concerned about it -- that because of the

20  consolidated nature of the high school and the middle school

21  and the near proximity of the elementary school, and perhaps

22  the students of all ages riding the buses, that somehow this

23  speech in question became more out of bounds, and more

24  justified the banning by the school.

25          And nobody has provided me any cases that really deal

with this question of how young is too young.  The plaintiff's

counsel has certainly pointed out in <u>Tinker</u> that plaintiff was

13 years old who wore the black armband.

We had the three young women testify, the plaintiff,

and two young women today, and I was particularly impressed

that notwithstanding their nervousness and probably justifiable

fright at being in a federal courtroom, how poised they were

and how they were -- had become so interested in this very

controversial topic in our society, and quite frankly, I

thought that they were far more insightful and more articulate

than I would have expected for their years.

So I don't really find that there has been some

showing that there was going to be some interruption or

disruption that warranted a ban just because of the age of

these children.

This speech certainly -- I think, even the principal

acknowledged that -- had trouble with arguing that these

somehow had a sexual connotation or promoted the practice of

homosexuality.

I find that the core message here is that of tolerance

and fairness, and that the issue of sexual preference is really

not the thrust of the argument.

But this has certainly been an issue for a number of

years all across the country.  Some states have addressed it

with laws.  Certainly any number of state legislatures have

debated this issue vigorously.  As we know, it's an issue now
in Florida.  Some of the Supreme Courts of other states have
taken the lead in dealing with this issue.  In short, this is
not a taboo issue.  It's an issue that I think we encounter on
close to a daily basis.  And to the extent that it is less
taboo or more tolerated and accepted now, as I mentioned
earlier today, you simply have to look at the popular
television shows of recent years, the situation comedies in
which on several -- some of the main characters are identified
as openly homosexual, but basically living responsible lives.

        I was concerned that the -- when the ACLU wrote the
School Board, I think it really gave a pretty clear notice of
the contentions about the problems.  But I was particularly
concerned about the School Board's response.  I don't know
whether he was the author of this strange notion about a secret
organization or secret society; he really gave very short
acknowledgment, almost a bump-and-run, to the requirements of
Tinker and Holloman.  I don't know if that is where this case
got off track.  I think the School Board may have taken a
different direction in this case and responded differently
perhaps with wiser counsel.

        And as far as the concern about further discord or
interruption that might be attributable to the 16 phrases and
symbols, if you look at what Tinker and Holloman say about
that, it's sort of a guess.  It's certainly -- I really heard

no real basis from the principal to warrant his fear that chaos was imminent.  In fact in <u>Tinker</u>, the Court noted that the trial court had sort of agreed with the school authorities in banning the armbands, and they said it was because of their fear of a disturbance from the wearing of the armbands.  "But, in our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right of freedom of repression."  It said, "Any departure from absolute regimentation may cause trouble.  Any variation from the majority's opinion may inspire fear.  Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance.  But our Constitution says we must take this risk; and our history says it is this sort of hazardous freedom, this kind of openness, that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious society."

        The Court went on then and said, "In order for the state in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint.  Certainly where there is no finding and no showing that engaging in the forbidden conduct

1    would 'materially and substantially interfere with the

2    requirements of appropriate discipline in the operation of the

3    school,' the prohibition cannot be sustained."

4          Now I find that the speech/conduct in this case, would

5    not materially and substantially interfere with the

6    requirements of appropriate discipline in the operation of the

7    Ponce de Leon school.  And I think the record, as in <u>Tinker</u>,

8    "fails," and I am quoting "to yield evidence that the school

9    authorities had reason to anticipate that the wearing of the

10   armbands would substantially interfere with the work of the

11   school or impinge on the rights of other students."

12         <u>Tinker</u> cited Justice Brennan in the <u>Keyishian vs.</u>

13   <u>Board of Regents</u> case.  He said, "The vigilant protection of

14   constitutional freedoms is nowhere more vital than in the

15   community of American schools.  The classroom is peculiarly the

16   'marketplace of ideas.'  The Nation's future depends upon

17   leaders trained through wide exposure to that robust exchange

18   of ideas, which discovers truth out of a multitude of tongues,

19   rather than through any kind of authoritative selection."

20         They said, "The Constitution says that Congress (and

21   the States)" -- this is the First Amendment and the

22   Fourteenth -- "may not abridge the right of free speech.  This

23   provision means what it says."

24         While many people, perhaps the Holmes County

25   community, disagree with the plaintiff, but I hope they will

keep in mind that this is one of the most fundamental

constitutional rights, that of the freedom of speech, and that

we are not making up the law today.  This law has been long

settled by the United States Supreme Court for almost 50 years.

I find that the investigation conducted by the School

Board through its superintendent was so deficient that it was

the equivalent of no investigation at all.  I would have

expected a detailed report on all issues raised by the ACLU

September 25th letter.

As I understood the testimony from the superintendent,

he was basically told, look into this; he called the principal;

the principal said it didn't happen.  And that was his report

back to the School Board.  No one else was interviewed.

I find that the plaintiff has properly proved the

allegations of the complaint and that the relief requested

should be granted.

Counsel, I will afford you an opportunity from --

Friday of next week to submit anything to me that would warrant

amending the relief, so that it is proper, but in the meantime,

I do declare that the defendants have violated the plaintiff's

rights protected under the First and Fourteenth Amendments of

the United States Constitution; that the defendants, their

officers, agents, affiliates, subsidiaries, servants, employees

and all other persons or entities in active concert or privity

or active participation with them are permanently enjoined from

restraining, prohibiting or suppressing the plaintiff or any

other student within the Holmes County School District from

expressing their support for the respect, equal treatment and

fair acceptance of homosexuals.  And this includes, but is not

limited to, the phrases and symbols which appear on Exhibit 2,

which is before us now.

I find that the argument raised by defendants about

illegal organizations or secret societies is impermissibly

vague as applied to the plaintiff and to the activities which

have been proscribed by the defendants.  And the enforcement of

the defendants' policies concerning expression related to

illegal organizations or secret societies as applied to the

plaintiffs is enjoined.

Defendants are ordered to take such affirmative steps

necessary to remediate the past restraints of expression of

support for the respect, equal treatment and acceptance of

homosexuals, including, but not limited to, notifying in

writing the Ponce de Leon High School student body, and the

middle school students, and school officials within the Holmes

County School District, that students are permitted to express

support for, respect, equal treatment and fair acceptance of

homosexuals pursuant to reasonable time, place and manner

restrictions that do not substantially interfere or disrupt the

missions of the schools.

The defendants, their officers, agents, affiliates,

1    subsidiaries, servants, employees, and all other persons or

2    entities in active concert or participation or privity with

3    them are enjoined from taking retaliatory action against

4    plaintiff for bringing this lawsuit or against any students for

5    their past or future expressions of support for the respect,

6    equal treatment and fair acceptance of homosexuals.

7           The clerk is directed to enter judgment for plaintiff

8    against the Defendant School Board for nominal damages of one

9    dollar.

10          The parties are to address the issue of attorneys'

11   fees and costs in the manner prescribed by the local rule of

12   the Northern District of Florida, which essentially requires

13   that you first attempt to work it out by agreement, and if that

14   is not successful, that you then follow the procedure to bring

15   it for my determination.

16          And I will retain jurisdiction of this case to enforce

17   the terms of these orders.

18          Counsel, are there any questions?

19          MS. DINCMAN:  No, Your Honor.

20          THE COURT:  Anything further that we need to consider?

21          MR. BEENEY:  Your Honor, just on behalf of plaintiff,

22   Ms. Gillman, and her mother, and on behalf of myself and my

23   co-counsel, I just want to thank Your Honor for your patience,

24   guidance and wisdom.  Thank you.

25          THE COURT:  All right.  Ms. Dincman, anything further?

1    MS. DINCMAN:  No, Your Honor.  We appreciate the

2  Court's time and consideration, and I can assure you that every

3  effort will be made by the Holmes County School Board to comply

4  fully with the terms of your order.

5    THE COURT:  Well, I think there was some wisdom said

6  here by one of the witnesses, it was what one of their family

7  members said, "Words don't hurt."  That's kind of what the

8  First Amendment is all about.  Thank you all.

9    **(Proceedings concluded at 3:08 p.m.)**

10

11    **\*\*\*\*\*\*\*\*\*\***

12    I certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15  **S/Lisa Girod Jones**

16  _____          _____
   LISA GIROD JONES, RPR, RMR, CRR                Date
17  Official Court Reporter

18

19

20

21

22

23

24

25

1                                    INDEX

2       **WITNESSES FOR THE PLAINTIFF**                      **PAGE**

3       TERESA COTTLE
            Direct Examination By Mr. Beeney              3
4           Cross-Examination By Mr. Freeman             12

5       STEVEN EARL GRIFFIN
            Direct Examination By Mr. Stevenson          22
6           Cross-Examination By Ms. Dincman             55
            Redirect Examination By Mr. Stevenson        73
7           Voir Dire Examination By Ms. Dincman         75
            Redirect Examination (Continuing) By Mr. Stevenson   76
8
        GLORIA PIPKIN
9           Direct Examination By Ms. Holzer             79
            Cross-Examination By Mr. Spellman            83
10          Redirect Examination By Ms. Holzer           90

11      **WITNESSES FOR THE DEFENDANT**                   **PAGE**

12      G.P.
            Direct Examination By Ms. Dincman            92
13          Cross-Examination By Ms. Miller             116
            Redirect Examination By Ms. Dincman         132
14
        C.B.
15          Direct Examination                          140
            Cross-Examination By Ms. Sun                153
16
        **CLOSING ARGUMENTS**
17          By Mr. Beeney                               162
            By Ms. Dincman                              178
18          By Mr. Beeney                               200

19      **MOTION**                                       **160**

20      **PLAINTIFF'S MOTION FOR JUDGMENT**              **160**

21      **DEFENDANTS' MOTION FOR JUDGMENT**              **160**

22      **COURT'S RULING**                               **161**

23      **COURT'S RULING**                               **205**

24      **CERTIFICATE OF REPORTER**                      **215**

25

217

| | PLAINTIFF EXHIBITS | |
|---|---|---|
| **NO.:** | | **RECEIVED** |
| 6 | Holmes County School District Policy 5.30 | 29 |
| 7 | Holmes County Code of Student Conduct | 28 |
| 8 | Letter to Holmes County District School Board 9/12/07 | 46 |
| 13 | Davis' handwritten and typed notes | 162 |