**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

HEATHER GILLMAN, through next
friend and mother, Ardena Gillman,

      Plaintiff,

vs.                                                  CASE NO. 5:08cv34-RS-MD

SCHOOL BOARD FOR HOLMES
COUNTY, FLORIDA,

      Defendant.
_____/

## <u>OPINION AND ORDER</u>

    The question presented is whether a public high school may prohibit students from wearing or displaying t-shirts, armbands, stickers, or buttons containing messages and symbols which advocate the acceptance of and fair treatment for persons who are homosexual.

## I.  Background

    Plaintiff Heather Gillman, through her mother, Ardena Gillman, has sued Defendant School Board for Holmes County, Florida, alleging that the School Board has deprived her of her right to free speech and political expression and has engaged in viewpoint-based discrimination, in violation of the First and Fourteenth Amendments to the United States Constitution. Gillman is an eleventh grade student at Ponce de Leon High School, a public school in a rural community in the Florida

panhandle serving approximately four hundred students in grades six through twelve.  Gillman, who identifies herself as heterosexual, contends that the School Board and the principal of Ponce De Leon, David Davis, unlawfully prohibited her and other students from wearing or displaying t-shirts, armbands, stickers, or buttons containing slogans and symbols which advocate the acceptance of and fair treatment for persons who are homosexual.  Banned from the school are rainbows, pink triangles, and the following slogans: "Equal, Not Special Rights," "Gay?  Fine By Me," "Gay Pride" or "GP," "I Support My Gay Friends," "I Support Gays," "God Loves Me Just the Way I Am," "I'm Straight, But I Vote Pro-Gay," "I Support Equal Marriage Rights," "Pro-Gay Marriage," "Sexual Orientation is Not a Choice.  Religion, However, Is."

## II.  Facts

This case arose from events involving a homosexual student at Ponce de Leon High School on Friday, September 7, 2007.  The twelfth-grade student, Jane Doe, reported to a teacher's aide that she had been taunted by a group of approximately five middle school students because of her sexual orientation.  The middle school students allegedly told Jane that "dykes," such as herself, were "nasty," "gross," and "sick."  The teacher's aide reported the incident to Principal David Davis.

At the end of the school day on the following Monday, September 10, 2007, Davis called Jane into his office.  Davis asked Jane if she had told the teacher's aide that she identified herself as a lesbian.  Jane answered, "Yes."  Davis then asked, "Are you a lesbian?"  Jane again answered, "Yes."  Davis counseled Jane that it was not "right" to be homosexual.  He then questioned Jane about whether her parents

were aware of her sexual orientation.  When Jane answered in the negative, Davis asked Jane for her parents' telephone number so that he could call them and inform them of her sexual orientation.[1]  Davis also instructed Jane to "stay away" from the middle school students or that he would suspend her.  Jane left Davis's office in tears.

Jane was not present at school the following day because her sister had surgery.  However, Davis's rebuke of Jane on the basis of her sexual orientation became known to the student body.  A false rumor circulated that Jane was absent from school because Davis had suspended her for being homosexual.  Numerous students expressed their support for Jane by writing "GP" or "Gay Pride" on their bodies, wearing t-shirts with messages supportive of gay rights, yelling "Gay Pride" in the hallways, circulating petitions to demonstrate support for gay rights, and creating signs with messages supporting homosexuals.

On Tuesday, September 11, 2007, a rumor circulated among the student body that Davis had invited an anti-gay preacher from a local church to speak at a mandatory assembly on Wednesday, September 12, 2007.  A silent bulletin on the video monitors in each classroom stated that a "morality assembly" would be held at the end of the day on Wednesday.

During lunch, on Wednesday, September 12, 2007, a group of Jane's friends discussed the prospect of peacefully walking out of the assembly in protest. Because the preacher did not discuss issues relating to homosexuality at the assembly, and because Davis instructed students that a walk-out would not be tolerated, no students walked out in protest, and the assembly proceeded without

---

[1]Testimony at trial revealed that Jane's father threatened to kick Jane out of the house upon learning of his daughter's sexual orientation.

incident.

Following the assembly, Davis began investigating what had come to be known as the "Gay Pride" movement at the school.  He interviewed approximately thirty students, interrogated them about their sexual orientations, and questioned them about their involvement in the planned walk-out of the assembly and their activities in relation to the movement.  During those meetings, Davis instructed students who were homosexual not to discuss their sexual orientations.  He also prohibited students from wearing rainbow belts or writing "Gay Pride" or "GP" on their arms and notebooks.  He required students to wash "GP" or "Gay Pride" from their arms and hands and lifted the shirts of female students to verify that no such writings were present on their bodies.

One of the students that Davis questioned was Gillman's cousin, who identifies as homosexual.  Davis questioned Gillman's cousin about her sexual orientation.  Davis stated that being gay was against the Bible and that it was not right.  He expressed his hope that Gillman's cousin would not "go down the road" of being a homosexual.  Davis then instructed her not to discuss her sexual orientation with any students at the school, not to say "Gay Pride" or write it on her body or school materials, and not to wear her rainbow-colored belt.  Davis warned Gillman's cousin that if she violated his instructions, he would suspend her from school.

On Friday, September 21, 2007, and Monday, September 24, 2007, Davis suspended eleven students, including Gillman's cousin, for five school days each as punishment for their involvement in the "Gay Pride" movement.  As grounds for the suspensions, Davis explained that the students belonged to a "secret society" or "illegal organization" forbidden by school board policy; had threatened to walk out

of an assembly; and had disrupted the school.  Davis told the mother of a student whom he had suspended that he could secretly "send her [daughter] off to a private Christian school down in Tallahassee" or to the juvenile detention center and that "if there was a man in your house, your children were in church, you wouldn't be having any of these gay issues."

On Wednesday, September 26, 2007, Gillman wore a rainbow belt and a handmade shirt with the slogan "I Support Gays" to school as an expression of support for her cousin, her acceptance of homosexuals, and her belief that homosexuals should be afforded equal and fair treatment.  On Thursday and Friday of that week, Gillman wore a rainbow belt to school to express the same beliefs. Gillman's conduct did not cause any disruption at the school or other negative reactions, and she was not reprimanded or punished.

In light of Davis's prohibition of messages relating to the support and acceptance of homosexuals, Gillman sought clarification from the School Board about its own position on the matter.  On November 2, 2007, Gillman and her cousin (who had previously been suspended by Davis), through legal counsel, sent a letter to the attorney for the School Board.  The letter requested guidance on which phrases and symbols students could display at school without being disciplined. Specifically, Gillman sought permission from the School Board to display rainbows, pink triangles, and the following slogans: "Equal, Not Special Rights," "Gay?  Fine By Me," "Gay Pride" or "GP," "I Support My Gay Friends," "I Support Gays," "God Loves Me Just the Way I Am," "I'm Straight, But I Vote Pro-Gay," "I Support Equal Marriage Rights," "Pro-Gay Marriage," "Sexual Orientation is Not a Choice.  Religion, However, Is."

By letter dated November 12, 2007, the School Board responded that none of

the phrases, symbols, or images contained in the letter dated November 2, 2007, could be displayed by students at Ponce de Leon High School.  The School Board justified its censorship on the ground that the expressions indicated membership in an "illegal organization" prohibited by School Board policy and were disruptive to the educational process.  The letter cited students' plan to walk out of the school assembly on September 12, as an example of the disruptive effect of the messages.

In her complaint (Doc. 1), filed January 31, 2008, Gillman contended that she desires to display the symbols and messages contained in the letter dated November 2.  She has, however, abstained from doing so based on her fear that she will be disciplined for violating the verbal and written instructions of Davis and the Holmes County School Board prohibiting students from displaying the symbols and messages.

### III.  Procedure

Named as defendants in the complaint were the School Board for Holmes County, Florida, and David Davis, in his official capacity as principal of Ponce de Leon High School.  Gillman alleged that Defendants' conduct in prohibiting students from wearing clothing and displaying writings and symbols which advocate the acceptance of and fair treatment for persons who are homosexual (1) deprived her of her right to free speech and political expression and (2) constituted viewpoint-based discrimination, in violation of the First and Fourteenth Amendments to the United States Constitution.  Gillman requested the following relief:

(1) Entry of an order declaring that Defendants violated Gillman's rights under the First and Fourteenth Amendments to the United States Constitution;

(2) Entry of an order preliminarily and then permanently enjoining Defendants from restraining, prohibiting, or suppressing the speech and expression at issue;

(3) Entry of an order enjoining the enforcement of Defendants' policies relating to "illegal organizations" or "secret societies" as they pertain to the speech and expression at issue in this case;

(4) Entry of an order directing Defendants to remedy their past restraints of the speech and expression at issue, including, but not limited to, notifying the officials and student body at Ponce de Leon High School in writing that students are permitted to engage in speech and expression which support the equal treatment and acceptance of homosexuals;

(5) Entry of an order enjoining Defendants from retaliating against Gillman or any other student for (a) bringing this lawsuit or (b) their past or future speech and expressions supporting the equal treatment and acceptance of homosexuals;

(6) Entry of judgment in favor of Gillman and against the School Board for nominal damages of $1.00;

(7) An award of reasonable attorneys' fees and costs incurred in connection with this action under 42 U.S.C. § 1988; and

(8) The retention of jurisdiction of this case by this Court to enforce the terms of its orders.

On February 11, 2008, Gillman filed a motion for preliminary injunction (Doc. 7). The motion was denied as moot, per the parties' stipulation to consolidate the motion with a bench trial on the merits of the complaint. On February 21, 2008, Defendants filed a motion to dismiss David Davis, in his official capacity (Doc. 22). Per the parties' stipulation, the complaint against David Davis, in his official

capacity, was dismissed with prejudice on March 10, 2008 (Doc. 30).  On April 28,
2008, Gillman filed a motion for partial summary judgment on her free speech
claim, and the School Board filed a motion for partial summary judgment on
Gillman's claim for viewpoint-based discrimination.  Both motions were denied on
May 1, 2008.

A bench trial was held on May 12 and 13, 2008.  Following the presentation
of evidence, I entered an oral order granting all relief requested by Gillman.  On
May 15, 2008, Judgment was entered in favor of Gillman and against the School
Board in the amount of $1.00 (Doc. 15).  On June 25, 2008, following a mediation,
the parties filed a stipulation for entry of judgment as to attorneys' fees and costs
(Doc. 87).  Pursuant to the stipulation, judgment was entered in favor of Gillman
and against the School Board for attorneys' fees and costs in the amount of
$325,000.00 (Doc. 89).

## IV.  Analysis

### A.  Free Speech Claim

#### 1.  Law

The First Amendment to the United States Constitution, as applied to the
States by the Fourteenth Amendment, prohibits Congress and the States from
"abridging the freedom of speech."  U.S. Const. amends. I & XIV; *Consol. Edison
Co. v. Public Serv. Comm'n*, 447 U.S. 530, 534, 100 S. Ct. 2326, 2331, 65 L. Ed. 2d
319 (1980).  First Amendment rights "unquestionably exist in public schools."
*Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (citation omitted).

Supreme Court precedent has identified four categories of student speech: (1)
vulgar, lewd, obscene, or plainly offensive speech under *Bethel Sch. Dist. No. 403*

*v. Fraser*, 478 U.S. 675, 92 L. Ed. 2d 549, 106 S. Ct. 3159 (1986); (2) school-sponsored speech under *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266, 98 L. Ed. 2d 592, 108 S. Ct. 562 (1988); (3) government speech; and (4) pure student expression under *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 89 S. Ct. 733 (1969).  *See Bannon v. Sch. Dist. of Palm Beach County*, 387 F.3d 1208, 1213 (11th Cir. 2004).  Because this case involves only pure student expression, the *Tinker* analysis applies.

Forty years ago, in the landmark case of *Tinker*, the United States Supreme Court held that the First Amendment protects the free speech rights of students and teachers. *Tinker*, 393 U.S. at 506, 89 S. Ct. at 736.  In *Tinker*, the Supreme Court stated that "the unmistakable holding of this Court for almost 50 years" has been that "[i]t can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id*.  Quoting Justice Jackson, *Tinker* emphasized that "educating the young for citizenship is reason for scrupulous protection of Constitutional freedoms of the individual, if we are not to strangle the free mind at its source and teach youth to discount important principles of our government as mere platitudes."  *Tinker*, 393 U.S. at 507, 89 S. Ct. at 737 (*quoting West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 63 S. Ctd. 1178, 87 L. Ed. 1628 (1943)).  Also quoting Justice Brennan's opinion in *Keyishian v. Bd. of Regents*, 385 U.S. 589, 87 S. Ct. 675, 17 L. Ed. 2d 629 (1967), the *Tinker* Court affirmed that:

> The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.  The classroom is peculiarly the 'marketplace of ideas.'  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, (rather)

than through any kind of authoritative selection.

*Tinker*, 393 U.S. at 512 (*quoting Keyishian*, 385 U.S. at 603) (internal citations omitted).

On the other hand, the Supreme Court has also recognized the limits of student speech in schools.  It has held that "the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings," *Fraser*, *supra*, 478 U.S. at 682 (First Amendment did not prevent public school district from suspending student for delivering a speech containing elaborate, graphic, and explicit sexual metaphors); that the rights of students "must be 'applied in light of the special characteristics of the school environment,'" *Kuhlmeier*, *supra*, 484 U.S. at 266 (*quoting Tinker*, 393 U.S. at 506) (educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns); *see Morse v. Frederick*, 127 S. Ct. 2618, 2622, 168 L. Ed. 2d 290, 296 (2007) (because schools may safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use, school officials did not violate the First Amendment by confiscating a student's pro-drug banner); that public educational institutions have the right "to adopt and enforce reasonable, nondiscriminatory regulations as to the time, place and manner of student expressions and demonstrations,"  *Bayless v. Martine*, 430 F.2d 873, 878 (5th Cir. 1970) (*citing Williamson v. Lee Optical*, 348 U.S. 483, 487-88, 75 S. Ct. 461, 464, 99 L. Ed. 563 (1955)); and that school officials must be permitted "to prescribe and control conduct in the schools." *Tinker*, 393 U.S. at 507, 89 S. Ct. at 737 (*citing Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S. Ct. 266, 270, 21 L. Ed. 2d 228 (1968); *Meyer v. Nebraska*, 262 U.S. 390,

402, 43 S. Ct. 625, 627, 67 L. Ed. 1042 (1923)).  *See also Bd. of Educ. v. Earls*, 536 U.S. 822, 829-30, 122 S. Ct. 2559, 153 L .Ed. 2d 735 (2002) (recognizing the schools' custodial and tutelary responsibility for children in the Fourth Amendment context), *cited in Morse, supra*, 127 S. Ct. at 302, 168 L. Ed. 2d at 27).

Cases, such as this, "which involve regulations limiting freedom of expression and the communication of an idea which are protected by the First Amendment present serious constitutional questions[,]" for "[a] valuable constitutional right is involved."  *Blackwell v. Issaquena County Bd. of Educ.*, 363 F.2d 749, 753 (5th Cir. 1966).  A First Amendment problem arises when students in a public school, in the exercise of their First Amendment rights, collide with the rules and policies of school officials.  *Tinker*, 393 U.S. at 507, 89 S. Ct. at 737.

In *Tinker*, the Court set forth a test to assess the respective interests of students and school officials in determining which party should prevail on a First Amendment problem.  Under the *Tinker* test, student speech in a public school may only be censored if it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school" or "collid[e] with the rights of others."  *Tinker*, 393 U.S. at 509, 513, 89 S. Ct. at 738, 740 (*quoting Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)) (internal quotations omitted).

Applying its test, *Tinker* held that a public school district's regulation prohibiting students from wearing black armbands to school in protest of the Vietnam War and suspension of any student who had refused to remove the armband was an unconstitutional denial of students' right to expression of opinion. The school district had banned the armbands because of its desire to avoid the

controversy associated with the Vietnam War.[2] *Tinker*, 393 U.S. at 510.  School officials also feared that if the armbands were worn, the friends of a high school student in the district who had been killed in the Vietnam War would "be difficult to control" and that disagreeing students would wear armbands of other colors, causing the potential for conflict.  *Tinker*, 393 U.S. at 509-10, n. 3. In rejecting the concerns of school officials as a basis for prohibiting speech, the *Tinker* Court stated:

> [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression.  Any departure from absolute regimentation may cause trouble.  Any variation from the majority's opinion may inspire fear.  Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a

---

[2]The district court in *Tinker* had upheld the decision by the school district to ban the armbands, basing its decision on the explosiveness of the issue surrounding the United States' involvement in the Vietnam War:

> [T]he school authorities, in prohibiting black armbands, were influenced by the fact that '(t)he Viet Nam war and the involvement of the United States therein has been the subject of a major controversy for some time.  When the arm band regulation involved herein was promulgated, debate over the Viet Nam war had become vehement in many localities. A protest march against the war had been recently held in Washington, D.C.  A wave of draft card burning incidents protesting the war had swept the country. At that time two highly publicized draft card burning cases were pending in this Court.  Both individuals supporting the war and those opposing it were quite vocal in expressing their views.'

*Tinker*, 393 U.S. at 510, n. 4 (citation omitted).

> disturbance.  But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom – this kind of openness – that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 508-09.  The Court then further explained that:

> In our system, state-operated schools may not be enclaves of totalitarianism.  School officials do not possess absolute authority over their students.  Students in school as well as out of school are 'persons' under our Constitution.  They are possessed of fundamental rights which the State must respect, just as they themselves must respect their obligations to the State.  In our system, students may not be regarded as closed-circuit recipients of only that which the State chooses to communicate.  They may not be confined to the expression of those sentiments that are officially approved.  In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views.

*Tinker*, 393 U.S. at 511.

The *Tinker* Court concluded that the display of armbands was a constitutionally protected form of expression because it was a "silent, passive expression of opinion, unaccompanied by any disorder or disturbance" or of "collision with the rights of other students to be secure and to be let alone."  *Tinker*, 393 U.S. at 508.  The Court concluded:

> Under our Constitution, free speech is not a right that is given only to be so circumscribed that it exists in principle but not in fact.  Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government has provided as a safe haven for crackpots.  The Constitution says that Congress (and the

> States) may not abridge the right to free speech.  That
> provision means what it says . . . . [W]e do not confine the
> permissible exercise of First Amendment rights to a
> telephone booth or the four corners of a pamphlet, or to
> supervised and ordained discussion in a school classroom.

*Tinker*, 393 U.S. at 513.

Consistent with *Tinker*, the Eleventh Circuit and its courts have protected the free speech rights of students when such speech was unaccompanied by "material and substantial disruption" or "collision with the rights of other students to be secure and to be let alone."  *See, e.g., Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966) (holding that students' free speech rights were breached by school officials when they prohibited students from peacefully wearing "freedom buttons" that advocated the lawful and peaceful abolition of racial segregation)[3]; *Johnston-Loehner v. O'Brien*, 859 F. Supp. 575, 581 (M.D. Fla. 1994) (holding that school district policy requiring that students obtain the review and approval of school officials prior to distributing any written material violated free speech rights of students); *Reineke v. Cobb County Sch. Dist.*, 484 F. Supp. 1252, 1258 (N.D. Ga. 1980) (holding that a teacher was unjustified in censoring an article in the school newspaper because it was "inconceivable that the use of the word 'damn' one time in the article would have caused material and substantial interference with school activities"); *Banks v. Bd. of Public Instr.*, 314 F. Supp. 285 (S.D. Fla. 1970), *vacated by* 401 U.S. 988, 91 S. Ct. 1223, 28 L. Ed. 2d 526 (1971), *reinstated without published opinion by dist. ct. and aff'd*, 450 F.2d 103 (5th Cir. 1971)

---

[3]In *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted, as binding precedent, all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

(holding that students' refusal to stand during the Pledge of Allegiance was constitutionally protected by First Amendment).

On the other hand, the Eleventh Circuit has upheld the censorship of speech and expression by school officials when such activity has caused material and substantial disruption or collided with the rights of others.  *See*, *e.g.*, *Scott v. Sch. Bd. of Alachua County*, 324 F.3d 1246 (11th Cir. 2003) (holding that ban of Confederate flags on school grounds was not an unconstitutional restriction of students' First Amendment rights where racial tensions existed at the school, racially-based fights had occurred in the months leading up to the case, and the Confederate flag is "inappropriate in the school context" because it is so "associated with racial prejudice" that it is "likely to provoke feelings of hatred and ill will in others."); *Blackwell*, *supra*, 363 F.2d at 751-54 (upholding ban on "freedom buttons" because students' conduct in skipping classes, ignoring teachers, pinning buttons on other students without their permission and causing a younger student to cry, and throwing buttons through school windows "constituted a complete breakdown in school discipline").

The *Tinker* Court characterized the armbands as "closely akin to 'pure speech' which, we have repeatedly held is entitled to comprehensive protection under the First Amendment." *Tinker*, 393 U.S. at 505-06.  More recently, the Supreme Court has stated that *Tinker* concerned "political speech," which is, "of course, . . . 'at the core of what the First Amendment is designed to protect.'" *Morse v. Frederick*, 127 S. Ct. 2618, 2626, 168 L. Ed. 2d 290, 300 (2007).

The Eleventh Circuit has emphasized the primacy of political speech.  In *Holloman v. Harland*, 370 F.3d 1252 (11th Cir. 2004), for example, the Eleventh Circuit held that a student's constitutional rights were violated as a matter of law

when he was punished for silently raising his fist during the Pledge of Allegiance rather than saluting the flag.  *Id*. at 1277.  Guided by *Tinker*'s authority, the *Holloman* court stated that "[t]here must be demonstrable factors that would give rise to any reasonable forecast by the school administration of 'substantial and material' disruption of school activities before expression may be constitutionally restrained."  *Holloman v. Harland*, 370 F.3d 1252, 1273 (11th Cir. 2004) (*quoting Shanley v. Northeast Indep. Sch. Dist.*, 462 F.2d 960, 974 (5th Cir. 1972); *Ctr. for Participant Educ*. *v. Marshall*, 337 F. Supp. 126, 135 (N.D. Fla. 1972)).

In interpreting the degree of disorder sufficient to justify censorship of speech, the *Holloman* court stated that "there must be a real or substantial threat of disorder, as opposed to the mere possibility of one."  *Holloman*, 370 F.3d at 1273 (*citing Center for Participant Ed. v. Marshall*, 337 F. Supp. 126, 135 (N.D. Fla. 1972) (suggesting that a "speculative fear" is insufficient to justify restrictions on student expression, but a "real and immediate fear of conduct potentially disruptive of the university routine" is enough).  The *Holloman* court further clarified that:

> [W]e cannot simply defer to the specter of disruption or the mere theoretical possibility of discord, or even some *de minimis*, insubstantial impact on classroom decorum. Particularly given the fact that young people are required by law to spend a substantial portion of their lives in classrooms, student expression may not be suppressed simply because it gives rise to some slight, easily overlooked disruption, including but not limited to 'a showing of mild curiosity' by other students, *see Burnside*, 363 F.2d at 748, 'discussion and comment' among students, *Reineke v. Cobb Cty. Sch. Dist.*, 484 F. Supp. 1252, 1261 (N.D. Ga. 1980), or even some 'hostile remarks' or 'discussion outside of the classrooms' by other students, *Tinker*, 393 U.S. at 508, 514, 89 S. Ct. at 737, 740.

*Holloman*, 370 F.3d at 1271-72.  Further, "[w]here students' expressive activity does not materially interfere with a school's vital educational mission, and does not raise a realistic chance of doing so, it may not be prohibited simply because it conceivably might have such an effect." *Id*. at 1274.  And when censorship constitutes a "prior restraint" on speech – a ban on speech that has not yet been expressed – the law is clear that a school board bears a "heavy burden" to justify its ban.[4]  *Healy v. James*, 408 U.S. 169, 184, 92 S. Ct. 2338, 2347, 33 L. Ed. 2d 266 (1972); *Shanley*, 462 F.2d at 969.

     In the context of speech involving the issue of homosexuality, several decisions have affirmed students' First Amendment rights.  *See Chambers v. Babbitt*, 145 F. Supp. 2d 1068 (D. Minn. 2001) (rejecting school board ban on a t-shirt with the message "Straight Pride," notwithstanding evidence of "gay-bashing" speech and vandalism of a student's car who was perceived to be homosexual); *Henkle v. Gregory*, 150 F. Supp. 2d 1067 (D. Nev. 2001) (holding that student stated a claim for violation of his First Amendment right to speech  when he alleged that school officials prevented him from openly stating that he was homosexual and retaliated against him for doing so); *Fricke v. Lynch*, 491 F. Supp. 381, (D. R.I. 1980) (holding that public school violated homosexual student's First Amendment right to speech and expression when it banned him from bringing a same-sex date to the prom, notwithstanding that the student and another homosexual student had previously been assaulted by other students and that the school was forced to provide additional security and escorts).

---

     [4]Most of the speech identified in the letter dated November 2, 2007, and banned by the School Board had not yet been expressed by the students.

### 2.  Application

The issues of homosexuality and its social implications are topics that have engendered intense feelings and debate throughout this nation and its communities. My task in this case is not to judicially determine which side – supporters or opponents of gay rights – is correct.  Nor is my proper role to mandate a social norm for Holmes County or its schools.  Indeed, the students and citizens of Holmes County are qualified to make that decision themselves.  Instead, my duty is to apply the Constitution and the law to the facts of this case.

In so doing, I am sensitive to the challenges to order and discipline that teachers and administrators are forced to confront each day.  Teaching children to respect authority is essential, and children must be taught that consequences exist when they disobey.  I therefore agree that "[i]f the schools are to perform their traditional function of 'inculcating the habits and manners of civility,' *Fraser*, 478 U.S. at 681, they must be allowed the space and discretion to deal with the nuances."  *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1543 (7th Cir. 1996).  I further heed the Supreme Court's admonition that "[t]he determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts." *Kuhlmeier*, 484 U.S. at 267 (*quoting Fraser*, 478 U.S. at 683).

However, the facts in this case are extraordinary.  The Holmes County School Board has imposed an outright ban on speech by students that is not vulgar, lewd, obscene, plainly offensive, or violent, but which is pure, political, and expresses tolerance, acceptance, fairness, and support for not only a marginalized group, but more importantly, for a fellow student at Ponce de Leon.  The student, Jane Doe, had been victimized by the school principal solely because of her sexual

orientation.  Principal David Davis responded to Jane Doe's complaints of harassment by other students, not by consoling her, but by shaming her.  Davis interrogated Jane about her sexual orientation, informed her parents that she identified as homosexual, warned her to stay away from other students because of her sexual orientation, preached to her that being homosexual was not "right," and ultimately suspended her for expressing her support for herself and for other homosexual students.

Regrettably, Jane's contact with Davis during her senior year may well have been her last interaction with a school administrator before her graduation.  Instead of providing Jane with a positive experience in the public school system during her final year, Davis crushed her and brought her to tears.  Davis's conduct, in the capacity of a role model and authority figure, is particularly deplorable in light of studies which confirm the vulnerability of gay and lesbian students:

> The demeaning of young gay and lesbian students in a school environment is detrimental not only to their psychological health and well-being, but also to their educational development.  Indeed, studies demonstrate that 'academic underachievement, truancy, and dropout are prevalent among homosexual youth and are the probable consequences of violence and verbal and physical abuse at school.'  Susanne M. Stronski Huwiler and Gary Remafedi, *Adolescent Homosexuality*, 33 REV. JUR. U.I.P.R. 151, 164 (1999); *see also* Thomas A. Mayes, *Confronting Same-Sex, Student-to-Student Sexual Harassment: Recommendations for Educators and Policy Makers*, 29 FORDHAM URB. L.J. 641, 655 (2001) (describing how gay students are at a greater risk of school failure and dropping out, most likely as a result of 'social pressure and isolation'); Amy Lovell, *"Other Students Always Used to Say, 'Look At The Dykes'": Protecting Students From Peer Sexual Orientation Harassment*, 86 CAL. L. REV. 617, 625-28 (1998)

(summarizing the negative effects on gay students of peer sexual orientation harassment).  One study has found that among teenage victims of anti-gay discrimination, 75% experienced a decline in academic performance, 39% had truancy problems and 28% dropped out of school.  *See* Courtney Weiner, Note, *Sex Education: Recognizing Anti-Gay Harassment as Sex Discrimination Under Title VII and Title IX*, 37 COLUM. HUM. RTS. L. REV. 189, 255 (2005). Another study confirmed that gay students had difficulty concentrating in school and feared for their safety as a result of peer harassment, and that verbal abuse led some gay students to skip school and others to drop out altogether. HUMAN RIGHTS WATCH, HATRED IN THE HALLWAYS (1999), http://hrw.org/reports/2001/uslgbt/Final-05.htm#P609_91364.  Indeed, gay teens suffer a school dropout rate over three times the national average.  NAT'L MENTAL HEALTH ASS'N, BULLYING IN SCHOOLS: HARASSMENT PUTS GAY YOUTH AT RISK, http://www.nmha.org/pbedu/backtoschool/bullyingGayYo uth.pdf; *see also* Maurice R. Dyson, *Safe Rules or Gays' Schools?  The Dilemma of Sexual Orientation Segregation in Public Education*, 7 U. PA. J. CONST. L. 183, 187 (2004) (gay teens face greater risks of "dropping out [and] performing poorly in school"); Kelli Armstrong, *The Silent Minority Within a Minority: Focusing on the Needs of Gay Youth in Our Public Schools*, 24 GOLDEN GATE U. L. REV. 67, 76-77 (1994) (describing how abuse by peers causes gay youth to experience social isolation and drop out of school). In short, it is well established that attacks on students on the basis of their sexual orientations are harmful not only to the students' health and welfare, but also to their educational performance and their ultimate potential for success in life.

*Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178-79 (9th Cir. June 6, 2006), *amended by* 2006 U.S. App. LEXIS 13402 (9th Cir. May 31, 2006), *motion denied by* 127 S. Ct 708, 166 L. Ed. 2d 511 (2006), *vacated by, remanded by,*

*motion denied by* 127 S. Ct. 1484, 167 L. Ed. 2d 225 (2007).

Although students mistakenly concluded that Jane Doe was absent from school the following day because Davis had suspended her for being homosexual and that a preacher would deliver an anti-gay speech at a "morality assembly," it is clear that Principal Davis, not the innocuous symbols and phrases at issue, bears sole responsibility for any unrest that occurred at Ponce de Leon in September 2007.  Indeed, it was Davis who catalyzed the "Gay Pride" movement because of his animosity toward students who were homosexual and his relentless crusade to extinguish the speech supporting them.  Students testified that the events of September 2007 resulted not from their desire to cause disruptions at their school, but because they perceived that Davis was anti-gay and had mistreated their homosexual classmates.  Indeed, Davis testified that several students *told* him that their purpose in displaying the proscribed speech was to express their disagreement with his views about homosexuality. (Tr., Doc. 76:198, lines 1-7.)

Despite Davis's awareness of students' perceptions and intent, Davis made no attempt to correct students' misunderstandings about either the rumored suspension of Jane Doe or the content of the morality assembly.  And following the incident with Jane Doe and the conclusion of the morality assembly, Davis embarked on what can only be characterized as a "witch hunt" to identify students who were homosexual and their supporters, further adding fuel to the fire.  He went so far as to lift the shirts of female students to insure that the letters "GP" or the words "Gay Pride" were not written on their bodies.  I find that the students at Ponce de Leon, who were involved in the gay pride movement, were simply taking prophylactic measures to counteract Davis's illegal conduct in stifling their speech and support for their homosexual friends.

Davis's testimony on the witness stand was disingenuous.  Although Davis testified that he did not inquire about students' sexual orientations at school, the testimony of several students and a parent contradict Davis's testimony.  Not only did Davis interrogate students about their sexual orientations, but he also told students that being homosexual was wrong and against the Bible.  One mother of a student whom Davis had suspended for participating in the gay pride movement testified that Davis told her that he could secretly "send her [daughter] off to a private Christian school down in Tallahassee" or to the juvenile detention center and that "if there was a man in your house, your children were in church, you wouldn't be having any of these gay issues."  (Tr., Doc. 77:7, lines 11-17.).  Based on the clear evidence, I find that no connection existed between the gay pride speech and any disruptions that may have resulted at Ponce de Leon in September 2007.  *See Chambers v. Babbitt*, 145 F. Supp. 2d 1068, 1072 (D. Minn. 2001) (finding that "other than the involvement of articles of clothing, little evidence has been presented to explain the nexus between a racial incident and the threat of a disruption relating to issues of sexuality."); *cf. Blackwell*, *supra*, 363 F.2d at 754 (upholding ban on speech because "the reprehensible conduct . . . was so inexorably tied to the wearing of the buttons that the two are not separable.").

Further, any disruptions that did occur at Ponce de Leon in September 2007, were not material and substantial, nor did they collide with the rights of other students to be secure and to be let alone.  The evidence revealed that Ponce de Leon is a typical high school.  Davis and several students testified that the approximately four hundred students at the school frequently argue about sports, social relationships, and topics of interest to teenagers, circulate petitions, and are loud.  It is not uncommon for teachers to tell students in class to be quiet and pay attention.  Like

the typical high school, classes at Ponce de Leon are disrupted every day by students' conversations.  Students pass notes during class and whisper to their classmates.  Students write on themselves and draw sketches unrelated to their classwork.  Most students are tolerant of other students, regardless of their sexual orientations.  Davis testified that harassment of homosexual students has generally not been a problem at Ponce de Leon and that the school is considered to be safe and orderly.

   No student walked out of the morality assembly in protest.  No student yelled "Gay Pride" or any similar expression at the assembly.  Nor did any student display any signs at the assembly.  Apparently, Davis was not concerned about the possibility of  disruptions at the assembly because he did not cancel the assembly, nor did he institute additional security measures.

   When Gillman wore her rainbow belt and t-shirt with the message "I Support Gays" to school, students complimented her, and one teacher laughed.  Another student wore a t-shirt with the words "Gay Pride" without incident.

   The vast majority of episodes involving the speech at issue were indistinguishable from the typical background noise of high school.  Students testified that they whispered and passed notes in class, occasionally shouted "Gay Pride" in the hallways, wrote "GP" and "Gay Pride" on their bodies, created signs and posters supporting gay rights, circulated petitions, and debated and argued about gay rights.  One student testified that students' conversations about gay rights were even quieter than normal conversations because the students were interested in the topic.  These activities, which the School Board contends were disruptive – whispering, note-passing, shouting in hallways, writing on bodies, drawing and creating signs, circulating petitions, and debating issues – occur on a daily basis at

Ponce de Leon and are divorced from the speech at issue.

During Davis's investigation of the alleged disruptions, he interviewed not one teacher.  Nor did any teacher testify at trial about any disruptions.  Only one teacher of the twenty-eight teachers at Ponce de Leon reported an isolated incident of a possible disturbance to Davis.  According to that teacher's deposition testimony, students discussed the gay pride issue during the first ten minutes of her class.  When she instructed the students to be quiet and pay attention, class resumed.

Unlike in *Scott, supra,* 324 F.3d at 1249, there were no threats of violence against homosexual students from which disruption could have, or did, result.  Nor did students skip classes, ignore teachers, force other students to display the messages and symbols at issue, or invade classrooms, clearly distinguishing this case from *Blackwell*, *supra*.  Students who advocated tolerance and acceptance of homosexuals at Ponce de Leon did not force their views and opinions on other students.  Students were free to disagree with the message or walk away.

The events in September 2007 also fail to *forecast* the substantial and material disruption that is required to justify the School Board's prior restraint on speech.  Davis himself testified that if students were to express or display the proscribed speech in the future, he could only "speculate" that disruption would occur. (Tr., Doc. 76:217, lines 1-9.)  His speculation was based, not on the events in September 2007, or thereafter, but on his general knowledge of "the sentiments of the children."  (Tr., Doc. 76:217, lines 10-17.)  He failed, however, to articulate any concrete or reasonable basis for that speculation.  *Tinker*, 393 U.S. at 508 ("[U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression."); *Marshall*, supra, 337 F. Supp. at 135 (a

"speculative fear" is insufficient to justify restrictions on student expression).

In essence, the events which occurred at Ponce de Leon in September 2007, were insufficient to justify a ban on speech because any disruption was, under *Holloman*, "speculative," "theoretical," and "de minimis." *Holloman*, 370 F.3d at 1271-72. Likewise, the "mild curiosity" of students, "discussion and comment" between students, and even "hostile remarks" that may have occurred did not justify censorship. *Id*. The speech did not "collid[e] with the rights of other students to be secure and to be let alone." *Tinker*, 393 U.S. at 509, 513, 89 S. Ct. at 738, 740 (*quoting Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)) (internal quotations omitted).

The School Board does not contend that Heather Gillman, the sole plaintiff in this case, caused any disruption. Indeed, Gillman was not suspended or punished for her speech. Thus, even if I were to assume that some students' behaviors were materially and substantially disruptive, the School Board has failed to articulate a reasonable justification for banning *Gillman's* speech. If a student's conduct traverses the threshold of acceptable heated exchange into the realm of material and substantial disruption, the law requires school officials to punish the disruptive student, not the student whose speech is lawful. *See Holloman*, 370 F.3d at 1276 ("Principals have a duty to maintain order in public schools, but they may not do so while turning a blind eye to basic notions of right and wrong"); *id*. (Merely because "other students may react inappropriately or illegally, such reactions do not justify suppression . . . "); *id*. ("[W]e cannot afford students less constitutional protection simply because their peers might illegally express disagreement through violence instead of reason."); *id.* at 1275 ("The fact that other students might take such a hairstyle as an incitement to violence is an indictment of those other

students, not long hair."); *id*. (To curtail a student's freedom of expression because of potential disruptive behaviors by other students "is to sacrifice freedom upon the alter of order, and allow the scope of our liberty to be dictated by the inclinations of the unlawful mob.").

Obviously, political speech involving a controversial topic such as homosexuality is likely to spur some debate, argument, and conflict.  Indeed, the issue of equal rights for citizens who are homosexual is presently a topic of fervent discussion and debate within the courts, Congress, and the legislatures of the States, including Florida.  The nation's high school students, some of whom are of voting age, should not be foreclosed from that national dialogue.

That middle school students also attended Ponce de Leon and that high school students came into contact with elementary school students before and after school do not render the speech any less appropriate.  The speech and symbols are clearly not sexual in nature.  Gloria Pipkin, a teacher who taught middle school for nineteen years, testified that in her experience, she could not envision any harm to middle school students resulting from the speech and symbols.  Her testimony was not contradicted.  Available in the school library, to which the middle school students have access, are the following magazines: *Cosmogirl*, *Teen Vogue*, *Seventeen*, *Redbook*, and *Women's Day*.  The magazines contain articles about sex and dating.  The innocuous expressions of tolerance and acceptance inherent in the banned expressions are far less inappropriate for middle school students than the sexually explicit articles in those magazines and the sexual content to which children are exposed daily in the popular culture.  I further note that numerous books have been written specifically for preschool and elementary-aged children that teach them about diverse families, including families with same-sex partners.

*See*, *e.g.*, Kaitlyn Taylor Considine, *Emma and Meesha My Boy: A Two Mom Story* (Twomombooks.com 2005), Justin Richardson, *And Tango Makes Three* (Simon & Schuster 2005); Johnny Valentine, *One Dad, Two Dads, Brown Dad, Blue Dads* (Alyson Books, 1st ed. 2004); Todd Parr, *The Family Book* (Little, Brown Young Readers, 1st ed. 2003); Leslea Newman, *Heather Has Two Mommies* (Alyson Books 10th ed. 2000); Michael Willhoite, *Daddy's Wedding* (Alyson Books, 1st ed. 2000); Robert Skutch, *Who's in a Family?* (Tricycle Press 1997).  The speech at issue in this case is therefore developmentally appropriate and distinguishable from the speech in *Heinkle v. Sch. Bd.*, 194 Fed. Appx. 604, 609-10 (11th Cir. 2006) (finding no clear error in district court's determination that the distribution of abortion and birth control material by middle school student to students ages eleven to fourteen would be substantially disruptive based, in part, on the students' ages).

The robust exchange of political ideas is essential in a vibrant, progressive society and is precisely the type of speech that is sacrosanct under the First Amendment.  Both Davis and the Superintendent of the Holmes County Schools, Steve Griffin, misunderstand the First Amendment.  Griffin testified at trial that not only should students be prohibited from engaging in the speech at issue in this case, but they should also be prevented from wearing political buttons at school supporting candidates for President.  According to Griffin, such speech and expression could cause "unrest," "controversy," and the feeling that "everyone is against me."  The Constitution, however, does not sanction such a result:

> Any variation from the majority's opinion may inspire fear.
> Any word spoken, in class, in the lunchroom, or on the
> campus, that deviates from the views of another person may
> start an argument or cause a disturbance.  But our
> Constitution says we must take this risk.

*Tinker*, 393 U.S. at 508.

In light of these findings, I conclude (1) that the speech and symbols banned by the School Board were not sufficiently connected to the students' behaviors at Ponce de Leon in September 2007, to justify their prohibition; (2) that the proscribed speech did not and would not "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school" or "collid[e] with the rights of others" under *Tinker*, 393 U.S. at 509, 513, 89 S. Ct. at 738, 740 (*quoting Burnside v. Byars*, 363 F.2d 744, 749 (5th Cir. 1966)) (internal quotations omitted); and (3) that Heather Gillman's speech should not be silenced because of alleged disruptions caused by other students.

## B.  Viewpoint-Based Discrimination Claim

### 1.  Law

Under the First Amendment, the government is prohibited from regulating speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, 829, 115 S. Ct. 2510, 2516, 132 L. Ed. 2d 700 (1995) (citations omitted).  "Discrimination against speech because of its message is presumed to be unconstitutional."  *Id*. (citations omitted).  "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  *Id*. (citations omitted).  *See also Texas v. Johnson*, 491 U.S. 397, 414, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."); *Tinker*, 393 U.S. at 511 (a

school cannot prohibit "expression of one particular opinion" unless it makes a specific showing of constitutionally valid reasons); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 615 (5th Cir. 2004) (stating that Tinker "applies to school regulations directed at specific student viewpoints").  Indeed, viewpoint-based discrimination is "[o]ne of the most egregious types of First Amendment violations." *Holloman*, 370 F.3d at 1279.  In a school setting, the silencing of a political message because of disagreement with that message, is particularly offensive to the Constitution because:

> The classroom is peculiarly the 'marketplace of ideas.'  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues.'

*Tinker*, 393 U.S. at 512 (*quoting Keyishian*, 385 U.S. at 603) (internal citations omitted).

The School Board, as the policymaker of the Holmes County Schools, may be held liable for the viewpoint-based discrimination of a subordinate under several theories. First, "[r]atification by the authorized policymakers of a subordinate's reasoning and decision is 'chargeable to the [policymaker] because [its] decision is final.'" *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 998 (11th Cir. 1990) (*quoting City of St. Louis v. Prapotnik*, 485 U.S. 112, 123, 125, 108 S. Ct. 915, 924, 99 L. Ed. 2d 107 (1988)) (plurality opinion).  A policymaker "ratifies" a subordinate's decision when it "approve[s] [the] surbordinate's decision and the basis for it." *Prapotnik*, 485 U.S. at 127.  Second, "policymakers cannot evade liability for unconstitutional acts by delegation." *Bannum*, *supra*, 901 F.2d at 998 (*citing Prapotnik*, *supra*, 485 U.S. at 127, 108 S. Ct. at 926).  *See also Parker v. Williams*, 862 F.2d 1471, 1478 (11th Cir. 1989).  Finally, the School Board may be

held liable if it acted with "deliberate indifference." *Sherrod v. Palm Beach County Sch. Dist.*, 424 F. Supp. 2d 1341, 1347-48 (S.D. Fla. 2006) (finding that other circuits, including the Eleventh Circuit, have approved the "deliberate indifference theory" of liability in cases involving claims of First Amendment violations).

### 2. Application

The evidence conclusively established that Davis banned the speech at issue because of his personal disagreement with its message.  Although Davis is entitled to express his own opinions about homosexuality, he may not lawfully extinguish the speech of those with views contrary to his own.

Numerous witnesses testified that Davis interrogated students about their sexual orientations, told them that homosexuality was wrong, instructed students who were homosexual "not to go down that road," preached that homosexuality was against the Bible, and warned students who were homosexual to stay away from other students.  At trial, Davis testified that homosexuality is a "sin" and an "abomination" that "God will punish."  (Tr., Doc. 76:222, lines 19-25; 223, lines 1 & 18-25; 224, lines 1-17.)  He considers himself to be an "evangelical spreading the gospel to those who will receive it."  (Tr., Doc. 76:223, lines 15-17.)  He testified that "What I believe is the Lord is expressing his view, his knowledge of what homosexuality is, that's what I believe, and I teach what the Lord says." (Tr., Doc 76:224, lines 1-3.)

Again, I emphasize that Davis's personal and religious views about homosexuality are not issues in this case.  Indeed, Davis's opinions and views are consistent with the beliefs of many in Holmes County, in Florida, and in the country.  Like the students who participated in the gay pride movement at Ponce de

Leon, Davis is entitled to his opinion.  In fact, the First Amendment protects his views just as it protects the beliefs of Heather Gillman.  *But see Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1178-79 (9th Cir. June 6, 2006) (reaching a contrary conclusion and prohibiting students from wearing t-shirts with messages that condemn homosexuality), *amended by* 2006 U.S. App. LEXIS 13402 (9th Cir. May 31, 2006), *motion denied by* 127 S. Ct 708, 166 L. Ed. 2d 511 (2006), *vacated by, remanded by, motion denied by* 127 S. Ct. 1484, 167 L. Ed. 2d 225 (2007). Where Davis went wrong was when he endeavored to silence the opinions of his dissenters.

Davis testified that merely wearing a t-shirt expressing support for homosexuals or displaying a rainbow-colored sticker amounts to "imposing" a certain view on others who find that view offensive.  Davis stated that such speech should not be imposed on children "[j]ust as I would not want religious ideas being imposed upon children who don't want to hear them."  (Tr., Doc. 76:109, lines 6-8.) However, Davis fails to realize the hypocrisy in his own behavior.  It was not the students who imposed their views about homosexuality on Davis or other students; rather, it was *Davis* who silenced and suspended students for expressing their views.  When Davis told a mother that he could secretly "send her [daughter] off to a private Christian school down in Tallahassee" and that "if there was a man in your house, your children were in church, you wouldn't be having any of these gay issues," the mother "sat on [her] hands." (Tr., Doc. 77:7, lines 19.)

Although the School Board conceded in its answers to interrogatories and at trial that the messages and symbols at issue are not vulgar, lewd, obscene, plainly offensive, or sexually suggestive, Davis attempted to justify the ban on speech, in part, by contending that rainbow stickers and the phrases "Equal, Not Special

Rights," "Gay?  Fine By Me," "Gay Pride" or "GP," "I Support My Gay Friends,"
"I Support Gays," "God Loves Me Just the Way I Am," "I'm Straight, But I Vote
Pro-Gay," and "I Support Equal Marriage Rights," are sexually suggestive and
immediately conjure images in children's minds of people engaging in sexual acts.
Notwithstanding his obvious mis-characterization of the speech as sexual in nature,
other evidence clearly suggests that the ban on speech was not motivated by Davis's
purported concerns about the sexual connotations of the speech.  For example,
during September 2007, a female student complained that a male student had dared
another male student to offer her five dollars to "get in her pants."  Davis testified
that he agreed that the conversation between the students was "far more sexually
explicit" than the banned speech.  (Tr., Doc. 76:210, lines 14-17.)  Yet, Davis
conceded that he did not warn the students not to discuss "heterosexual issues" at
Ponce de Leon (Tr., Doc. 76:210, lines 23-25), nor did he investigate or even speak
to the male students about the female student's complaint. (Doc. 76:212, lines 19-
25).  Davis also stated that he would not prohibit a male student from telling a
female student that she is "cute" or that he wants to "date her," (Tr., Doc. 76:161,
lines 5-25) but that he would ban "I Vote Pro-Gay."

Nor were school officials concerned about students' expressions of other
political views at Ponce de Leon.  While rainbows are banned at Ponce de Leon,
Superintendent Griffin testified that swastikas are not.  (Doc. 77:44, lines 14-25; 45,
lines 1-3.)  While "Equal, Not Special Rights," and "God Loves Me Just the Way I
Am" are prohibited, Davis and Superintendent Griffin stated that the Confederate
flag is not.  (Doc. 76:113, lines 3-7; Doc. 77:45, lines 4-9.)  It is therefore apparent
that the ban on speech at Ponce de Leon was motivated, not by school officials'
angst about political expressions at school, but by the hostility of school officials

toward the particular message sought to be conveyed.

The School Board, however, contends that any viewpoint-based discrimination by Davis cannot properly be imputed to it.  That contention is without merit.  The School Board is liable for its unconstitutional ban on speech under the theories of ratification, delegation, and deliberate indifference.

The evidence conclusively established that the School Board was acting as Davis's alter ego in this dispute.  Davis testified that he is "intricately connected" with the School Board.  (Doc. 76:99, lines 6-8.)  He stated that questioning him, "is, in essence, questioning the School Board."  (Doc. 76:99, lines 22-24.)

The School Board was aware of the alleged constitutional violations and disregarded them.  On September 25, 2007, Heather Gillman, through legal counsel, sent a letter to the School Board. (*See* Plaintiff's Exhibit 8.)  The letter unambiguously informed the School Board in detail about the factual allegations constituting Gillman's claim that Davis had been discriminating against students on the basis of their sexual orientations and their political views about homosexuality. The letter demanded, in no uncertain terms, a "full investigation of these serious allegations."  The letter also stated that "[w]e anticipate filing suit in federal court."

The School Board, through Superintendent Griffin, responded to the letter by conducting a two-sentence "investigation."  Despite Griffin's acknowledgment at trial that the allegations in the letter were "very serious," his complete inquiry into the matter consisted solely of asking Davis if the allegations were true.  Davis responded that they were not, and the investigation was closed.  (Doc. 77:47, lines 1-23.)  Griffin did not interview one teacher, one student, or one parent.  Nor did he appoint any member of his administrative staff to investigate.

Based on Griffin's report to the School Board that Davis had denied all

allegations contained in the letter, the School Board wholesale delegated its policymaking authority, as such authority related to the speech at issue, to Davis and ratified his ban on speech.  The School Board's conduct was more than negligent; the Board completely abrogated its duties and responsibilities, and it disregarded a known or obvious consequence of its inaction.  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S. Ct. 1382, 1391, 137 L. Ed. 2d 626 (1997).  The School Board did not speak to Davis, any teacher, any other administrator, any student, or any parent.  Despite its knowledge and awareness of the alleged constitutional violations, the School Board's "inquiry" amounted to no investigation at all, rendering the School Board deliberately indifferent. *See Ware v. Unified Sch. Dist. No. 492, Butler County*, 902 F.2d 815 (10th Cir. 1990) (where school board members "knew about" a possible constitutional violation by the superintendent but failed to make an "independent investigation" or ask the superintendent questions about the reasons for his alleged unlawful decision, "the evidence is sufficient to create a jury question on whether the board acted with deliberate indifference to the plaintiff's First Amendment rights).

## V.  Conclusion

Plaintiff has properly proven all allegations in the complaint.  The defendant, School Board for Holmes County, Florida, has (1) violated Plaintiff's right to free speech and (2) discriminated against her viewpoint, in violation of the First and Fourteenth Amendments to the United States Constitution.

Accordingly, **IT IS ORDERED:**

1.  The School Board for Holmes, County, Florida, its officers, agents,

affiliates, subsidiaries, servants, employees, and all other persons or entities in active concert or privity or participation with them, are permanently enjoined from restraining, prohibiting, or suppressing the Plaintiff or any other student within the Holmes County School District from expressing their support for the respect, equal treatment, and acceptance of gays and lesbians, including, but not limited to, the phrases and symbols which appear in the letter dated November 2, 2007 (Exh. 2);

2.  The School Board's policy about "illegal organizations" and "secret societies" is vague as applied to the Plaintiff and to the activities and speech which have been proscribed by the School Board.  The enforcement of the School Board's policies concerning expression related to "illegal organizations" and "secret societies" as applied to the Plaintiff is permanently enjoined;

3.  The School Board for Holmes County, Florida, shall take such affirmative steps as are necessary to remedy the past restraints of expression of support for the respect, equal treatment, and acceptance of homosexuals, including, but not limited to, notifying in writing the Ponce de Leon High School student body, including the middle school students who attend the school, as well as school officials within the Holmes County School District, that students are permitted to express their support for the respect, equal treatment, and acceptance of homosexuals pursuant to reasonable time, place, and manner restrictions that do not materially and substantially disrupt the missions of the schools;

4.  The School Board for Holmes County, Florida, its officers, agents, affiliates, subsidiaries, servants, employees, and all other persons or entities in active concert or privity or participation with them, are permanently enjoined from taking retaliatory action against Plaintiff for bringing this lawsuit, or against any students for their participation in this lawsuit, or for their past, present, or future

expressions of support for the respect, equal treatment, and acceptance of homosexuals;

    5.  This Court retains jurisdiction of this case to enforce the terms of its orders;

    6.  Plaintiff's counsel shall provide a copy of this Opinion and Order to Plaintiff Heather Gillman, Jane Doe (C.W.), and Gloria Pipkin; and

    7.  Defendant's counsel shall provide a copy of this Opinion and Order to Defendant School Board for Holmes County, Florida, Superintendent Steve Griffin, and Principal David Davis.

        **ORDERED** on July 24, 2008.

                /s/ Richard Smoak
                **RICHARD SMOAK**
                **UNITED STATES DISTRICT JUDGE**